Joanna M. Fuller (SBN 266406)
jfuller@fr.com
FISH & RICHARDSON PC
633 West Fifth Street, 26th Floor
Los Angeles, CA 90071
Tel:  213-533-4240
Fax: 858-678-5099

Attorneys for Plaintiff, PLUSPASS, INC.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
LOS ANGELES DIVISION

| | |
|---|---|
| PLUSPASS, INC., <br><br> Plaintiff, <br><br> v. <br><br> VERRA MOBILITY CORP., PLATINUM EQUITY LLC, THE GORES GROUP LLC, and ATS PROCESSING SERVICES, INC., <br><br> Defendants. | Case No. 2:20cv10078 <br><br> **COMPLAINT** <br><br> JURY TRIAL DEMANDED |

### PLAINTIFF PLUSPASS, INC.'S ORIGINAL COMPLAINT

PlusPass, Inc. ("PlusPass"), Plaintiff, complains of Defendants Verra Mobility Corporation ("Verra"), Platinum Equity LLC ("Platinum"), The Gores Group LLC ("Gores") and ATS Processing Services, Inc. ("ATS Processing"), for violations of federal antitrust laws, as set forth below:

### I.   INTRODUCTION AND OVERVIEW

1.   PlusPass sues Defendants for violations of Section 7 of the Clayton Antitrust Act and Sections 1 and 2 of the Sherman Antitrust Act, arising from the

March 2018 acquisition of Highway Toll Administration LLC ("HTA") by Verra's predecessor, American Traffic Solutions, Inc. ("ATS").   This acquisition substantially lessened competition, tended to monopolize, and resulted in monopolies by Verra in the relevant markets and sub-markets for third-party administration of electronic tolls for rental cars.   The consolidation of these companies into one supplier has excluded PlusPass from competition in these markets and inflated prices for rental car companies, and in the downstream markets for car renters', use of electronic toll services.   These markets and sub-markets are listed on Exhibit A, which comprise all commercially-viable markets for the third-party administration of electronic toll services for rental cars.

2.     Verra has a monopoly in every relevant market and sub-market for third-party administration of electronic toll services for rental cars in the United States.   Verra was created through the 2018 merger of the two dominant vendors in this industry, American Toll Services, Inc. ("ATS") and Highway Toll Administration LLC ("HTA"), followed by a combination with Gores Holding II to form the first publically-traded company focused on this market.   PlusPass is a competitor of Verra. Platinum is a private investment firm that purchased ATS in 2017, and was instrumental in its 2018 merger with HTA.   Gores is a private investment firm that owned Gores Holdings II as a vehicle for investment transactions.   ATS Processing is a subsidiary of Verra that services contracts for rental car companies.

3.     Verra, Gores, Platinum and ATS Processing conspired and combined to illegally and unfairly maintain Verra's monopolies by requiring its rental car company clients to deal exclusively with Verra, tying together different services for different markets.   These contracts have raised barriers to competition that are insurmountable (or nearly so) in the relevant markets and sub-markets.   Moreover, these contracts are either *per se* illegal or, at a minimum, unreasonable restraints on

trade.  15 U.S.C. §§ 1, 2.  Further, Verra's illegal maintenance of its monopolies through, among other things, its illegal exclusive dealing and tying contracts, have excluded PlusPass, its App-based technology, and its prepaid toll tag financial model[1] from the relevant markets and sub-markets, artificially inflating prices for rental car companies and their customers by forcing Verra's much more expensive solution on them.

4.     By locking rental car companies into Verra's costly exclusive dealing and tying contracts, and preventing them from instead using PlusPass' alternative technologies and/or its lower cost services, consumers who rent cars are also harmed because these inflated costs are passed on to them.  Verra is using these illegal contracts to lock out the "other vendors" and "new technologies or financial models" Verra has identified as competitive risks in its most recent annual report.[2]  By locking PlusPass out of these markets, Defendants have caused PlusPass' business to be artificially limited, resulting in lost profits and lost enterprise value.

5.     Further, Verra, Gores, Platinum and ATS Processing have conspired to create artificially high barriers to market entry to prevent PlusPass from entering these markets and to limit PlusPass' growth in these markets.  Verra's contract structure for rental car companies means a new or existing competitor would have to be invested in and doing business in *every* relevant market and sub-market in order to bid on business for a major or national rental car company in *any* relevant market

---

[1] Verra's Year-End 2019 10-K SEC filing (March 2, 2020) (available at https://ir.verramobility.com/sec-filings/sec-filing/10-k/0001564590-20-008153) at page 8 states: "In our Commercial Services segment, we face competition from both our own customers, as they may choose to invest in their own internal solutions, and *vendors offering or seeking to offer new technologies or financial models*, and we must continue to innovate for our offerings to remain competitive."  (Emphasis added.)  PlusPass and its PToll App and prepaid toll tags meet this description. PlusPass also is able to use direct contracts with rental car fleet owners as Verra does in its business model.

[2] *See* footnote 1, quoting Verra's Year-End 2019 10-K.

COMPLAINT

or sub-market.  Their contracts also stop rental car companies from engaging with "other vendors" and "new technology or financial models" as a second source of supply or qualifying them in a pilot program.  Ultimately, these contracts harm consumer welfare because eliminating competing vendors, different technologies and/or financial models from the relevant markets and sub-markets cause rental companies to pay more for administration of electronic tolls than if they were free to bid-out their business or otherwise shop the competition.  Rental car companies push these higher costs down to consumers.  These contracts are illegal and/or unfair means to maintain Verra's already illegal monopoly, and further are unreasonable restraints on trade in violation of Title 15, United States Code, Sections 1 and 2.

6.     PlusPass has been excluded from competing for business in the relevant markets and sub-markets where it has been long-established and where it is authorized to do business because no major or national rental car company can bid-out contracts for less than all of the commercially-viable relevant markets and sub-markets in the United States due to Verra's exclusive dealing and tying contracts. Moreover, PlusPass has had its solicitation for contracts cut-off or turned down during negotiations with customers serviced by Verra because PlusPass is unable to offer services from "day 1" in every relevant market and sub-market.  Because PlusPass' pricing is a small fraction of Verra's pricing, rental car companies pass down higher costs to their customers.  Instead, in a competitive market, Verra's rental car company clients could pass on some or all of their savings to customers, and/or reinvest their savings in their businesses or build value for their shareholders, while still continuing to profit from these premium electronic toll services.

7.     PlusPass has been injured by the harm to competition caused by Verra because it has been unable to sell or bid or market to buyers who make up approximately ninety-five percent (95%) of these markets.  This has increased rental car company costs above what they would have been if PlusPass were able to

compete for their business and has cascading adverse effects in downstream markets, including inflated prices paid by car renters for electronic toll services.  Verra has extracted monopoly rents from rental car companies and their renters by eliminating competition.  PlusPass has suffered antitrust injuries because the losses it has suffered flow from the harm to competition by Verra.

8.     PlusPass is an efficient enforcer of the antitrust laws against Verra and its co-conspirators.  PlusPass' principals have decades of experience in electronic tolling.  PlusPass is one of the very few competitors (and would-be competitors) of Verra in any of the relevant markets and sub-markets.  Rental car companies are able to pass Verra's charges on to their customers, and may not have sufficient incentive to litigate Verra's practices.  Rental car companies are also captive to Verra as the only provider of these services in every relevant market and sub-market, and cannot risk loss of their sole source of supply in certain markets (e.g., Puerto Rico, others).

9.     Moreover, car renters' individual losses are small, which reduces their incentives to enforce the antitrust laws against Verra.  Further, arbitration agreements that prohibit class remedies are common in this industry, which raise significant barriers to enforcement of the antitrust laws by rental car customers. Further, where the rental car company, rather than Verra, bills the consumer, Verra can assert the indirect purchaser defense to renters' standing.

10.     PlusPass has incentive, infrastructure, experience, and expertise to pursue these claims and to seek remedies to cure the harm to competition, while others injured by this conduct do not have the same reasons or resources to remedy competition in these markets or are not otherwise in the position to do so without risks to their businesses.

11.     PlusPass has standing to pursue these claims and is entitled to damages and injunctive relief, including divestiture of HTA by Verra, to remedy these wrongs.  *See* 15 U.S.C. §§ 1, 2, 15(a), 18, 26.

COMPLAINT

## II.   **PARTIES**

12.     Plaintiff PlusPass, Inc. is a corporation based in Austin, Texas.

13.     Gores is an investment firm with its principal place of business at 9800 Wilshire Boulevard, Beverly Hills, California 90212.  Gores can be served with process by serving its registered agent, CSC – Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150, Sacramento, California 95833.

14.     Platinum is an investment firm with its principal office at 360 North Crescent Drive, Beverly Hills, California 90210.  Platinum can be served with process by serving its registered agent, C T Corporation System, 818 West Seventh Street, Suite 930, Los Angeles, California 90017.

15.     Verra is a Delaware corporation with its principal place of business at 1150 North Alma School Road, Mesa, Arizona 85201.  Verra can be served with process by serving The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

16.     ATS Processing is a Delaware corporation, which is a subsidiary of Verra, with its principal place of business at 1150 North Alma School Road, Mesa, Arizona 85201.  ATS Processing can be served with process by serving The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

## III.   **SUBJECT MATTER JURISDICTION**

17.     This Court has jurisdiction under Section 1331 of Title 28 because PlusPass' claims arise under the federal antitrust laws.

## IV.   **PERSONAL JURISDICTION AND VENUE**

18.     This Court has specific personal jurisdiction over each Defendant because this lawsuit arises out of their contacts with California and the exercise of personal jurisdiction over each of them is consistent with due process and the California long-arm statute.  FED. R. CIV. P. 4, CAL. CIV. PROC. CODE § 410.10.  The

negotiations, decisions, and contracts that resulted in the merger of HTA and ATS, the creation of the merged Verra, and use of illegal exclusive dealing and tying contracts occurred in whole or in part in Los Angeles, California, because Platinum and Gores and their principals are based in and work from Beverly Hills.  Further, Verra and ATS Processing service electronic tolls for major car rental facilities and vehicles in California on the FasTrak electronic toll roads and the Golden Gate Bridge, among other places.  Moreover, they provide services to rental car companies at facilities at or near airports in Burbank, Los Angeles, Oakland, Ontario, Orange County, Sacramento, San Diego, San Francisco and San Jose, among others.

19.    This Court has general personal jurisdiction over Gores and Platinum because their businesses are based in Beverly Hills, California.

20.    Alternatively, this Court has specific personal jurisdiction over all Defendants because they are corporations and do business here.  15 U.S.C. § 22.

21.    Venue is proper in this district over all Defendants under Title 28, United States Code, Section 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in this district through negotiations involving Platinum and Gores in Beverly Hills, California, and electronic toll services on FasTrak electronic toll roads in this district, and also  services for cars rented from facilities at the Burbank, Los Angeles, Ontario and Orange County airports, among others.

22.    Venue is also proper as to all of the Defendants under Title 15, United States Code, Section 22, because each of them may be found or transacts business here and each is a corporation.

## V.    FACTS

### A.    The Relevant Markets and Sub-Markets

23.    Twenty states and Puerto Rico have significant networks of roads, bridges, and/or tunnels with electronic tolls (collectively referred to as "toll roads").

COMPLAINT

24.     Many of these toll roads (or sections of them) only permit for payment by electronic means.  Toll roads that only have electronic toll collection are known as All Electronic Toll roads ("AET").

25.     There is not a national electronic toll system.

26.     Most autonomous toll authorities have inter-local agreements with regional and/or state-wide agencies to handle electronic tolls in addition to their own individual systems for electronic tolling.

27.     The regional, state and local tolling systems and toll roads on Exhibit A[3] are all served by Verra.  They constitute the commercially-viable relevant market and sub-markets for third-party administration of electronic tolls for rental cars that are located in the United States.  As shown on Exhibit A, the regional and state systems are not generally compatible or interoperable with other systems that operate outside of their state or area of the country.  Each of these relevant markets and submarkets are defined by their system requirements and geographic reach of their toll roads.

28.     Toll roads in the different states are part of the networks of roads that make possible trucking, shipping, and vehicle traffic throughout the United States and with foreign countries (Canada and Mexico), as well as transportation to and from ports and airports within the United States.  The relevant markets and sub-markets are parts of interstate commerce and international commerce in and for the United States.

29.     Rental car companies and renters have a need to manage electronic tolls for rental cars because electronic toll systems bill the registrant of, or account-holder for, the vehicle for the toll.  However, in the rental car relationship, it is the driver—the renter—that incurs the toll, and the renter is obligated to pay it.  Toll authorities have a lag-time between when the renter incurs the toll and when the toll authority

---

[3]     Exhibit   A   is   taken   from   Verra's   PlatePass   website, https://www.platepass.com/locations/.

bills for it, sometimes as long as two weeks or more.  This lag time generally means the rental car company typically is not billed for electronic tolls incurred by renters until after they return their rental cars.  Most major and national rental car companies deal with this situation by using a third-party administrator to provide services for payment, management, and collection of electronic tolls from their renters.

30.    A third-party administrator ("administrator") steps between the rental car company and/or the renter and the toll authority.  The administrator has fleet contracts with toll authorities.  The administrator adds rental vehicles to its fleets with the toll authorities.  The toll authorities charge tolls as incurred by fleet vehicles to their administrators, who pay the tolls, and then charge the tolls and their fees for services to the rental car company or the renter.  Verra and PlusPass both act as third-party administrators for electronic tolls for rental cars in relevant markets and sub-markets.

31.    Third-party administration of rental car tolls is a "back office" operation: essentially, it is a specialized data processing service.  The costs in equipment and personnel to enter the market are relatively low compared to many other businesses because an administrator only needs people, software, and computer systems for data processing and interfacing with rental car companies, toll authorities, and renters.  If a toll authority requires toll tags (RFID devices), or the administrator or rental car company want to use toll tags, the administrator can use contractors or rely on the rental car company to deploy tags.  However, in most systems, license plate reader technology is used for rental cars rather than toll tags.[4]

32.    For example, Texas has several different local toll authorities, but their electronic toll collection systems must be interoperable with each other under state law, so that an account on any one of the systems can be used on all toll collection

---

[4]https://www.hertz.com/rentacar/productservice/index.jsp?targetPage=USplatepass.jsp&leftNavUserSelection=globNav_3_5_1&selectedRegion=United%20States (last accessed November 1, 2020).

systems within the state—such as TxTag, TOLLTAG, EZ-Tag, and others. Accordingly, Texas is a relevant market for services of electronic tolls for rental cars, and each independent toll authority in Texas is a sub-market for these services. The Texas systems also are interoperable with smaller electronic toll systems in Oklahoma and Kansas. These systems are part of, and also sub-markets within, the Texas relevant market.

33.   By way of another example, California is home to the Transportation Corridor Agency's "FasTrak" system, which administers tolling functions for toll authorities in California under inter-local agreements. FasTrak is not interoperable with any electronic toll systems outside of California. The FasTrak system is a relevant market and the constituent local toll authorities that have agreements with it are sub-markets.

34.   Illinois has its I-Pass brand system, which is interoperable with the EZ Pass brand system. There is a relevant market for services for tolls for rental cars in Illinois.

35.   Indiana, most Mid-Atlantic and Northeastern States, Ohio, and Michigan participate in an interoperable regional toll system branded EZ Pass. There is a relevant market for services for tolls for rental cars in the region served by the EZ Pass system. The toll roads in each constituent toll authority in the EZ Pass system are sub-markets for these services.

36.   Several other states have their own systems, some of which are interoperable with other regional or state systems and constitute relevant markets and sub-markets for these services:

a.   Florida has multiple toll systems, which are interoperable, either in whole or in part, with each other, and the toll system in Georgia.

b.   Georgia has a toll system that has overlapping interoperability, in whole or in part, with systems in Florida and North Carolina.

c.    North Carolina is interoperable, in whole or in part, with several branded systems that serve nearby states.

d.    Colorado, Puerto Rico, and Washington State, each have their own systems; none of these systems is interoperable with systems outside of their respective jurisdictions.  Each of these jurisdictions is a relevant market for third-party administration services for electronic tolls for rental cars, and their constituent local toll authorities are sub-markets for these services within each relevant market.

e.    Each of these relevant markets and their constituent sub-markets are defined by the different system requirements and geographic reach of their toll roads.

37.    Verra has a monopoly in each of these relevant markets and sub-markets because it has exclusive contracts with nearly all major, national, and/or regional rental car companies, which cover about ninety-five percent or more of the rental cars in these markets.

38.    Verra uses exclusive dealing contracts with its rental car company clients.

39.    Verra's exclusive dealing contracts are also tying contracts because they tie different services in different, unrelated relevant markets to each other; by way of examples, Washington State and Florida, or Texas and Puerto Rico.  These contracts illegally and unfairly sustain Verra's monopoly, and also are unreasonable restraints of trade on competition in each of these relevant markets and sub-markets. The tying contracts are *per se* illegal because they tie together different services in different markets; alternatively, these tying contracts are unreasonable restraints on trade in the relevant markets and sub-markets.

40.    Verra's contracts are extremely profitable, even during the pandemic. In Spring 2020, the second quarter of the year, many government entities in the United States and Europe restricted gatherings, closed schools, closed indoor dining

and entertainment establishments, and many business also closed their facilities. Canada and several European countries banned travel to and from the United States.

41.    This resulted in a tremendous drop in travel, including rental car use within the United States.

42.    Verra's Customer Service Segment revenue fell about forty percent (40%) from $99,497,000 in the first quarter of 2020, to $62,815,000 in the second quarter of 2020.   Verra's cost of sales for the first two quarters of 2020 was $2,232,000.   While Verra's revenue declined for this business segment, it nonetheless remained incredibly profitable in the second quarter.[5]

43.    According to Verra's Securities Exchange Commission filings, Verra's contracts with its rental car company clients compensate Verra by "margin sharing."[6]

44.    "Margin sharing" is a means of compensation whereby Verra gets a share of the "margin" generated by service fees and other revenue from renters for the electronic tolling service net of toll charges and certain other expenses.

45.    Although Verra is sometimes referred to by a rental car company as an agent, Verra seems in some respects to be more like a joint venture partner because it shares profits and losses with its rental car company clients, rather than receives a commission on or percentage of tolls or revenue or fee per service basis.   Margin sharing also is more characteristic of a joint venture than a typical arms-length agency arrangement because it necessitates sharing of highly sensitive competitive information that would not be shared in a fee for service or commission or

---

[5] Verra's 2d Quarter 10-Q, pp. 6, 34.

[6] "Because the revenue from our agreements with our RAC customers is largely based on a margin share model, any changes to our RAC customers' pricing or pricing model for tolling, such as changing from charging their customers per rental day to per toll usage day, could have a material impact on the revenue we realize under those agreements.   Further, although we have long-term agreements with many of our RAC customers, most provide the customer with a termination right in certain situations, including if we commit an uncured material breach of the agreement."   Verra Year-End 2019 10-K (March 20, 2020) at p. 12.

COMPLAINT

percentage of revenue type agency model.  Verra's "margin sharing" results in gross margins for these services that are more than 50 times relevant costs.

46.    Verra's margins and revenues show its charges far exceed PlusPass' charges (15% of the face amount of the tolls).

47.    Verra's pricing results in its own margins being ten to twenty times more than typical in the "high-end" of the data processing industry.

**B.    Verra's and PlusPass' Services for Administration of Electronic Tolls for Rental Cars**

48.    Tolls are incurred by a vehicle when it travels past a toll collection point (*e.g.*, toll plaza, exit gate).  The toll system charges the toll to the vehicle owner or registrant.

49.    For individual account holders, a payment mechanism, such as a deposit, credit card, or bank account, is charged for the toll when posted to the account.

50.    Fleet accounts typically require some type of guaranteed or automatic payment system or deposit.

51.    Most toll systems utilize electronic RFID "tags" and RFID readers to collect tolling information from account-holders.

52.    Toll systems also typically deploy video cameras to capture license plate data.

53.    Some systems require, or incentivize, individual account-holders to install tags on their vehicles.

54.    Rental car fleets historically have not used RFID tags unless required to do so by a toll system.

55.    For vehicle owners who drive on electronic toll roads without accounts, the vehicle's license plate is the source of information for toll collection.

COMPLAINT

56.    Collection of tolls electronically is more cost-efficient than having toll booths staffed with collectors or installation of other mechanisms to collect cash or tokens.

57.    Moreover, in the pandemic, some toll authorities closed staffed toll booths as a public health measure.  *See* Exhibit A.

58.    The pandemic has increased the momentum to eliminate cash-tolls due to the fear of spread of disease through handling of coins and cash as well as through toll booth attendants.

**C.    Development of Third-Party Toll Administration for Rental Cars**

59.    HTA began offering services to administer electronic tolls for rental cars in 2002.

60.    ATS began selling these services in 2004.

61.    ATS began a service for electronic tolls for rental cars called "PlatePass."  Hertz and its Dollar and Thrifty brands adopted PlatePass.

62.    ATS also used PlatePass with its regional clients, including EZ Rent, Advantage, Fox, and Firefly.

63.    HTA developed two different programs with each of its two big clients: 1) the "eToll" program Avis uses for its brands (Avis, Budget, and Payless); and 2) "TollPass" for Enterprise Car Rental brands (Enterprise, Alamo, and National). HTA also sold services to car dealers for the car rental and loaner car functions.

64.    The Enterprise brands make up about one-half of the rental cars in the United States, with Hertz and Avis Groups having most of the remaining rental cars.

65.    By about 2013, the service fees charged to renters by rental car companies for use of electronic toll roads were as high as about $25.00 per day, ***charged for each day*** of a rental, if an electronic toll was ***incurred on any day*** of the rental.  In addition, tolls were billed to renters at the highest posted rate not the rate paid by ATS or HTA.

66.   By 2013, these charges prompted numerous complaints and consumer lawsuits by renters.

67.   PlusPass was founded by electronic tolling industry veterans to develop and deploy the PlusPass App, formerly known as PToll, for servicing electronic tolls.[7]  PlusPass offered an inexpensive way for renters to cope with electronic tolls in lieu of costly rental car company services.  PToll is also a toll that can be used by any vehicle owner, including rental car companies, to out-source electronic tolling services.

68.   PlusPass alpha tested PToll in 2013, followed by beta testing through early 2015.  PlusPass made PToll generally available in 2015.

69.   The PlusPass App is downloaded from Apple's App Store or Google Play.  The user signs up for an account with one of the compatible payment mechanisms (*e.g.*, credit card).  When deployed, the user opens the App, takes a photo of the car's license plate through the App, PlusPass' server reads the plate number, and adds the car to PlusPass' fleet contracts with the relevant toll authorities.  Toll authorities bill PlusPass for the tolls for vehicles on its fleet contracts, and PlusPass charges its customers' accounts for the tolls and service fees per toll.  The PlusPass App-based system's retail cost is 15% of the tolls (in the amounts actually incurred) as a service fee, and there is no upfront purchase or separate periodic fee (*e.g.*, monthly membership).  A portion of the 15% fee is to cover credit card and other payment processing fees.

70.   After its App was in the markets, PlusPass next developed a prepaid toll tag which, like a prepaid calling card, allows a user to buy the prepaid tag on-line or from select HEB, Kroger, and CVS stores. Consumers purchase the prepaid card and subsequent refills by cash, credit, or debit card at a point of sale or on-line

---

[7] PlusPass has an issued patent on inventions related to App-based electronic toll administration, U.S. Patent 9,691,061B2, and other applications for patents pending in the U.S. Patent & Trademark Office.

by credit card or electronic payment. The tag can be "refilled" in the same ways. After the initial purchase, PlusPass does not require a minimum balance. Consumers have purchased this product to use with rental cars to avoid the expense of Verra's rental car company programs.

71.     PlusPass' App and prepaid tag are two ways to interface with the toll authorities.  PlusPass can also use a direct billing arrangement with a customer for electronic toll management, which bypasses the App and the toll tag.  All of the App, prepaid tag, and direct contract means function the same way: they are interfaces between toll systems on the one-side, and vehicle owners and users on the other side with PlusPass serving as the administrator for electronic tolls between them. PlusPass uses the same fleet contracts for all of these different interfaces.

72.     Verra's and PlusPass' systems work in the same ways: the toll authority's readers (e.g., RFID or license plate readers at toll points) record tolls for vehicles listed on their fleet contracts, charge the tolls to them according to their fleet contracts, and each of them collect toll charges and fees for this service.

73.     The regional, state, and local toll systems generally are agnostic as to how PlusPass (or Verra) interfaces with their toll readers or their customers. PlusPass and Verra interface with the toll authority's computer systems according to the interface, systems and requirements set by the toll authority.

74.     After PToll's general release, the App quickly began to gain traction with consumers.

75.     Surprisingly, after general release, there were unexpected, infrequent issues regarding PlusPass' temporary license plate registrations when used with rental cars covered by ATS's or HTA's contracts.  PlusPass had not experienced these errors in the more than one year of testing prior to PToll's general release. Rather, these problems only occurred after PToll began competing with HTA and ATS.

COMPLAINT

76.     After PlusPass' PToll experienced these issues in competition with HTA and ATS, PlusPass became concerned that even a small error rate would impair the credibility of its App as well as its company's reputation.   PlusPass warned renters that PToll generally was not suitable for rental cars (since HTA and ATS had over 95 percent of the rental cars in the United States under contract, this warning was directed at their rental car customers' vehicles).

77.     PlusPass, however, remained on the market as a third-party administrator of electronic tolls targeting vehicle owners and for its own rental car company and car dealer customers.

78.     PlusPass' prepaid card program has been a success.  The Harris County Toll Road Authority's website lists this tag as an alternative to a regular account.  The prepaid tag is also a solution for rental car customers wherever EZ tag is accepted (that is, the Texas market).

79.     Unlike the PToll App, the prepaid cash tag did not experience problems when used with rental cars under contract to Verra.

80.     PlusPass also has marketed itself to fleet owners for direct contracts, which do not require use of the App or a prepaid tag.

81.     PlusPass has been solicited to bid on data processing services on the toll authority side of the business by the toll authority in Georgia.

82.     Sometime in or around 2016, following years of negative press and consumer lawsuits, most rental car companies cut their daily rates, and also limited daily fees only to the days when tolls were incurred by renters.  Moreover, several rental companies capped fees at about $20.00 per rental (or per month if there were multiple rentals in a month).

83.     This change in pricing and price structure caused fast, steep reductions in revenues for HTA and ATS.

84.    Since HTA and ATS were both private companies, they did not make their financial information public, and their revenues and profit margins on their services for managing electronic tolls for rental car companies are not known to PlusPass.

85.    The rates of returns by HTA and ATS when they were charging up to $25 dollars per day, for every rental day, as opposed to $5.99 in fees, and only on days a toll was incurred, showed that for many years HTA and ATS must have enjoyed extraordinary margins far in excess of what Verra enjoys today.

86.    ATS had begun as a business that provided products and services for traffic management and enforcement (including "red light cameras"), and it had business independent of servicing electronic tolls for rental cars.

87.    HTA's business, however, was exclusively or almost exclusively administration of electronic tolls for rental cars.  After pricing changes in 2016-2017, HTA's would have experienced a steep decline in its revenues and margins, with no other substantial businesses to cushion its fall.

**D.    The Monopoly Rises**

88.    After rates for toll services paid by renters began to fall, Platinum purchased a controlling interest in ATS (May 2017).

89.    In early 2018, Gores, Platinum and ATS agreed to create a monopoly for third-party administration of rental cars by combining ATS and HTA.  Tom Gores and Alex Gores—billionaire brothers in Beverly Hills who are the heads of Platinum and Gores, respectively—actively participated in this plan and were part of the agreement.

90.    The co-conspirators planned to profit by using the monopoly to turn around HTA's and ATS' revenues from their recent fall by extracting monopoly rents from the markets and keeping new entrants away from major regional and national rental car companies.  Gores, Platinum, Tom Gores, Alex Gores and principals of the former ATS and HTA could then profit from sales of their stock in

their publically traded monopoly.

91.    Platinum's ATS acquired HTA in March 2018.

92.    Platinum rebranded ATS as Verra Mobility LLC in June 2018.

93.    In 2018, Gores owned Gores Holding II as an entity for acquisition or other transactions for its investment business.

94.    Gores Holding II and Verra Mobility LLC were combined into Verra Mobility Corporation on October 18, 2018.

95.    Verra Mobility Corporation went public on the NASDAQ stock exchange on October 18, 2018.

96.    ATS Processing is a subsidiary of Verra, and was created to, among other things, process data for electronic tolls for rental cars.

97.    The merger of ATS and HTA resulted in consolidation of contracts for administration of electronic tolls covering approximately 2,116,200 rental cars or 95.6% of the rental cars in the United States at the time.[8]

98.    Within a few months of the merger, new means of subjecting renters to additional charges for electronic toll services emerged and old ones were revived. One new method for pricing Verra and some of its rental car company customers now use is a fixed-price daily charge—a single fee inclusive of all tolls and service charges, charged for each day of the rental, analogous to the prepaid gas option. Another new tool that has been adopted is to require renters to affirmatively opt-in to a service fee for each day of the rental at the time of the rental, and impose a substantial penalty of $15 dollars or more *per toll* if they do not buy the service. Further, the model of charging for each day of the rental (regardless of the number of tolls) has also been revived post-merger by renting toll tags. *See, e.g.*, J.T.

---

[8] These rental cars would have been disproportionately located and operated in states with heavy tourism, convention and business travel, such as Texas, Florida, and Washington, where PlusPass was doing business, and less so in states which do not have heavy visitor traffic, such as Iowa or Nebraska.

Gentner, "Dollar Car Rental Charged Me $59.99 For a Single $1.75 Toll — Here's How To Avoid The Same Fate" (July 19, 2019 post), The Points Guy (website), last accessed November 1, 2020.[9]  In addition, some of Verra's rental car company clients have removed the cap on service fees incurred during a rental or a month.[10]

99.   The flat fee pricing mechanism illustrates that each regional, state and local toll authority is its own relevant market or sub-market because the flat fee depends on the system where the service will likely be used and the systems that will be accessed by the renter.  For example, Budget's website states:  "If you choose e-Toll Unlimited, you agree to pay a flat daily fee of $10.99 - $25.99, depending on checkout location, for each day of the rental period, regardless of whether or not you incur any tolls, up to a maximum of $54.95 - $129.95 per week."[11]  In the model where administrative fees are charged to those who do not opt into the service at the time of the rental, the amounts of those fees also vary by market.[12]

100.   Increasingly, the flat fee is the ***only option offered*** in some of the relevant markets and sub-markets, and some brands now exclusively rely on it in all markets (*e.g.*, Dollar).

101.   For example, as shown in the "Points Guy" July 19, 2019 post, prepaid fees inclusive of tolls for a one week car rental from Dollar at Logan Airport where the only two tolls to be incurred were in and out of the airport ($1.75 each way), amounted to $87.43.  One consumer reported being charged $60.00 by Dollar for its

---

[9] https://thepointsguy.com/news/dollar-overcharged-me-for-tolls-tips-avoiding-fees/ (last accessed November 2, 2020).
[10] https://www.hertz.com/rentacar/productservice/index.jsp?targetPage=USplatepass.jsp&leftNavUserSelection=globNav_3_5_1&selectedRegion=United%20States
[11] https://www.budget.com/en/products-services/services/e-toll#:~:text=e%2DToll%20fees%20(Standard),not%20to%20exceed%2030%20days) (last accessed November 1, 2020).
[12] A. Hussain, "The Ultimate Guide to Car Rental Tolls Across the U.S." (updated as of August 20, 2020), https://upgradedpoints.com/car-rental-tolls-in-the-us (last accessed November 1, 2020).

rental period where it incurred a single $1.75 toll.[13]

102.   If rental car companies or their customers deployed the PlusPass App or had a direct contract with PlusPass, the fees would have cost no more than 15% of the electronic tolls at the license plate rate of $2.05 (the PlusPass App does not use tags).  Using the example of the renter who complained about paying $60.00 for a $1.75 toll though Dollar, PlusPass would have charged $0.31 for administering the toll at the license plate rate of $2.05, for a total of about $2.36.

103.   Since the October 18, 2018 merger existing pricing mechanisms have also been inflated in some instances: for example, Budget increased its daily fee to $5.99 from $3.99, and the per rental or per month cap, to $29.95 from $19.95; Hertz eliminated its per rental or per month caps.

104.   Verra charges tolls at the highest posted rate regardless of discounts available to it.

105.   Accordingly, using the Dollar example again, assuming hypothetically a simple 50/50 profit split,[14] for a margin that is $58.25 ($60.00 – 1.75), then Verra would take $29.12.  If, however, the rental car company had a direct contract with PlusPass, assuming it paid as much as PlusPass' retail rate for App users (15% of the toll), then the rental car company would get $60 minus $2.35, for a total of $57.65.  The rental car company could retain those earnings to help support its overall business in providing rental cars to the public, or otherwise improve its financial performance, or increase dividends, or reduce the fees to its renters, or a combination of things.  Moreover, the rental car company would not have to share any of its internal financial data to compute margins with a vendor that sits as a hub between it and its competitors.

[13] https://thepointsguy.com/news/dollar-overcharged-me-for-tolls-tips-avoiding-fees/ (last accessed November 2, 2020).

[14] PlusPass does not know the split in the "margin sharing" so it assumes 50/50 based on a frequent outcome when John Nash's bargaining theory is applied, "The Bargaining Problem," Econometrica Vol. 28, pp. 155-162 (1950).

COMPLAINT

106.   A significant cost for PlusPass is credit card processing fees.  In a direct fleet contract with a rental car company, this overhead is eliminated (there would not be credit card processing fees, rather direct payments would be made to PlusPass).  Thus, the retail price used in this example is a conservative measure for comparison of the potential costs of a PlusPass direct contract for administration of electronic tolls with Verra's margin sharing contracts.

107.   Verra is imposing monopoly rents far above what pricing would be in competitive markets for third-party administration of electronic tolls for rental cars, which ultimately harms consumer welfare as well as PlusPass.

**E.    PlusPass Competes with Verra in Relevant Markets and Sub-Markets**

108.   PlusPass currently provides electronic toll administration services for customers of a car rental company based in Austin and for a dealership in Austin.  It has been approached by the toll authority in Georgia to provide back-office operations.  Today, PlusPass offers consumer services through its App in California, Colorado, Florida, Georgia, Illinois, Kansas, Massachusetts, North Carolina, Oklahoma, Texas and Washington State.  PlusPass' prepaid tag is operable in all systems compatible with the Harris County Toll Road Authority – which is all Texas systems and electronic tolls in Oklahoma and Kansas.  PlusPass can also offer services for direct contracts in any system where it is operable.

109.   PlusPass has met with a national company that is a Verra client, regarding direct fleet contracts.  PlusPass has also marketed its direct contract services to, and dialogued with, another Verra client that is a national rental car company.  PlusPass' toll tags are purchased by renters to avoid excessive service fees: the tag product has been specifically called out as an option on the Harris County Toll Road Authority's webpage (this is a system of toll roads in Houston, Texas, and its suburbs), which connects with the U.S. interstate highway system and is frequently used in travel to and from the airports in Houston.

COMPLAINT

110.   Upon information and belief, Verra maintains its monopoly by exclusive dealing contracts with rental car companies that are also tying contracts. These contracts prevent Verra's rental car company clients from dealing with PlusPass or any other vendor in any local, state, or regional market or sub-market for services for electronic tolls for rental cars.  According to Verra's Year-End 2019 10-K (March 20, 2020) these are mainly "long-term" contracts (p. 12).  But even if the contracts are relatively short, because Verra preempts all competition in all of the commercially-viable relevant markets and sub-markets for all regional, state, and local toll authorities, any new entrant or competitor would have to provide services in each relevant market and sub-market to displace Verra, and they would still have a profound negative impact on competition.

111.   Since Verra has each of its rental car company clients' sensitive pricing information for electronic tolls as part of its margin sharing arrangement, it has visibility into its clients' competitive decision-making, which gives it an unfair advantage in illegally maintaining its monopoly.

112.   Administration of electronic tolls for rental cars is a type of specialized data processing.  Each toll authority with which Verra interacts requires different specifications and interfaces.

113.   Verra's exclusive dealing contracts tie purchase of different services together for different incompatible systems.

114.   Verra's exclusive dealing and tying contracts with its rental car company clients are unreasonable barriers to competition in regional, state, and local markets and sub-markets.  These contracts tie different services in different markets together and are *per se* illegal, and also cause unreasonable restraints on trade because of their exclusivity and tying requirements.

115.   For example, there are no reasons why Verra should force a rental car company to award its contract for servicing tolls in Washington State with the

COMPLAINT

contract for Puerto Rico.  The systems in these places are not compatible, have different requirements and specifications, and are geographically remote from one another; indeed, it is impossible to drive a car between Puerto Rico and any state.

116.   Further, since Verra is compensated by "margin sharing," it makes no sense for a rental car company to forego a rate of 15% or less of the toll actually paid through a direct contract with PlusPass, rather than hand over a significant share of its profits on these services to Verra.  Given Verra's margins, its monopoly power, and revenues, the "margin share" it extracts from rental car companies is many times the cost of PlusPass.

117.   Nor can the "national contract" be justified on efficiency grounds. Take, for example again, the tolls charged by Dollar to its Logan Airport renter. Verra is sharing the "margin" from the electronic toll services with Dollar ($58.25) for the same service where PlusPass would have charged $0.31.

118.   In addition, there is no technical reason why data processing services for every regional system (and several state systems) should be operated by a single vendor since the systems are not interoperable and have different requirements and specifications.

119.   If a rental car company wants to deal with only one service provider then it is free to choose Verra's contracts on the merits of its services and pricing— *but Verra should not be able to foreclose competition by exclusive dealing and tying, extracting monopoly rents from its rental car company clients, and ultimately their renters.*  This causes waste and burden on the economy, and harm to consumer welfare and PlusPass through foreclosure of competition.  This is the type of harm that antitrust law is designed to prevent.

120.   At a minimum, rental car companies acting in an economically rational way would explore PlusPass as an option when they might reap potentially millions

COMPLAINT

of dollars of additional profits each year.  The fact that they have not been able to do so, is illustrative of the effects of Verra's illegal monopoly and illegal contracts.

121.   The negotiations PlusPass had with two of Verra's customers show that at least some of the people among its customers are looking for competitive options.

122.   Moreover, Verra's enormous margins of 50 or 60 to 1 further show that it has used its monopoly to generate gross revenues in far excess of norms for data processing (2 - 4 to 1).[15]

123.   When HTA and ATS were competing with each other prior to the March 2018 merger, there remained the possibility that one of these two competitors would be willing to take customer business away from the other if a customer wanted a competing bid for less than all regions covered by Verra.  Post-merger, this is not a possibility, and rental car companies are forced to deal with Verra.

124.   The drop in their revenues caused by the drop in pricing of services for electronic tolls for renters forced by litigation gave ATS, HTA, Platinum, Gores and others acting in concert with them, the incentive to combine HTA and ATS into a monopoly to extract more revenue from its rental car company customers and their renters.  By "going public" with the monopoly, the co-conspirators could immediately profit from their plan by leveraging and trading stock in Verra.

125.   The rental car companies are subject to Verra's monopoly power because they do not have any option for these services in any relevant market or sub-market unless they buy all services for all of the relevant markets and sub-markets from Verra.

---

[15] For example, a January 2020 study by Aswath Damodaran, Professor of Finance at the Stern School of Business at New York University, showed that the average percentage of gross margin for businesses in computer services was 24.64%, and for software systems and applications companies 71.37%. http://pages.stern.nyu.edu/~adamodar/New_Home_Page/datafile/margin.html  (last visited October 14, 2020).

126.   Further, there is no justification for rental car companies to do business with only one third-party administrator in all relevant markets and sub-markets when the cost of these services would be substantially reduced by using competitive bidding for different regions or states (e.g., using the Logan Airport example, from $60.00 to $2.35).  This is especially true considering the markets where PlusPass has the longest track record, Texas and Washington State, are remote from other toll systems, and there is not likely significant overlap with other regional, state and local markets and sub-markets.

127.   It is common in many industries to have more than one source of supply so that if there is a failure of a supplier to perform, the purchaser can isolate operational problems.   Further, potentially, overlapping vendors across regions might be a resource in the event of an operations failure by one of them.  A rental car company loses these benefits by being forced to concentrate all of this business in Verra.

128.   Rental car companies do business with multiple vendors when they perceive an advantage in doing so.   For example, many rental car companies purchase and service automobiles from multiple automobile companies.  A recent check of the Avis website showed it rents cars from Chevrolet, Ford, Toyota, Chrysler, and Volkswagen.[16]

129.   It is much more complex to deal with and maintain cars from different manufacturers than to integrate data processing solutions in back office operations.

130.   Moreover, data must be processed separately for each toll collection agency or authority, and separate fleet contracts must be made for coverage in each of the relevant markets.

131.   It makes no sense for rental car companies to shut out Verra's competitors in the relevant markets and sub-markets for these services as opposed

---

[16] https://www.avis.com/en/reservation#/vehicles (last accessed November 1, 2020).

to being forced to deal with a single vendor in all markets as a condition of purchasing services in any market. And if it did make sense, then it would not be necessary for Verra to use exclusive dealing and tying contracts with its rental car company clients to force its customers to do so: Verra's reliance on these types of contracts shows it is deliberately acting to thwart competition.

132.   Verra's exclusive dealing contracts also preclude a rental car company from launching a pilot program or test to qualify PlusPass as a provider. "Qualification", "testing" and/or "pilot programs" are common business practices where a potential buyer evaluates the products or services of new vendors for inclusion in their businesses. For example, a rental car company could experiment with the PlusPass App or prepaid cash tag or a direct contract to test PlusPass' services. So, while PlusPass should be an attractive alternative to rental car companies where it is already doing business, PlusPass has been unable to get even a pilot or test program with a major or national rental car company to prove the value of its service.

### F.   Tying Different Products in Different Relevant Markets

133.   Electronic toll system services for different regional, state, and local toll authorities have different data processing system interfaces, system requirements, specifications, and/or legal requirements. These services are different products for each toll agency or authority.

134.   These services are provided in different geographic areas within the United States, which are defined by the geographic reach of the toll roads they serve.

135.   Each of the regional, state, and local toll authorities are different relevant markets or sub-markets.

136.   Verra is tying sales of different services in different markets to each other, which is a *per se* violation of the antitrust laws, or alternatively illegal when analyzed under the rule of reason.

137.   Rental car company pricing of electronic toll services in different markets shows that the markets are in fact separate from one another.  For example, TollPass charges $3.99 per day that its electronic toll service is used, except in locations in the Chicago area where it only offers all-inclusive daily charges.  Avis and Budget state the price for their eToll Unlimited program ranges from $10.99 to $25.99 for all-inclusive service fees and toll charges, for the same benefits, depending on location.

138.   Verra's 10-K states that it has to maintain separate systems for each toll authority it serves because their systems are incompatible with each other, and then Verra adds its own system to integrate the data on a national level.

139.   Verra's own PlatePass website "facts" likewise show that Verra operates in different relevant markets and sub-markets because it advises renters who want to pay their own tolls to "[c]heck with the applicable toll authority to learn all payment options."[17]   In its facts discussing the Golden Gate Bridge, PlatePass describes how its electronic tolls work there and directs consumers to the different resources for paying these tolls directly;[18] the same is true for its facts on tollways in Southern California.

140.   Different incompatible toll systems that are geographically remote from one another should not be tied together in a single contract, nor should competitors be foreclosed by exclusive dealing contracts from dealing with different customers in different relevant markets.  Verra should not be able to illegally maintain its

---

[17] PlatePass, *Renting with Hertz*, https://platepass.com/faq/ (answering the fifth "renter question").

[18] Verra was forced to adopt these practices at the Golden Gate Bridge by a lawsuit filed by the City of San Francisco: **Verra Mobility and Hertz Settle Toll Road Lawsuit"**, February 26, 2019, The Newspaper.com, https://www.thenewspaper.com/news/66/6657.asp (last accessed November 2, 2020).

COMPLAINT

monopoly by its exclusive dealing, tying and unfair access to rental car company pricing information.

## VI.    **ANTITRUST INJURY AND STANDING**

141.   PlusPass competes with Verra for third-party administration of electronic tolls for rental cars.  While it has had some success with local car rental and dealer operations, and renters' use of its prepaid tag product, it has been rebuffed during negotiations with a national car rental company due to Verra's exclusive dealing and tying contracts.  It was also rebuffed by a national company that manages car dealer rental and loaner cars because the customer required a national platform (to replace Verra's national platform).

142.   PlusPass is further handicapped in competition with Verra because the merger of ATS and HTA combined the only two competitors that each served every relevant market and sub-market in the United States where there is demand for these services.[19]  With no source besides Verra for servicing electronic tolls for rental cars in some markets, Verra's exclusive dealing practices and tying requirements force major and national rental car companies to do business with Verra and only with Verra.  Financing and launching what amounts to a nationwide series of networks without any customer contracts for any of those networks is a nearly insurmountable burden to entry of any relevant market—and should be wholly unnecessary from a technical, business, and economic viewpoint.  PlusPass has been excluded from dealing with major and national rental car companies in at least the relevant markets and sub-markets where it does business now, and from others where it could have and should have expanded, but for Verra's conduct in distorting competition in the relevant markets and sub-markets, causing it to suffer lost profits and lost enterprise value.

---

[19] *See* Exhibit A.  This reference does not include very small, local tolls, such as two of the bridges of the Columbia River in Oregon.

143.   Rental car companies have paid monopoly rents to Verra through its margin sharing agreements, and have been forced to share sensitive cost and revenue pricing information with a "hub" that deals with its competitors.  Renters have in turn paid excessive fees for services to use electronic tolls.  The harm suffered by PlusPass comes from the type of conduct and harm to competition in the relevant markets and sub-markets that the antitrust laws were designed to prevent and remedy.

144.   PlusPass also is an efficient enforcer and suitable entity to enforce the antitrust laws against Verra.  Verra has few remaining competitors.  PlusPass has contracts to serve rental and loaner car businesses.  Its toll tag is used by renters to avoid high rental company charges.  PlusPass has negotiated with potential buyers of services for electronic tolls for rental cars, and been turned away due to Verra's anticompetitive conduct.  PlusPass' operations show it has the experience and resources to succeed in this business on a level playing field.

145.   Moreover, PlusPass' principals are experts in the technology and business of electronic tolling, each of them is very experienced in this industry, and each frequently speaks on issues to industry groups.  They have the specialized knowledge necessary to challenge Verra's practices in these markets.

146.   PlusPass has incentives to enforce the antitrust laws that the rental car companies may not have since they pass the costs of their programs to their rental car customer clients.  Moreover, since Verra has their sensitive competitive information and they also need to ensure service in all markets without interruption, Verra can punish a rental car company that challenges it.

147.   Further car renters' individual claims are likely small, which minimizes incentive to enforce antitrust laws against Verra.  Further, many car rental companies have arbitration clauses that prohibit class claims in their rental agreements, which increase the complexity of enforcement for renters.  Finally, for renters who in turn

are charging part or all of their fees and tolls to their employers or clients, the incentive to enforce the antitrust laws is not pressing.

148.   PlusPass has more incentive, greater expertise, and faces fewer obstacles than rental car companies and their renters in enforcing the antitrust laws against Verra.

149.   PlusPass has been injured as a result of harm to competition in one or more relevant markets and sub-markets.  PlusPass is entitled to its damages resulting from the harm to competition, trebled attorneys' fees and other recoverable costs and expenses, an order that Verra divest itself of HTA, and such other injunctive relief as is necessary to restore competition in the relevant markets.  15 U.S.C. §§ 1, 2, 4, 15, 18, 26.

## VII.   <u>FIRST CAUSE OF ACTION – CLAYTON ACT SECTION 7</u>

150.   Section 7 of the Clayton Act prohibits any person engaged in commerce or in any activity affecting commerce from acquiring, directly or indirectly, the whole or any part of the stock of another corporation engaged in any activity affecting commerce in any section of the country, where the effect of such acquisition may be substantially to lessen competition, or tend to create a monopoly in a relevant market.

151.   Gores, Platinum, Verra, Tom Gores, and Alex Gores, have together combined and/or conspired with each other to take control of the relevant markets and submarkets by ATS's takeover of HTA in March 2018, and then reinforcing their monopoly by combining Gores Holdings II and Verra Mobility LLC into a publically-traded company.

152.   The effect of the acquisition of HTA by ATS was to substantially lessen competition or tend to create a monopoly, and created a monopoly, in the relevant markets and sub-markets for processing electronic tolls for rental cars.   The combination of Verra Mobility LLC and Gores Holding II into the publicly-traded

Verra Mobility Corporation gave Verra access to capital that it did not have before October 18, 2018, and permitted its co-conspirators to monetize and leverage their investments.

153.   The sale and trading of stock on the NASDAQ gave Gores, Platinum, Tom Gores and Alec Gores as well as the principals for ATS and HTA a means to recoup their investments and profit from them.   The value of the stock was maximized by Verra's monopoly.

154.   Verra has about ninety-five percent (95%) of the rental cars in the United States under contract as their exclusive administrator for services for electronic tolls, and is the sole provider of third-party administrator services that operates in every regional and state relevant market, and local sub-market, in the United States.   The merger of HTA and ATS is a *prima facie* violation of Section 7.

155.   The combination of the only two competitors that served major and national rental car companies in every relevant market and sub-market in the United States foreclosed PlusPass from doing business with any of the major and national rental car companies since the rental car company customers no longer had an alternative supplier to negotiate with for services.

156.   As a result of the harm caused to competition in the relevant markets and sub-markets, PlusPass has been injured in its business and property, including lost profits and lost enterprise value of its business, among other damages.   PlusPass is entitled to an order of divestiture of HTA to help restore competition, its damages, trebled, attorneys' fees and such other relief as may be appropriate.

## VIII.  SECOND CAUSE OF ACTION – SHERMAN ACT SECTION 1

157.   Gores, Platinum, Verra, ATS Processing, Tom Gores, and Alex Gores combined and/or conspired to enter contracts that unreasonably restrain trade in the different regional, state markets, and local sub-markets for processing electronic tolls for rental cars.   They have used illegal exclusive dealing and tying contracts to

COMPLAINT

unreasonably restrain trade, and also to perpetuate Verra's illegal monopolies in the relevant markets and sub-markets.  In Verra's most recent 10-K, it has characterized these as mostly "long-term" contracts.  Even for those that are not "long-term", under the conditions created by Verra short-term contracts would also be illegal.

158.   Verra's practices of tying different electronic toll services together for rental cars in different, unrelated regional markets are *per se* illegal under the Sherman and Clayton Antitrust Acts.

159.   As a result of the harm caused by Defendants to competition in the relevant markets and submarkets, PlusPass has been injured in its business and property, including lost profits and lost enterprise value among other damages. PlusPass is also entitled to injunctive relief to restore competition in the relevant market.

## IX.   **THIRD CAUSE OF ACTION – SHERMAN ACT SECTION 2**

160.   Verra, Gores, Platinum, Tom Gores, and Alex Gores, combined and conspired to create monopolies in the relevant markets and sub-markets for processing tolls for rental cars by working together and executing contracts to combine the operations of ATS and HTA into a single enterprise, and form the "new" Verra, to monopolize and maintain its monopoly in the relevant markets and sub-markets for administration of electronic tolls for rental cars.

161.   Verra, Gores, Platinum, ATS Processing, Tom Gores, and Alex Gores combined and conspired to illegally maintain that monopoly through exclusive dealing and tying contracts, which Verra has said are mostly "long-term", and regardless of term are illegal.

162.   Their acts and exclusive dealing and tying contracts have resulted in Verra having and maintaining over 95% or more of the relevant markets and sub-markets for processing tolls for rental cars, have raised barriers to entry that are

insurmountable, and exclude PlusPass and others from competing from processing electronic tolls for rental car companies in the relevant markets and sub-markets.

163.   As a result of the harm caused by Defendants to the relevant markets and sub-markets, PlusPass has been injured in its business and property, including lost profits and lost enterprise value among other damages.  PlusPass is also entitled to injunctive relief to restore competition in the relevant markets and sub-markets.

## X.   CONCLUSION AND JURY DEMAND

164.   For the foregoing reasons, PlusPass seeks an order finding that the Defendants are jointly and severally liable for damages, and that PlusPass receive the following relief:

a.   injunctive relief to restore competition in the relevant markets voiding the exclusivity provisions in the exclusive dealing contracts and/or arrangements, and prohibiting same in the future;

b.   injunctive relief to restore competition in the relevant markets by voiding Verra's tying contracts that tie services for unrelated relevant markets together;

c.   divestiture by Verra of HTA;

d.   PlusPass' lost profits;

e.   PlusPass' lost enterprise value;

f.   PlusPass' injuries from increased development and testing costs, increased cost of capital, inability or impairment of its capacity to borrow or raise funds;

g.   damages should be trebled;

h.   attorneys' fees awarded;

i.   pre- and post-judgment interest; and

j.   such other and further relief to which PlusPass may show itself entitled, including but not limited to in this case.

165.   PlusPass demands a trial by jury on all facts and causes of action to which it is entitled.

COMPLAINT

Respectfully Submitted,

Dated: November 2, 2020           FISH & RICHARDSON P.C.

                                  By:   */s/  Joanna M. Fuller*
                                        Joanna M. Fuller (SBN 266406)
                                        jfuller@fr.com
                                        FISH & RICHARDSON P.C.
                                        633 W. 5th Street, 26th Floor
                                        Los Angeles, CA 90071
                                        Tel:  213-533-4240
                                        Fax:  858-678-5099

                                        Danielle J. Healey (*pro hac vice pending*)
                                        healey@fr.com
                                        FISH & RICHARDSON P.C.
                                        1221 McKinney Street, Suite 2800
                                        Houston, TX 77010
                                        Tel: 713-654-5300
                                        Fax: 713-652-0109

                                        Ahmed J. Davis (*pro hac vice pending*)
                                        adavis@fr.com
                                        FISH & RICHARDSON P.C.
                                        1000 Maine Avenue, SW, Suite 1000
                                        Washington, DC 20024
                                        Tel:  202-783-5070
                                        Fax:  202-783-2331

                                        Ethan Gibson (*pro hac vice pending*)
                                        egibson@fulkersonlotz.com
                                        Nick Brown (*pro hac vice pending*)
                                        nbrown@fulkersonlotz.com
                                        FULKERSON LOTZ LLP
                                        4511 Yoakum Blvd., Suite 200
                                        Houston, TX 77006
                                        Tel: 713-654-5845
                                        Fax: 713-654-5801

                                  *Attorneys for Plaintiff*, PLUSPASS, INC.