Joanna M. Fuller (SBN 266406)
jfuller@fr.com
FISH & RICHARDSON PC
633 West Fifth Street, 26th Floor
Los Angeles, CA 90071
Tel: 213-533-4240
Fax: 858-678-5099

Attorneys for Plaintiff, PLUSPASS, INC.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
LOS ANGELES DIVISION

PLUSPASS, INC.,

                          Plaintiff,

v.

VERRA MOBILITY CORP.,
PLATINUM EQUITY LLC, THE
GORES GROUP LLC, and ATS
PROCESSING SERVICES, INC.,

                          Defendants.

Case No. 2:20-cv-10078-AS

**FIRST AMENDED COMPLAINT**

JURY TRIAL DEMANDED

**PLAINTIFF PLUSPASS, INC.'S FIRST AMENDED COMPLAINT**

PlusPass, Inc. ("PlusPass"), Plaintiff, complains of Defendants Verra Mobility Corporation ("Verra"), Platinum Equity LLC ("Platinum"), The Gores Group LLC ("Gores") and ATS Processing Services, Inc. ("ATS Processing"), for violations of federal antitrust laws, as set forth below:

I.    **THE NATURE OF THE CASE**

1.    PlusPass sues Defendants for violations of Sections 4 and 7 of the Clayton Antitrust Act and Sections 1 and 2 of the Sherman Antitrust Act for illegally

creating and maintaining monopolies in the relevant markets and sub-markets in the United States for third-party administration of electronic tolls for rental cars. The monopolies were illegally created by merging the only two major national competitors in this business, Highway Toll Administration, LLC ("HTA") and American Traffic Solutions, Inc., ("ATS"), into a single enterprise, Verra. As a result of this combination, Verra had over ninety-five percent of rental cars under contract for electronic toll services. Verra's monopolies are illegally maintained by long-term exclusive dealing contracts between Verra and its rental car company clients, which are also tying arrangements. The illegal monopolization of the relevant markets, illegal maintenance of those monopolies, and illegal contracts, have harmed competition in the relevant markets. PlusPass has been injured in its business and property by the harm to competition in the relevant markets.

2.     These acts and resulting harm to competition in the relevant markets, arise from a combination or conspiracy among Alec Gores, The Gores Group LLC ("Gores"), Gores Sponsor II, LLC, Gores Holdings II, Inc., Platinum, PE Greenlight Holdings LLC, and Greenlight Holdings II Corporation, to consolidate the businesses of HTA and ATS into a single company whose value was based on illegal monopolies and illegal contracts. Their plan was then to take this consolidated company public by combining it with Gores Holdings II, creating securities that could be traded on NASDAQ. Their plan was to then monetize the company's monopoly power through its publically traded securities.

3.     PlusPass has standing to pursue claims under the Antitrust laws and is entitled to damages and injunctive relief, including divestiture of HTA by Verra, to remedy these wrongs. *See* 15 U.S.C. §§ 1, 2, 15(a), 18, 26.

## II.   **PARTIES**

4.     Plaintiff PlusPass is a corporation based in Austin, Texas.

5.      Gores is an investment firm with its principal place of business at 9800 Wilshire Boulevard, Beverly Hills, California 90212.  Gores can be served with process by serving its registered agent, CSC – Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150, and Sacramento, California 95833.

6.      Platinum is an investment firm with its principal office at 360 North Crescent Drive, Beverly Hills, California 90210.  Platinum can be served with process by serving its registered agent, C T Corporation System, 818 West Seventh Street, Suite 930, Los Angeles, California 90017.

7.      Verra is a Delaware corporation with its principal place of business at 1150 North Alma School Road, Mesa, Arizona 85201.  Verra can be served with process by serving The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

8.      ATS Processing is a Delaware corporation, which is a subsidiary of Verra, with its principal place of business at 1150 North Alma School Road, Mesa, Arizona 85201.  ATS Processing can be served with process by serving The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

## III.   SUBJECT MATTER JURISDICTION

9.      This Court has jurisdiction under Section 1331 of Title 28 because PlusPass' claims arise under the federal antitrust laws.

## IV.   PERSONAL JURISDICTION AND VENUE

10.     This Court has specific personal jurisdiction over each Defendant because this lawsuit arises out of their contacts with California and the exercise of personal jurisdiction over each of them is consistent with due process and the California long-arm statute.  FED. R. CIV. P. 4, CAL. CIV. PROC. CODE § 410.10.  The negotiations, decisions, and contracts that resulted in the merger of HTA and ATS, the creation of the merged Verra, and use of illegal exclusive dealing and tying

contracts occurred in whole or in part in Los Angeles, California, because Platinum and Gores and their principals are based in and work from Beverly Hills.  Further, Verra and ATS Processing service electronic tolls for major car rental facilities and vehicles in California on the FasTrak electronic toll roads and the Golden Gate Bridge, among other places.   Moreover, they provide services to rental car companies at facilities at or near airports in Burbank, Los Angeles, Oakland, Ontario, Orange County, Sacramento, San Diego, San Francisco and San Jose, among others.

11.    This Court has general personal jurisdiction over Gores and Platinum because their businesses are based in Beverly Hills, California.

12.    Alternatively, this Court has specific personal jurisdiction over all Defendants because they are corporations and do business here.  15 U.S.C. § 22.

13.    Venue is proper in this district over all Defendants under Title 28, United States Code, Section 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in this district through negotiations involving Platinum and Gores in Beverly Hills, California, and electronic toll services on FasTrak electronic toll roads in this district, and also  services for cars rented from facilities at the Burbank, Los Angeles, Ontario and Orange County airports, among others.

14.    Venue is also proper as to all of the Defendants under Title 15, United States Code, Section 22, because each of them may be found or transacts business here and each is a corporation.

## V.   FACTS

### A.    The Relevant Markets and Sub-Markets

15.    Twenty states and Puerto Rico have significant networks of roads, bridges, and/or tunnels with electronic tolls (collectively referred to as "toll roads").

16.     Many of these toll roads (or sections of them) only permit for payment by electronic means.  Toll roads that only have electronic toll collection are known as All Electronic Toll roads ("AET").

17.     There is not a national electronic toll system.

18.     Most autonomous toll authorities have inter-local agreements with regional and/or state-wide agencies to handle electronic tolls in addition to their own individual systems for electronic tolling.

19.     The regional, state and local tolling systems and toll roads on Exhibit A[1] are all served by Verra.  They constitute the commercially viable relevant markets and sub-markets for third-party administration of electronic tolls for rental cars that are located in the United States.

20.     As shown on Exhibit A, the regional and state systems are not generally compatible or interoperable with other systems that operate outside of their state or area of the country.

21.     These relevant markets and submarkets are defined by the system requirements and geographic reach of their toll roads.

22.     Toll roads in the different states are part of the networks of roads that make possible trucking, shipping, and vehicle traffic throughout the United States and with foreign countries (Canada and Mexico), as well as transportation to and from ports and airports within the United States.  The relevant markets and sub-markets are parts of interstate commerce and international commerce in and for the United States.

23.     Rental car companies and renters have a need to manage electronic tolls for rental cars because electronic toll systems bill the account-holder for the vehicle for the toll (or registered owner when there is no account).   However, in the rental car relationship, it is the driver—the renter—that incurs the toll, and the renter is

---

[1] Exhibit A is taken from Verra's PlatePass website, https://www.platepass.com/locations/.

FIRST AMENDED COMPLAINT

obligated to pay it. Toll authorities have a lag-time between when the renter incurs the toll and when the toll authority bills for it, sometimes as long as two weeks or more. This lag time generally means the rental car company typically is not billed for electronic tolls incurred by renters until after they return their rental cars. Most major and national rental car companies deal with this situation by using a third-party administrator to provide services for payment, management, and collection of electronic tolls from their renters.

24.    A third-party administrator ("administrator") steps between the rental car company and/or the renter and the toll authority. The administrator has fleet contracts with toll authorities. The administrator adds rental vehicles to its fleets with the toll authorities. The toll authorities charge tolls as incurred by fleet vehicles to their administrators, who pay the tolls, and then charge the tolls and their fees for services to the rental car company or the renter.   Verra and PlusPass both act as third-party administrators for electronic tolls for rental cars in relevant markets and sub-markets in the United States.

25.    Third-party administration of rental car tolls is a "back office" operation: essentially, it is a specialized data processing service. The costs in equipment and personnel to enter the market are relatively low compared to many other businesses because an administrator only needs people, software, and computer systems for data processing and interfacing with rental car companies and/or renters, and toll authorities. If a toll authority requires toll tags (RFID devices), or the administrator or rental car company or renter want to use toll tags, the administrator can use contractors or rely on the rental car company or the renter to deploy tags. Historically, most systems use license plate reader technology for rental cars rather than toll tags.[2]

_____

[2] https://www.hertz.com/rentacar/productservice/index.jsp?targetPage=USplatepass.jsp&leftNavUserSelection=globNav_3_5_1&selectedRegion=United%20States (last accessed November 1, 2020).

26.     For example, Texas has several different local toll authorities, but their electronic toll collection systems must be interoperable with each other under state law, so that an account on any one of the systems can be used on all toll collection systems within the state—such as TxTag, TOLLTAG, EZ-Tag, and others. Accordingly, Texas is a relevant market for services of electronic tolls for rental cars, and each independent toll authority in Texas is a sub-market for these services. The Texas systems also are interoperable with smaller electronic toll systems in Oklahoma and Kansas.  These smaller systems are part of, and also sub-markets within, the Texas relevant market.

27.     By way of another example, California is home to the Transportation Corridor Agency's "FasTrak" system, which administers tolling functions for toll authorities in California under inter-local agreements.  FasTrak is not interoperable with any electronic toll systems outside of California.  The FasTrak system makes California a relevant market and the constituent local toll authorities that have agreements with it are sub-markets.

28.     Illinois has its I-Pass brand system, which is interoperable with the EZ Pass brand system.  There is a relevant market for services for tolls for rental cars in Illinois, with the I-Pass system as a sub-market within it.

29.     Indiana, most Mid-Atlantic and Northeastern States, Ohio, and Michigan participate in an interoperable regional toll system branded EZ Pass. There is a relevant market for services for tolls for rental cars in the region served by the EZ Pass system.  The toll roads in each constituent toll authority in the EZ Pass system are sub-markets for these services.

30.     Several other states have their own systems, some of which are interoperable with other regional or state systems and constitute relevant markets and sub-markets for these services:

a.     Florida has multiple toll systems, which are interoperable, either in whole or in part, with each other, and the toll system in Georgia.

b.    Georgia has a toll system that has overlapping interoperability, in whole or in part, with systems in Florida and North Carolina.

c.    North Carolina is interoperable, in whole or in part, with several branded systems that serve nearby states.

d.    Colorado, Puerto Rico, and Washington State, each have their own systems; none of these systems is interoperable with systems outside of their respective jurisdictions.  Each of these jurisdictions is a relevant market for third-party administration services for electronic tolls for rental cars, and their constituent local toll authorities are sub-markets for these services within each relevant market.

e.    Each of the above relevant markets and their constituent sub-markets are defined by the different system requirements and geographic reach of their toll roads.  See Exhibit A.

**B.    Verra Has Illegal Monopolies Maintained by Illegal Contracts**

31.    The combination of ATS and HTA created a single company, Verra, with a monopoly in each of these relevant markets and sub-markets because it has long-term exclusive contracts with nearly all major, national, and/or regional rental car companies, which cover about ninety-five percent or more of the rental cars in these markets.

32.    ATS and HTA used long-term exclusive dealing contracts with their rental car company clients.  Verra now controls these long-term exclusive dealing contracts with the rental car companies. According to 2018 SEC filings prior to the combination of Verra Mobility LLC and Gores Holdings II, most of these contracts expire in 2024 and one in 2021.

33.    Post-merger, Verra having has exclusive dealing contracts covering over ninety-five percent of the rental cars in the United States, giving the combined company control of the markets and sub-markets for third-party administration of electronic tolls for rental cars.  Verra's long-term exclusive dealing contracts are also tying contracts because they tie different services in different, unrelated relevant

markets to each other; by way of examples, Washington State and Texas, or Texas and Puerto Rico.  These contracts illegally and unfairly sustain Verra's monopoly, and also are unreasonable restraints on trade in each of these relevant markets and sub-markets.  The tying arrangements are *per se* illegal because they tie together different services in different markets; alternatively, these tying contracts are unreasonable restraints on trade in the relevant markets and sub-markets.

**C.    Development of Third-Party Toll Administration for Rental Cars**

34.    HTA began offering services to administer electronic tolls for rental cars in 2002.

35.    ATS began selling these services in 2004.

36.    ATS began a service for electronic tolls for rental cars called "PlatePass."  Hertz and its Dollar and Thrifty brands adopted PlatePass.

37.    ATS also used PlatePass with its regional clients, including EZ Rent, Advantage, Fox, and Firefly.

38.    HTA developed two different programs with each of its two big clients: 1) the "eToll" program Avis uses for its brands (Avis, Budget, and Payless); and 2) "TollPass" for Enterprise Car Rental brands (Enterprise, Alamo, and National). HTA also sold services to car dealers for the car rental and loaner car functions.

39.    The Enterprise brands make up about one-half of the rental cars in the United States, with Hertz and Avis Groups having most of the remaining rental cars.

40.    By about 2013, the service fees charged to renters by rental car companies for use of electronic toll roads were as high as about $25.00 per day, **charged for each day** of a rental, if an electronic toll was **incurred on any day** of the rental.  In addition, tolls were billed to renters at the highest posted rate not the rate paid by ATS or HTA.

41.    By 2013, these charges prompted numerous complaints and consumer lawsuits by renters.

42.    PlusPass was founded by electronic tolling industry veterans to develop and deploy the PlusPass App, formerly known as PToll, for servicing electronic tolls.[3]  PlusPass offered an inexpensive way for renters to cope with electronic tolls in lieu of costly rental car company services and for rental car companies to offer their customers an easy to use, economical electronic toll service.  PToll is used to out-source electronic tolling services by connecting the toll information for the vehicle to PlusPass for registration on its fleet accounts with toll authorities, on a short term or long term basis.

43.    PlusPass alpha tested PToll in 2013, followed by beta testing through early 2015.  PlusPass made PToll generally available in 2015.

44.    The PlusPass App is downloaded from Apple's App Store or Google Play.  The user signs up for an account with one of the compatible payment mechanisms (*e.g.*, credit card).  When deployed, the user opens the App, takes a photo of the car's license plate through the App, PlusPass' server reads the plate number, and adds the car to PlusPass' fleet contracts with the relevant toll authorities.  Toll authorities bill PlusPass for the tolls for vehicles on its fleet contracts, and PlusPass charges its customers' accounts for the tolls and service fees per toll.  The PlusPass App-based system's retail cost is 15% of the tolls (in the amounts actually incurred) as a service fee, and there is no upfront purchase or separate periodic fee (*e.g.*, monthly membership).  A portion of the 15% fee is to cover credit card and other payment processing fees.

45.    After its App was in the markets, PlusPass next developed a prepaid toll tag which, like a prepaid calling card, allows a user to buy the prepaid tag on-line or from select HEB, Kroger, and CVS stores. Consumers purchase the prepaid card and subsequent refills by cash, credit, or debit card at a point of sale or on-line

---

[3] PlusPass has an issued patent on inventions related to App-based electronic toll administration, U.S. Patent 9,691,061B2, and other applications for patents pending in the U.S. Patent & Trademark Office.

by credit card or electronic payment. The tag can be "refilled" in the same ways. After the initial purchase, PlusPass does not require a minimum balance. Consumers have purchased this product to use with rental cars to avoid the expense of Verra's rental car company programs.

46.     PlusPass' App and prepaid tag are two ways to interface with the toll authorities.  PlusPass can also use a direct billing arrangement with a customer for electronic toll management, which bypasses the App and the toll tag.

47.     All of the App, prepaid tag, and direct contract means function the same way: they are interfaces between toll systems on the one-side, and vehicle owners or users on the other side, with PlusPass serving as the administrator for electronic tolls between them.  PlusPass uses the same fleet contracts for all of these different interfaces.

48.     Verra's and PlusPass' systems work in the same ways: 1) the toll authority's readers (e.g., RFID or license plate readers at toll points) record tolls according to the license plate information or the toll tag; 2) they charge the tolls to the matching fleet contracts; and 3) then the fleet contract holder collects its toll charges and fees for this service from whoever is responsible for the toll, based on information provided by the user and/or vehicle owner.

49.     The regional, state, and local toll systems generally are agnostic as to the choice of an authorized interface with the toll readers, or how PlusPass or Verra interface with their customers.  PlusPass and Verra interface with the toll authority's computer systems according to the interface, systems and requirements set by the toll authority.

50.     Each of the toll authority systems typically have different interface and system requirements from each other.

51.     After PToll's general release, the App quickly began to gain traction with consumers.

52.     Surprisingly, after general release, there were unexpected, infrequent issues regarding PlusPass' license plate registrations when used with rental cars covered by ATS's or HTA's contracts.  PlusPass had not experienced these errors in the more than one year of testing prior to PToll's general release.  Rather, these problems only occurred after PToll began competing with HTA and ATS, and only on cars covered by their contracts.

53.     PlusPass worked to eliminate any errors in its App, including the issues with cars under contract to ATS and HTA.  Upon information and belief, recently Verra has taken measures to make it more difficult to implement the PlusPass App, including use of fictitious Hawaiian license plates in toll road accounts (thereby breaking the link between the vehicle's registration information and the toll authorities' fleet contract database).  While PlusPass had concerns in the past that ATS or HTA or both were undermining aspects of PlusPass' App, the evidence shows Verra has used fictitious Hawaiian license plate registrations, and there is no legitimate reason for Verra to fictitious Hawaiian license plate registrations.   The App has worked well with rental cars not under contract to HTA, ATS or Verra, such as local car rental and dealer clients.  Moreover, the App is not needed for tag based tolling or direct contracts. PlusPass' pre-paid tags and direct contracts are not vulnerable to this type of outside interference.

54.     After PlusPass' PToll experienced these infrequent issues in competition with HTA and ATS, PlusPass became concerned that even a small error rate would impair the credibility of its App as well as its company's reputation. PlusPass warned renters that PToll generally was not suitable for rental cars.  Since HTA and ATS, and later Verra, had over 95 percent of the rental cars in the United States under contract, this warning was directed at their rental car customers' vehicles.

55.   PlusPass, however, remained on the market as a third-party administrator of electronic tolls targeting vehicle owners and for its own rental car company and car dealer customers.

56.   PlusPass' prepaid toll tag program has been a success.  The Harris County Toll Road Authority's website lists this tag as an alternative to a regular account.  The prepaid tag is currently a solution for rental car customers wherever EZ tag is accepted (that is, the Texas market).

57.   Unlike the PToll App, the prepaid cash tag did not experience problems when used properly with rental cars under contract to Verra.

58.   PlusPass also has marketed itself to fleet owners for direct contracts, which do not require use of the App or a prepaid tag.

59.   PlusPass has been solicited to bid on data processing services on the toll authority side of the business by the toll authority in Georgia.

60.   Sometime in or around 2016, following years of negative press and consumer lawsuits, most rental car companies cut their daily rates, and also limited daily fees only to the days when tolls were incurred by renters.  Moreover, several rental companies capped fees at about $20.00 per rental (or per month if there were multiple rentals in a month).

61.   This change in pricing and price structure caused fast, steep reductions in revenues for HTA and ATS.

62.   Since HTA and ATS were both private companies, they did not make their financial information public, and their revenues and profit margins on their services for managing electronic tolls for rental car companies are not known to PlusPass.

63.   The rates of returns by HTA and ATS when they were charging up to $25 dollars per day, for every rental day, as opposed to $5.99 in fees, and only on

days a toll was incurred, showed that for many years HTA and ATS must have enjoyed extraordinary margins far in excess of what Verra enjoys today.

64.    ATS had begun as a company that provided products and services for traffic management and enforcement (including "red light cameras"), and it had business independent of servicing electronic tolls for rental cars.

65.    HTA's business, however, was exclusively or almost exclusively administration of electronic tolls for rental cars.  After pricing changes in 2016-2017, HTA's would have experienced a steep decline in its revenues and margins, with no other substantial businesses to cushion its fall.

D.    **The Monopoly Rises: Monopolize, Monetize, Cash Out**
1.    **The "SPAC": Gores, Gores Sponsor II LLC and the Gores Holdings II, Inc.**

66.    Gores has a business model where it organizes sponsor companies and special purpose acquisition companies ("SPACs"), raises money from investors to purchase shares in SPACs, and then guide the SPACs investments in "public ready companies."  A SPAC is a company formed by a sponsor and then taken public with no business plan other than to purchase another business.  A SPAC might also be called a "blank check" company, in that shareholders who invest in a SPAC are relying on the SPAC to find and make money on a future deal that is not under contract or otherwise confirmed at the time of their investment.

67.    By merger with the SPAC, the purchased business becomes a public company, with much less expense, delay and scrutiny than doing its own initial public offering under the securities laws.  The SPAC's shareholders and sponsor profit from the increase in value of the enterprise from the merger, and by increase of the value of their shares in the enterprise.  They also benefit from the public market created for their shares of the acquired business.  The original investors in the sponsor for the SPAC can see extremely high returns on their investments.  This allows the sponsors and investors to reap profits from liquidating their shares or

otherwise leveraging them.   When Gores raises investor money for purchase of shares in SPACs, once a target is acquired, the resulting companies generally are referred to by Gores as Gores' portfolio companies.[4]

68.    Gores together with, by and through its Chairman Alec Gores, Senior Managing Director Mark Stone, Finance and Tax Director Andrew McBride, among others, organized Gores Sponsor II LLC, which in turn organized a SPAC called Gores Holdings II, Inc.  Gores is an affiliate of Gores Sponsor II, LLC.  Alec Gores was a director and the Chairman of Gores Sponsor II, LLC and Gores Holdings II, Inc.  Andrew McBride was a director and the Chief Financial Officer and Secretary of Gores Sponsor II, LLC.  Mark Stone was a director and officer of Gores Sponsor II, LLC and Gores Holdings II, Inc.

### 2.    Creating a Monopolist to Take Public

69.    In April 2017, after rates for toll services paid by renters began to fall, Platinum purchased a controlling interest in ATS (effective June 2017).

70.    Platinum was founded by Alec Gores' brother, Tom Gores. Platinum and Gores had done deals together in the past, as had brothers Alec and Tom Gores.

71.    No later than early February 2018, Gores, Alec Gores, Gores Sponsor II, LLC, Gores Holdings II, and Platinum had discussed and set in motion the plan to monopolize the markets and sub-markets for third party administration of electronic tolls by combining ATS and HTA, and then to monetize and capitalize on the monopoly value of the combined companies by merger with Gores Holdings II, Inc. (a public company).

72.    Platinum would first acquire HTA and combine it with ATS.   The monopoly would then be monetized by combining the merged company with the

---

[4] Information describing The Gores Group LLC's business model, Gores Holdings II, Inc., Verra, Alec Gores, Mark Stone, and Andrew McBride can be found on its website, www.gores.com, including https://www.gores.com/portfolio/.  (Last visited November 14, 2020).

publically-traded Gores Holdings II.  This would allow for sale of shares in the public markets to capitalize on the monopoly value of the combined companies. Alec Gores, Mark Stone, Gores and Platinum could then implement plans to profitably sell and/or leverage shares in Verra.

73.     Accordingly, in March 2018, Platinum (through its Greenlight subsidiaries) purchased HTA.  In early June 2018, ATS was rebranded as Verra Mobility LLC.

74.     In late June 2018, the merger agreement was executed to combine Verra Mobility LLC with Gores Holdings II, Inc.

75.     The merger closed on October 17, 2018, with the new combined entity called Verra Mobility Corporation ("Verra"), trading publically on the NASDAQ stock exchange.

76.     Gores organized its affiliate Gores Sponsor II, LLC, which sponsored the Gores Holding II SPAC.  Gores raised over $400 million in investor funds for Gores Holdings II's public securities.  Gores promoted the combination of Gores Holdings II and Verra Mobility LLC to the shareholders of Gores Holdings II.  Gores lists Verra on its website as one of its portfolio companies.[5]

77.     Verra, Gores, Alec Gores, Platinum and ATS Processing conspired and combined to illegally and unfairly maintain Verra's monopolies by enforcing contracts with the rental car companies to deal exclusively with Verra, tying together different services for different markets.  The long-term contracts with the rental car companies were touted to investors and shareholders by Gores and Alec Gores in promotional materials for the deal and in the proxy statement.

78.     In the summer and early fall of 2018, Gores and Alex Gores promoted the proposed combination to shareholders of Gores Holdings II.

79.     Gores and the officers of Gores Holdings II, Inc. sought regulatory

---

[5] https://www.gores.com/profiles/verra-mobility/

approval of proxy materials from the SEC.

80.     They also worked on notification of the transaction to antitrust regulators under the Hart-Scott-Rodino Act.

81.     During the SEC process, Gores wanted to characterize Verra Mobility LLC (and hence the combined entity) as the "market leader" in administering electronic tolls for rental cars.  The proxy materials show that the SEC had issues throughout various drafts of the materials on what was meant by "market leader" and the back-up materials to support this assertion.  Upon information and belief, there was a tension between characterizing Verra Mobility LLC and/or the combined entity as the market leader and explaining to the antitrust regulators that the combination would not harm competition.  Ultimately, they put the explanation for market leader into the definitions section of the proxy materials and they declined to provide the back-up information to the SEC.

82.     The transaction combining Gores Holding II and Verra Mobility LLC into Verra Mobility Corporation was closed on October 17, 2018.

83.     Verra Mobility Corporation went public on the NASDAQ stock exchange on October 17, 2018.

84.     ATS Processing is a subsidiary of Verra, and was created to, among other things, process data for electronic tolls for rental cars.

85.     The merger of ATS and HTA resulted in consolidation of contracts for administration of electronic tolls covering approximately 2,116,200 rental cars or 95.6% of the rental cars in the United States at the time.[6]

86.     These contracts are barriers to competition that are insurmountable (or nearly so) in the relevant markets and sub-markets.  Moreover, these contracts are

---

[6] These rental cars would have been disproportionately located and operated in states with heavy tourism, convention and business travel, such as Texas, Florida, and Washington, where PlusPass was doing business, and less so in states which do not have heavy visitor traffic, such as Iowa or Nebraska.

either *per se* illegal or, at a minimum, unreasonable restraints on trade. 15 U.S.C. §§ 1, 2. Further, Verra's illegal maintenance of its monopolies through, among other things, its illegal exclusive dealing and tying contracts, have excluded or dramatically limited, PlusPass, its App-based technology, and its prepaid toll tag financial model[7] from the relevant markets and sub-markets – artificially inflating prices for rental car companies and their customers by forcing Verra's much more expensive solution on them.

87. By having rental car companies locked into Verra's costly, long-term exclusive dealing and tying contracts, consumers who rent cars are also harmed because these inflated costs are passed on to them. Verra is enforcing these illegal contracts to lock out the "other vendors" and "new technologies or financial models" that Verra has identified as competitive risks in its most recent annual report.[8] By illegally monopolizing these markets, locking up the rental car companies, and locking PlusPass out of these markets, Defendants have caused PlusPass' business to be harmed, resulting in lost profits and lost enterprise value.

88. Further, Verra, Gores, Platinum and ATS Processing have conspired to create artificially high barriers to market entry to prevent PlusPass from entering these markets and to limit PlusPass' growth in these markets. Verra's contract structure for rental car companies means a new or existing competitor would have to be invested in and doing business in ***every*** relevant market and sub-market in order

---

[7] Verra's Year-End 2019 10-K SEC filing (March 2, 2020) (available at https://ir.verramobility.com/sec-filings/sec-filing/10-k/0001564590-20-008153) at page 8 states: "In our Commercial Services segment, we face competition from both our own customers, as they may choose to invest in their own internal solutions, and *vendors offering or seeking to offer new technologies or financial models*, and we must continue to innovate for our offerings to remain competitive." (Emphasis added.) PlusPass and its PToll App and prepaid toll tags meet this description. PlusPass also is able to use direct contracts with rental car fleet owners as Verra does in its business model.

[8] *See* footnote 1, quoting Verra's Year-End 2019 10-K.

to bid on business for a major or national rental car company in ***any*** relevant market or sub-market.

89.     Verra's contracts also stop rental car companies from engaging with "other vendors" and "new technology or financial models" as a second source of supply or qualifying them in a pilot program.  Ultimately, these contracts harm consumer welfare because eliminating competing vendors, different technologies and/or financial models from the relevant markets and sub-markets, causing rental companies to pay more for administration of electronic tolls than if they were free to bid-out their business or otherwise shop the competition.

90.     Rental car companies push all or part of these higher costs down to consumers.

91.     Verra's contracts are extremely profitable, even during the pandemic. In Spring 2020, the second quarter of the year, many government entities in the United States and Europe restricted gatherings, closed schools, closed indoor dining and entertainment establishments, and many business also closed their facilities. Canada and several European countries banned travel to and from the United States.

92.     This resulted in a tremendous drop in travel, including rental car use within the United States.

93.     Verra's Customer Service Segment revenue fell about forty percent (40%) from $99,497,000 in the first quarter of 2020, to $62,815,000 in the second quarter of 2020.  Verra's cost of sales for the first two quarters of 2020 was $2,232,000.  While Verra's revenue declined for this business segment, it nonetheless remained incredibly profitable in the second quarter.[9]

---

[9] Verra's 2d Quarter 10-Q, pp. 6, 34.

94.    According to Verra's Securities Exchange Commission filings, Verra's contracts with its rental car company clients compensate Verra by "margin sharing."[10]

95.    "Margin sharing" is a means of compensation whereby Verra gets a share of the "margin" generated by service fees and other revenue from renters for the electronic tolling service net of toll charges and certain other expenses.

96.    Although Verra is sometimes referred to by a rental car company as an agent, Verra in several respects looks more like a joint venture partner because it shares profits and losses with its rental car company clients through "margin sharing" on most of its business.  Margin sharing also is more characteristic of a joint venture than a typical arms-length agency arrangement because it necessitates sharing of highly sensitive competitive information that would not typically be shared in a fee for service or commission or percentage of revenue type agency model.  Verra's "margin sharing" results in gross margins for these services that are more than 50 times relevant costs.

97.    Verra's margin sharing arrangements provide it with competitively sensitive information from rental car companies relevant to their pricing.  This information gives Verra unfair advantages in negotiating with rental car companies.  This information also gives Verra leverage in enforcing its contracts because each company knows that Verra can use their information against them to give competitors pricing and other advantages.

_____

[10] "Because the revenue from our agreements with our RAC customers is largely based on a margin share model, any changes to our RAC customers' pricing or pricing model for tolling, such as changing from charging their customers per rental day to per toll usage day, could have a material impact on the revenue we realize under those agreements.  Further, although we have long-term agreements with many of our RAC customers, most provide the customer with a termination right in certain situations, including if we commit an uncured material breach of the agreement."  Verra Year-End 2019 10-K (March 20, 2020) at p. 12.

98.    Verra's margins and revenues show its charges far exceed PlusPass' charges (15% of the face amount of the tolls).

99.    Verra's pricing results in its own margins being ten to twenty times more than typical in the "high-end" of the data processing industry.

100.    Within a few months of the merger, new means of subjecting renters to additional charges for electronic toll services emerged and old ones were revived. One new method for pricing Verra and some of its rental car company customers now use is a fixed-price daily charge—a single fee inclusive of all tolls and service charges, charged for each day of the rental, collected at the start of the rental, analogous to the prepaid gas option.  Another new tool that has been adopted is to require renters to affirmatively opt-in to a service fee for each day of the rental at the time of the rental, and impose a substantial penalty of $15 dollars or more *per toll* if they do not buy the service.  Further, the model of charging for each day of the rental (regardless of the number of tolls) has also been revived post-merger by renting toll tags.  *See, e.g.*, J.T. Gentner, "Dollar Car Rental Charged Me $59.99 For a Single $1.75 Toll — Here's How To Avoid The Same Fate" (July 19, 2019 post), The Points Guy (website), last accessed November 1, 2020.[11]  In addition, Verra and at least some of its rental car company clients have removed or substantially raised the cap on service fees incurred during a rental or a month.[12]

101.    The flat fee pricing mechanism illustrates that each regional, state and local toll authority is its own relevant market or sub-market because the flat fee depends on the system where the service will likely be used; that is,  the systems that will be accessed by the renter.  For example, Budget's website states: "If you choose e-Toll Unlimited, you agree to pay a flat daily fee of $10.99 - $25.99, depending on

---

[11] https://thepointsguy.com/news/dollar-overcharged-me-for-tolls-tips-avoiding-fees/ (last accessed November 2, 2020).
[12] https://www.hertz.com/rentacar/productservice/index.jsp?targetPage=USplatepass.jsp&leftNavUserSelection=globNav_3_5_1&selectedRegion=United%20States

checkout location, for each day of the rental period, regardless of whether or not you incur any tolls, up to a maximum of $54.95 - $129.95 per week."[13]   In the model where administrative fees are charged to those who do not opt into the service at the time of the rental, the amounts of those fees also vary by market.[14]

102.   Increasingly, the flat fee is the ***only option offered*** in some of the relevant markets and sub-markets, and some brands now exclusively rely on it in all markets (*e.g.*, Dollar).

103.   The revival of past practices and adoption of new practices has harmed consumers. For example, as shown in the "Points Guy" July 19, 2019 post, prepaid fees inclusive of tolls for a one week car rental from Dollar at Logan Airport where the only two tolls to be incurred were in and out of the airport ($1.75 each way), amounted to $87.43.  One consumer reported being charged $60.00 by Dollar for its rental period where it incurred a single $1.75 toll.[15]

104.   If rental car companies or their customers deployed the PlusPass App or had a direct contract with PlusPass, the fees would have cost no more than 15% of the electronic tolls at the license plate rate of $2.05 (the PlusPass App does not use tags).  Using the example of the renter who complained about paying $60.00 for a $1.75 toll though Dollar, PlusPass would have charged $0.31 for administering the toll at the license plate rate of $2.05, for a total of about $2.36.

105.   Since the October 17, 2018 merger existing pricing mechanisms have also been inflated in some instances: for example, Budget increased its daily fee to

---

[13] https://www.budget.com/en/products-services/services/e-toll#:~:text=e%2DToll%20fees%20(Standard),not%20to%20exceed%2030%20days) (last accessed November 1, 2020).

[14] A. Hussain, "The Ultimate Guide to Car Rental Tolls Across the U.S." (updated as of August 20, 2020), https://upgradedpoints.com/car-rental-tolls-in-the-us (last accessed November 1, 2020).

[15] https://thepointsguy.com/news/dollar-overcharged-me-for-tolls-tips-avoiding-fees/ (last accessed November 2, 2020).

$5.99 from $3.99, and the per rental or per month cap, to $29.95 from $19.95; Hertz eliminated its per rental or per month caps.

106.   Verra charges tolls at the highest posted rate regardless of discounts available to it.

107.   Upon information and belief, Verra has negotiated with some or all of the toll authorities with whom it does business, discounts below the face amount of the toll such that Verra is making a profit on each discounted toll since it charges renters the highest posted rate.

108.   Upon information and belief, Verra has negotiated with some or all of the toll authorities over unauthorized use or other tolling violations, and also earns money off of resolution of violation notices.

109.   Accordingly, using the Dollar example again, assuming hypothetically a simple 50/50 profit split,[16] for a margin[17] that is $58.25 ($60.00 – 1.75), then Verra would take $29.12.  If, however, the rental car company had a direct contract with PlusPass, assuming it paid as much as PlusPass' retail rate for App users (15% of the toll), then the rental car company would get $60 minus $2.35, for a total of $57.65.  The rental car company could retain those earnings to help support its overall business in providing rental cars to the public, or otherwise improve its financial performance, or increase dividends, or reduce the fees to its renters, or a combination of things.  Moreover, the rental car company would not have to share any of its internal financial data to compute margins with a vendor that sits as a hub between it and its competitors.

110.   A significant cost for PlusPass is credit card processing fees.  In a direct

---

[16] PlusPass does not know the split in the "margin sharing" so it assumes 50/50 based on a frequent outcome when John Nash's bargaining theory is applied, "The Bargaining Problem," Econometrica Vol. 28, pp. 155-162 (1950).

[17] This hypothetical only uses the charge and the toll in computing margin, Plaintiff does not know what other considerations are included in "margin sharing" under Verra's contracts.

fleet contract with a rental car company, this overhead is eliminated (there would not be credit card processing fees, rather direct payments would be made to PlusPass). Thus, the retail price used in this example is a conservative measure for comparison of the potential costs of a PlusPass direct contract for administration of electronic tolls with Verra's margin sharing contracts.

111.   Verra is imposing monopoly rents far above what pricing would be in competitive markets for third-party administration of electronic tolls for rental cars, which ultimately harms consumer welfare as well as PlusPass.

### E.   PlusPass Competes with Verra in Relevant Markets and Sub-Markets and Is Prepared to Compete in Relevant Markets and Sub-Markets

112.   PlusPass currently provides electronic toll administration services for customers of a car rental company based in Austin and for a dealership in Austin. The local car rental company points its customers to PlusPass as a solution for dealing with electronic tolls in the area.

113.   It has been approached by the toll authority in Georgia to provide back-office operations.

114.   Today, PlusPass offers services through its App in California, Colorado, Florida, Georgia, Illinois, Kansas, Massachusetts, North Carolina, Oklahoma, Texas and Washington State.  The App can be used to deal with electronic tolls for rental cars.

115.   PlusPass' prepaid tag is operable in all systems compatible with the Harris County Toll Road Authority – which is all Texas systems and electronic tolls in Oklahoma and Kansas.  The prepaid tags can be used to deal with electronic tolls for rental cars.

116.   PlusPass can also offer services for direct contracts in any system where it is operable to deal with electronic tolls for rental cars.

117.   Being operable requires the infrastructure (hardware and software resources), as well as authorization by, and fleet contracts with the, toll authorities. Authorization and fleet contracts are manageable hurdles for PlusPass once it has a workable business model for a market, based on its experience with large toll authorities, such as those in Texas.  PlusPass is experienced in tag management, and if it were necessary to use toll tags it could install them through vendors or contractors, as is common in the industry.

118.   PlusPass has met with a national company that is a Verra client, regarding direct fleet contracts.  PlusPass has also marketed its direct contract services to, and dialogued with, another Verra client that is a national rental car company.  PlusPass' toll tags are purchased by renters to avoid excessive service fees: the tag product has been specifically called out as an option on the Harris County Toll Road Authority's webpage (this is a system of toll roads in Houston, Texas, and its suburbs), which connects with the U.S. interstate highway system and is frequently used in travel to and from the airports in Houston.

119.   PlusPass is in the business of servicing electronic tolls for rental cars through its App and its tag.  PlusPass is authorized to engage in this business and has the infrastructure and personnel to do so, for California, Colorado, Florida, Georgia, Illinois, Kansas, Massachusetts, North Carolina, Oklahoma, Texas and Washington State.  PlusPass is a competitor in these relevant markets and sub-markets.

120.   PlusPass is able to enter the markets in other toll authorities and areas but its growth has been stymied by Verra.

121.   Verra maintains its monopoly by long-term exclusive dealing contracts with rental car companies that are also tying contracts.  These contracts prevent Verra's rental car company clients from dealing with PlusPass or any other vendor in any local, state, or regional market or sub-market for services for electronic tolls

for rental cars.  According to Verra's Year-End 2019 10-K (March 20, 2020) these are mainly "long-term" contracts (p. 12).  But even if the contracts are relatively short, because Verra preempts all competition in all of the commercially-viable relevant markets and sub-markets for all regional, state, and local toll authorities, any new entrant or competitor would have to provide services in each relevant market and sub-market to displace Verra, and they would still have a profound negative impact on competition.

122.   Since Verra has each of its rental car company clients' sensitive pricing information as part of its margin sharing arrangements, it has visibility into its clients' competitive decision-making on pricing these services, which gives it an unfair advantage in dealing with its rental car company clients over PlusPass. Moreover, this information gives Verra leverage over its clients since they know Verra can use this information against them with their competitors.

123.   Each toll authority with which Verra interacts requires different specifications and interfaces.

124.   Verra's long-term exclusive dealing contracts tie purchase of different services together for different incompatible systems.

125.   Verra's long-term exclusive dealing and tying contracts with its rental car company clients are unreasonable barriers to competition in regional, state, and local markets and sub-markets.  These contracts tie different services in different markets together and are *per se* illegal.

126.   These contracts are also unreasonable restraints on trade in the relevant markets and sub-markets.  There is insufficient justification for Verra to force a rental car company to award a long-term exclusive dealing contract for servicing tolls in Washington State with one for Texas or Puerto Rico or North Carolina.  The systems in these places are not compatible, have different requirements and specifications, and are geographically remote from one another; indeed, it is

impossible to drive a car between Puerto Rico and any state.  So for example a rental car company should be able to do business with PlusPass in Washington state or Texas, regardless of where it also business with Verra.

127.   Further, since Verra is compensated by "margin sharing," it makes no sense for a rental car company to forego a rate of 15% or less of the toll actually paid through a direct contract with PlusPass, rather than hand over a significant share of its profits on these services to Verra (and also sensitive pricing information).  Given Verra's margins, its monopoly power, and revenues, the "margin share" it extracts from rental car companies appears to be many times the cost of PlusPass.

128.   Nor can the "national contract" be justified on efficiency grounds.  Take, for example again, the tolls charged by Dollar to its Logan Airport renter.  Verra is sharing the "margin" from the electronic toll services with Dollar ($58.25) for the same service where PlusPass would have charged $0.31.

129.   In addition, there is no technical reason why data processing services for every regional system (and several state systems) should be operated by a single vendor since the systems are not interoperable and have different requirements and specifications.

130.   If a rental car company wants to deal with only one service provider then it is free to choose Verra's contracts on the merits of its services and pricing—*but Verra should not be able to foreclose competition by exclusive dealing and tying, extracting monopoly rents from its rental car company clients, and ultimately their renters.*  This causes waste and burden on the economy, as well as harm to consumer welfare and PlusPass through foreclosure of competition.  This is the type of harm that antitrust law is designed to prevent.

131.   At a minimum, rental car companies acting in an economically rational way would explore PlusPass as an option when they might reap potentially millions

FIRST AMENDED COMPLAINT

of dollars of additional profits each year.  The fact that they have not been able to do so, is illustrative of the effects of Verra's illegal monopoly and illegal contracts.

132.   The negotiations PlusPass had with two of Verra's customers show that at least some of the people among its customers are looking for competitive options.

133.   Moreover, Verra's enormous spread of 50 or 60 to 1 further show that it has used its monopoly to generate gross revenues in far excess of norms for data processing (2 - 4 to 1).[18]

134.   When HTA and ATS were competing with each other prior to the March 2018 acquisition of HTA, there remained the possibility that one of these two competitors would be willing to take customer business away from the other if a customer wanted a competing bid for less than all regions covered by Verra.  Post-merger, this is not a possibility, rental car companies are forced to deal with Verra, and PlusPass is shut out of the relevant markets and submarkets.

135.   By "going public" with the monopoly, the co-conspirators could immediately profit from their plan by leveraging and arranging to trade stock in Verra.

136.   The rental car companies are subject to Verra's monopoly power because they do not have any option for these services in any relevant market or sub-market unless they buy all services for all of the relevant markets and sub-markets from Verra.

137.   Further, there is no justification for rental car companies to do business with only one third-party administrator in all relevant markets and sub-markets when the cost of these services would be substantially reduced by using competitive

---

[18] For example, a January 2020 study by Aswath Damodaran, Professor of Finance at the Stern School of Business at New York University, showed that the average percentage of gross margin for businesses in computer services was 24.64%, and for software systems and applications companies 71.37%. http://pages.stern.nyu.edu/~adamodar/New_Home_Page/datafile/margin.html  (last visited October 14, 2020).

bidding for different regions or states (e.g., using the Logan Airport example, from $60.00 to $2.35). This is especially true considering the markets where PlusPass has the longest track record, Texas and Washington State, are remote from other toll systems, and there is not likely significant overlap with other regional, state and local markets and sub-markets.

138.   It is common in many industries to have more than one source of supply so that if there is a failure of a supplier to perform, the purchaser can isolate operational problems.   Further, potentially, overlapping vendors across regions might be a resource in the event of an operations failure by one of them.   A rental car company loses these benefits by being forced to concentrate all of this business in Verra.

139.   Rental car companies do business with multiple vendors when they perceive an advantage in doing so.   For example, many rental car companies purchase and service automobiles from multiple automobile companies.   A recent check of the Avis website showed it rents cars from Chevrolet, Ford, Toyota, Chrysler, and Volkswagen.[19]

140.   It is much more complex to deal with and maintain cars from different manufacturers than to integrate data processing solutions in back office operations.

141.   Moreover, not only must data be processed separately for each toll collection agency or authority, but also separate fleet contracts must be made with each of them.

142.   Verra's exclusive dealing contracts also preclude a rental car company from launching a pilot program or test to qualify PlusPass as a provider. "Qualification", "testing" and/or "pilot programs" are common business practices where a potential buyer evaluates the products or services of new vendors for inclusion in their businesses.   For example, a rental car company could experiment

---

[19] https://www.avis.com/en/reservation#/vehicles (last accessed November 1, 2020).

with the PlusPass App or prepaid cash tag or a direct contract to test PlusPass' services.   So, while PlusPass should be an attractive alternative to rental car companies where it is already doing business, PlusPass has been unable to get even a pilot or test program with a major or national rental car company to prove the value of its service.

### F.   Tying Different Products in Different Relevant Markets

143.   Electronic toll system services for different regional, state, and local toll authorities have different data processing system interfaces, system requirements, specifications, and/or legal requirements.   These services are different products for each toll agency or authority since they are not compatible with each other.

144.   These services are provided in different geographic areas within the United States, which are defined by the geographic reach of the toll roads they serve.

145.   Each of the regional, state, and local toll authorities are different relevant markets or sub-markets.

146.   Verra is tying sales of different services in different markets to each other, which is a *per se* violation of the antitrust laws, or alternatively illegal when analyzed under the rule of reason.

147.   Rental car company pricing of electronic toll services in different markets shows that the markets are in fact separate from one another.   For example, TollPass charges $3.99 per day that its electronic toll service is used, except in locations in the Chicago area where it only offers all-inclusive daily charges.   Avis and Budget state the price for their eToll Unlimited program ranges from $10.99 to $25.99 for all-inclusive service fees and toll charges, for the same benefits, depending on location.

148.   Verra's 10-K states that it has to maintain separate systems for each toll authority it serves because their systems are incompatible with each other, and then Verra adds its own system to integrate the data on a national level.

149.   Verra's own PlatePass website "facts" likewise show that Verra operates in different relevant markets and sub-markets because it advises renters who want to pay their own tolls to "[c]heck with the applicable toll authority to learn all payment options."[20]  In its facts discussing the Golden Gate Bridge, PlatePass describes how its electronic tolls work there and directs consumers to the different resources for paying these tolls directly;[21] the same is true for its facts on tollways in Southern California.

150.   Different incompatible toll systems that are geographically remote from one another should not be tied together in a single contract, nor should buyers be foreclosed by exclusive dealing contracts from dealing with different sellers in different relevant markets.  Verra should not be able to illegally maintain its monopoly by its exclusive dealing, tying and exploiting its access to rental car company margin and pricing information.

## VI.   ANTITRUST INJURY AND STANDING

151.   PlusPass competes with Verra for third-party administration of electronic tolls for rental cars.  It has had some success with local car rental and dealer operations, and renters' use of its prepaid tag product.

152.   PlusPass has tried to sell to a national rental car customer of Verra but has been rebuffed during negotiations due to Verra's exclusive dealing and tying

---

[20] PlatePass, *Renting with Hertz*, https://platepass.com/faq/ (answering the fifth "renter question").

[21] Verra was forced to adopt these practices at the Golden Gate Bridge by a lawsuit filed by the City of San Francisco: **Verra Mobility and Hertz Settle Toll Road Lawsuit**, February 26, 2019, The Newspaper.com, https://www.thenewspaper.com/news/66/6657.asp (last accessed November 2, 2020).

contracts. It was also rebuffed by a national company that manages car dealer rental and loaner cars because the customer required a national platform (to replace Verra's national platform).

153. PlusPass is further handicapped in competition with Verra because the merger of ATS and HTA combined the only two competitors that each served every relevant market and sub-market in the United States where there is demand for these services.[22] With no source besides Verra for servicing electronic tolls for rental cars in some markets, Verra's exclusive dealing practices and tying requirements force major and national rental car companies to do business with Verra and only with Verra. Financing and launching what amounts to a nationwide series of networks without any customer contracts for any of those networks is a nearly insurmountable burden to entry of any relevant market—and should be wholly unnecessary from a technical, business, and economic viewpoint. PlusPass has been excluded from dealing with major and national rental car companies in at least the relevant markets and sub-markets where it does business now, and from others where it was capable of expanding its operations, but for Verra's conduct in distorting competition in the relevant markets and sub-markets. Verra's conduct has caused harm to competition in the relevant markets and sub-markets, and PlusPass is damaged by that harm to the market.

154. Rental car companies have paid monopoly rents to Verra through its margin sharing agreements, and have been forced to share sensitive cost and revenue pricing information with a "hub" that deals with its competitors. Renters have in turn paid excessive fees for services to use electronic tolls. The harm suffered by PlusPass comes from the type of conduct and harm to competition in the relevant markets and sub-markets that the Antitrust laws were designed to prevent and remedy.

---

[22] *See* Exhibit A. This reference does not include very small, local tolls, such as two of the bridges of the Columbia River in Oregon.

155.   PlusPass also is an efficient enforcer and suitable entity to enforce the antitrust laws against Verra.  Verra has few remaining competitors.  PlusPass has contracts to serve rental and loaner car businesses.  Its toll tag is used by renters to avoid high rental company charges.  PlusPass has negotiated with potential buyers of services for electronic tolls for rental cars, and been turned away due to Verra's anticompetitive conduct.   PlusPass' operations show it has the experience and resources to succeed in this business on a level playing field.

156.   Moreover, PlusPass' principals are experts in the technology and business of electronic tolling, each of them is very experienced in this industry, and each frequently speaks on issues to industry groups.  They have the specialized knowledge necessary to challenge Verra's practices in these markets.   Their knowledge would also give them insight into Verra's "margin sharing" in competition in the markets and sub-markets for administering electronic tolls for rental cars.

157.   PlusPass has incentives to enforce the antitrust laws that the rental car companies may not have since they pass the costs of their programs to their rental car customer clients.   Moreover, since Verra has their sensitive competitive information and only Verra can ensure service in all markets without interruption, Verra can punish a rental car company that challenges it (e.g., exploiting its knowledge of the rental car companies' margins to ask for higher tolls).

158.   Further car renters' individual claims are likely small, which minimizes incentive to enforce antitrust laws against Verra.  In addition, many car rental companies have arbitration clauses that prohibit class claims in their rental agreements, which increase the complexity of enforcement for renters.  For renters who in turn are charging part or all of their fees and tolls to their employers or clients, the incentive to enforce the antitrust laws is not pressing.

159.   PlusPass has more incentive, greater expertise, and faces fewer obstacles than rental car companies and their renters in enforcing the antitrust laws against Verra.

160.   PlusPass has been injured as a result of harm to competition in one or more relevant markets and sub-markets.  PlusPass is entitled to its damages resulting from the harm to competition, trebled attorneys' fees and other recoverable costs and expenses, an order that Verra divest itself of HTA, and such other injunctive relief as is necessary to restore competition in the relevant markets.  15 U.S.C. §§ 1, 2, 4, 15, 18, 26.

## VII.   FIRST CAUSE OF ACTION – CLAYTON ACT SECTION 7

161.   Section 7 of the Clayton Act prohibits any person engaged in commerce or in any activity affecting commerce from acquiring, directly or indirectly, the whole or any part of the stock of another corporation engaged in any activity affecting commerce in any section of the country, where the effect of such acquisition may be substantially to lessen competition, or tend to create a monopoly in a relevant market.

162.   Gores, Platinum, Verra, and Alex Gores, have together combined and/or conspired with each other to take control of the relevant markets and submarkets by ATS's takeover of HTA in March 2018, and then monetizing their monopoly by combining Gores Holdings II and Verra Mobility LLC into a publically-traded company.

163.   The effect of the acquisition of HTA by ATS was to substantially lessen competition or tend to create a monopoly, and created a monopoly, in the relevant markets and sub-markets for processing electronic tolls for rental cars.  The combination of Verra Mobility LLC and Gores Holding II into the publically-traded Verra Mobility Corporation gave Verra access to capital that it did not have before

October 18, 2018, and permitted its co-conspirators to monetize and leverage Verra's monopoly power.

164.   The sale and trading of stock on the NASDAQ gave Gores, Platinum, Tom Gores and Alec Gores as well as the principals for ATS and HTA a means to recoup their investments and profit from them.   The value of the stock was maximized by Verra's monopoly.

165.   Verra has about ninety-five percent (95%) of the rental cars in the United States under contract as their exclusive administrator for services for electronic tolls, and is the sole provider of third-party administrator services that operates in every regional and state relevant market, and local sub-market, in the United States.  The merger of HTA and ATS is a *prima facie* violation of Section 7.

166.   The combination of the only two competitors that served major and national rental car companies in every relevant market and sub-market in the United States foreclosed PlusPass from doing business with any of the major and national rental car companies since the rental car company customers no longer had an alternative supplier to negotiate with for services.

167.   As a result of the harm caused to competition in the relevant markets and sub-markets, PlusPass has been injured in its business and property, including lost profits and lost enterprise value of its business, among other damages.  PlusPass is entitled to an order of divestiture of HTA to help restore competition, its damages, trebled, attorneys' fees and such other relief as may be appropriate.

## VIII.  SECOND CAUSE OF ACTION – SHERMAN ACT SECTION 1

168.   Gores, Platinum, Verra, ATS Processing, and Alex Gores combined and/or conspired to enter into and/or enforce contracts that unreasonably restrain trade in the different regional, state markets, and local sub-markets for processing electronic tolls for rental cars.  They have used illegal exclusive dealing and tying contracts to unreasonably restrain trade, and also to perpetuate Verra's illegal

monopolies in the relevant markets and sub-markets.  In Verra's most recent 10-K, it has characterized these as mostly "long-term" contracts.  Even for those that are not "long-term," under the conditions created by Verra short-term contracts would also be illegal.

169.   Verra's practices of tying different electronic toll services together for rental cars in different, unrelated regional markets are *per se* illegal under the Sherman and Clayton Antitrust Acts.

170.   As a result of the harm caused by Defendants to competition in the relevant markets and submarkets, PlusPass has been injured in its business and property, including lost profits and lost enterprise value among other damages.  PlusPass is also entitled to injunctive relief to restore competition in the relevant market.

## IX.    THIRD CAUSE OF ACTION – SHERMAN ACT SECTION 2

171.   Verra, Gores, Platinum, and Alex Gores, combined and conspired to create monopolies in the relevant markets and sub-markets for processing tolls for rental cars by working together and executing contracts to combine the operations of ATS and HTA into a single enterprise, and form the "new" Verra, to monopolize and maintain its monopoly in the relevant markets and sub-markets for administration of electronic tolls for rental cars.

172.   Verra, Gores, Platinum, ATS Processing, and Alex Gores combined and conspired to illegally maintain that monopoly through enforcing exclusive dealing and tying contracts, which Verra has said are mostly "long-term", and regardless of term are illegal.

173.   Their acts and exclusive dealing and tying contracts have resulted in Verra having and maintaining over 95% or more of the relevant markets and sub-markets for processing tolls for rental cars, have raised barriers to entry that are

insurmountable, and exclude PlusPass and others from competing from processing electronic tolls for rental car companies in the relevant markets and sub-markets.

174.   As a result of the harm caused by Defendants to the relevant markets and sub-markets, PlusPass has been injured in its business and property, including lost profits and lost enterprise value among other damages.  PlusPass is also entitled to injunctive relief to restore competition in the relevant markets and sub-markets.

## X.   CONCLUSION AND JURY DEMAND

175.   For the foregoing reasons, PlusPass seeks an order finding that the Defendants are jointly and severally liable for damages, and that PlusPass receive the following relief:

a.   injunctive relief to restore competition in the relevant markets voiding the exclusivity provisions in the exclusive dealing contracts and/or arrangements, and prohibiting same in the future;

b.   injunctive relief to restore competition in the relevant markets by voiding Verra's tying contracts that tie services for unrelated relevant markets together;

c.   divestiture by Verra of HTA;

d.   PlusPass' lost profits;

e.   PlusPass' lost enterprise value;

f.   PlusPass' injuries from increased development and testing costs, increased cost of capital, inability or impairment of its capacity to borrow or raise funds;

g.   damages should be trebled;

h.   attorneys' fees awarded;

i.   pre- and post-judgment interest; and

j.   such other and further relief to which PlusPass may show itself entitled, including but not limited to in this case.

176.   PlusPass demands a trial by jury on all facts and causes of action to which it is entitled.

1

Respectfully Submitted,

2   Dated: November 16, 2020

FISH & RICHARDSON P.C.

3                                                    By:   */s/  Joanna M. Fuller*
4                                                          Joanna M. Fuller (SBN 266406)
                                                           jfuller@fr.com
5                                                          FISH & RICHARDSON P.C.
                                                           633 W. 5th Street, 26th Floor
6                                                          Los Angeles, CA 90071
7                                                          Tel:  213-533-4240
                                                           Fax:  858-678-5099
8

9                                                          Danielle J. Healey (*pro hac vice pending*)
                                                           healey@fr.com
10                                                         FISH & RICHARDSON P.C.
                                                           1221 McKinney Street, Suite 2800
11                                                         Houston, TX 77010
                                                           Tel:  713-654-5300
12                                                         Fax:  713-652-0109
13

14                                                         Ahmed J. Davis (*pro hac vice pending*)
15                                                         adavis@fr.com
                                                           FISH & RICHARDSON P.C.
16                                                         1000 Maine Avenue, SW, Suite 1000
17                                                         Washington, DC 20024
                                                           Tel:  202-783-5070
18                                                         Fax:  202-783-2331
19

20                                                         Ethan Gibson (*pro hac vice pending*)
                                                           egibson@fulkersonlotz.com
21                                                         Nick Brown (*pro hac vice pending*)
                                                           nbrown@fulkersonlotz.com
22                                                         FULKERSON LOTZ LLP
23                                                         4511 Yoakum Blvd., Suite 200
                                                           Houston, TX 77006
24                                                         Tel:  713-654-5845
25                                                         Fax:  713-654-5801

26                                                         *Attorneys for Plaintiff*, PLUSPASS, INC.
27

28

38                          FIRST AMENDED COMPLAINT