**KESSELMAN BRANTLY STOCKINGER LLP**
David W. Kesselman (SBN 203838)
*dkesselman@kbslaw.com*
Trevor V. Stockinger (SBN 226359)
*tstockinger@kbslaw.com*
1230 Rosecrans Avenue, Suite 400
Manhattan Beach, CA 90266
Tel: 310-307-4555 | Fax: 310-307-4570

**GIBSON WUNDER P.C.**
Ethan Gibson (PHV)
*ethan@gibsonwunder.com*
Victoria Mery (PHV)
*vmery@gibsonwunder.com*
4 Houston Center
1221 Lamar St. Ste. 1001
Houston, TX 77010
Tel: 713-897-8008 | Fax: 713-897-8007

**FISH & RICHARDSON P.C.**
Danielle J. Healey (*PHV*)
*healey@fr.com*
1221 McKinney Street, Suite 2800
Houston, TX 77010
Tel: 713-654-5300 | Fax: 713-652-0109

Ahmed J. Davis (*PHV* pending)
*adavis@fr.com*
1000 Maine Avenue, SW, Suite 1000
Washington, DC 20024
Tel: 202-783-5070 | Fax: 202-783-2331

Attorneys for Plaintiff, PLUSPASS, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| PLUSPASS, INC., | Case No. 2:20-cv-10078-SB-SK |
| Plaintiff, | **SECOND AMENDED COMPLAINT** |
| v. | |
| VERRA MOBILITY CORP., | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

Plaintiff PlusPass, Inc. ("PlusPass") brings this federal antitrust action against Defendant Verra Mobility Corporation ("Verra") and, demanding trial by jury, complains and alleges as follows:

## OVERVIEW

1.      This case is about Defendant Verra's anticompetitive scheme to monopolize the market for administrative services of electronic toll payment collection for rental cars. Numerous states have tolls for roads, bridges, and tunnels. Electronic toll systems bill the registered owner of the vehicle or account holder electronically. This system creates a unique challenge for rental car companies because renters incur the toll, but the rental car companies usually do not learn of the toll payment until after the renter returns the car. Third party administrators for electronic toll payment collection solve this problem by paying the toll, and managing the billing and collection of the toll payment from the renter – integrating data from the local tolling authorities and rental car companies to do so.

2.      For years, there were two dominant competitors in the market, Highway Toll Administration, LLC ("HTA") and American Traffic Solutions, Inc. ("ATS"), which serviced rental car companies through older, legacy technology. In 2013, Plaintiff PlusPass, founded by industry veterans, launched an innovative and patented service to modernize the market and allow renters to pay tolls directly from their smartphones at a fraction of the cost. Indeed, while the HTA and ATS systems often cost renters up to $25 per day for the entire rental period, PlusPass charged the renter a mere 15% service fee on the cost of the actual toll – a dramatic savings. PlusPass also developed the capability of servicing tolls for rental car operations directly through its contracts with tolling authorities to provide the same service HTA and ATS provided at much lower cost.  Rental car companies, including Avis, expressed interest in PlusPass' app and services. PlusPass also had agreements with regional rental car companies.

3.     In order to thwart PlusPass and other new entrants, Defendant Verra, through the equity firms that created it, orchestrated the acquisition and merger of HTA and ATS. As a result, the two dominant competitors in the market were consolidated into one entity, which held long-term, exclusionary contracts with rental car companies that covered 95.5% of all rental cars in the nation at the time of the merger. These contracts expressly prohibit rental car companies from using alternative service providers to Verra – or even testing a competitive service. These contracts, thus, foreclose PlusPass from all but 4.5% of the market, depriving it of enough customers to reach necessary economies of scale. Evincing the purpose behind the anticompetitive scheme, documents associated with the acquisition and merger expressly condition the deal on maintenance of these exclusionary agreements, state these agreements are long-term, and note the value of the merger derived from consolidating the contracts to create the "#1 Provider" in the toll market.

4.     The exclusionary contracts foreclosing PlusPass from 95.5 percent of the market were not enough for Verra. When PlusPass attempted technological work-arounds to provide its service directly to customers, Verra used its market power to stymie PlusPass's innovation. For example, Verra fraudulently registered thousands of rental cars to false license plates to break PlusPass' technology, which relied upon license plate reading technology to associate the rental car with the renter.

5.     As a result of Verra's anticompetitive conduct, PlusPass has lost hundreds of millions of dollars in profits and enterprise value while Verra has locked rental car companies and renters into supra-competitive prices and decade-old technology. PlusPass now brings claims under Sherman Act Sections 1 and 2, and Clayton Act Section 7, seeking trebled damages and divestiture of HTA by Verra to restore competition to the market.

## PARTIES

6.      Plaintiff PlusPass is a corporation based in Austin, Texas that does business in California. It has negotiated and entered fleet contracts with the California Transportation Corridor Agency that would give it access to provide third-party administration of electronic toll collection for rental cars in California, but for Verra's bad acts.

7.      Verra is a Delaware corporation with its principal place of business at 1150 North Alma School Road, Mesa, Arizona 85201.  Verra does extensive business in California with rental car companies that rent cars from California locations, and was formed through a series of transactions negotiated and executed in California. Verra can be served with process by serving The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

## SUBJECT MATTER JURISDICTION

8.      This action is instituted under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26) to secure injunctive relief and recover treble damages caused by violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2) and Section 7 of the Clayton Act (15 U.S.C. § 18), as alleged herein. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337.

## PERSONAL JURISDICTION AND VENUE

9.      This Court has general and specific personal jurisdiction over Verra because this lawsuit arises out of contacts with California and the exercise of personal jurisdiction is consistent with due process and the California long-arm statute.  15 U.S.C. § 22; Fed. R. Civ. P. 4; Cal. Civ. Proc. Code § 410.10.  The negotiations, decisions, and contracts that resulted in the merger of HTA and ATS, the creation of Verra, and use of illegal exclusive dealing and tying contracts occurred in whole or in part in Los Angeles County in  California, because Verra's equity firms, Platinum Equity LLC and The Gores Group, and their principals, are

based in and work from Beverly Hills.  Further, Verra maintains exclusive dealing agreements with rental car companies that cover rental cars rented in California. For example, Verra services electronic tolls for major car rental facilities and vehicles in California on FasTrak electronic toll roads and the Golden Gate Bridge, among other places.  As further example, Verra provides services to rental car companies at facilities at or near airports in Burbank, Los Angeles, Oakland, Ontario, Orange County, Sacramento, San Diego, San Francisco and San Jose, among others.

10.    Venue is proper in this district under Title 28, United States Code, Section 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in this district through negotiations involving Platinum and The Gores Group in Beverly Hills, California, and electronic toll services on FasTrak electronic toll roads in this district, and also  services for cars rented from facilities at the Burbank, Los Angeles, Ontario and Orange County airports, among others.

11.    Venue is also proper under Title 15, United States Code, Section 22, because Verra may be found or transacts business here and is a corporation.

**FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**

**A.    MARKET BACKGROUND**

12.    Numerous states have significant toll networks for roads, bridges, and tunnels (collectively "toll roads"). Most of these networks offer or require electronic payment of tolls. However, the United States does not have a single electronic toll road payment collection system that is interoperable on a national basis. Rather, the disparate toll road systems are run by autonomous local toll authorities that have agreements with statewide or regional agencies to handle collection of electronic toll payments and make some of these systems interoperable.

13.    By way of example, electronic payments for California's toll roads are administered by the Transportation Corridor Agency's "FasTrak" system. However, FasTrak is not interoperable with any electronic toll systems outside of California. In contrast to California's single state system, Texas has several different intrastate

electronic toll collection systems, including TxTag, EZ-Tag, and TOLLTAG. Those electronic toll collection systems are made interoperable with each other under state law. As further example, Delaware, the District of Columbia, central Florida, Illinois, Indiana, Kentucky, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, Virginia, and West Virginia participate in an interoperable regional toll system branded EZ Pass that works in all of these places.

14.    Electronic toll systems bill the account holder of the vehicle. If there is no account for a vehicle, the registered owner will be billed for the toll. This system has limitations when used for rental cars. Rental car companies own fleets of cars that are registered in the name of the rental car company. When a renter of a rental car incurs an electronic toll, the rental car company – rather than the renter – is billed as the vehicle owner. The rental car company usually cannot determine that renters incur tolls until after they have returned the car because toll authorities have a lag-time, sometimes longer than two weeks, in billing the tolls. Rental car companies solve this issue by turning to third-party administrators to provide services for payment, management, and collection of electronic tolls from their renters.

15.    The third-party administrator has fleet contracts with regional or state toll authorities that show the administrator as responsible for the tolls for vehicles in the fleet. The administrator registers rental cars to its fleet and pays any tolls to the toll authorities incurred by cars listed on its fleet contracts. The administrator uses software integrated with each rental car company to identify the renter who incurred the toll to either give billing information to the rental car company or bill the renter's credit card itself. Third party administrators may also assist the rental car companies by obtaining and deploying radio-frequency identification ("RFID") devices or toll tags for their fleets of rental cars if the companies choose to use them or were still required by a toll system to use them.

16.     Defendant Verra, and before it HTA and ATS, along with PlusPass, are or were third party administrators of electronic toll payment collections to rental car companies.

17.     HTA began offering administration services for rental cars in 2002. It developed two programs called "eToll" and "TollPass". The "eToll" program was used by the Avis brands, which include Avis, Budget, and Payless. The "TollPass" program was used for Enterprise brands, which include Enterprise, Alamo, and National.

18.     ATS began selling these services in 2004. ATS' service was called "PlatePass." Hertz and its Dollar and Thrifty brands adopted PlatePass. Regional rental car companies, like EZ Rent, Advantage, Fox, and Firefly, also used PlatePass.

19.     HTA and ATS' systems worked in a similar manner. HTA and ATS maintain records of the fleet of cars owned by a given rental company. When a toll was incurred by a car on their fleet, HTA and ATS would use software to cross reference that car's information with the rental car company's information on who was renting the car at the time. HTA and ATS would then either give billing information to the rental car company or use the renters' credit card obtained by the rental car company to bill the renter.

20.     HTA and ATS charged high fees for their services. By about 2013, the service fees charged to renters for use of electronic toll roads were as high as about $25.00 per day. This charge was incurred on a daily basis for the entire period of the rental even if a toll was incurred only one day during the rental. Moreover, tolls were billed to renters at the highest posted rate, not the rate paid by ATS or HTA – which was typically lower as those entities received a fleet discount in many systems. As an example, if a renter rented a car for 5 days and incurred a toll of $1.00 just once during the rental period, the renter would be charged $125 plus the cost of the toll at the highest posted rate. As these charges far exceed not only the costs but any justifiable relationship to reasonable profits, HTA and ATS provided rental car

companies with what was essentially a "kick-back" – in the form of sharing a portion of these fees with them – to maintain this high-cost structure to renters. It also provided "retention payments" based on the percentage or volume of customers who used Verra.

21.     These extraordinarily high charges prompted significant negative press and numerous complaints and consumer lawsuits brought by renters. As a result of these lawsuits, prices began to drop for a period of time, which was facilitated by the fact that rental car companies had two competitive options to choose from when selecting a third-party administrator, ATS and HTA.

## B.     PLUSPASS CHALLENGES ATS AND HTA'S MODEL TO THE BENEFIT OF CONSUMERS

22.     Around this time, PlusPass saw an opportunity to enter the market and challenge the structure of electronic toll payment administration. PlusPass was founded by electronic tolling industry veterans to develop and deploy the PlusPass app, formerly known as PToll, for servicing electronic tolls. PlusPass sought to offer an inexpensive, direct-to-consumer option for renters to cope with electronic tolls and avoid the historically exorbitant fees charged by HTA and ATS through the rental car companies.

23.     PlusPass allowed consumers to download its app to their smartphones and read the license plate of the rental car with their smartphone camera. The rental car would then be temporarily moved for the duration of the rental agreement to PlusPass's fleet for purposes of electronic toll payment. PlusPass would pay the toll to the toll authority and charge the electronic toll fees incurred on the car directly to the renter through the app. In this manner, PlusPass alleviated rental car companies of the administrative burden relating to electronic toll payments in a convenient cost-effective way for the renter.

24.     The PlusPass app had several advantages over the legacy systems that HTA and ATS created. First, the app allowed PToll to directly bill customers on

their credit cards rather than relying upon rental car company records to do so. This automated system was more efficient than the legacy system. Second, PToll functioned by using license reader technology through the smartphone to register the car to PlusPass' fleet. This method of registration is more efficient and lower cost than using toll tags. Further, with the merger of machine learning into open-source license plate reader technology, this technology is becoming the dominant technology in traffic applications. License plate reader technology is automated and does not require employees to place and maintain tags in vehicles by hand.

25.     PlusPass' technology is recognized as innovative. The United States Patent & Trademark Office issued U.S. Patent 9,691,061B2 to PlusPass covering technology embodied in its app.

26.     The PlusPass app was also far less expensive than the services offered by HTA and ATS. PlusPass only charged 15% above the actual toll fee as a service charge. There were no recurring fees or upfront fees.

27.     PlusPass' app was introduced in early 2012 and became available to the public in January 2013.

28.     PlusPass had initial success, starting in Texas and then expanding to other regions and states. Today, its administrative services are authorized by the local electronic toll collection agencies for use in nine states, including California, Colorado, Florida, Georgia, Illinois, Massachusetts, North Carolina, Texas, and Washington State. PlusPass was also approached by the toll authority in Georgia to directly administer their toll collection. Further, in addition to a growing direct demand from individual renters, at least one rental car company in Austin entered an agreement with PlusPass whereby it had renters use PlusPass' app for electronic toll payment administration.

29.     PlusPass had further reason to continue growing as its founders had significant industry and software experience, and PlusPass had invested significant capital. PlusPass' Chief Marketing Officer has over 20-years' experience in the toll

collection industry, is Chair of the Tolling and Customer Management Work Group under the International Bridge Tunnel & Turnpike Association writing White Papers on industry standards, and was named to the Women in Tolling Council in 2020. PlusPass's Chief Technology Officer has 25-years' experience in software development and data integration in the toll collection industry, led a team through the architecture and development of New York City's MTA Bridges and Tunnels E-ZPass Electronic Toll Collection software at a previous company he founded, and has worked on committees of industry organizations to set standards on toll collection. PlusPass had and still maintains offices, employees, easily-scalable technology, and sufficient resources to grow as needed.

## C.   VERRA ILLEGALLY MONOPOLIZES THE MARKET.

30.   Verra obtained monopoly power in the market for the administration of toll payments for rental cars by merging HTA and ATS and, then, used that consolidated power to exclude PlusPass and other competitors through anticompetitive means.

31.   Verra became a monopoly when the two largest competitors in the market, HTA and ATS, merged. One of Verra's equity firms, Platinum Equity LLC, acquired both HTA and ATS, rebranding the combined entity as Verra Mobility LLC. Platinum and The Gores Group then raised hundreds of millions of dollars in capital and merged Verra Mobility LLC with a Special Purpose Acquisition Company ("SPAC"), named Gores Holding II to form Defendant Verra – a publicly-traded company. (A SPAC is a company used solely to raise money from investors as shares in the SPAC to then purchase and take public a "public ready company.")

32.   Verra, thus, consolidated the exclusive contracts ATS and HTA had with rental car companies into a single organization. It now exclusively administers toll payments for 95.5% of all rental cars in the market, amounting to over 2 million cars, reporting that it offers services on 95% of toll roads in the U.S.  By these measures alone, Verra controls over 95 percent of the market and its submarkets.

1
2

**D.    PUBLICLY-FILED DOCUMENTS EVINCE VERRA'S ANTICOMPETITIVE INTENT AND MONOPOLY POWER.**

3      33.    Verra publicly-filed numerous documents with the Security Exchange
4 Commission that evince Verra's anticompetitive intent to monopolize the market
5 through control of exclusive dealing arrangements with rental car companies. For
6 example, presentations to current and potential stockholders, including Deutsche
7 Bank, filed in September and October 2018, state that Verra "boasts a competitive
8 advantage" because of "Contracted and Long Dated Relationships with RAC [Rent-
9 a-Car Companies]." The presentations reiterate that the new single-entity, Verra,
10 was the "#1 Provider of toll management" to rental car companies in North America
11 and speak of its "extensive geographic reach in the U.S." and "superior scale." The
12 presentation boasts that it has "Multiple year contracts with core customers,"
13 including the "three largest" U.S. rental car companies, some of which "do not expire
14 until 2024." It lists as a "highlight:" "Contracted recurring revenue business model,"
15 and notes that about 80% of its revenue is protected by these long-term exclusive
16 dealing arrangements.

17      34.    Indeed, it explains that Verra "Strengthened its competitive position"
18 because it "Consolidated the Market," *i.e.* "Verra Mobility + HTA combined to
19 create the #1 player" in tolling. It states that Verra will continue to "Pursue Accretive
20 Acquisitions" and highlights that its past purchase of HTA was particularly
21 important. It notes its "high-margin revenue growth" obtained by "displacing
22 competitors."

23      35.    Relatedly, the presentations further repeatedly note Verra's "robust
24 margins" and that the merger allowed Verra to increase its margins from 37% in
25 2016 to a projected 60% in 2018. Indeed, Verra seems to have beat those projections
26 in 2020, even during the pandemic. In 2020, Verra's commercial services segment
27 reported $180,856,000 in revenue and an operating profit of $128,351,000. That
28 amounts to an over 70 percent margin on its commercial services. In a competitive

market where Verra was forced to price compete, its marginal revenues would be much closer to marginal costs. This further demonstrates Verra's monopoly power.

### E.   VERRA USES EXCLUSIVE DEALING ARRANGEMENTS TO EXCLUDE PLUSPASS FROM THE MARKET.

36.   After acquiring extraordinary market power through the merger, Defendant Verra abused its monopoly power by engaging in multiple anticompetitive and exclusionary acts to thwart the ability of PlusPass and other competitors to compete against it.

37.   First, as evinced in its own SEC filings, Verra strategically acquired and maintained long-term exclusive dealing contracts covering over 95% of rental cars in the market. These contracts are meant to foreclose rivals, like PlusPass, and deprive them of enough customers to gain economies of scale to compete. According to SEC filings, some of the contracts do not expire until 2024. Moreover, Verra's CEO stated that Verra signed an extension of long-term exclusivity contracts with six "partners" in the fourth quarter of 2020. Further, in 2020, Verra forced a new entity, "Debtor-in-Possession Hertz" (a different entity from "old Hertz," which filed bankruptcy) to assume the "old Hertz"-ATS long-term contracts.

38.   Verra's exclusive dealing contracts not only preclude rental car companies from using any service other than Verra's, they also preclude a rental car company from launching a pilot program or testing to qualify PlusPass as a provider. "Qualification", "testing" and/or "pilot programs" are common business practices where a potential buyer evaluates the products or services of new vendors for inclusion in their businesses. Verra is now enforcing these illegal contracts to foreclose its actual or potential competitors, like PlusPass, from the market.

39.   For example, PlusPass approached Avis to use PlusPass as an alternative to Verra, at a significantly lower cost than Verra charges. This would have provided Avis a competitive advantage as PlusPass' solution is exponentially less expensive than Verra's solution. Avis could have reduced fees to renters for toll

services, or maintained its prior fees but had more revenue for Avis' own business. However, Avis executives with whom PlusPass was communicating cut-off the meeting before it happened based on the exclusive dealing provisions in the Verra-Avis agreement.

40.    By consolidating these anticompetitive agreements into one entity, Defendant Verra has left rental car companies with no other options. Whereas prior to the merger, there were two competitors that could be leveraged one against the other to allow for pilot programs or reduced exclusivity, now rental car companies have no other choice but to bend to Verra's will. Moreover, the contracts, which cover 95.5% of the market, along with Verra's other anticompetitive acts, deprive PlusPass of a minimal necessary customer base to reach economies of scale and national coverage to offer a competitive choice.

41.    Further, as a practical matter, direct marketing to renters is not a viable alternative because of the exclusive dealing agreements and Verra's sabotage of PlusPass's technology. As noted above even testing and pilot programs of competitors to Verra are prohibited under the exclusive dealing arrangements. Rental car companies, thus, cannot even promote PlusPass as an alternative. For example, the information Hertz provides to renters discloses no alternative to the use of Verra except for paying cash or using renters' own toll tags. Cash is not an alternative because today many toll roads do not have a cash pay option but require electronic payment. Toll tags are also not a viable alternative, particularly for tourists or business travelers who only stay for short times and would not go through the trouble of obtaining one or want to post the opening deposit.  Finally, avoiding toll roads is not practical as in many places toll roads are the only direct route for vehicle traffic between points. Moreover, even were Verra able to market to renters directly, Verra has taken steps, described herein, to thwart PlusPass' app.

42.    Verra's exclusive dealing agreements are against rental car companies' self-interest. Competition among rental car companies is intense. Rental car

companies should have an incentive to offer less expensive and more convenient alternatives to Verra in order to take market share from its competitors. PlusPass is such an alternative. PlusPass costs less than Verra, a cost-savings that rental car companies could choose to pass on to customers when they are competing on price against other companies. PlusPass also permits the options of either a traditional fleet contract in the manner Verra uses (at a much lower price) or use of its more sophisticated and convenient technology, which in turn takes advantage of advances in license plate reader technology and permits renters to be billed immediately through the direct payment feature on the app.

43.     Thus, PlusPass would provide rental car companies with a competitive advantage against their rivals.  Yet, rental car companies are unable to make this choice because of Verra's market dominance and the exclusive dealing agreements. Indeed, during bankruptcy proceedings, Debtor-in-Possession Hertz resisted assuming the Verra contract post-bankruptcy for months. Verra's anticompetitive acts thus not only exclude competitors, like PlusPass, but also undermine the competitive process forcing rental car companies to make suboptimal choices and causing consumers to accept supra-competitive prices.

## F.     VERRA USES ADDITIONAL ANTICOMPETITIVE MEANS TO EXCLUDE PLUSPASS FROM THE MARKET.

44.     Verra has engaged in anticompetitive and exclusionary conduct beyond consolidating and enforcing its exclusive dealing agreements with rental car companies. PlusPass' app works by having the renter photograph and read the license plate of the car, and then register it to PlusPass' account for the duration of the rental agreement. Tolling agencies prioritize who should be considered the account holder for a given car if it receives conflicting information. For example, if a car passes through a toll with a tag, the account holder information on that tag will trump fleet registration information. Some tolling authorities have supported PlusPass and other competitors' new technology by implementing a middle-tier of

prioritization between tags and fleet information. If a car were registered through a license plate reader on an app, that information would trump fleet registration, but not toll tag information.

45.     Verra took multiple steps within its fleets to undermine PlusPass' app and the tolling agencies' technical changes. Most egregiously, Verra directly undermined PlusPass' license plate reader technology by fraudulently registering its cars under false license plates. Thus, customers who wished to use PlusPass for rental cars could not because the license plate data associated with the rental car was made inaccurate through the false registrations.

46.     Verra also placed toll tags on cars in its fleets. Thus, the new middle-tier prioritization implemented by government authorities to better enable PlusPass' technology failed. PlusPass sought to work-around this issue by having customers use the toll tag ID itself rather than the license plate to re-register. To undermine this approach, Verra had employees, by hand, obscure the toll tag ID number and then place deceptive stickers that mimicked toll tag ID numbers, but instead were tied to Verra's system so that any attempt to use toll tag borrowing technology would fail.

47.     Moreover, some electronic tolling systems prioritize the most recent registrant as the account holder for toll payment purposes. Registrant information is not usually updated unless there is a new account holder. Nonetheless, upon information and belief, Verra updated the registration information for its fleets far more frequently than necessary. By doing so it purposely undermined PlusPass' technology. If a renter registered a car to PlusPass, that registration would be transferred back to Verra when Verra updated the registration information, undermining PlusPass' customer's decision to use PlusPass. There was no reason for Verra to continually re-register the same cars in its fleet other than to thwart PlusPass and exclude it from the market.

48.     None of these acts can be justified other than as attempts to stifle PlusPass' competitive advantage, undermine customer demand for its app, and

frustrate governmental agencies' attempts to upgrade their software. There is simply no reason to fraudulently register cars under new license plates. That creates more work for Verra as it would have to cross-reference the fraudulent license plate with the real license plate to know what car is rented in its fleet. Likewise, it is highly labor intensive to deploy toll tags, and then place, by hand, deceptive boxes and stickers to obscure the toll tag ID to make it impossible for a PlusPass customer to use toll tag borrowing technology.

49.     Verra has made other decisions that would be irrational unless they were intended to maintain monopoly power. Verra offers a PlusPass copycat app, named Peasy, that allows consumers to pay for tolls like PlusPass' app does. Verra has disabled Peasy's functionality for rental cars. That choice makes no economic sense in a competitive market because Verra should want to increase marginal revenue and profits by competing for renters in the market for administration of tolls on rental cars. Verra's choice to undermine its own technology only makes sense if it intends to maintain its monopoly power by thwarting a competitive threat via a direct-to-consumer distribution channel.

50.     Through each of these acts Defendants have met their intended goal to exclude PlusPass and other competitors from 95.5% of the market, which deprives them of necessary customers to reach economies of scale and compete fully on a national basis.

51.     PayTollo, which was purchased by Sirius, is a competitor in the market that sought to provide consumers an app for electronic toll payment services for rental cars. Verra's anticompetitive behavior, including the anticompetitive long-term exclusive dealing agreements and other bad acts, have foreclosed it from the market. Kapsch, GeoToll, and GoToll are also competitors as they could provide similar services, but, upon information and belief, have been unable to do so because of Verra's anticompetitive behavior.

### G.     VERRA HAS EXERCISED ITS ILLEGAL MONOPOLY POWER BY INCREASING PRICES.

52.     Verra's illegally obtained monopoly power has allowed it to charge supracompetitive prices to rental car companies and consumers because it has foreclosed competitors, like PlusPass, from challenging its dominance and offering a lower-priced alternative. After the merger, Verra changed practices to subject renters to higher prices. For example, the model of charging for each day of the rental (regardless of the number of tolls) has been revived post-merger by renting toll tags. *See, e.g.*, J.T. Gentner, "Dollar Car Rental Charged Me $59.99 For a Single $1.75 Toll — Here's How To Avoid The Same Fate" (July 19, 2019 post), The Points Guy (website), last accessed November 1, 2020.[1]  In addition, Verra and at least some of its rental car company clients have removed or substantially raised the cap on service fees incurred during a rental or a month.[2] As further example, as shown in the "Points Guy" July 19, 2019 post, prepaid fees inclusive of tolls for a one-week car rental at Logan Airport where the only two tolls to be incurred were in and out of the airport ($1.75 each way), amounted to $87.43. One consumer reported being charged $60.00 for its rental period where it incurred a single $1.75 toll.[3]  Further, since the October 17, 2018 merger, Verra's services for a Budget rental car increased from a daily fee of $3.99 to $5.99, and the per rental or per month cap, from $19.95 to $29.95.

53.     Moreover, Verra's contracts provide it *de facto* control over the pricing rental car companies charged consumers. Verra is paid by "margin sharing" with the rental car company, and thus seeks to maintain certain minimum prices to avoid the

---

[1] https://thepointsguy.com/news/dollar-overcharged-me-for-tolls-tips-avoiding-fees/ (last accessed November 2, 2020).
[2] https://www.hertz.com/rentacar/productservice/index.jsp?targetPage=USplatepass.jsp&leftNavUserSelection=globNav_3_5_1&selectedRegion=United%20States
[3] https://thepointsguy.com/news/dollar-overcharged-me-for-tolls-tips-avoiding-fees/ (last accessed November 2, 2020).

rental car company cutting its fees significantly. As a consequence, in many instances, Verra has effective control over the prices that the rental car companies charged through these exclusive dealing agreements. Verra also had customer retention agreements with one or more rental car companies even beyond margin sharing. These "kick-backs" were to encourage the rental car companies to maintain high prices and conform to Verra's exclusive dealing contracts. The percentage of the kick-back received would increase as more rental car customers used the service – thereby further locking rental car companies into continuing to use Verra, and foreclosing competition from PlusPass and others.

## H.   RELEVANT MARKET

54.   The relevant product market is the market for administration of electronic toll payment collection for rental cars. As described above, electronic toll systems charge fees to the account holder or registered owner of the vehicle. In the case of rental cars, this means that the rental car company would be charged for a toll incurred by the renter of the vehicle. Because tolling authorities do not charge the rental car company immediately after the fee is incurred, they would not know if the renter incurred such a fee before the rental car is returned. Administrators of electronic toll payment collection address this issue by paying tolls to the tolling authority and then managing the process of obtaining payment from the renter. Third-party administrators may also assist the rental car companies by obtaining and deploying RFID devices or toll tags for their fleets of rental cars.

55.   This is a separate product market because of its unique characteristics and barriers to entry in the market. Administration of electronic toll payments for rental cars is a market distinct from that for all cars because, while rental car companies are the registered owners of the vehicles, renters are the ones incurring the fees. Other vehicles, where the identity of the owner of the vehicle and the account holder for electronic toll payments is the same, do not present the same technological or implementation issues.

56.    In addition, there are significant barriers to entry, including the cost and difficulty of obtaining agreements with tolling authorities to administer toll collection; the cost and expertise needed to develop software to integrate information from the tolling agencies and the rental car companies; and the cost of developing the hardware, software, and personnel infrastructure needed to provide management of electronic toll payment data among the tolling authorities, the rental car companies, the renters, and the third-party administrator.

57.    The relevant geographic market consists of the twenty-two states, the District of Columbia, and Puerto Rico that have electronic tolls for roads, bridges, or tunnels, or the regional submarkets therein of interoperable electronic toll payment systems. Verra's investor presentations disclosed to the SEC note that it has an "extensive geographic reach in the U.S." because it covers these states.

58.    As described above, electronic toll systems are run by autonomous local toll authorities that have agreements with statewide or regional agencies to handle collection of electronic toll payments and make some of these systems interoperable. The regional submarkets include:

a.    The EZPass system, which includes Delaware, the District of Columbia, central Florida (CFX), Illinois, Indiana, Kentucky, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, Virginia, and West Virginia.

b.    Texas, which has multiple branded systems, including the TxTag, TOLLTAG, and EZ-Tag, that are interoperable with each other.

c.    Florida, Georgia, and North Carolina, which have multiple systems that are interoperable, in whole or in part, with each other, including CFX.

d.    California's "FasTrak" system, which is not interoperable with systems outside its jurisdiction.

e. Colorado, which has its own system, and is not interoperable with systems outside its jurisdiction.

f. Puerto Rico, which has its own system and is an island.

g. Washington State, which has its own system, and is not interoperable with systems outside its jurisdiction.

59.   The geographic market of the twenty-two states, the District of Columbia, and Puerto Rico is properly defined because rental car companies do not allow their cars to drive into Mexico or Canada except from limited locations and subject to extensive additional driving requirements. In addition, the regional submarkets are properly defined because the vast majority of renters drive within a close vicinity of the rental car location, and do not cross state or regional boundaries when driving a rental car. Further, even if renters wanted to cross regional boundaries, many regions compromise states that have toll roads and others that do not. For example, California, which requires the FasTrak system, is bordered by Oregon, Arizona, and Nevada, none of which have toll roads (except for one bridge in Oregon). New Mexico (which borders Arizona) and Idaho (which borders Nevada and Oregon) also do not have toll roads. Thus, a renter could travel within most of the Western region of the United States as long as a third-party administrator had the ability to collect tolls in California. Regional rental car companies' demand for third party electronic toll payment collection administrators could, thus, be met by administrators that have integration with only California's system. Moreover, even national rental car companies could use multiple administrators for different regions without loss of efficiency. For example, as described above, but for Verra's anticompetitive acts and illegal exclusive dealing agreements that create artificial barriers to entry, national rental car companies could use both Verra and PlusPass to provide consumers a choice of electronic toll payment services in the regions that PlusPass serves.

60.    Further, but for the artificial barriers to entry created by Verra, PlusPass would be able to grow in scale and achieve a national presence. It has already proven that it can obtain the necessary permission and interoperability with certain tolling authorities within the United States and can do so with those it has not yet contracted with as a fleet operator. Indeed, its founders have a long history working with electronic toll payments and the specific connections and expertise needed to compete. PlusPass' app based on license plate reader technology is expressly designed to work with multiple different tolling authorities and already does so. In addition, PlusPass has or can obtain the capital to expand its infrastructure to grow into new regions.

61.    Verra and PlusPass currently compete in the defined markets or submarkets. PayTollo attempted to compete in the defined markets and submarkets, but were excluded by Verra's anticompetitive and exclusionary acts. On information and belief, Kapsch, GeoToll, and GoToll could also have competed in the defined market and submarkets, but were excluded by Verra's anticompetitive and exclusionary acts. While these competitors have withdrawn from the market because of the artificial barriers to entry and expansion that Verra has imposed, PlusPass has been foreclosed from reaching enough of the market to achieve necessary economies of scale. Verra has monopoly power in the entire market of twenty-two states, the District of Columbia, and Puerto Rico, with exclusive dealing arrangements covering over 95% of rental cars and about 95% of the toll roads in the United States. Verra also has monopoly power in each of the regional submarkets, with above 90% market share in each of the regions described above.

## I.    HARM TO COMPETITION AND ANTITRUST STANDING

62.    Competition is harmed in the relevant market or submarkets because Verra's illegal anticompetitive long-term exclusive agreements and other anticompetitive behavior excludes PlusPass and other competitors, like PayTollo, Kapsch, GeoToll, and GoToll, from competing in the market and submarkets;

reduces the choices rental car companies and consumers have for electronic toll payment administrators for rental cars; increases prices to rental car companies for electronic toll payment administrative services; increases prices to consumers for electronic toll payment administrative services for rental cars; and reduces innovation for technology used in electronic toll payment administrative services.

63.    PlusPass' harm flows from that which makes Verra's actions anticompetitive because PlusPass is excluded from the market as a competitor and its attempts at innovation in the market have been stifled. Verra's merger made this exclusion possible because rental car companies have no alternative to Verra, and its long-term exclusive dealing agreements preclude rental car companies from even testing start-up competitors. Consumers, thus, have no practical choice other than Verra, leading to the exclusion of PlusPass. For example, rental car companies do not and cannot offer alternatives to Verra, and do not and cannot suggest customers use PlusPass or any other competitor. Further, Verra's other anticompetitive acts, meant to undermine PlusPass' technology and distribution model, also directly targeted PlusPass.

64.    PlusPass has been injured as a result of harm to competition in one or more relevant markets and submarkets. PlusPass is entitled to its trebled damages resulting from the harm to competition, attorneys' fees and other recoverable costs and expenses, an order that Verra divest itself of HTA, and such other injunctive relief as is necessary to restore competition in the relevant markets.  15 U.S.C. §§ 1, 2, 4, 15, 18, 26.

## FIRST CAUSE OF ACTION – CLAYTON ACT SECTION 7
### (Illegal Acquisition – Against Defendant Verra)

65.    PlusPass hereby incorporates by reference the allegations contained in paragraphs 1 through 64, inclusive, as though set forth fully herein.

66.    Section 7 of the Clayton Act prohibits any person engaged in commerce or in any activity affecting commerce from acquiring, directly or indirectly, the

whole or any part of the stock of another corporation engaged in any activity affecting commerce in any section of the country, where the effect of such acquisition may be substantially to lessen competition, or tend to create a monopoly in a relevant market.

67.     The relevant market is that for the administration of electronic toll payment collection for rental cars. The section of the country affected is the states that use electronic toll payments for their toll roads, including the submarkets of each separate interoperable region.

68.     Verra has substantially lessened competition and created a monopoly in the relevant market through the acquisition and merger of ATS and HTA. It has obtained monopoly power and controls over 95% of third-party administration of electronic toll payment collection on rental cars in the United States.

69.     The merger is presumptively illegal because it is an acquisition of stock and assets between competitors that caused an increased concentration in an already highly concentrated market.

70.     The effect of the acquisition is to exclude PlusPass through Verra's long-term exclusive dealing agreements and markedly increase its ability to engage in anticompetitive conduct. Indeed, Verra has engaged in additional conduct to undermine PlusPass' technology and its ability to compete. Rental car companies and consumers have expressed interest in alternatives to Verra. However, rental car companies are now left with no choice of electronic toll payment administrators other than Verra, and the agreements preclude the rental car companies from even testing PlusPass or other competitors as alternatives. Consumers lack a choice for alternatives as a practical matter.

71.     The merger of HTA and ATS into Verra has produced antitrust injury, and, unless enjoined by this Court, will continue to produce at least the following anticompetitive, exclusionary and injurious effects upon competition in interstate commerce:

a.  competition in the relevant market and submarkets has been substantially and unreasonably restricted, lessened, foreclosed and eliminated;

b.  barriers to entry into the relevant markets have been raised;

c.  Verra has deprived PlusPass of the minimum economies of scale necessary to compete;

d.  choice has been, and will continue to be, significantly limited and constrained to provide third party administrative services for electronic toll payment of rental cars;

e.  innovation relating to technology used for third party administrative services for electronic toll payment of rental cars has been restricted;

f.  access to PlusPass and other competitive services will be artificially restricted and reduced and its products will continue to be excluded from the market;

g.  Verra will continue to provide inferior terms, including on price and services, to the detriment of rental car companies and consumers; and

h.  Verra will continue to charge rental car companies and consumers supra-competitive prices.

72.   The anticompetitive effects of the merger outweigh any purported beneficial effects on competition.

73.   As a direct and proximate result of the acquisition and merger of HTA and ATS into Verra, PlusPass has been substantially injured in its business and property and is likely to be injured further in its business and property.  These injuries flow from that which makes the acquisitions unlawful and anticompetitive. PlusPass is entitled to an order of divestiture of HTA to help restore competition, as well as trebled damages, attorneys' fees, and such other relief as may be appropriate.

## SECOND CAUSE OF ACTION – SHERMAN ACT SECTION 2
## (Monopolization – Against Defendant Verra)

74.    PlusPass hereby incorporates by reference the allegations contained in paragraphs 1 through 73, inclusive, as though set forth fully herein.

75.    Section 2 of the Sherman Act prohibits, *inter alia*, monopolization and attempts to monopolize any part of the trade or commerce among the States.

76.    The relevant product market is that for the administration of electronic toll payment collection for rental cars. The relevant geographic market is the states that use electronic toll payments for their toll roads, including the submarkets of each separate interoperable region.

77.    Defendant Verra dominates the market, controlling third party administrative services for electronic toll payment on over 95% of all rental cars through long-term exclusive dealing arrangements. At all relevant times, Verra possessed monopoly power in the relevant market and submarkets.

78.    Defendant Verra sought to acquire and maintain monopoly power through the anticompetitive means described herein, including merging ATS and HTA, consolidating long-term exclusive dealing agreements with rental car companies, enforcing those agreements, and engaging in anticompetitive conduct to undermine PlusPass' technology and ability to compete.

79.    Among other things, Verra has consolidated express exclusive dealing agreements in 95% of the market. Verra has entered into a series of anticompetitive, long term exclusive agreements to foreclose competition in the market and submarkets.  These exclusive dealing agreements last a minimum of 5 to 7 years and have been and/or are likely to be renewed. These agreements specifically exclude rental car companies from using competitors, like PlusPass, or even testing them as alternatives to Verra's services.  The purpose and effect of the exclusionary agreements has been to preclude more efficient competitors like PlusPass from

offering better terms and services, thereby stifling price competition, innovation, and reducing output.

80.    Verra has further engaged in illegal conduct to manipulate the technology used by tolling authorities to target and exclude PlusPass from the market and submarkets.

81.    There is no legitimate business justification for Verra's actions. The anticompetitive effects of these restraints outweighs any purported beneficial effects on competition.

82.    Verra's conduct has produced antitrust injury and, unless enjoined by this Court, will continue to produce at least the following anticompetitive, exclusionary and injurious effects upon competition in interstate commerce:

  a. competition in the relevant market and submarkets has been substantially and unreasonably restricted, lessened, foreclosed and eliminated;

  b. barriers to entry into the relevant markets have been raised;

  c. Verra has deprived PlusPass of the minimum economies of scale necessary to compete;

  d. choice has been, and will continue to be, significantly limited and constrained to provide third party administrative services for electronic toll payment of rental cars;

  e. innovation relating to technology used for third party administrative services for electronic toll payment of rental cars has been restricted;

  f. access to PlusPass and other competitive services will be artificially restricted and reduced and its products will continue to be excluded from the market;

g.   Verra will continue to provide inferior terms, including on price and services, to the detriment of rental car companies and consumers; and

h.   Verra will continue to charge rental car companies and consumers supracompetitive prices.

83.   Verra's practices, described above, have foreclosed competition in a substantial share of the relevant market and lessened competition and tended to create a monopoly for Verra in the relevant market.

84.   As a direct and proximate result of Verra's violations of the Sherman Act, PlusPass has been substantially injured in its business and property and is likely to be injured further in its business and property. The amount of such injury is substantial and will be determined at trial.  These injuries flow from that which makes Verra's conduct unlawful and anticompetitive. Further, the entry of permanent and mandatory injunctive relief against Verra is needed to enable and restore competition in the relevant market and submarkets.

## THIRD CAUSE OF ACTION – SHERMAN ACT SECTION 1
## (Agreement to Unreasonably Restrain Trade – Against Defendant Verra)

85.   PlusPass hereby incorporates by reference the allegations contained in paragraphs 1 through 84, inclusive, as though set forth fully herein.

86.   Section 1 of the Sherman Act prohibits, *inter alia*, agreements or arrangements that unreasonably restrain competition in interstate commerce.

87.   The relevant product market is that for the administration of electronic toll payment collection for rental cars. The relevant geographic market is the states that use electronic toll payments for their toll roads, including the submarkets of each separate interoperable region.

88.   Defendant Verra dominates the market, controlling third party administrative services for electronic toll payment on over 95% of all rental cars

through long-term exclusive dealing arrangements. At all relevant times, Verra possessed monopoly power in the relevant market and submarkets.

89.     Verra has entered into a series of anticompetitive, long term exclusive agreements covering 95% of all rental cars in the nation in order to foreclose competition in the market and submarkets.  These exclusive dealing agreements last a minimum of 5 to 7 years, and have been and/or are likely to be renewed. These agreements specifically exclude rental car companies from using competitors, like PlusPass, or even testing them as alternatives to Verra's services. These agreements also, as a practical matter, directly preclude consumers from choosing alternatives to Verra.

90.     The purpose and effect of the exclusionary agreements has been to preclude more efficient competitors like PlusPass from offering better terms and services, thereby stifling price competition, innovation, and reducing output.  These agreements and combinations constitute unreasonable restraints of trade.

91.     Verra's agreements are unlawful under the antitrust laws when assessed under the "Rule of Reason."   The anticompetitive consequences of Verra's agreements outweigh any procompetitive effects, if any. There is no legitimate business justification for these agreements.

92.     The purpose and effect of Verra's anticompetitive and exclusionary conduct has been done with the intent to specifically eliminate PlusPass as a viable competitor.

93.     Verra's conduct has produced antitrust injury and, unless enjoined by this Court, will continue to produce at least the following anticompetitive, exclusionary and injurious effects upon competition in interstate commerce:

      a.  competition in the relevant market and submarkets has been substantially and unreasonably restricted, lessened, foreclosed and eliminated;

      b.  barriers to entry into the relevant markets have been raised;

c.  Verra has deprived PlusPass of the minimum economies of scale necessary to compete;

d.  choice has been, and will continue to be, significantly limited and constrained to provide third party administrative services for electronic toll payment of rental cars;

e.  innovation relating to technology used for third party administrative services for electronic toll payment of rental cars has been restricted;

f.  access to PlusPass and other competitive services will be artificially restricted and reduced and its products will continue to be excluded from the market;

g.  Verra will continue to provide inferior terms, including on price and services, to the detriment of rental car companies and consumers; and

h.  Verra will continue to charge rental car companies and consumers supracompetitive prices.

94.  Verra's practices, described above, have foreclosed competition in a substantial share of the relevant market and lessened competition and tended to create a monopoly for Verra in the relevant market.

95.  As a direct and proximate result of Verra's violations of the Sherman Act, PlusPass has been substantially injured in its business and property and is likely to be injured further in its business and property.  The amount of such injury is substantial and will be determined at trial.  These injuries flow from that which makes Verra's conduct unlawful and anticompetitive. Further, the entry of permanent and mandatory injunctive relief against Verra is needed to enable and restore competition in the relevant market and submarkets.

## **CONCLUSION**

96.     For the foregoing reasons, PlusPass seeks an order finding that the Verra is liable for damages, and that PlusPass receive the following relief:

a.   injunctive relief, including to restore competition in the relevant markets voiding the exclusivity provisions in the exclusive dealing contracts and/or arrangements, and prohibiting same in the future;

b.   divestiture by Verra of HTA;

c.   PlusPass' lost profits;

d.   PlusPass' lost enterprise value;

e.   PlusPass' injuries from increased development and testing costs, increased cost of capital, inability or impairment of its capacity to borrow or raise funds;

f.   damages should be trebled;

g.   attorneys' fees and costs awarded;

h.   pre- and post-judgment interest; and

i.   such other and further relief to which PlusPass may show itself entitled, including but not limited to in this case.

Dated: April 27, 2021                Respectfully Submitted,

KESSELMAN BRANTLY STOCKINGER LLP

By:     _s/Trevor V. Stockinger_
            Trevor V. Stockinger

KESSELMAN BRANTLY STOCKINGER LLP
David W. Kesselman (SBN 203838)
*dkesselman@kbslaw.com*
Trevor V. Stockinger (SBN 226359)
*tstockinger@kbslaw.com*
1230 Rosecrans Avenue, Suite 400
Manhattan Beach, CA 90266
Telephone:   (310) 307-4555
Facsimile:   (310) 307-4570

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FISH & RICHARDSON P.C.
Danielle J. Healey (*pro hac vice*)
*healey@fr.com*
1221 McKinney Street, Suite 2800
Houston, TX 77010
Telephone:   (713) 654-5300
Facsimile:    (713) 652-0109

FISH & RICHARDSON P.C.
Ahmed J. Davis (*pro hac vice*)
*adavis@fr.com*
1000 Maine Avenue, SW, Suite 1000
Washington, DC 20024
Telephone:   (202) 783-5070
Facsimile:    (202) 783-2331

GIBSON WUNDER P.C.
Ethan Gibson (*pro hac vice*)
*ethan@gibsonwunder.com*
Victoria Mery (*pro hac vice*)
*vmery@gibsonwunder.com*
4 Houston Center
1221 Lamar St., Ste. 1001
Houston, TX 77010
Telephone:   (713) 897-8008
Facsimile:    (713) 897-8007

Attorneys for Plaintiff, PLUSPASS, INC.

SECOND AMENDED COMPLAINT

**JURY DEMAND**

Plaintiff PlusPass, Inc. hereby demands a trial by jury on all issues so triable as a matter of right.

Respectfully Submitted,

Dated: April 27, 2021                KESSELMAN BRANTLY STOCKINGER LLP
                                     FISH & RICHARDSON P.C.
                                     GIBSON WUNDER P.C.

                                     By:  _____*s/Trevor V. Stockinger*_____
                                              Trevor V. Stockinger

                                     Attorneys for Plaintiff, PLUSPASS, INC.