JOHN S. GIBSON (SBN 140647)
*john.gibson@us.dlapiper.com*
JULIE A. GRYCE (SBN 319530)
*julie.gryce@us.dlapiper.com*
CHELSEA R. DAL CORSO (SBN 290663)
*chelsea.dalcorso@dlapiper.com*
DLA PIPER LLP (US)
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, CA 90071-4704
Tel:   310.595.3000
Fax:   310.595.3300

JOHN ROBERT ROBERTSON
(admitted *pro hac vice*)
*robby.robertson@us.dlapiper.com*
DLA PIPER LLP (US)
444 W. Lake Street, Suite 900
Chicago, IL 60606
Tel:   312.368.4060
Fax:   312.251.5710

Attorneys for Defendant
VERRA MOBILITY CORPORATION

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

PLUSPASS, INC.

        Plaintiff,

    v.

VERRA MOBILITY CORP.,

        Defendant.

CASE NO.  2:20-cv-10078-SB-SK

**NOTICE OF MOTION AND MOTION OF DEFENDANT VERRA MOBILITY CORPORATION TO DISMISS PLAINTIFF PLUSPASS, INC.'S SECOND AMENDED COMPLAINT PURSUANT TO FRCP 12(b)(6)**

Judge:  Hon. Stanley Blumenfeld, Jr.
Ctrm:   6C
Date:   July 30, 2021
Time:   8:30 a.m.

SAC Filed:  April 27, 2021

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

**PLEASE TAKE NOTICE** that on July 30, 2021, at 8:30 a.m. or as soon thereafter as the matter may be heard, in Courtroom 6C of the above-entitled court, DEFENDANT VERRA MOBILITY CORPORATION ("Verra") will and hereby does move the Court, pursuant to Federal Rule of Civil Procedure 12(b)(6), for an order dismissing Plaintiff PLUSPASS, INC.'s ("PlusPass") Second Amended Complaint based on this Notice, the accompanying Memorandum of Points and Authorities, the Request for Judicial Notice ("RJN") filed concurrently herewith, all the records and papers filed herein; and such evidence and argument as may be presented at the hearing of this Motion.

This Motion is made following the pre-filing conference of counsel pursuant to L.R. 7-3, which occurred on May 21, 2021, at which the parties were unable to resolve the substantive issues addressed in this Motion.

Dated:  May 28, 2021                    DLA PIPER LLP (US)

                                        By: */s/ John S. Gibson*
                                            JOHN S. GIBSON

                                        Attorneys for Defendant
                                        VERRA MOBILITY CORPORATION

1
2

# **TABLE OF CONTENTS**

3
4

INTRODUCTION ............................................................................................... 1

5

STATEMENT OF FACTS ................................................................................. 3

6
7

     A.     PLUSPASS'S PRIOR INCONSISTENT LITIGATION
POSITIONS AND RELEASE OF CLAIMS AGAINST
VERRA. ........................................................................................ 3

8
9
10
11

     B.     VERRA'S INDIRECT SUBSIDIARIES SERVE THE
NATIONAL RENT-A-CAR COMPANIES' DEMAND FOR
THIRD-PARTY ADMINISTRATION OF ELECTRONIC
TOLLS INCURRED BY THEIR VEHICLES. ................................. 5

12

     C.     PLUSPASS FAILS TO OFFER PRACTICAL INNOVATIONS
FOR RENTAL CARS. ................................................................... 9

13
14

     D.     AT EACH CRITICAL POINT, THE MARKET CHOSE
VERRA. ...................................................................................... 10

15

ARGUMENT ................................................................................................... 11

16
17

I.     THE SAC FAILS TO PLEAD A VALID ALTERNATIVE
GEOGRAPHIC SUB-MARKET. ................................................... 12

18
19
20

II.     PLUSPASS IS JUDICIALLY ESTOPPED FROM ARGUING THAT
THE CONTRACTS AT ISSUE ARE EXCLUSIVE AS TO RENTAL
CAR CUSTOMERS. ..................................................................... 13

21
22

III.     THE SAC FAILS TO ALLEGE A VIOLATION OF § 7 OF THE
CLAYTON ACT. ........................................................................... 14

23

     A.     PlusPass Fails to Allege Antitrust Injury. ........................................ 14

24

     B.     To Protect Shareholders, Laches Bars PlusPass's Claim. .................. 16

25

IV.     THE SAC FAILS TO ALLEGE ILLEGAL MONOPOLIZATION ........... 18

26
27

V.     THE SAC FAILS TO ALLEGE ANTICOMPETITIVE EXCLUSIVE
DEALING AGREEMENTS. .......................................................... 22

28

VI.  DISMISSAL WITH PREJUDICE IS APPROPRIATE................................25

CONCLUSION...........................................................................................................25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

## <u>TABLE OF AUTHORITIES</u>

2                                                                             **Page(s)**

3   **Federal Cases**

4   *Abbyy USA Software House, Inc. v. Nuance Commc'ns Inc.*,
5       No. C 08-01035 JSW, 2008 WL 4830740 (N.D. Cal. Nov. 6, 2008) ................. 23

6   *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
7       592 F.3d 991 (9th Cir. 2010) ...................................................................... 22

8   *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
9       190 F.3d 1051 (9th Cir. 1999) ................................................................... 14

10  *Antoine L. Garabet, M.D., Inc. v. Autonomous Techs. Corp.*,
        116 F. Supp. 2d 1159 (C.D. Cal. 2000) ...................................................... 17
11

12  *Ashcroft v. Iqbal*,
        556 U.S. 662 (2009) .................................................................................. 11

13
14  *Bell Atl. Corp. v. Twombly*,
        550 U.S. 544 (2007) .................................................................................. 11

15
16  *Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
        182 F.3d 1096 (9th Cir. 1999) ................................................................... 16

17
18  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
        429 U.S. 477 (1977) .................................................................................. 14

19
20  *California v. Am. Stores Co.*,
        495 U.S. 271 (1990) ............................................................................. 16, 17

21  *Carbajal v. Wells Fargo Bank, N.A.*,
        No. 14-cv-7851, 2015 WL 2454054 (C.D. Cal. Apr. 10, 2015) ......................... 25
22

23  *Cascade Health Sols. v. PeaceHealth*,
        515 F.3d 883 (9th Cir. 2008) ...................................................................... 23

24
25  *Devincenzi v. Wells Fargo Bank*
        WL 13221016 (C.D. Cal. Nov. 9, 2011) ...................................................... 14

26
27  *Dumas v. Kipp*,
        90 F.3d 386 (9th Cir. 1996) ....................................................................... 25

28

*Eastman v. Quest Diagnostics Inc.*,
   724 F. App'x 556 (9th Cir. 2018)................................................................24

*Falstaff Brewing Co. v. Stroh Brewery Co.*,
   628 F. Supp. 822 (N.D. Cal. 1986)..........................................................25

*Fayer v. Vaughn*,
   649 F.3d 1061 (9th Cir. 2011) ..................................................................11

*Fed. Home Loan Bank Bd. v. Elliott*,
   386 F.2d 42 (9th Cir. 1967) ......................................................................16

*Fed. Trade Comm'n v. Qualcomm Inc.*,
   969 F. 3d 974 (9th Cir. 2020) .............................................................19, 22

*Ginsburg v. InBev NV/SA*
   623 F.3d 1229 (8th Cir. 2010) ..................................................................17

*Hamilton v. State Farm Fire & Cas. Co.*,
   270 F. 3d 778 (9th Cir. 2001) ...................................................................13

*Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp.*,
   518 F.2d 913 (9th Cir. 1975) ....................................................................17

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008) ..................................................................11

*Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*,
   140 F.3d 1228 (9th Cir. 1998) ..................................................................15

*Marin Alliance for Med. Marijuana v. Holder*,
   2012 WL 2862608 (N.D. Cal. Jul. 11, 2012) ...........................................13

*Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*,
   924 F.2d 1484 (9th Cir. 1991) ..................................................................12

*Morris Commc'ns Corp. v. PGA Tour, Inc.*,
   364 F.3d 1288 (11th Cir. 2004) ..........................................................18, 21

*Name.Space, Inc. v. Internet Corp. for Assigned Names and Numbers*,
   795 F.3d 1124 (9th Cir. 2015) ..................................................................18

*New Hampshire v. Maine*,
   532 U.S. 742 (2001) .................................................................................13

*Newcal Indus., Inc. v. Ikon Office Sol.*,
   513 F.3d 1038 (9th Cir. 2008) ............................................................. 12

*Novell v. Microsoft Corp.*,
   731 F.3d 1064 (10th Cir. 2013) (Gorsuch, J.) .................................. 19, 20, 21, 22

*Omega Envtl., Inc. v. Gilbarco, Inc.*,
   127 F.3d 1157 (9th Cir. 1997) ............................................................. 12

*Planet Drum Found. v. Hart*,
   No. 17-cv-02676-JCS, 2017 WL 4236932 (N.D. Cal. Sept. 24,
   2017) ................................................................................................ 16

*PNY Techs., Inc. v. SanDisk Corp.*,
   2014 WL 1677521 (N.D. Cal. Apr. 25, 2014)..................................... 23

*PNY Techs., Inc. v. SanDisk Corp.*,
   2014 WL 2987322 (N.D. Cal. July 2, 2014) ...................................... 24

*In re Pomona Valley Med. Grp., Inc.*,
   476 F.3d 665 (9th Cir. 2007) ............................................................. 25

*Pool Water Prods. v. Olin Corp.*,
   258 F.3d 1024 (9th Cir. 2001) ........................................................... 15

*Power Analytics Corp. v. Operation Tech., Inc.*,
   2017 WL 11486807 (C.D. Cal. Dec. 7, 2017) .................................... 24

*Romero v. Countrywide Bank, N.A.*,
   740 F. Supp. 2d 1129 (N.D. Cal. 2010)............................................. 25

*Spectrum Sports, Inc. v. McQuillan*,
   506 U.S. 447 (1993) .......................................................................... 12

*Sprint Nextel Corp. v. AT&T Inc.*,
   821 F. Supp. 2d 308 (D.D.C. 2011) .............................................. 15, 16

*Tampa Elec. Co. v. Nashville Coal Co.*,
   365 U.S. 320 (1961) .......................................................................... 12

*Tanaka v. Univ. of S. Cal.*,
   252 F.3d 1059 (9th Cir. 2001) ........................................................... 12

*U.S. v. Marine Bancorporation, Inc.*,
   418 U.S. 602 (1974) .......................................................................... 12

*United Nat'l Ins. Co. v. Spectrum Worldwide, Inc.*,
    555 F.3d 772 (9th Cir. 2009) .................................................................. 13

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966) .............................................................................. 13

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001).................................................................. 18

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ................................................................ 18, 19, 22

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

In its Second Amended Complaint ("SAC"), PlusPass again blames its business failures on Verra's success in providing nationwide tolling administration to rent-a-car companies ("RACs").[1] But, as detailed below, PlusPass's own allegations, and judicially noticeable facts, show that PlusPass and other potential competitors had ample opportunity to compete with Verra for the RACs' business. As alleged in the SAC, the RACs have repeatedly renewed their contracts with Verra's indirect subsidiaries. PlusPass is simply not prepared to compete in providing the nationwide services that a national RAC needs and demands. In fact, PlusPass even concedes on its website that while its ultimate goal is to provide "national interoperability," it first needs approval from more tolling authorities, and thus still is not ready to provide national tolling services.

Likewise, PlusPass is judicially estopped from pursuing its newly-minted claim that Verra's indirect subsidiaries' contracts with the RACs are "exclusive dealing arrangements" which prevent competition by PlusPass's direct-to-consumer tolling app for rental vehicle users. That is because PlusPass already obtained key rulings in federal court litigation holding that Verra's indirect subsidiary's contracts with Enterprise and Avis—comprising the vast majority of rental vehicles nationally—are *not* exclusive and do not prevent PlusPass's direct-to-consumer business. Further, PlusPass complains about a three-year-old merger involving Verra's indirect subsidiaries. But that merger had no anticompetitive effects, in large part because the complained-of contracts with the RACs were in place long before the merger.

---

[1] After Verra moved to dismiss the First Amended Complaint ("FAC") (Dkt. 34)—and following the Court's denial of PlusPass's *ex parte* application for leave to amend (Dkt. 48)—PlusPass abandoned various theories and claims and dismissed the three other defendants. Verra stipulated for PlusPass to have leave to amend, which the Court granted. Dkt. 55.

1    Neither the national contracts that Verra's indirect subsidiaries have won (and
2    renewed) with RACs nor the merger had any impact on competition or PlusPass's
3    ability to do business. Instead, it is PlusPass's unworkable business model that has
4    prevented it from attracting the renters and national RACs that it claims it is seeking
5    to serve. PlusPass's inability to gain traction with the RACs is attributable solely to
6    its inferior model, which is *inoperable* in most states. PlusPass now tries to use the
7    antitrust laws improperly to accomplish what it has failed to accomplish on its own in
8    the market. But because the antitrust laws protect competition—not an individual
9    seller's inferior business model that ignores market demand and the tolling
10   authorities' structure and requirements—PlusPass's allegations are unavailing.

11   Unsurprisingly, therefore, the SAC does not—and cannot—state any plausible
12   antitrust claim. In Argument Section I, Verra explains that all of PlusPass's claims
13   fail because the SAC's "relevant market" definition is facially, and thus fatally,
14   defective. It relies improperly on invalid sub-market definitions, based on
15   interoperability of some local toll payment systems—and thus on local rather than
16   nationwide markets. But third-party toll administrators like the Verra subsidiaries in
17   fact compete by offering the same service everywhere in the United States—not a
18   different service in each locale or for each of the interoperable local toll payment
19   systems. This is especially important for RACs who operate nationally because each
20   car in their fleet is capable of being driven through multiple states by the renter at any
21   time (regardless of where the rental commenced) without the RAC's knowledge.
22   RACs also move cars across states to meet demand.

23   In Section II, Verra illustrates how PlusPass is judicially estopped from arguing
24   that the RAC contracts exclude PlusPass from reaching rental car customers since it
25   obtained previous rulings directly to the contrary in other federal court litigation.

26   In Section III, Verra dispels PlusPass's claim in its first cause of action that a
27   three-year-old acquisition should be unwound pursuant to the Clayton Act §7, since:

28

(1) the SAC fails to plead antitrust injury because PlusPass's inability to compete did not change as a result of the 2018 merger; and (2) the claim is barred by laches.

In Section IV, Verra dispatches the second cause of action for monopolization because PlusPass fails to allege any plausible anticompetitive conduct and ignores bedrock antitrust law that Verra has no duty to provide market terms and conditions that rivals prefer.

Finally, in Section V, Verra debunks the SAC's third cause of action for unreasonable restraint of trade via exclusive dealing arrangements. Not only is PlusPass's claim judicially estopped by prior litigation as to sales to renters, but the SAC also fails to allege the basic elements of anticompetitive exclusive dealing agreements as to the RACs since PlusPass admits that it lacks the capacity to deliver the nationwide tolling services required by the national RACs.

Therefore, the SAC should be dismissed with prejudice.

## STATEMENT OF FACTS

PlusPass has incorporated in the SAC portions of the Introduction and Statement of Facts from Verra's motion to dismiss the FAC. *Compare* Dkt. 56 (SAC) ¶¶ 12-19 *with* Dkt. 34 at 10-11, 14-15. The following facts are also relevant.

### A.   PLUSPASS'S PRIOR INCONSISTENT LITIGATION POSITIONS AND RELEASE OF CLAIMS AGAINST VERRA.

PlusPass's claims in the SAC rely heavily on PlusPass's allegations that the contracts Verra's indirect subsidiaries, Highway Toll Administration, LLC ("HTA") and American Traffic Solutions, Inc. ("ATS"),[2] have with the RACs are "long-term exclusive dealing arrangements." *E.g.,* ¶¶ 33, 37, 51, 63, 70, 77, 78, 88, 89-92.[3] But in prior litigation it initiated against HTA, PlusPass argued—and the district court and

---

[2] PlusPass attributes various merger activities and customer contracts to ATS. While ATS is not the correct entity associated with those activities, this Motion refers to the entities as stated in the SAC.
[3] Unless stated otherwise, all paragraph citations herein are to the SAC.

Fifth Circuit held—that the very same contracts do *not* have an exclusive effect on PlusPass's attempts to win business with the renter.

Specifically, on October 29, 2014, PlusPass, operating then as BancPass, Inc.[4] filed suit against HTA in Travis County, Texas District Court. *See* RJN, Ex.1. HTA removed the case to the United States District Court for the Western District of Texas on November 24, 2014 (the "Texas Litigation"). *Id*. At issue in the Texas Litigation was the "key question" of whether HTA's contracts with Enterprise and Avis "prohibit[ed] customers from using" PlusPass. *Id*., Ex. 10 at 19. PlusPass originally alleged that HTA used the exclusivity provisions in its contracts with the RACs to keep PlusPass out of the market, violating the antitrust laws. PlusPass claimed that HTA's conduct had a "high probability for monopolization." *Id*. at ¶ 39. HTA then counterclaimed that it had not violated the federal or state antitrust laws. *Id*., Ex. 3.

PlusPass sought summary judgment on HTA's claim that PlusPass's toll payment app ("PlusPass App") tortiously interfered with HTA's contracts with RACs Avis and Enterprise. RJN, Ex. 4 at 16–21. PlusPass argued that "HTA maintains vendor agreements with both Avis and Enterprise, but there is no allegation that [PlusPass] interfered with these agreements other than to market its product to rental car customers." *Id*. at 18.[5] PlusPass asserted that HTA's RAC contracts did not exclude renters from using the PlusPass App to pay electronic tolls. *Id*.

Agreeing with PlusPass, the court held that HTA's RAC agreements did *not* "prohibit customers from using" the PlusPass App. RJN, Ex. 10 at 24. Rather, they "unambiguously permit renters to use [PlusPass's App] rather than opt into HTA's services." *Id*. at 21. The Fifth Circuit affirmed the order on appeal. *Id.*, Ex. 11. PlusPass then settled and released its claims against HTA and its present and future successors and affiliates—which include Verra. RJN, Exs. 6-7.

---

[4] On August 24, 2020, BancPass announced a name change to PlusPass, Inc. *See* RJN, Ex. 12.
[5] PlusPass attached copies of the contracts between HTA and Enterprise and Avis to its motion for summary judgment. RJN, Ex.5.

Now, PlusPass completely ignores the binding holdings in its favor in the Texas Litigation and argues that Verra's agreements with the RACs, including those same agreements with Enterprise and Avis[6] that PlusPass alleged make up 80% of the US market, "directly preclude consumers from choosing alternatives to Verra." ¶ 89. PlusPass further alleges that direct marketing to renters is not a viable alternative because of the exclusive dealing agreements. ¶ 41. Thus, PlusPass is now taking a position directly contrary to the position it argued and won in the Texas Litigation.

**B.**   **VERRA'S INDIRECT SUBSIDIARIES SERVE THE NATIONAL RENT-A-CAR COMPANIES' DEMAND FOR THIRD-PARTY ADMINISTRATION OF ELECTRONIC TOLLS INCURRED BY THEIR VEHICLES.**

The advent of electronic tolling held promise for more efficient highway travel and toll collection. It allowed drivers to pay a toll through a transponder or tag that communicates directly with the toll authority, or through the vehicle's license plate, rather than stopping to pay at a toll booth. Numerous states across the country have toll roads, many of which are All Electronic Toll roads ("AETs") that allow for payment only by electronic means. ¶ 12. For these AETs, the toll is charged based on either a physical transponder or "toll tag," or the vehicle's license plate, which are registered with the toll authority and associated with a specific account for payment. The toll authorities assess the toll against the registered account, or if there is none, by sending an invoice to the registered owner (¶ 14), which may escalate to a violation if no payment is received. There is a lag-time between when a vehicle incurs the toll and when the toll authority bills for it. ¶ 14; *see also* RJN, Ex. 15, PlusPass FAQ website (billing can occur "within a few hours," or "as long as 60 or 90 days").

The United States does not have a single electronic toll road payment collection system that is interoperable on a national basis. ¶¶ 12-13. There is no universal

---

[6] PlusPass admits that these are the same agreements at issue in the Texas litigation since it alleges that Verra "consolidated" the HTA agreements into one entity. ¶ 40.

transponder, tag, or license plate account that can manage payment of tolls across the country. *Id.* This creates challenges for RACs because a single rental car can be driven across multiple states (with different toll systems) by the same renter. Accordingly, a third-party toll service provider who can deliver nationwide coverage in the absence of interoperability between the toll authorities brings simplicity and certainty to the RAC that its vehicles will be covered, regardless of where the car is driven. Toll authorities themselves acknowledge that opting into a RAC's tolling program "is the most seamless and convenient option" for paying tolls for rental cars. RJN, Ex. 16, Golden Gate Bridge Highway & Transportation District website.

Because the toll authorities issue invoices for payment, or later send toll violations against the registered owner (in this case, the RAC), electronic tolling created a complex administrative process for the RAC, given that the renter incurs, and should therefore pay for, the toll. ¶ 14. When a renter drives through an electronic toll gantry without paying the toll authority, the RAC is left with two options: (1) pay the toll to avoid penalties and fines, and attempt to recover from the renter, or (2) notify the toll authority of the renter's name and contact information to transfer liability (if permissible in that jurisdiction), in which case the toll authority's efforts to collect payment would then begin again, by sending a paper invoice to the identified renter, and later a violation if no payment is received.

To solve these critically important challenges, HTA and ATS, now indirect wholly-owned subsidiaries of Verra, pioneered third-party toll administration using patented and proprietary technology. Through direct integrations with toll authorities nationwide, they use their proprietary software to enroll (and update daily) entire RAC fleets by license plate, and in many jurisdictions also install transponders or tags in vehicles that are enrolled in their account. They also pay all tolls incurred by the millions of rental cars (by plate or by transponder/tag) that are enrolled in their account through prefunded or credit card backed accounts with the toll authorities,

thus guaranteeing payment to the toll authority while protecting the RACs against violations and fines. ¶ 19. HTA and ATS then take the data they receive from their integrations with the toll authorities nationwide and use their proprietary software and data exchanges with the RACs to identify the renter at the time of each toll. *See e.g.*, ¶¶ 15, 19. They then bill the renter on the RAC's behalf, according to the terms of the applicable rental agreement, including the price of the service. *Id.*

As a result of this innovation through a national platform, HTA and ATS service major and national rental car companies across the United States who require a national platform, such as Enterprise, Hertz, and Avis. ¶¶ 17-18. The RACs that operate nationally expect that their vehicles will be covered across all toll authorities—which is possible only if the administrator has a national platform. This model provides assurance for RACs that tolls on their vehicles are paid, avoiding significant penalties, no matter where they are driven. By way of example, a RAC customer may pick up a rental car in Washington and drive to California or Colorado. On such a trip, the renter could drive through toll roads operated by several discrete toll authorities—well outside the proposed interoperable regional sub-markets proposed by PlusPass. *See e.g.*, ¶ 58.

PlusPass alleges that the relevant geographic market consists of the twenty-two states, the District of Columbia, and Puerto Rico that have electronic tolls for roads, bridges, or tunnels; *or* "the regional submarkets therein of interoperable electronic toll payment systems." ¶ 57. PlusPass's own website flatly contradicts its proposed alternative "sub-market" definition. There, PlusPass concedes that *national* interoperability is not only preferable but necessary and is the goal of its technology. *See e.g.*, RJN, Ex. 13, Xevo and BancPass Form Partnership | BancPass Cash Reloadable Toll Sticker ("[a]s BancPass moves toward *national* interoperability …") (emphasis added); *see also* RJN, Ex. 14, BancPass Issued Patent for Mobile Transactions | BancPass Cash Reloadable Toll Sticker ("the goal is to promote

*national* interoperability") (emphasis added); *see also* ¶ 40 (discussing reaching economies of scale and national coverage to offer a competitive choice); ¶ 60 (discussing desire to grow into new regions to achieve a national presence). All of Verra's RAC contracts are national and not segmented by these arbitrary sub-markets.

There are numerous reasons why a nationwide provider for electronic toll administration is necessary. Using multiple providers would require the RACs to design and implement data exchange integrations with each separate provider, not only increasing their internal administrative burden, but requiring them to share sensitive customer information with multiple parties. At the same time, renters who drive across multiple states managed by different toll service providers outside of any delineated "sub-market" would be billed by different service providers after the conclusion of their rental, based on different pricing models and terms of service, creating confusion for the renter. These varying models and operating practices would create complex issues for the RAC when disclosing the tolling program terms to the renter in the rental agreement and other disclosure materials.

PlusPass contends that "the vast majority of renters drive within a close vicinity of the rental car location." ¶ 59. But this contention conveniently ignores that *each* rental vehicle needs to be covered *everywhere*. By PlusPass's own allegations, each vehicle in a RAC's fleet is capable of being driven through multiple states by the renter at any time (regardless of where the rental commenced) without the RAC's knowledge. RACs also move cars across states to meet demand. As such, national integrations are necessary to ensure the vehicle is covered everywhere. *See e.g.*, ¶ 59. It is simply impractical to change the third-party toll administrator on a renter-by-renter basis, rendering a national platform all the more necessary and valuable to RACs who operate on a national basis like Avis, Enterprise and Hertz.

Critically, HTA and ATS met this market demand pre-merger. Both provide nationwide services to administer electronic tolls for rental cars and have done so

since as early as 2002 and 2004, respectively. ¶¶ 17-18. Moreover, the RAC contracts at issue existed *before the merger* between HTA and ATS. ¶ 40; RJN, Exs. 5, 8. HTA and ATS offered national services to the RACs long before their merger; PlusPass still cannot.

## C.   **PLUSPASS FAILS TO OFFER PRACTICAL INNOVATIONS FOR RENTAL CARS.**

PlusPass's original goal when it entered the market and developed the PlusPass App was to provide a direct-to-consumer model that would allow an individual renter to enroll their rental vehicle. ¶¶ 22-23; RJN, Ex. 1 at ¶ 10. PlusPass competed *against* the RACs' tolling programs by offering the renters the ability to enroll the rental car license plate in the PlusPass App, rather than use the RAC's tolling service. ¶¶ 23-24.

The SAC alleges that PlusPass had initial success with its direct-to-consumer app in Texas and other regions and states, yet concedes that unlike Verra, which has national capabilities, PlusPass operates in only nine states. ¶ 28. Unlike the services offered by HTA and ATS, which enroll entire fleets under one account, the PlusPass App would rely on each individual renter to download the PlusPass App and register the rental vehicle's license plate in an account. ¶ 23 (requiring the *user/renter* to download and use the PlusPass App to add the car to PlusPass's toll authority contracts by reading the license plate with their smartphone camera). The process for an individual renter to enroll with PlusPass can take up to 24 hours, which leaves the vehicle unprotected until enrollment. RJN, Ex. 15. Moreover, because it relies on the renter to enroll the vehicle, the remainder of the RAC's unregistered vehicles in that sub-market would be unprotected from toll violations, unless the renter pays the toll directly. PlusPass also expects errors with its product because it instructs users "what to do if [they] receive a toll violation notice in the mail." *Id*.

Recognizing these significant deficiencies, PlusPass presents itself as a *potential* competitor to service RACs nationally by making certain allegations about the industry and software experience of its founders, its investment of "significant

capital," and that it "has or can obtain the capital to expand its infrastructure to grow into new regions" in order to achieve a national presence. ¶¶ 29, 60. But inherent in its allegations is the simple fact that PlusPass cannot compete on a national scale yet.

### D. AT EACH CRITICAL POINT, THE MARKET CHOSE VERRA.

PlusPass has had many opportunities to compete but has failed.  For example:

*First*, PlusPass alleges that it approached Avis (at some unidentified time) to use PlusPass as an alternative to Verra, but Avis chose not to proceed with PlusPass and chose Verra's indirect subsidiary, HTA, instead. ¶ 39.

*Second*, in Hertz's bankruptcy, the debtors chose to assume the contracts with Verra's indirect subsidiaries in October 2020. The SAC alleges that "Verra forced a new entity, 'Debtor-in-Possession Hertz' …  to assume" the ATS contracts. ¶ 43. This allegation is not only inaccurate but completely ignores the significant implication of what actually occurred. The Hertz debtors voluntarily assumed the ATS third-party toll administration contracts when they could have rejected the contracts (resulting in their termination). The Hertz debtors in fact voluntarily filed a notice of assumption of those executory contracts stating they had "determined, in the exercise of their business judgment, to assume" such contracts. RJN, Ex. 8, at 1. The bankruptcy judge, Hertz's unsecured creditors' committee, and the United States Trustee all approved this contract assumption. RJN, Ex. 9. The fact that the Hertz debtors chose to continue using ATS as their third-party toll administrator when they had the option to reject the contracts through the protection of the bankruptcy proceedings establishes that Verra's services, and not the terms of its contract, made it the preferrable vendor. If PlusPass were really competitive and cheaper, it could have competed for Hertz's business—but it did not.

*Finally*, in the fourth quarter of last year, Verra renewed its contract with Sixt, a national RAC that the SAC mistakenly calls "six partners," ¶ 37, and, on May 17, 2021, announced "an agreement in principle to renew" with Enterprise, which is still

being finalized—highlighting that RACs chose to continue doing business with Verra due to the value and strength of its platform and services. RJN, Ex. 20. These are but a few examples of RACs renewing their relationships with HTA or ATS absent any contractual obligation to do so and where PlusPass simply failed to win or even attempt to win any contract.

## ARGUMENT

Rule 12(b)(6) requires dismissal of complaints that "fail[ ] to state a claim upon which relief can be granted." To survive a Rule 12(b)(6) motion, a complaint's "[f]actual allegations must be enough to raise a right to relief beyond the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). This "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* Factual allegations must "permit the court to infer more than the mere possibility of misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Where instead factual allegations are "merely consistent with" misconduct, a complaint fails to state a plausible claim for relief. *Id*. at 678 (citation omitted).

The Supreme Court has mandated that courts should identify allegations that are "no more than [legal] conclusions" and thus "are not entitled to the assumption of truth." *Id*. at 679; *see Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011). Then, a court should address only the "well-pleaded, nonconclusory factual allegation[s]" and determine whether those allegations "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679-80. In an antitrust case, the district court is the gatekeeper empowered to prevent a plaintiff from advancing beyond the pleading stage based on implausible allegations to generate expensive antitrust discovery, *Twombly*, 550 U.S. at 557-58, or "extort large settlements." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008). When a complaint fails to state a plausible antitrust claim, it should be dismissed "at the point of minimum expenditure of time and money by the parties and the court." *Twombly*, 550 U.S. at 558.

## I.   **THE SAC FAILS TO PLEAD A VALID ALTERNATIVE GEOGRAPHIC SUB-MARKET.**

Alleging valid relevant product and geographic markets is essential to every antitrust claim. *U.S. v. Marine Bancorporation, Inc*., 418 U.S. 602 (1974) (affirming pleading stage dismissal based on invalid market definition in merger case); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 455-56 (1993) (same – monopolization); *Omega Envtl., Inc. v. Gilbarco, Inc.,* 127 F.3d 1157, 1169 (9th Cir. 1997) (same – exclusive dealing). A "complaint may be dismissed under Rule 12(b)(6) if the complaint's 'relevant market' definition is facially unsustainable." *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008); *Tanaka v. Univ. of S. Cal.,* 252 F.3d 1059, 1063 (9th Cir. 2001).

PlusPass alleges that the relevant product market is "the market for administration of electronic toll payment collection for rental cars." ¶ 54. The SAC contends that the product market includes the direct-to-consumer model and RAC contracts. *See e.g.*, ¶ 2 (discussing service that allows renters to pay tolls directly from their smartphones as an alternative to the services that HTA and ATS provide to RACs); *see also* ¶¶ 22-24 (same). However, PlusPass has failed to allege a plausible geographic market. PlusPass contends that the geographic market is either the aggregated market comprised of twenty-two states, the District of Columbia, and Puerto Rico that have electronic tolls, or the regional submarkets therein of interoperable electronic toll payment systems. ¶¶ 57, 59.

The Supreme Court has defined the relevant geographic market as the region "in which the seller [*e.g.,* HTA] operates, and to which the purchaser [*i.e.*, RACs] can practicably turn for supplies"—not where PlusPass is able to compete. *Tampa Elec. Co. v. Nashville Coal Co.,* 365 U.S. 320, 327 (1961); *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.,* 924 F.2d 1484, 1490 (9th Cir. 1991) (same). Pre-merger, ATS and HTA competed on a national, not local, basis. That PlusPass is incapable of competing beyond a handful of states does not justify the alternative local sub-markets

for third-party toll administration PlusPass proposes. Since HTA and ATS competed nationally before the merger, PlusPass's alternative local geographic markets definition is invalid. *See United States v. Grinnell Corp.*, 384 U.S. 563, 575 (1966) (even with local differentiated technology, the market was nationwide because "the business of providing such a service is operated on a national level").

## II.    PLUSPASS IS JUDICIALLY ESTOPPED FROM ARGUING THAT THE CONTRACTS AT ISSUE ARE EXCLUSIVE AS TO RENTAL CAR CUSTOMERS.

A motion to dismiss may be granted on the basis of judicial estoppel. *See New Hampshire v. Maine*, 532 U.S. 742, 756 (2001). Under the equitable doctrine of judicial estoppel, the court intends to uphold the integrity of the judicial process by preventing "litigants from playing 'fast and loose' with the courts by taking one position, gaining advantage from that position, then seeking a second advantage by later taking an incompatible position." *United Nat'l Ins. Co. v. Spectrum Worldwide, Inc.*, 555 F.3d 772, 778 (9th Cir. 2009). "'[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.'" *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (citation omitted). Judicial estoppel bars a party from taking inconsistent positions in two different cases. *Hamilton v. State Farm Fire & Cas. Co.*, 270 F. 3d 778, 783 (9th Cir. 2001). In determining whether judicial estoppel should be applied, courts consider: (1) whether a party's subsequent position is clearly inconsistent with a former position; (2) whether the party was successful on its earlier position; and (3) "whether allowing the inconsistent position would allow the party to derive an unfair advantage or impose an unfair detriment on the opposing party." *Marin Alliance for Med. Marijuana v. Holder*, 2012 WL 2862608, at *9 (N.D. Cal. Jul. 11, 2012).

1      Here, all factors require a finding that PlusPass is judicially estopped from

2  arguing that the contracts at issue prevent rental car customers from using the PlusPass

3  App. *First*, PlusPass's position in the Texas Litigation—namely that HTA's

4  agreements with Avis and Enterprise did not preclude the use of its app by rental car

5  customers—is clearly and directly inconsistent with its latest position that these same

6  agreements prohibit rental car customers from using PlusPass's product. *Second*,

7  PlusPass was successful in the Texas Litigation, because the court agreed that HTA's

8  agreements with the RACs did not prevent rental car customers' use of the PlusPass

9  App, and that ruling was affirmed on appeal.   Thereafter, the parties, including

10 PlusPass, settled the Texas Litigation and dismissed with prejudice the claims,

11 including HTA's request for a declaration that it was not violating the antitrust laws.

12 *Third*, allowing PlusPass to assert the exact opposite position in a subsequent

13 litigation on the key question of whether the same RAC contracts are exclusive and

14 prevent PlusPass from competing in violation of antitrust laws would both allow

15 PlusPass to derive an unfair advantage and be unfairly detrimental to Verra. Thus,

16 PlusPass should be judicially estopped from asserting that Verra's RAC agreements

17 are exclusive as to rental car customers, *i.e.*, the users of PlusPass's app.   *See*

18 *Devincenzi v. Wells Fargo Bank*, WL 13221016, at *3 (C.D. Cal. Nov. 9, 2011)

19 (dismissing claims on the basis of judicial estoppel).

20 **III.      THE SAC FAILS TO ALLEGE A VIOLATION OF § 7 OF THE**
21 **CLAYTON ACT.**

22          **A.      *PlusPass Fails to Allege Antitrust Injury.***

23      PlusPass's First Cause of Action (Clayton Act § 7) should be dismissed because

24 PlusPass fails to allege an antitrust injury "that flows from that which makes the

25 conduct unlawful." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055

26 (9th Cir. 1999). As the Supreme Court has made clear, Congress "has condemned

27 [acquisitions] only when they may produce anticompetitive effects." *Brunswick Corp.*

28 *v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487 (1977). Here, the acquisition and

merger of ATS and HTA did not create either the pre-existing contracts or the national business model about which PlusPass complains.

*First*, PlusPass cannot challenge an acquisition or merger that did not cause its claimed injury from the RAC contracts. *See Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1032 (9th Cir. 2001) (claimed wrong must cause the harm). Simply claiming that the merger is illegal because the acquisition causes increased concentration (¶ 69) fails to establish antitrust injury. *Sprint Nextel Corp. v. AT&T Inc.*, 821 F. Supp. 2d 308, 319 (D.D.C. 2011). Thus, PlusPass lacks standing to sue.

As an alleged competitor, PlusPass must show that it "[w]ould [*not*] have suffered the same injury" absent the acquisition of HTA by ATS. *Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1233 (9th Cir. 1998) (emphasis added). But long before the alleged transactions, ATS and HTA had their same market share and the same alleged contracts that each has today. ¶¶ 32, 37 (discussing ATS and HTA contracts existing pre-merger). PlusPass does not allege that it was able to compete prior to the merger, but then lost that ability after the merger—in fact, it alleged in the Texas Litigation that even *before* the merger, HTA alone was preventing it from competing in the market. RJN, Exs. 1, 2, 4.

Even absent the combination of HTA and ATS, PlusPass would still be in the same position as it has always been. As PlusPass admits, it operates in only nine non-contiguous states. ¶ 28. Moreover, PlusPass admits that it does not have the necessary customers to reach economies of scale and compete fully on a national basis. ¶ 50. Because its own limitations and impractical business model rendered PlusPass unable to compete before the merger, the merger is blameless and PlusPass cannot demonstrate antitrust injury. Thus, PlusPass "would have suffered the same injury"— if there were any—because ATS and HTA, separately, "acquired the exclusive right to" sell the services. *Lucas Auto*, 140 F.3d at 1233.

PlusPass also claims that HTA's and ATS's RAC contracts cause rental car companies to pay more for administration of electronic tolls. ¶¶ 26, 52.[7] These allegations preclude any antitrust injury to PlusPass because "[w]hen allegedly anticompetitive behavior '[has] the effect of…raising market price…it 'actually *benefit[s]* competitors by making supracompetitive pricing more attractive." *Sprint Nextel Corp.*, 821 F. Supp. 2d at 319 (emphasis in original). Indeed, PlusPass should "'want [its] competitors to charge high prices.'" *Id.* at 320 (citation omitted); *see also Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1102 (9th Cir. 1999) (competitor lacks antitrust injury from higher prices).

As PlusPass alleges, consumers can download the PlusPass App to their smartphones and read the license plate of their rental car with their smartphone camera. ¶ 23. PlusPass is judicially estopped from alleging harm to competition because, as PlusPass successfully asserted in the Texas Litigation, HTA's and ATS's agreements with the RACs do not interfere with a renter's right to use the PlusPass App as an alternative.

### B.    To Protect Shareholders, Laches Bars PlusPass's Claim.

PlusPass challenges the merger of HTA and ATS, which occurred over three years ago.  ¶¶ 33, 52. PlusPass's delay in seeking redress precludes the divestiture PlusPass seeks. *California v. Am. Stores Co.*, 495 U.S. 271, 296 (1990) (laches is a defense to a divestiture claim).Courts grant motions to dismiss based on laches "when the defense of laches is clear on the face of the complaint, and where it is clear that the plaintiff can prove no set of facts to avoid the [defense]." *Planet Drum Found. v. Hart*, No. 17-cv-02676-JCS, 2017 WL 4236932, at *7 (N.D. Cal. Sept. 24, 2017) (citation omitted) (alteration in original); *Fed. Home Loan Bank Bd. v. Elliott*, 386

---

[7] PlusPass's allegation assumes the implausible fact that large RACs could not turn away from ATS or HTA, just because they are both owned by Verra. But in fact, PlusPass admits that such RACs chose sole source contracts for toll administration with either ATS or HTA before the merger. ¶¶17, 18.

F.2d 42, 56 (9th Cir. 1967) (dismissal on grounds of laches where shareholders waited three months to sue). The Supreme Court has held that "equitable defenses such as laches…may protect consummated transactions from belated attacks by private parties." *Am. Stores Co.*, 495 U.S. at 296. The Ninth Circuit explained: "We do not believe that Congress intended, in passing § 16 of the Clayton Act, to permit potential plaintiffs to sleep through their competitors' antitrust violations and then sue many years later." *Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp.,* 518 F.2d 913, 926-27 (9th Cir. 1975).

The merger PlusPass complains about closed over three years ago in February 2018, and because Verra went public in October 2018 (¶ 52), divestiture now would harm its shareholders and Verra. ¶ 31. This multi-year delay is extraordinary and precludes PlusPass from seeking divestiture. In *Ginsburg v. InBev NV/SA*, the plaintiffs waited only two *months* after Anheuser-Busch and InBev announced their agreement to merge before filing suit—and even that relatively fast response was too late. 623 F.3d 1229, 1235 (8th Cir. 2010). The court found the delay "inexcusable" given the nature of the transaction. *Id*. The court determined that "[h]ypothetical anticompetitive conduct, speculative monopoly power, and remote injuries do not merit the extreme remedy of divestiture." *Id.* at 1236 (citation omitted). Similarly, in *Antoine L. Garabet, M.D., Inc. v. Autonomous Techs. Corp.*, where plaintiffs filed suit *on the date the merger closed*, but six months after it was announced, the court "ha[d] no difficulty concluding that the [p]laintiffs failed to exercise proper diligence in the pursuit of their claim(s)." 116 F. Supp. 2d 1159, 1173 (C.D. Cal. 2000).

These holdings apply with equal force here. The HTA and ATS merger happened over three years ago. Since 2018, Verra has been a publicly-traded company with accountability to its shareholders. PlusPass has no justification for its delay. To require the break-up of a public company now would be inequitable and would change nothing for PlusPass, because ATS and HTA would still have the same RAC

DEFENDANT'S MEMO IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT

contracts. Given PlusPass's extreme delay, it is facially apparent from the SAC that it will be unable to plead any set of facts to avoid a laches defense, and its request for divesture in Count I should be dismissed.

### IV.      THE SAC FAILS TO ALLEGE ILLEGAL MONOPOLIZATION.

A monopolization claim fails absent allegations of plausible predatory—i.e., "anticompetitive"—conduct. *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). PlusPass's Second Cause of Action for monopolization alleges three types of conduct by Verra: contracts with RACs (¶¶ 77, 79), consolidation of those contracts through merger (¶ 78), and "conduct to manipulate the technology used by tolling authorities to target and exclude PlusPass from the market and submarket" (¶ 80). In Argument Sections V and III, respectively, Verra debunks the notions that its indirect subsidiaries' contracts with RACs are anticompetitive or that the merger somehow violated Section 7 of the Clayton Act. Here, Verra dispatches PlusPass's allegations that Verra monopolized by "manipulat[ing] technology."

The fatal flaw in PlusPass's "manipulation of technology" theory is that it fails to allege any plausible creation or extension of a monopoly through predatory or anticompetitive conduct by Verra. *Trinko*, 540 U.S. at 407; *see also United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001) ("possessing monopoly power is not itself an antitrust violation" (citation omitted)). A monopoly is not illegal unless it is maintained through illegal means. *Trinko*, 540 U.S. at 407 ("The mere possession of monopoly power" is not "unlawful"); *see also Name.Space, Inc. v. Internet Corp. for Assigned Names and Numbers*, 795 F.3d 1124, 1131-32 (9th Cir. 2015). Conduct that is simply "not advantageous to [PlusPass's] business model" is not anticompetitive and does not violate Section 2 of the Sherman Act. *Id*. at 1132. Rather, anticompetitive conduct is "conduct without a legitimate business purpose that makes sense only because it eliminates competition." *Morris Commc'ns Corp. v. PGA Tour,*

*Inc.*, 364 F.3d 1288, 1295 (11th Cir. 2004); *see also Novell v. Microsoft Corp.*, 731 F.3d 1064, 1075 (10th Cir. 2013) (Gorsuch, J.) ("the monopolist's conduct must be irrational but for its anticompetitive effect.").

PlusPass bases its "manipulation of technology" theory of monopolization on four kinds of alleged conduct by Verra: (1) "obscur[ing] the toll tag ID number" (¶ 46), (2) "registering its cars under false license plates" (¶ 45), (3) "updat[ing] the registration information for its fleets far more frequently than necessary" (¶ 47), and (4) offering a "PlusPass copycat app, named Peasy, that allows consumers to pay for tolls" and "disabl[ing] Peasy's functionality for rental cars" (¶ 49). But the SAC fails to plausibly allege that such conduct is "anticompetitive conduct" under *Trinko*.

*First*, PlusPass's allegation that Verra "had employees, by hand, obscure the toll tag ID number and then place deceptive stickers that mimicked toll tag ID numbers" to interrupt the app's "toll tag borrowing technology" (¶ 46), falls far short of alleging anticompetitive conduct. As the SAC alleges, Verra procured and "placed toll tags on cars in its fleets." *Id.* PlusPass thus concedes that Verra procured and registered these toll tags to its account. Yet, PlusPass oddly contends that it sought to have its customers use *Verra's* toll tag ID number (rather than the license plate) to register the vehicle with the PlusPass App. Verra has no obligation to let any competitor use its transponders. *Trinko,* 540 U.S. at 411; *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F. 3d 974, 993 (9th Cir. 2020) (quoting *Pac. Bell Tel. Co. v. LinkLine Commc'ns, Inc.*, 555 U.S. 438, 457 (2009) (other citations omitted) ("'As the Supreme Court has repeatedly emphasized, there is 'no duty to deal under the terms and conditions preferred by [a competitor's] rivals[.]'"). Moreover, transponders cannot be registered to more than one account at a time, so even if the renter could read the Transponder ID number, he or she would not be able to register it with a PlusPass account while it was already registered to Verra's account.[8] Thus,

---

[8] "A single vehicle may not contain or be associated with more than one TollTag™." *See, e.g.*, RJN, Ex. 17, NTTA TollTag Agreement Sections 3 and 4(g).

even taking PlusPass's allegations as true, such alleged conduct could not be anticompetitive because the renter's inability to read the Transponder ID is not the impediment. Additionally, nothing prevents a rental car customer from using the PlusPass App by registering the license plate to pay a toll, as it is common knowledge that a renter can avoid using a transponder by simply closing its box cover.[9]   The inventory sticker argument is a red herring.

*Second*, PlusPass's allegations that Verra registered rental vehicles using "false license plates" also fail to allege anticompetitive conduct. Even if PlusPass's allegations were true (which they are not), such conduct would not constitute exclusionary conduct because it would have *helped* PlusPass compete for business. In PlusPass's own words, "PlusPass' app works by having the renter photograph and read the license plate of the [rental] car, and then register it to PlusPass' account for the duration of the rental agreement." ¶ 44. So, if, as PlusPass alleges, Verra's indirect subsidiaries had "register[ed] its cars [with the tolling authority] under false license plates" (¶ 45), then the actual license plates for such rental cars would *not* have been enrolled with the tolling authority. Thus, far from excluding competition, the alleged conduct would have enabled PlusPass App users to register the actual license plates of such rental cars with the tolling authority through the PlusPass App.

In reality, neither Verra nor its indirect subsidiaries ever registered cars belonging to RACs under "false license plates." Rather, with respect to only one tolling authority in Texas, the North Texas Tollway Authority (NTTA), which uses toll tags, Verra's indirect subsidiaries initially procured toll tags for large fleets by assigning temporary numbers, rather than real license plate numbers. The reason is simple and justified: in order to obtain the toll tags at the outset (before installing them

---

[9] Verra's indirect subsidiaries in fact place unique *inventory numbers* on their procured transponders to track inventory and vehicle association. That practice began in 2008, well before PlusPass marketed its app. Employing such an inventory tracking system, justified by a legitimate business purpose, is not anticompetitive conduct. *Novell*, 731 F.3d at 1066 (Not illegal for Microsoft to "refuse to share its intellectual property with rivals").

in the vehicle), the tag was required to be associated with a license plate number. Because Verra procures the tags in large volumes in order to install them into fleets, it has no way of knowing the actual license plate that would be associated with each toll tag at the time of procurement and therefore, with NTTA's knowledge and permission, used temporary plate numbers solely for the purpose of obtaining the tag. As soon as the tag is installed in a specific vehicle, the account information is updated with the correct (and actual) vehicle information. RJN, Ex. 18, North Texas Tollway Authority TollTag FAQ page ("Each TollTag is directly associated with a specific license plate on record with NTTA.")

*Third*, allegedly "updat[ing] the registration information for its fleets far more frequently than necessary" (¶ 47), is not exclusionary conduct, and to the contrary, serves the legitimate business purpose of ensuring that a RAC's vehicle fleet and its rental car customers are always protected from toll violations. *Morris*, 364 F.3d at 1295; *Novell*, 731 F.3d at 1075. RACs have hundreds of thousands of vehicles, which can change daily with new vehicles being added to the fleet, vehicles being "defleeted," transponders being moved between vehicles, and in some jurisdictions, the transfer of license plates from one vehicle to another. A significant value of Verra's services is that it is able to update the information for its RAC's fleets on a daily basis to ensure that every rental vehicle is covered on its account to ensure payment of the toll, and, if applicable, associated with the tag or transponder that is installed in the vehicle. Without this daily updating, renters could be driving cars that incur violations, or worse, a renter could be driving a car associated with a transponder or license plate for a different vehicle, with the result that any tolls would then be charged to the wrong renter. Even beyond this legitimate business purpose, PlusPass's claim makes no sense: on the one hand PlusPass claims that Verra is registering its fleet with false license plates (¶ 45), and on the other hand, that Verra is updating the registration information of its vehicles "more frequently than necessary" to ensure

that the vehicle's plate is correctly attached to Verra's account. Verra has no obligation to slow down its updates to help PlusPass. *Trinko*, 540 U.S. at 411 ("there is no duty to aid competitors" under the antitrust laws); *Qualcomm*, 969 F. 3d at 993.

*Fourth* and finally, PlusPass's allegation that Verra made the "irrational" decision to disable Peasy for rental car use, also fails to allege anticompetitive conduct.[10] ¶ 49. If it actually were a practical alternative for rental cars (which it is not), Peasy would take away business from PlusPass. So, the fact that Peasy has no functionality for rental cars *helps* rather than "thwarts" PlusPass. ¶ 49. Further, the decision not to offer Peasy for rental car use was quite rational because such use could interfere with the business interests of Verra's RAC customers and contractual obligations to provide nationwide tolling services to them. *Novell*, 731 F.3d at 1075.

## V. THE SAC FAILS TO ALLEGE ANTICOMPETITIVE EXCLUSIVE DEALING AGREEMENTS.

As to Count III, PlusPass fails to allege the basic elements of anticompetitive exclusive dealing agreements. Given the well-recognized economic benefits of exclusive dealing arrangements, such agreements violate Section 1 *only* if their effect is to "foreclose competition in a substantial share of the line of commerce affected." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010) (citation omitted). The contracts here do nothing of the kind.

PlusPass makes the conclusory claim that "Verra has entered into a series of anticompetitive, long term exclusive dealing agreements…to foreclose competition." ¶ 89. As established in Statement of Facts Section A and Argument Section II *supra*, however, the court in the Texas Litigation explicitly held to the contrary—that the contracts at issue do not preclude the use of apps such as the PlusPass App. RJN, Ex. 10 at 21-24. PlusPass cannot now argue that the contracts at issue directly

---

[10] Although Verra does offer the Peasy tolling app for consumers, Verra did not disable Peasy's functionality for rental cars, since it *never* offered consumers such functionality for rental cars.

preclude consumers from choosing the PlusPass App as an alternative to Verra's services.[11] Also, the Ninth Circuit has held, "[i]f competitors can reach the ultimate consumers of the product [or services] by employing existing or potential alternative channels of distribution, it is unclear whether [exclusive dealing arrangements] foreclose from competition *any* part of the relevant market." *PNY Techs., Inc. v. SanDisk Corp.*, 2014 WL 1677521, at *7 (N.D. Cal. Apr. 25, 2014) (citing *Omega Envtl., Inc. v. Gilbarco,* 127 F.3d 1157, 1163 (9th Cir. 2010)).

With respect to agreements with RACs, PlusPass's argument is equally unavailing. HTA and ATS compete to provide *national* third-party toll administration services. ¶ 40 (national coverage required to offer a competitive choice). The SAC concedes that the market consists of the twenty-two states, the District of Columbia and Puerto Rico that have electronic tolls. ¶ 57. In such an aggregated market, PlusPass admittedly cannot compete, as it operates in only nine states. National RACs expect that their vehicles will be covered beyond state lines. PlusPass did not and cannot provide that service.

The claim fails because it lacks factual allegations that Verra's conduct foreclosed PlusPass from competing with the same national service. *See Abbyy USA Software House, Inc. v. Nuance Commc'ns Inc.*, No. C 08-01035 JSW, 2008 WL 4830740, at *2 (N.D. Cal. Nov. 6, 2008) (conclusory allegations insufficient on a motion to dismiss claim that "certain retail outlets" were foreclosed); *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 906-07 (9th Cir. 2008) (no exclusionary harm unless conduct would exclude equally efficient competitor). PlusPass wants this Court to give it a leg up so that it can compete without making the kind of investments that

---

[11] PlusPass has not pointed to anything that could somehow cause the Hertz contracts to exclude the PlusPass App despite the judicial determination that the similar Enterprise and Avis contracts are not exclusive. In any event, Hertz has only about a twenty-five percent (25%) share of rental vehicles nationally. *See* RJN, Ex. 19, Hertz Feb. 26, 2021 10-K ("The average number of vehicles in the U.S. vehicle rental industry…[is] about 2 million vehicles," and noting that Hertz operated a peak rental fleet in its U.S. rental car segment of approximately 515,700 vehicles).

Verra made (*e.g.,* costs of integration of hardware, software, and personnel infrastructure, ¶ 56).

Moreover, as PlusPass concedes on its website, it depends on toll operators—*not* modification of existing contracts with RACs—to enable the PlusPass App for rental car use. RJN, Ex. 15 (Q: "Why can't I use PlusPass® for Rental Vehicles?"; A: "We depend on the Toll Operators in order to make this happen."). The PlusPass App also relies entirely on the initiative of individual rental car users to enroll with PlusPass, making it an impractical solution for RACs and subjecting them to substantial risk of violations. PlusPass also contends that it "has or can obtain the capital to expand its infrastructure to grow into new regions" (¶ 60), thus conceding that it cannot compete nationally. Therefore, PlusPass has failed to plead any foreclosure in a relevant market, as it has failed to allege how the contracts impact other competitors capable of providing the same or similar *national* services. *See Eastman v. Quest Diagnostics Inc.*, 724 F. App'x 556, 558 (9th Cir. 2018) (affirming Rule 12(b)(6) dismissal where plaintiffs failed to allege how the "exclusive dealing arrangements" impacted competitors). The agreements at issue here do not foreclose competition. The majority of RACs simply chose ATS or HTA as their third-party toll administrator. Finally, the Texas Litigation has already established that these contracts do not prevent PlusPass from competing. The SAC thus fails to allege anticompetitive agreements.

Additionally, absent a showing that one of the parties was *coerced* to enter an agreement or that there was similar anticompetitive conduct, an exclusive dealing agreement may function simply as legal competition on the merits. *See PNY Techs., Inc. v. SanDisk Corp.*, 2014 WL 2987322, at *6 (N.D. Cal. July 2, 2014) (assertion of exclusive dealing was not plausible because plaintiff did not plead facts showing it failed to win contracts despite offering better terms); *see also Power Analytics Corp. v. Operation Tech., Inc.*, 2017 WL 11486807, at *18 (C.D. Cal. Dec. 7, 2017)

(affirmed on appeal in *Power Analytics Corp. v. Operation Tech. Inc*, 748 F. App'x 334, 335 (Fed. Cir. 2019), cert. denied sub nom. *Power Analytics Corp. v. Operation Tech., Inc.*, 140 S. Ct. 910, 205 L. Ed. 2d 456 (2020)). By PlusPass's own allegations, RACs continue to choose Verra. Avis chose to continue with Verra. ¶ 39. Hertz chose to continue with ATS in the bankruptcy proceeding when it had the option not to do so. ¶ 37; *In re Pomona Valley Med. Grp., Inc.*, 476 F.3d 665, 670 (9th Cir. 2007) (decision to assume or reject executory contracts is subject to the business judgment of the debtor-in-possession). And another RAC partner, Sixt, signed an extension in 2020, demonstrating not coercion, but rather that RACs continue to value Verra's platform and performance. *Id.* An additional renewal with Enterprise is being finalized. RJN, Ex. 20. Thus, PlusPass has failed to plausibly allege coercion and anticompetitive exclusive dealing and more importantly has not been selected by a single RAC. Failing to compete in the marketplace, it sues here.

## VI. DISMISSAL WITH PREJUDICE IS APPROPRIATE.

"When amendment would be futile, ... dismissal may be ordered with prejudice." *Romero v. Countrywide Bank, N.A.*, 740 F. Supp. 2d 1129, 1135 (N.D. Cal. 2010); *Dumas v. Kipp*, 90 F.3d 386, 393 (9th Cir. 1996). Here, PlusPass has utterly failed—in three attempts—to state a claim. *Falstaff* Brewing *Co. v. Stroh Brewery Co.*, 628 F. Supp. 822, 831 (N.D. Cal. 1986). Discovery in antitrust actions is "extensive, and the expense of such litigation [is] crushing." *Id.* "To require defendants to further defend an anti-trust action, where it appears that plaintiffs cannot properly allege, much less prove, [an antitrust violation] would be a gross miscarriage of justice." *Id.* Thus, any further amendment would be futile. *Carbajal v. Wells Fargo Bank, N.A.*, No. 14-cv-7851, 2015 WL 2454054, at *4 (C.D. Cal. Apr. 10, 2015).

## CONCLUSION

For the foregoing reasons, Verra respectfully requests that its Motion to Dismiss be granted and that the SAC be dismissed in its entirety with prejudice.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated:  May 28, 2021

Respectfully submitted,

DLA PIPER LLP (US)

By: */s/ John S. Gibson*
 _____
       JOHN S. GIBSON

Attorneys for Defendant
VERRA MOBILITY CORPORATION