SQUIRE PATTON BOGGS (US) LLP
Mark C. Dosker (CA Bar #114789)
Thomas J. Lloyd (CA Bar # 305507)
555 California Street, Suite 550
San Francisco, California 94104
Telephone: (415) 954-0200
Facsimile: (415) 393-9887
E-mail: mark.dosker@squirepb.com
thomas.lloyd@squirepb.com

SQUIRE PATTON BOGGS (US) LLP
Brian A. Cabianca (*pro hac vice*)
Kerryn L. Holman (*pro hac vice*)
David S. Norris (*pro hac vice*)
2325 E. Camelback Road, Suite 700
Phoenix, AZ 85016
Telephone: (602) 528-4000
Facsimile: (602) 253-8129
E-mail: brian.cabianca@squirepb.com
kerryn.holman@squirepb.com
david.norris@squirepb.com

Attorneys for Defendant
VERRA MOBILITY CORPORATION

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PLUSPASS, INC., <br><br> Plaintiff, <br><br> v. <br><br> VERRA MOBILITY CORP., <br><br> Defendant. | Case No. 2:20-CV-10078-FWS-SKx <br><br> **MEMORANDUM OF POINTS AND AUHTORITIES IN SUPPORT OF DEFENDANT VERRA MOBILITY CORPORATION'S MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF EINER ELHAUGE** <br><br> The Honorable Fred W. Slaughter <br><br> Date: *September 26, 2023* <br> Time: *8:30 a.m.* <br> Place: Courtroom 10D |

Professor Einer Elhauge's opinions on the relevant market and PlusPass' purported damages should be excluded because they both fail *Daubert*'s reliability standard.[1] First, Elhauge arbitrarily excludes "reasonably interchangeable" products from his definition of the relevant market based on subjective and unsupported conclusions of "convenience." Second, Elhauge manufactured a speculative measure of damages built on unsupported assumptions, which renders his damages opinion unreliable. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

In addition, Elhauge's "cartel ringmaster" theory—which he uses to imply the existence of a giant price-fixing conspiracy between Defendant Verra Mobility Corp. and virtually every rent-a-car company ("RAC") in the United States—must be excluded because it is contrary to PlusPass' actual allegations in the operative complaint, and PlusPass is not asserting claims for conspiracy or price-fixing. *Oliver v. Ralphs Grocery Co.*, 654 F.3d 903, 908–09 (9th Cir. 2011) (Rule 8 "preclud[es] consideration" of expert opinions on claims not plead in the complaint).

## I. Elhauge's Opinions on Relevant Market and PlusPass' Damages Should Be Excluded Under FRE 702.

FRE 702 "imposes a special obligation upon a trial judge" to ensure all expert testimony "is not only relevant, but reliable.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). The Court must act as "gatekeeper" by assessing the soundness of the expert's methodology and excluding testimony that is unreliable. *Id.* at 147–48; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589–90 (1993). In short, there must be "good grounds" for the expert's testimony; it cannot be based on "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. "The

---

[1] During the parties' L.R. 7-3 meet and confer, PlusPass suggested that the Court's Scheduling Order prohibited Verra from filing this *Daubert* motion prior to the October 4, 2023 deadline to file *Daubert* motions. To the contrary, the Scheduling Order explicitly allows "other motions" to be filed prior to the summary judgment hearing [Dkt. 165 at 2]. And the parties *stipulated* a year ago that *Daubert* motions would likely accompany any summary judgment motion. [Dkt. 115 at 3–4, 5.]

proponent of expert testimony has the burden of proving by a preponderance of the evidence that the admissibility requirements are met." *In re Canvas Specialty, Inc.*, 261 B.R. 12, 17 (Bankr. C.D. Cal. 2001).

### A.  Elhauge's Opinion on the Relevant Market Is Unreliable.

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Golden Gate Pharm. Servs., Inc. v. Pfizer, Inc.*, 433 F. App'x 598, 598 (9th Cir. 2011). In a consumer market, "[i]f consumers view the products as substitutes, the products are part of the same market." *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1435 (9th Cir. 1995)

Elhauge's definition of the relevant market is unreliable because he excludes reasonably interchangeable products based on (1) erroneous data and (2) subjective and unfounded opinions. Specifically, after defining the relevant product market as "electronic toll payment ('ETP') for rental cars," Elhauge summarily excludes from his definition of the market both cash and tolling solutions offered by toll authorities. [Expert Report of Einer Elhauge (April 12, 2023) ("Elhauge") ¶¶ 36–37, 49, Ex. 39.][2]

Elhauge's basis for excluding cash is his reading of IBTTA's TollMiner Data, which he uses to state that only 8% of tolling facilities accepted cash payments in 2021. [*Id.* ¶ 37.] But Elhauge simply misread the data, which actually shows that ***almost 50%*** of tolling facilities in the U.S. were accepting cash in 2021. [Rebuttal Expert Report of Robert Ling (May 10, 2023), ¶¶ 23–24 & Figures 28–29, Ex. 42.]

Elhauge similarly provides no support for his conclusion that tolling products offered by the toll authorities—including mobile applications and web-based pay-by-plate—are not reasonably interchangeable with the PlusPass App. [Elhauge ¶ 49.] The sole basis for this conclusion is Elhauge's personal opinion that toll authority

---

[2] All exhibits referenced in this Motion are attached as exhibits to the Declaration of David Norris, filed concurrently herewith.

products are less "convenient[]" and "far more cumbersome" than using the PlusPass App. [*Id.*] But this personal opinion is unreliable for two reasons.

*First*, Elhauge suggests the registration process for toll authority apps and products is more cumbersome than the PlusPass App. [*Id.*] But Elhauge admitted that he has never used the PlusPass App or any other mobile tolling app (including any toll authority app), and has only used one state's web-based pay-by-plate product "a couple years" ago. [Deposition of Einer Elhauge ("Elhauge Depo.") at 65:10–66:10, 67:15–69:24, Ex. 37.] He thus lacks foundation for even a personal opinion, let alone an expert one, about whether one product is "more cumbersome" than another.

*Second*, Elhauge suggests the PlusPass App is more convenient to renters because it works in multiple states, while toll authority apps only work in one state. [Elhauge ¶ 49.] But Elhauge performs no analysis on the number of renters who incur tolls in more than one state. [*Id.*] Verra's economist, Dr. Israel, did, and found that 85% of renters incur tolls in only one state. [Expert Report of Mark A. Israel, Ph.D. (May 10, 2023), ¶ 30 & Table 1, Ex. 43.] Elhauge does not explain why a solution that works for 85% of renters is not "reasonably interchangeable." Elhauge even has a contradictory opinion later in his report that a product can be in the relevant market even if it works in only one state. [Elhauge ¶ 83 (it is "not necessary to offer a rental car ETP app in all states . . . to operate in the relevant market" because "absent Verra's exclusionary restraints, it would have been commercially viable for rivals to begin by offering rental car ETP apps *in only one state* . . . .") (emphasis added).]

Notably, Elhauge's relevant market opinions have been excluded before for this exact same reason. *It's My Party, Inc. v. Live Nation, Inc.*, 88 F. Supp. 3d 475, 488 (D. Md. 2015), *aff'd* 811 F.3d 676 (4th Cir. 2016). There, Elhauge defined the relevant product market as "major amphitheaters" because certain artists "prefer amphitheaters." *Id.* at 485. The court held that Elhauge's quantitative analysis that most artists either "strongly prefer playing at amphitheaters or they strongly prefer playing at non-amphitheaters" was unreliable because it "identifies only what

- 3 -

MEMORANDUM IN SUPPORT OF MOTION
TO EXCLUDE EXPERT EINER ELHAUGE
2:20-CV-10078-FWS-SKx

1   percentage of revenue artists make from each type of show" but "does nothing to
2   indicate whether a change in the price to artists for amphitheaters . . . would induce
3   greater demand for arenas or other venues." *Id.* at 486. Similarly, "Elhauge's attempt
4   to offer subjective proof of artist preference"—based on testimony from the lead
5   singer of Nine Inch Nails—that "amphitheaters had significant advantages over arena
6   venues" was unreliable because it did not show artists "would not substitute non-
7   amphitheaters for amphitheaters" in the face of a price change. *Id.* at 487; *see also In
8   re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 994–96 (C.D. Cal. 2012)
9   (excluding expert testimony on relevant market based on expert's subjective opinion).

10  Here, Elhauge's product market opinion is even flimsier. Elhauge has **zero**
11  quantitative or quantitative evidence on whether consumers prefer the PlusPass App
12  versus toll authority apps or web-based payment solutions. He does not even have
13  foundation for a personal opinion about what products are more convenient or
14  cumbersome because he has never used the PlusPass App or the toll authority
15  solutions. Elhauge's unreliable product market definition should be excluded. *See,
16  e.g.*, *Malaney v. UAL Corp.*, 2010 WL 3790296, at *5 (N.D. Cal. Sept. 27, 2010),
17  *aff'd*, 434 F. App'x 620 (9th Cir. 2011) ("[A] market definition that is too narrow or
18  excludes relevant competition is misleading.").

19  **B.    Elhauge's Opinion on PlusPass' Damages Is Unreliable.**

20  Elhauge's opinions on damages should be excluded as unreliable because his
21  opinion is speculative and based on unfounded assumptions. *Brooke Grp. Ltd. v.
22  Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) (expert opinion must
23  be "supported by sufficient facts to validate it in the eyes of the law"); *McGlinchy v.
24  Shell Chem. Co.*, 845 F.2d 802, 807 (9th Cir. 1988) (affirming exclusion of expert
25  whose "speculation about the amount of appellants' damages has scant basis in the
26  record" and whose "study rests on unsupported assumptions and unsound
27  extrapolation"); *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 861 (9th
28  Cir. 2014) (affirming exclusion of testimony that was "unsupported by the facts").

SQUIRE PATTON BOGGS (US) LLP
555 California Street, Suite 550
San Francisco, California 94104

Elhauge's entire damages methodology and calculation is built on top of five, fatally-flawed assumptions, the exclusion of *any* of which renders his entire conclusion that PlusPass suffered $73 million in lost profits wholly unreliable.

*First*, Elhauge opines on the "but-for size of the now-foreclosed part of the market" from 2018 through 2030 based on "tolls paid by U.S. RAC customers to Verra." [*Id.* ¶¶ 162–63 & Table 3.] But Elhauge's calculation assigns lost profits to PlusPass from certain states **before** PlusPass even offered the PlusPass App in those states. Specifically, Elhauge's lost profits damages calculation begins in March 2018. [*Id.* ¶ 157.] But it is undisputed that the PlusPass App was available to the public in only three states at that time: Texas, Colorado, and Washington. [Pl. PlusPass, Inc.'s Resps. to Def.'s First Set of Interrogs., at 5, 7–8, Ex. 69.] Elhauge includes California in his damages model starting in March 2018, even though PlusPass did not obtain a contract to work in California until **June 2022**. [*Id.*] Elhauge thus includes four years of lost profits damages from a state with one of "the largest number of rental cars" [Elhauge ¶ 84] when PlusPass did not work in that state. Elhauge implicitly acknowledges this unsustainable position later in his report when he excludes other (smaller) states from the but-for market because "PlusPass cannot currently be used in those states." [*Id.* ¶ 162.]

*Second*, Elhauge speculates that in the "but-for" world, ~58% of all renters (within seven years) would use mobile tolling apps—his so-called app penetration rate—instead of using another method like paying cash, a toll authority app, or a RAC solution. [Elhauge ¶ 170.] This entire assumption is based on the supposed app penetration of ridesharing apps (Uber and Lyft) in New York and two parking apps (ParkBoston and ParkMobile) in Boston and Miami Beach. [*Id.* ¶¶ 166–70.] But Elhauge provides no legitimate basis for concluding that rideshare and parking apps are the correct "yardstick" for tolling apps. *See El Aguila Food Prods. Inc. v. Gruma Corp.*, 131 F. App'x 450, 453 & n.7 (5th Cir. 2005) (affirming exclusion where expert made no effort to demonstrate "reasonable similarity" of the firms being compared);

- 5 -

MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE EXPERT EINER ELHAUGE
2:20-CV-10078-FWS-SKx

1  *Loeffel Steel Prod., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 812–17 (N.D. Ill. 2005) (excluding expert model based on yardstick companies in the same "industry," where expert did not "consider[] such critical factors as what services the companies provided, their customer base, the products they sold, the geographic markets in which they operated, their prices and other critical aspects of the business").

Elhauge also offers no support for why app penetration in major metropolitan cities on the East Coast are comparable to nationwide adoption for mobile tolling apps, nor does he offer any basis for comparing the PlusPass App and its four-person operation to two of the most successful apps in history—Uber and Lyft. *See In re Incretin-Based Therapies Prods. Liab. Litig.*, 524 F. Supp. 3d 1007, 1039 (S.D. Cal. 2021), *aff'd,* 2022 WL 898595 (9th Cir. Mar. 28, 2022) (excluding expert report based on a "cherry-picked selection of favorable data"); *Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 667 (5th Cir. 1974) ("[T]he business used as a [yardstick] standard must be as nearly identical to the plaintiffs as possible.").

Elhauge also ignores far more comparable apps, including apps the RACs offer their customers, likely because the evidence shows that adoption of those apps is very low. [Elhauge Depo. at 314:24–317:10; Deposition of Beth Gibson at 319:7–23 (approximately 25% of Avis renters use the Avis app), Ex. 28.] He also ignores the **only direct evidence in this case** of potential market penetration for rental car ETP apps, which is testimony from a representative from Advantage Rent-A-Car that **less than 10%** of renters are likely to use ETP apps. [Deposition of James Sutton Deposition at 197:2–14, Ex. 30; Elhauge Depo. at 318:4–19.]

<u>Third</u>, Elhauge's assumption that PlusPass would capture 75% of the rental car tolling app market based on a purported "first mover advantage" is also speculative and unreliable. [Elhauge ¶¶ 171, 175.] Elhauge does not cite a single case, article, or treatise to support the supposed "first mover advantage." In fact, the literature shows that any "first-mover advantage" is highly fact specific, first movers in an industry regularly do not achieve the highest share, and those that do have satisfied a number

- 6 -

MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE EXPERT EINER ELHAUGE
2:20-CV-10078-FWS-SKx

1  of factors (none of which Elhauge even considers). [Gerard Tellis and Peter Golder
2  (1996), "First to Market, First to Fail? Real Causes of Enduring Market Leadership,"
3  *Sloan Management Review*, 37(2), pp. 65–75, Ex. 81.]

4   Elhauge's statement that PlusPass would have obtained a 75% share of the app
5  market is also refuted by the actual data in the record. The tolling app market is
6  crowded with competing apps, **every one of which has vastly outperformed**
7  **PlusPass**. [Keating ¶ 64.] It is undisputed that the PlusPass App has been downloaded
8  across the Apple and Google Play Stores approximately 20,000 times while PlusPass'
9  competitors Upoad, GoToll, and PayTollo have been download **up to 50 times** more
10 than that. [Expert Rebuttal Report of Bryan G.M. Keating (May 10, 2023), ¶ 64 &
11 Figure 4 (providing undisputed data reflecting download counts for Upoad
12 (>500,000), PayTollo (>300,000), and GoToll (>100,000)), Ex. 44.] All three of
13 these competitor apps also have **ten times** the number of ratings as, and higher
14 average ratings than, the PlusPass App. [*Id.* ¶ 58 & Table 2.] Elhauge ignores all this
15 to speculate in PlusPass' favor that it would have won 75% of the market.

16  *Fourth*, Elhauge assumes PlusPass' "but-for profitability" would be 5.535%
17 and its "but-for profit margin" would be 36.9%. [Elhauge ¶¶ 177–83.] This
18 assumption is based on the additional assumption that PlusPass will continue to
19 charge a 15% administrative fee on all toll payments. [*Id.* ¶ 177.] But PlusPass' CEO
20 testified that its 15% revenue model **would not work in the but-for world** because
21 part of the toll fee would have to be paid to the RACs for access to their rental cars.
22 [Deposition of Glenn Deitiker at 316:10–19, Ex. 31.]

23  In the real world, the PlusPass App has never turned a net profit using its 15%
24 administrative fee. [*Id.*, at 239:19–22.] That is bad, of course, for a litigant like
25 PlusPass who wants to treble a lost profits award of $75 million. [SAC ¶ 98 (seeking
26 treble damages).] To get around this problem, Elhauge turns to a *different* yardstick—
27 large "payment processors" like FiServ and Fidelity—to opine that PlusPass would
28 enjoy a 36.9% profit rate. [Elhauge ¶ 182.] Thus, while he says Uber/Lyft are a "good

- 7 -  MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE EXPERT EINER ELHAUGE
2:20-CV-10078-FWS-SKx

yardstick" for app penetration, Elhauge (without explanation) abandons that "yardstick" for purposes of profitability, undoubtedly because it is well-publicized that Uber has never turned a profit. *See, e.g.*, *Uber Techs. Net Income 2017-2023*, Macrotrends, https://shorturl.at/hnALO (last visited June 16, 2023). And Elhauge provides no reasonable explanation for why these global financial services businesses would be a reliable benchmark for the profitability of a mobile tolling app, especially when they—unlike PlusPass—do not lose "close to half" of all revenue to credit card processing fees. [*Id.* at 38:2–4]; *Lehrman,* 500 F.2d at 667.

The unreliability of Elhauge's profit assumptions is further exposed by Elhauge's assertion that "a 2017 PlusPass financial forecast" provides "additional support" for his 36.9% profit rate. [Elhauge ¶ 181.] But PlusPass' 30(b)(6) witness testified that PlusPass "threw away" this same 2017 "forecast" because it was "broken." [Deposition of PlusPass 30(b)(6) at 278:23–279:11, 291:22–25, 296:6–11, Ex. 32.] If it was "broken" to PlusPass out of court, it is not a reliable basis for a expert economic calculations in a court of law.

*Finally*, at deposition, Elhauge testified that his "but for" world is based on the use of "a backstop platform that would allow rival tolling products." [Elhauge Depo. at 278:9–25.] This "platform," Elhauge testified, is "describe[d] well" in the Rebuttal Report of Matthew Zehnder, served a month after Elhauge's Report. [*Id.* at 281:13–282:21.] That rebuttal report should be excluded as untimely and improper rebuttal, as set forth in Verra's contemporaneous motion. Elhauge's admission that his "but for" world is not based on PlusPass' current app but is instead based on using an entirely new "platform" that "PlusPass hasn't actually developed" renders his damage calculation even more speculative. [*Id.* at 281:18–282:5, 285:17–286:9.] Every flaw discussed above—from inapposite "yardstick" apps like Uber and Lyft to unfounded assumptions about PlusPass' profitability—is magnified because Elhauge did not even mention the "platform" in his report, let alone model its features, like the time and cost to develop, operate, or market it to toll authorities or RACs. Elhauge

- 8 -

MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE EXPERT EINER ELHAUGE 2:20-CV-10078-FWS-SKx

does not even explain who would operate the "platform" and what they would charge for access. *See El Aguila*, 131 F. App'x at 453 & n.7.

In sum, Elhauge's opinions on PlusPass' damages are rife with unsupported speculation, rendering his entire damages opinion an inadmissible "castle made of sand." *Benjamin v. Peter's Farm Condo. Owners Ass'n*, 820 F.2d 640, 643 (3d Cir. 1987); *Gen. Elec. Co.*, 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."). Accordingly, the Court should exclude Elhauge's damages opinion in its entirety.

## II. Elhauge's "Cartel Ringmaster" Theory Should Be Excluded as Undisclosed and Conflicting with PlusPass' Allegations.

Elhauge's opinion that Verra is acting as a "cartel ringmaster" in a giant, price-fixing conspiracy involving 99% of the rental car market should also be excluded because it was previously undisclosed and is completely contrary to the allegations in PlusPass' operative Complaint. *See Oliver*, 654 F.3d at 908–09 (Rule 8 "preclud[es] consideration" of expert opinions on theories not plead in the complaint); *see also Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.").

The premise of PlusPass' operative complaint is that the RACs are the ***victims*** of Verra's anticompetitive conduct. PlusPass alleges that Verra "***forc[es]*** rental car companies to make suboptimal choices"; that "rental car companies have no other choice ***but to bend to Verra's will***"; that Verra "provide[s] inferior terms, including on price and services, ***to the detriment of rental car companies***"; that "Verra has locked rental car companies . . . into supra-competitive prices and decade-old technology"; and, most importantly, that "Verra's exclusive dealing agreements are ***against rental car companies' self-interest***." [SAC ¶¶ 3, 37–43 (emphases added).]

In his report, Elhauge offers an entirely new, previously undisclosed, and contradictory theory that Verra is acting as a "cartel ringmaster by inducing RACs to

- 9 -

MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE EXPERT EINER ELHAUGE
2:20-CV-10078-FWS-SKx

1  agree to anticompetitive ETP price increases in return for sharing some of the
2  increased profits with the RACs." [Elhauge ¶ 9.] In other words, Elhauge opines that
3  exclusivity is **good** for the RACs. [Elhauge Depo. at 238:23–239:1 ("But in this case,
4  because they share in the profits, *I think exclusivity is in the interests of both the*
5  *RACs and of Verra* -- or Verra's predecessors.").] But PlusPass cannot now flip the
6  entire case on its head to assert a conspiracy claim based on a cartel ringmaster theory,
7  only after discovery has closed and representatives from four RACs were deposed
8  based on PlusPass' actual claims that exclusivity and the merger were **bad** for the
9  RACs. *See Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968 (9th Cir.
10 2006) (defendant not provided adequate notice of certain claims when grounds not
11 disclosed until expert report served after close of discovery); *Apple, Inc. v. Samsung*
12 *Elecs. Co.*, 2012 WL 3155574, at *4 (N.D. Cal. Aug. 2, 2012) (excluding expert
13 theories not disclosed during the discovery period).

14        Nor can PlusPass argue that cartel ringmaster is simply encompassed in the
15 claims that it actually pled. Cartel ringmaster is a "collusion" or "conspiracy" claim.
16 *See, e.g.*, *Package Shop, Inc. v. Anheuser-Busch, Inc.*, 675 F. Supp. 894, 921 (D.N.J.
17 1987); Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and*
18 *Their Application* ¶ 2212 (5th ed. 2023) (describing a "ringmaster" as facilitating
19 "effective collusion"). And such claims are subject to special pleading standards. *Bell*
20 *Atl. Corp. v. Twombly*, 550 U.S. 554, 553, 556–67 (2007) ("an allegation of parallel
21 conduct and a bare assertion of conspiracy" do not meet the "standard for pleading
22 an antitrust conspiracy"). PlusPass cannot bypass its pleading standard and a motion
23 to dismiss by disclosing its conspiracy theory for the first time after close of fact
24 discovery in an expert report. Indeed, PlusPass knows this, as it previously *plead* a
25 conspiracy claim in its First Amended Complaint ("FAC") but then abandoned all of
26 those allegations in its Second Amended Complaint ("SAC"). [*Compare* FAC (Dkt.
27 9) ¶¶ 2, 162, 168, 171, *with* SAC (Dkt. 56).]
28

SQUIRE PATTON BOGGS (US) LLP
555 California Street, Suite 550
San Francisco, California 94104

Dated: *September 14, 2023*

Respectfully submitted,

SQUIRE PATTON BOGGS (US) LLP

By: */s/ Mark C. Dosker*
    Mark C. Dosker

Attorneys for Defendant
VERRA MOBILITY CORPORATION

- 11 -

MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE EXPERT EINER ELHAUGE
2:20-CV-10078-FWS-SKx