UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION AT SANTA ANA

HONORABLE FRED W. SLAUGHTER, JUDGE PRESIDING

**CERTIFIED TRANSCRIPT**

PLUSPASS, INC.,                    )
                                   )
            PLAINTIFF,             )
                                   )
         vs.                       ) SACV NO. 20-10078-FWS
                                   )
VERRA MOBILITY CORP.,              )
                                   )
            DEFENDANT.             )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

TUESDAY, SEPTEMBER 26, 2023

8:57 A.M.


DEBORAH D. PARKER, CSR 10342
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
411 WEST FOURTH STREET
SUITE 1-053
SANTA ANA, CALIFORNIA 92701
(657) 229-4305
transcripts@ddparker.com

**APPEARANCES OF COUNSEL:**

FOR THE PLAINTIFF, PLUSPASS, INC.:

                        DAVID W. KESSELMAN
                        KESSELMAN BRANTLY STOCKINGER LLP
                        1230 ROSECRANS AVENUE
                        SUITE 400
                        MANHATTAN BEACH, CALIFORNIA 90266
                        (310) 307-4555
                        dkesselman@kbslaw.com

                        AMY THOMAS BRANTLY
                        KESSELMAN BRANTLY STOCKINGER LLP
                        1230 ROSECRANS AVENUE
                        SUITE 400
                        MANHATTAN BEACH, CALIFORNIA 90266
                        (310) 307-4555
                        abrantly@kbslaw.com

                        ETHAN G. GIBSON
                        GIBSON WUNDER, PC
                        1221 LAMAR STREET
                        SUITE 1001
                        HOUSTON, TEXAS 77010
                        (713) 897-8008
                        ethan@gibsonwunder.com

**APPEARANCES OF COUNSEL:**

FOR THE DEFENDANT, VERRA MOBILITY CORP.:

                        MARK C. DOSKER
                        SQUIRE PATTON BOGGS US LLP
                        555 CALIFORNIA STREET
                        SUITE 550
                        SAN FRANCISCO, CALIFORNIA 94104
                        (415) 954-0200
                        mark.dosker@squirepb.com

                        DAVID S. NORRIS
                        SQUIRE PATTON BOGGS, LLP
                        2325 EAST CAMELBACK ROAD
                        SUITE 700
                        PHOENIX, ARIZONA 85016
                        (602) 528-4000
                        david.norris@squirepb.com

                        BRIAN A. CABIANCA
                        SQUIRE PATTON BOGGS, LLP
                        2325 EAST CAMELBACK ROAD
                        SUITE 700
                        PHOENIX, ARIZONA 85016
                        (602) 528-4000
                        brian.cabianca@squirepb.com

# I N D E X

| PLAINTIFF'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| EINER ELHAUGE | 26 | 63 | 100<br>114 | 112 |

| VOIR DIRE EXAMINATION<br>  BY THE COURT | | | | |
|---|---|---|---|---|
| EINER ELHAUGE | 115 | | | |
| MATTHEW PAUL ZEHNDER | 161 | | | |

# E X H I B I T S

| PLAINTIFF'S EXHIBITS: | | IDENTIFICATION | EVIDENCE |
|---|---|---|---|
| 16 | Excerpts from Draft American Traffic Solutions Presentation, dated July 2017, (Kesselman Decl. Ex. N., Dkt. 272-3) | 106 | |
| 18 | Curriculum Vitae of Matthew Zehnder | | 164 |

# E X H I B I T S

| DEFENDANT'S EXHIBITS: | | IDENTIFICATION | EVIDENCE |
|---|---|---|---|
| 106 | Plaintiff PlusPass, Inc.'s Supplemental Responses to Defendant's First Set of Interrogatories | 68 | |
| 107 | *It's My Party, Inc. v. Live Nation, Inc.*, 88 F.Supp.3d 475 | 90 | |

# E X H I B I T S

| DEFENDANT'S EXHIBITS: | IDENTIFICATION | EVIDENCE |
|---|---|---|
| 109    Phil Areeda and Herbert Hovenkamp's "Antitrust Law: An Analysis of Principles and Their Application," Fourth and Fifth Editions 2023 | 74 | |
| 110    Uber Technologies, Inc., Form 10-K, for the fiscal year ended, December 31, 2019 | 80 | |

EINER ELHAUGE                115

```
 1            SANTA ANA, CALIFORNIA; TUESDAY, SEPTEMBER 26, 2023;

 2                              8:57 A.M.

 3                               -oOo-

 4            THE CLERK:  Calling Calendar Item No. 1,

 5    CV 20-10078, PlusPass, Inc. versus Verra Mobility Corp.,

 6    et al.

 7            Counsel, please state your appearances for the

 8    record, beginning with the plaintiff.

 9            MR. KESSELMAN:  Good morning, Your Honor.

10            David Kesselman, on behalf of the plaintiff.

11            THE COURT:  Thank you.

12            MS. BRANTLY:  Good morning, Your Honor.

13            Amy Brantly, on behalf of the plaintiff.

14            THE COURT:  Thank you.

15            Good morning, Your Honor.

16            MR. GIBSON:  Ethan Gibson, on behalf of the

17    plaintiff.

18            THE COURT:  Thank you.

19            MR. CABIANCA:  Good morning, Your Honor.

20            Brian Cabianca, on behalf of Verra Mobility.

21            And with me is David Norris -- my colleague

22    David Norris and my colleague Mark Dosker, all representing

23    Verra Mobility.

24            THE COURT:  Thank you.  And good morning.

25            I hope everyone is doing well.
```

*Deborah D. Parker, U.S. Court Reporter*

7

08:57:51  1            The Court has come out a little bit later.  I

  2   usually start right when we're started, but there's a lot of

  3   material here and also the proffers were filed, like, at

  4   10:26 and 10:27.

08:58:00  5            I stopped work at 9:37 last night, so I appreciate

  6   that.  I did try to stay up as late as I could.  I know that

  7   the deadline was 8:00 a.m., so there's no problem with that.

  8   It's just, I have to be prepared.  And I also want to make

  9   sure I read all of the reports multiple times, which I have.

08:58:17  10  And so, I appreciate everyone's patience.  And also I think

  11  it gave you a little bit of time to get acclimated.  Is

  12  everyone going to be ready?

  13            MR. KESSELMAN:  Yes, Your Honor.

  14            MR. GIBSON:  Yes, Your Honor.

08:58:28  15            THE COURT:  All right.  Thank you.

  16            So we are going to have our hearings today.  Are

  17  both of the witnesses here?

  18            MR. KESSELMAN:  Yes, Your Honor.

  19            THE COURT:  Okay.  All right.

08:58:36  20            And so we're going to start, and I just always

  21  want to make sure -- make sure that I have the

  22  pronunciations correct.

  23            Your two witnesses are named -- just so I have it

  24  correct.

08:58:48  25            MR. KESSELMAN:  Professor Einer Elhauge.

*Deborah D. Parker, U.S. Court Reporter*

8

08:58:51  1                    THE COURT:  Elhauge.  Yes.

          2                    MR. KESSELMAN:  Mr. Matthew Zehnder.

          3                    THE COURT:  Yes.  We we're going to start with

          4      Elhauge.

08:58:56  5              And so the Court has your proffers, has the

          6      reports.  And so what the Court is also interested in is,

          7      this is just the *Daubert* hearing.  This is not a discovery

          8      hearing.  I think sometimes *Daubert* hearings turn into

          9      *de facto* depositions trying to get material for a later

08:59:21 10      trial, maybe in this case?  Maybe for a different case?

         11      That sometimes happens.

         12              Have you ever seen that happen, either side?

         13                    MR. KESSELMAN:  Sure, Your Honor.

         14                    MR. CABIANCA:  Yes, Your Honor.

08:59:35 15                    THE COURT:  Okay.  So we're not doing that.

         16              So is everyone ready with the standard on what

         17      we're doing here today?  There may be later on questions as

         18      to other things, other issues; but today, it's only *Daubert*,

         19      *Kumho*, all the Ninth Circuit cases that are going to talk

08:59:57 20      about, you know, "relevant and reliable."

         21              So what the Court has to try to glean, because

         22      this, for example, is not, if we look at Elhauge's report,

         23      a -- say, a D.U.I.  Let's just go to a criminal case,

         24      outside of this, where you take a lot of information.  And

09:00:17 25      there could be journals and things that are relied on,

*Deborah D. Parker, U.S. Court Reporter*

9

09:00:21  1   versus case-specific hearsay, things of that nature.   And

2   it's just an opinion on, kind of, one basis.

3           So when we're going through this, as we go through

4   the questions, I'm going to have to try to understand what

09:00:37  5   opinions are actually trying to be rendered, because the

6   report reads like a narrative in some sense, and I don't

7   know if that's what you're looking for to, basically, go

8   from a narrative, or -- I have an executive summary.   Are

9   those the opinions that are going to be relied upon?   Or is

09:00:55 10   it more of a narrative that is going to comment on the

11   entire case?   So I will have to understand that from

12   plaintiff's point of view as the proffer goes through.

13           So in looking at that, the Court is going to have

14   each side have a half an hour to be able to ask the

09:01:31 15   questions as to the opinions that are going to be rendered.

16           Let me just ask the plaintiff:   How many opinions

17   that are expert opinions, rather than just the background

18   qualifications, things of that nature, are you looking to

19   provide in this matter?

09:01:47 20           Just so it's clear so both sides understand.

21           MR. KESSELMAN:   So, Your Honor, we put it -- can I

22   use the podium, Your Honor?

23           THE COURT:   You may.

24           MR. KESSELMAN:   So we put it in the proffer.   We

09:02:01 25   had understood that the focus of the *Daubert* hearing would

*Deborah D. Parker, U.S. Court Reporter*

09:02:04  1    be solely on the grounds that defendant Verra has moved to

2    exclude certain opinions by Professor Elhauge.  Those are

3    his opinion as it relates to the relevant market, although

4    we contend as --

09:02:21  5          THE COURT:  Okay.  This could go on for a long

6    time.  Please just listen to the question.

7          The opinions -- I understand everything you just

8    said.  I understand we're here for specific questions as to

9    the *Daubert*, so just -- you could point me to the opinions

09:02:35 10    that you're saying were the opinions.  You could just say,

11    *They're listed in this section of the proffer.*

12          That's all I'm looking for.  I'm not looking for

13    anything broader.  The Court spent some time reading

14    everything.  I read this -- this report, the whole report to

09:02:50 15    be able to be prepared, okay, which is quite some length for

16    Professor Elhauge.

17          So, again, for everyone today, again, this Court

18    is super positive.  My glass isn't half full.  It's not half

19    empty.  It's overflowing.  And even when it's empty, it's

09:03:07 20    full of air, okay.  Every moment is an opportunity for

21    greatness.

22          But what I do find happens sometimes is, I ask a

23    question and it starts going into argument on other things.

24    I'm just asking this question.  I understand that you

09:03:21 25    understood that this is only going to be the challenged

*Deborah D. Parker, U.S. Court Reporter*

09:03:23  1    *Daubert* hearing opinions.  Tell me what opinions you're

2    relying on here and then I'm going to see that for the focus

3    of the testimony, so I'm just trying to see what it's going

4    to be.

09:03:36  5            I see the relevant market, which I understand that

6    you disagree.  We talked about this before during --

7    what? -- the motion for summary judgment, right?

8            MR. KESSELMAN:  Yes, Your Honor.

9            THE COURT:  There's a big disagreement about the

09:03:48 10   rental car versus all cars.  I'm prepared, okay, so I don't

11   need the background.  So on the relevant market and also

12   damages, correct?

13           MR. KESSELMAN:  Yes, Your Honor.

14           THE COURT:  Okay.  So let's go through your

09:03:58 15   proffer.  That's what I'm trying to get to.

16           So all of this -- all of these statements here

17   that are within your proffer, I'll ask it a different way,

18   are what you expect your witness to be able to testify to,

19   correct?

09:04:21 20           MR. KESSELMAN:  Yes, Your Honor.

21           THE COURT:  Okay.  Let me turn to the defense.

22           And based on the proffer, have you had a chance to

23   review it?  I know that they were filed late.

24           MR. NORRIS:  Yes, Your Honor.

09:04:34 25           THE COURT:  Does anything change on your *Daubert*

|  |  |  |
|--|--|--|
| 09:04:38 | 1 | challenge now that you see what the proffer is?  Because the |
| | 2 | Court has seen -- maybe not in this case but in others, |
| | 3 | where perhaps in the original proffer of the opinions, they |
| | 4 | talk about 100 percent.  Then all of a sudden in the |
| 09:04:53 | 5 | proffer, there's 40 percent.  And so the Court is trying to |
| | 6 | just have an understanding on what the parties' intentions |
| | 7 | are, because you've all been talking for some time now.  I |
| | 8 | haven't been privy to those conversations.  You all have |
| | 9 | discovery.  I don't have the discovery.  So I'm trying to |
| 09:05:09 | 10 | get on the same level based on the materials the officers of |
| | 11 | the Court provided to me, because I can't go out and |
| | 12 | investigate. |
| | 13 | So to understand:  Is this everything you thought |
| | 14 | was going to be in the report?  Or is there any issues or |
| 09:05:23 | 15 | anything else I'm supposed to be looking to, just before we |
| | 16 | start the questioning? |
| | 17 | MR. NORRIS:  What I'm struggling with, Your Honor, |
| | 18 | is, I guess when I understand a proffer, it's the |
| | 19 | affirmative opinions that the expert plans to offer and |
| 09:05:35 | 20 | those are the affirmative opinions that we're challenging in |
| | 21 | our *Daubert* motion. |
| | 22 | And I guess when I read this proffer, it reads |
| | 23 | like an outline of their opposition brief to our motion. |
| | 24 | And so there's things in here that aren't in the reports |
| 09:05:48 | 25 | that the experts claim in the reports that they were going |

09:05:51  1    to testify that are responses to our arguments.  I

2    understand why plaintiff's counsel is including --

3         *(Court Reporter requests clarification for the*

4         *record.)*

09:05:59  5              MR. NORRIS:  I'm so sorry.

6              What I'm just struggling with, that does seem to

7    go beyond a proffer of what they're seeking to recover at

8    trial.

9              THE COURT:  Okay.  I bring this question up,

09:06:09 10   because this can often happen where we merge into later

11   issues of Rule 26 and Rule 37, and *Yeti* would be the

12   Ninth Circuit case where -- let's just start with

13   preliminary kind of thought process.

14              If it's not in the report, can you offer that

09:06:30 15   opinion?

16              MR. KESSELMAN:  No, Your Honor.

17              THE COURT:  Okay.  How about the defense:  Do you

18   agree with that?

19              MR. NORRIS:  Yes, Your Honor.

09:06:36 20              THE COURT:  Okay.  So what -- the last question

21   I'll ask before we start the testimony, because it can

22   sometimes be where in preparing for the *Daubert* hearing, you

23   know, the person is an expert as to video technology.  But

24   all of a sudden, they're starting to talk about they were in

09:06:56 25   the military and they understand how a 40-millimeter grenade

09:07:02  1    launcher sounds.

2         It's not in the report but it kind of starts going

3    around, so that's why I'm trying to understand the proffer.

4         So with the proffer are all the proffered

09:07:12  5    opinions -- because you said now that it's what's in this

6    document -- is what you're seeking to offer that is subject

7    to the *Daubert*, correct?

8         MR. KESSELMAN:  Well, I want to make sure I'm

9    clear on the question, Your Honor.

09:07:29 10         Exhibit 39 to the Norris declaration, which

11   contains Professor Elhauge's report, that contains his

12   affirmative opinions that we expect to offer at trial.

13        What I understood today's hearing was about is a

14   more contained set of challenges that were set forth in the

09:07:53 15   defendant's *Daubert* motion.  And each side, when we were

16   here last, agreed that each witness would be subject to

17   two hours of questioning.  One hour for each side.  So we

18   tried to contain the proffer solely to the issues that were

19   addressed in their *Daubert* motion, because that's the only

09:08:13 20   grounds I understood they were challenging his opinions on.

21        So for today's hearing what's in the proffer is

22   what we intend to address, but I want to make clear that

23   it's not every opinion he plans to offer at trial, because

24   they're not challenging that.

09:08:29 25         THE COURT:  I feel like we've just missed each

09:08:31  1    other.  We've been on the wrong side of the train station

2    tracks.  I am asking what opinions that are subject to the

3    *Daubert* that you believe are in your proffer.  The proffer

4    is supposed to be the opinions that you expect that your

09:08:50  5    witness is going to utilize that are subject to the *Daubert*

6    that we're trying to apply the *Daubert/Kumho* standard to.

7              So my question was:  Are these all the opinions

8    that you expect to utilize that -- in the case, presumably,

9    that are subject to the *Daubert* attack?  That's what we're

09:09:09  10   looking at right now.

11             What I'm hearing from you -- I don't know if your

12   answer was responsive.  I feel like I missed that.  I have

13   to look and just ask one more time:  The opinions that are

14   being contained within the proffer, again, are not the whole

09:09:37  15   report.  Understood.  This is a proffer on what's being

16   challenged.

17             So my question, again, is:  Are all -- is all

18   that's contained in the proffer, for example, what you

19   believe is admissible and then what would it also be --

09:09:58  20   *Daubert* -- again, we're not -- I started at the beginning

21   saying we're not talking about other things.

22             Also, then there's a question about Rule 26 and

23   Rule 37.  Are all these opinions in the report, or are they

24   expanded?  Because the proffer, I believe, is:  These are

09:10:14  25   the opinions proffered from the report that are subject to

*Deborah D. Parker, U.S. Court Reporter*

09:10:17  1    the *Daubert*.

2                    To the defense, is that what your thought was?

3                    MR. NORRIS:  Correct, Your Honor.

4                    THE COURT:  Is there a difference in your thought

09:10:28  5    of what it was?

6                    MR. KESSELMAN:  So I guess I'm trying to -- I'm

7    struggling a little bit, as Mr. Norris is.  What I

8    understood Your Honor to be asking for is a hearing on the

9    limited grounds that they brought a *Daubert* motion on.  And

09:10:46  10   yes, the proffer addresses those points.  It is possible

11   that in the proffer there is a reference to, for example,

12   what their expert criticizes our expert on those two topics:

13   Product market, damages.

14                   There is some effort to respond to that.  If

09:11:07  15   Your Honor does not want us to do that, then we can take

16   that up.

17                   THE COURT:  Well, again, the Court talked about an

18   hour or two, but I see the reports.  We may not need an

19   hour.  So, again, you need to be efficient with your time on

09:11:19  20   what it's going to be.  But I'm still just trying to

21   understand this, because you may be responding to a slightly

22   different question.

23                   I'm trying to determine if these are the opinions

24   that you are seeking that are subject to the *Daubert*.  You

09:11:36  25   can say yes or no.  Now, you can characterize them and say,

09:11:39 1    *Well, now they respond to some other* -- that's going beyond

2    my question, so please listen carefully to my question.

3    For example, I'll go back to the D.U.I.  We have a proffer

4    on the D.U.I., and it starts talking about, you know, what

09:11:54 5    challenges whether the person is under the influence.  And

6    then they start talking about, *Well, you know* -- and the

7    report talks about being under the influence.  *Well, a*

8    *person is known for being* -- *you know, I'm good at knowing*

9    *the skid pattern on a car.*  That's kind of outside the

09:12:11 10   report and outside the scope, so I'm trying to just

11   understand that.

12          Is everything in this proffer in the report for

13   the respective witness?

14          MR. KESSELMAN:  It should almost be everything.

09:12:23 15   The only thing I will say is it is possible -- I have to

16   look at the proffer again, whether there's any reference to

17   the experts on the other side providing criticism which,

18   obviously, our expert would not have had at the time he

19   issued his opening report.

09:12:40 20          But other than that, Your Honor, yes, the proffer

21   contains the opinions that are intended to be addressed

22   specifically as to the *Daubert* challenge by defendants.

23          THE COURT:  Do you agree with that, from the

24   defense, before we get started?

09:12:55 25          MR. NORRIS:  I do not, Your Honor.

09:12:57  1        THE COURT:  Okay.  So it looks like we have a
       2   discussion that we may have to move into a different area
       3   later on, but we're going to start with the witness at this
       4   time.
09:13:05  5        Again, I thought it was a relatively simple
       6   question, but it ended up taking 10 minutes to try to get
       7   the answer.  I'll try to be as clear as possible to
       8   everyone.  But, again, what I'm trying to just see is, from
       9   the proffer, what's been added, or -- because we're trying
09:13:22 10   to stay within the report.  And if there's new opinions on a
      11   proffer, then how am I going to then anticipate and rule on
      12   something that's not in the expert's report from the
      13   beginning?
      14        Should I -- what should I do with that?  Say the
09:13:36 15   report only talks about oranges and you start talking about
      16   apples to be able to respond to things.  If it's not in the
      17   report, how am I supposed to deal with that type of issue?
      18        Counsel?
      19        MR. KESSELMAN:  Your Honor, there's nothing new in
09:13:47 20   the sense of his opinions.  The opinions are the opinions
      21   that are in the report.  The proffer explains the basis for
      22   the opinions and responds to criticisms that are raised by
      23   the defense on the two issues that they're challenging
      24   relevant product market and damages.
09:14:06 25        THE COURT:  All right.  And I would like you also

| | |
|---|---|
| 09:14:07 | 1 |

to be prepared while the hearing is going on.  I see that we

have a team of attorneys on both sides, so there'll be time

to be able to do this.  Identify for me -- because I didn't

write the report.  And remember the report is for an

audience.  The writer may have it where they completely

understand everything and this is supposed to mean for this

[sic].  But this is a report that has an executive summary

and then a lot of narrative going on.

Can you identify in the report where -- this is

just on a separate issue for the Court -- where -- is there

a summary of the opinions, or if it's the whole report

wanted?

And, again, there's no criticism going back and

forth.  I'm just trying to understand the format.  I see

formats that are different on many different reports.  But

for Professor Elhauge, what's the summary of the reports?  I

see -- For example, this is on ECF 556.  We have the

introduction and executive summary.  And then that goes 559.

And it goes through quite a bit of different things and the

basis and charts and everything.  I've read it all:

Footnotes.  Appendix.

Where are the -- all the opinions there, the

compilation of the final opinions, not the basis for going

into them?

MR. KESSELMAN:  So the compilation of final

09:15:36  1    opinions should be set forth in the introduction and

2    executive summary.

3         THE COURT:  Excellent.  Let me turn to defense

4    before we get started here.

09:15:44  5         And of that, which I just identified earlier, what

6    would you characterize your *Daubert* attacks on, which of

7    those within the introduction -- and then we'll get

8    started -- so the record is clear also for any reviewer of

9    this, because, again, someone is reviewing this.  I want

09:16:03 10   them to be understanding, because it may be so clear to the

11   parties.  I always want to make this like an instruction

12   manual so the record is really clear on what and not have it

13   convoluted.  I don't know.  You've maybe read some appellate

14   stuff.  What happened here?  I'm trying to make it very

09:16:20 15   clear.

16        So to the defense, if you had to look at those

17   pages, ECF 556 to 559, on Document 174-4, from the record --

18        MR. NORRIS:  Paragraphs -- it would be paragraphs

19   four, five, six and 12.

09:16:41 20        THE COURT:  Four, five, six and 12.  Thank you.

21        I believe we're ready to go.  Any other questions?

22        MR. KESSELMAN:  Well, Your Honor, I think there's

23   a point of clarification, because while the *Daubert* motion

24   that they filed does address Paragraph 4, the relevant

09:16:56 25   market, as I understand it, there was no direct challenge to

09:17:01  1  Paragraph 6 which addresses monopoly power and market power.

2           THE COURT:  All right.  And then to the defense.

3  Your thoughts.

4           MR. NORRIS:  Just to the extent that those

09:17:13  5  opinions are based on his market and to the extent that they

6  are incorrect because the market is incorrect.

7           THE COURT:  Okay.  All right.  I think I have

8  enough information.  I greatly appreciate everyone answering

9  the Court's questions, because, again, this may be so always

09:17:30 10  [sic] clear because you've been living with the case for

11  some time, and I try to be as prepared as I can.  But I

12  think someone once said, *There is no bad students.  Just bad*

13  *teachers.*  I mean, I've got to learn this, and I rely on all

14  of you, you know.  No bad players.  Just bad coaches.  I

09:17:49 15  don't know.  Maybe there are some bad coaches.  I'm not

16  sure.

17           But the bottom line here is -- and I appreciate

18  everyone's smiles on that -- I just want to be prepared.  I

19  want to understand everything that you're saying, where

09:17:58 20  you're coming from, what's actually happening here, because

21  there is a lot of material.  And I'm not saying it's been

22  placed before the Court in the clearest manner where I can

23  say *There's an inescapable conclusion that this is what*

24  *you're trying to do.*  I think I can get an idea of it.  But

09:18:18 25  if I have a question, I pull over and ask for directions

09:18:21  1    when I'm lost.  There is no pride here.

2             So I'm just trying to understand to be on the same

3    level as you, but I would ask you all, please, make sure you

4    have full explanations.  There's an audience here, like

09:18:35  5    you're a movie maker.  Don't just know, because you've been

6    living with the movie for a long time.  There may be holes

7    in that movie, but, you know, you know the movie so well

8    that you don't think it's a hole.  But the audience may sit

9    there and be like, *Where did that character go?*

09:18:50 10             So I'm ready to proceed.

11             MR. KESSELMAN:  Your Honor, could I just ask one

12    procedural question before we call the witness?

13             So will Your Honor allow for me to reserve any

14    time for redirect after their cross?

09:19:10 15             THE COURT:  Yes.  You can budget your time

16    accordingly.

17             MR. KESSELMAN:  Okay.  And last question --

18             THE COURT:  Again, remember, look to the standard.

19    This isn't a time to be going into talking about, you know,

09:19:21 20    the origins of the universe or, you know, what Blackstone

21    thought about things.  This is about the standard here.

22    Does everyone have the standard in front of them for the

23    *Daubert*, *Kumho* and Ninth Circuit authority?  That's what the

24    Court follows.

09:19:34 25             This is a trial court.  I don't make the law.  I

09:19:37  1  follow the law.  So does everyone have that standard?

2  Because that's what you should be playing to.

3  You know, you're doing a *Miranda* hearing.  You

4  look to *Miranda.*  You're not talking about *Terry* stops.

09:19:45  5  Bringing in the criminal law, trying to make it fun.

6  Okay.  So I appreciate that.  Appreciate the

7  smiles.  Please stay to the standard, not discovery.

8  MR. KESSELMAN:  And then last point of

9  clarification, Your Honor, just so I understand:  When we

09:20:01  10  were here last, the parties had agreed up to two hours

11  for each witness.  And we planned, accordingly, that there

12  would be an hour of direct and I assume an hour of cross.  I

13  just want to make sure that's still what we're doing,

14  because I --

09:20:13  15  THE COURT:  No, I said a half an hour and a half

16  an hour.  I have your materials.  The Court --

17  You know, if there's some reason why you can

18  explain to me why you need that much more time, as opposed

19  to just trying to use that time for discovery and to tighten

09:20:29  20  up different thought process, again, go to the standard.  Is

21  it relevant?  Is it reliable?  Use the factors you think are

22  appropriate under that.  That's what it comes down to.

23  That's what we're here for, right?

24  And if you want to show me why you need more time,

09:20:47  25  I would be willing.  I'm always flexible.  But unless you

*Deborah D. Parker, U.S. Court Reporter*

09:20:51  1    show me the need, you know -- you want a car, okay?  You get

2    a $20,000 car.  Tell me why you need the $400,000 car, okay?

3                MR. KESSELMAN:  Well --

4                THE COURT:  Let's go.  Let's get started.

09:21:02  5                MR. KESSELMAN:  Okay.

6                THE COURT:  Please call your witness.  Who are you

7    calling at this time?

8                MR. KESSELMAN:  Professor Einer Elhauge,

9    Your Honor.

09:21:11  10                THE COURT:  Thank you.

11                And to the witness, please come forward.  I

12    appreciate you being here.

13                Please stand by the court reporter to be sworn by

14    the clerk.

09:21:16  15                Thank you.

16                MR. CABIANCA:  Your Honor, can we -- there's

17    another witness here.  Could we ask him to leave?

18                THE COURT:  Thank you.

19                Your thought.

09:21:24  20                MR. KESSELMAN:  Do we need -- he's an expert.

21    This is not trial.  Is there a reason he needs to leave the

22    courtroom?  His opinions are distinct from

23    Professor Elhauge.

24                THE COURT:  Is there a reason why he should be

09:21:35  25    here?

25

09:21:36   1          MR. KESSELMAN:  Just to see the proceeding,

2    Your Honor.  That's all.

3          THE COURT:  All right.  The Court will grant the

4    request to have him excluded during this proceeding.  The

09:21:44   5    Court exercises authority under the federal rules.

6          And so to the witness, thank you so much.  There

7    is a witness room that's immediately outside.

8          We've talked about the proceedings before this and

9    what the schedule is going to be, so I'm not persuaded by

09:21:57  10    your justification that you're trying to just understand

11    what the proceedings are.  We went through what the ground

12    rules were already and what we're going to be doing.

13          Thank you so much.

14          Okay.  Please swear the witness.

09:22:08  15          THE CLERK:  Please raise your right hand.

16          EINER ELHAUGE, PLAINTIFF'S WITNESS, SWORN

17          THE WITNESS:  I do.

18      *(Pause)*

19          THE CLERK:  Please state and spell your full name

09:22:30  20    for the record.

21          THE WITNESS:  Einer Elhauge.  You said spelled,

22    too?

23          E-I-N-E-R; last name, E-L-H-A-U-G-E.

24          THE COURT:  Thank you, Professor Elhauge.

09:22:44  25    Thank you for being here today.

*Deborah D. Parker, U.S. Court Reporter*

09:22:44   1          Please make sure you're speaking slowly, clearly

2   and loudly into the microphone.  The court reporter is

3   directly in front of you, taking down the testimony.

4          And to Counsel, you may proceed when ready.

09:22:57   5          MR. KESSELMAN:  Thank you, Your Honor.

6                         DIRECT EXAMINATION

7   BY MR. KESSELMAN:

8   Q    Good morning, Professor Elhauge.

9   A    Good morning.

09:23:02  10   Q    So as we get into your specific opinions, I'm just

11   going to start with just a couple of background questions on

12   your qualifications.

13          Given time constraints, I'm going to see if Your

14   Honor --

09:23:14  15          THE COURT:  Please ask your questions.  Thank you.

16          Again, he heard the time constraints, and so

17   you're eating into your time.  The Court wants to get right

18   to the hearing, okay?

19          MR. KESSELMAN:  Your Honor, may my colleague

09:23:27  20   approach and provide Professor Elhauge with his reports, so

21   he can simply identify?

22          THE COURT:  All counsel may approach freely

23   throughout the entire proceeding as to not have any delay.

24          Thank you.

09:23:41  25          MR. KESSELMAN:  Thank you, Your Honor.

09:23:41   1    BY MR. KESSELMAN:

           2    Q    Professor Elhauge, we're going to be providing you with

           3    the exhibits that were provided to the Court.  And when

           4    Ms. Brantly brings it to you, I'd ask you to turn to

09:23:54   5    Exhibit 1, which is the Elhauge report, dated

           6    April 12, 2023.

           7    A    Yes, it is.

           8    Q    I was just going to ask, is this a true and correct

           9    copy of the expert report you drafted?

09:24:08  10    A    Yes.

          11    Q    And is that your signature on the front of the

          12    document?

          13    A    It is.

          14    Q    Okay.  And if you turn to page 119 of your expert

09:24:15  15    report, entitled "Exhibit A," is that a true and correct

          16    copy of your CV, at least at the time of the report?

          17    A    Yes.

          18    Q    If you turn to page 120 of your expert report, does

          19    this list articles and text that you've authored on

09:24:32  20    antitrust law and economics?

          21    A    Yes.

          22    Q    If you turn to page 128 of your expert report, does

          23    this contain the list of cases in which you served as

          24    an antitrust economics testifying expert?

09:24:46  25    A    Yes.

*Deborah D. Parker, U.S. Court Reporter*

09:24:47  1   Q    Okay.  And how many court opinions have held, to your

       2   understanding, that you're qualified to testify on antitrust

       3   economics?

       4   A    23.

09:24:56  5   Q    How many court opinions have held you're not qualified

       6   to testify on antitrust economics?

       7   A    Zero.

       8   Q    How many court opinions --

       9        (Court Reporter requests clarification for the

09:25:04 10        record.)

      11   BY MR. KESSELMAN:

      12   Q    How many court opinions have denied challenges to your

      13   economic methodologies?

      14   A    23.

09:25:17 15   Q    Okay.  How many court opinions have accepted challenges

      16   to at least some of your economic methodologies?

      17   A    That's one.  The It's My Party case which excluded one

      18   of my market definitions but didn't exclude the rest of my

      19   economic opinions.

09:25:36 20   Q    And have several of the 23 court opinions called you an

      21   antitrust titan?

      22   A    Yes.  Four of them.

      23        MR. NORRIS:  Objection, Your Honor.  Hearsay.

      24        THE COURT:  Overruled.  You may continue.  The

09:25:48 25   Court will be considering the applicable law for Daubert

| | |
|---|---|
| 09:25:51 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 09:25:57 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 09:26:14 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 09:26:29 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 09:26:49 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 09:26:59 | 25 |

1  hearing, the admissible evidence for the relief being

2  sought.

3         You may ask your next question.  Thank you.

4  BY MR. KESSELMAN:

5  Q    To your understanding, Mr. Elhauge, is Verra

6  challenging your qualifications as an expert in its motion?

7  A    I believe they are not.

8  Q    And you understand that Verra is represented by Squire

9  Patton Boggs.  Have they ever hired you as an expert in

10  antitrust economics?

11  A    Yes, they've hired me in several past cases back when

12  they were Patent Boggs before they merged with Squires.

13  Q    Now, we're going to limit the questions today, as

14  you've heard, to the challenge in the *Daubert* motion.  But

15  just for the record, do you recall the topics -- the

16  high-level topics that you've been asked to opine on in this

17  case?

18  A    Yes.  I opined on product market definition, geographic

19  market definition, market power, whether the --

20         *(Court Reporter requests clarification for the*

21         *record.)*

22         THE WITNESS:  -- whether the exclusionary

23  agreements foreclosed the relevant market, whether the

24  merger and the exclusionary agreements had anticompetitive

25  effects, whether the merger and the exclusionary agreements

09:27:05  1    lacked any pro-competitive efficiency, and on damages.

2    BY MR. KESSELMAN:

3    Q    And to your understanding, which of your opinions does

4    Verra challenge in its *Daubert* motion?

09:27:15  5    A    In its *Daubert* motion, Verra challenges two paragraphs

6    of my product market analysis which address qualitative

7    arguments why two specific potential substitutes should not

8    be in a relevant market.  They challenge five of the inputs

9    that I used for my damages analysis, and they challenge

09:27:37 10    references to a cartel ringmaster theory in various parts of

11    my analysis.

12    Q    Let's start with relevant product market first.

13         Professor, how do you define the relevant product

14    market in this case?

09:27:52 15    A    This is the market for electronic toll payments for

16    rental cars or "rental car ETP" for short.

17    Q    What was the main basis for your conclusion that the

18    rental -- excuse me, the relevant product market was

19    rental car ETP?

09:28:08 20    A    The main method I used was the hypothetical monopolist

21    test.  The hypothetical monopolist test asked whether in the

22    positive market a hypothetical monopolist could raise prices

23    by five percent above competitive levels.

24    Q    And is that a standard -- the hypothetical monopolist

09:28:30 25    test, is a standard used by the federal antitrust agencies?

09:28:36  1    A    Yes, it is used by the federal antitrust agencies.

2    Q    And to your understanding, is Verra challenging your

3    methodology for using the hypothetical monopolist test here?

4    A    No, they didn't challenge it in the motion, and their

09:28:52  5    economics expert, actually, expressly said he thought it was

6    a standard and appropriate methodology.

7    Q    Now, when you applied this methodology, the

8    hypothetical monopolist test, what did you conclude with

9    respect to the positive market here?

09:29:07  10    A    I concluded the hypothetical monopolist test did

11    support my relevant product market for two main reasons:

12    One, after the merger, Verra had 99 percent market share in

13    the positive market and it was able to raise prices by 17 to

14    25 percent above prior --

09:29:31  15         (Court Reporter requests clarification for the

16         record.)

17         THE WITNESS:  -- duopoly, D-U-O-P-O-L-Y.  And

18    Verra also was able to charge prices in the positive market

19    that were 150 to 400 percent higher than the prices that

09:29:47  20    were charged for non-rental car ETP apps, which is a

21    competitive market.

22         So that evidence, I concluded, more than sufficed

23    to show that a hypothetical 100 percent monopolist could

24    raise prices by at least five percent over competitive price

09:30:04  25    levels, because here you have much higher price increases

*Deborah D. Parker, U.S. Court Reporter*

09:30:06  1    and big price increases even from relatively uncompetitive

2    levels.

3            So it's a kind of direct evidence on pricing,

4    actually, you don't normally get, because normally you have

09:30:17  5    to infer whether that power existed by modeling other

6    factors.  Here, we have direct evidence that the requisite

7    pricing power exists to define the relevant product market.

8    Q    Professor, to your understanding, does Verra's *Daubert*

9    motion dispute either the hypothetical monopolist test or

09:30:39  10   your application of that test to this case?

11   A    No, it does not.

12   Q    Now, does the hypothetical monopolist test have any

13   relation to the methodology in the *It's My Party* case, with

14   respect to market definition?

09:30:54  15   A    Yes.  The hypothetical monopolist test application here

16   shows that a significant price increase for rental car ETP

17   did not cause enough substitution to any other potential

18   substitute to constrain that price increase.  So that is

19   actually the very sort of methodology that *It's My Party*

09:31:18  20   court criticized me for not using.

21           So here my main method is precisely the

22   methodology that *It's My Party* court was calling for in its

23   opinion.

24   Q    And just so the record is clear, taking His Honor's

09:31:34  25   suggestion that, you know, for a reader later, do you

09:31:37  1    understand that in their *Daubert* motion, Verra is

2    challenging your opinions in this case by referencing the

3    decision in the *It's My Party* case?

4    A    Yes.

09:31:48  5    Q    Okay.  And in this case, was your product market

6    definition also supported by any documentary evidence?

7    A    Yes.  It was supported by two sources of documentary

8    evidence:  First, there was internal Verra documents --

9         *(Court Reporter requests clarification for the*

09:32:13  10        *record.)*

11         THE WITNESS:  First, Verra's internal documents

12   have statements that expressly state that the closest

13   competitor to them is rental car ETP apps.  And second,

14   Verra's contracts define the excluded rivals in a way that's

09:32:28  15   limited to rental car ETP and does not include other

16   products, indicating that as a contractual matter they

17   didn't view the other potential substitutes as relevant

18   constraints that they needed to exclude.

19   BY MR. KESSELMAN:

09:32:42  20   Q    To your understanding, Professor Elhauge, does Verra's

21   *Daubert* motion dispute the relevance of the documentary

22   evidence?

23   A    No.

24   Q    As it relates to your market definition?

09:32:55  25   A    Correct.

*Deborah D. Parker, U.S. Court Reporter*

09:32:57  1   Q    To your understanding, what about your product market

       2   definition analysis does Verra's *Daubert* motion dispute?

       3   A    They dispute two paragraphs where I supplement my

       4   analysis by discussing qualitative reasons why two specific

09:33:14  5   potential substitutions -- namely, cash and tolling product,

       6   tolling authority products -- are not reasonably

       7   interchangeable with rental car ETP.

       8   Q    And do you agree with Verra's critique of your

       9   qualitative arguments for why it makes sense to exclude cash

09:33:35 10   and tolling authority products from the relevant market?

      11              MR. NORRIS:  Objection, Your Honor.

      12              This goes back, I guess, to the -- the question I

      13   have is:  These aren't affirmative opinions.  They're

      14   responses to their opinions.  And so, I'm just -- I don't

09:33:49 15   understand whether these are the opinions Professor Elhauge

      16   is seeking to offer at trial that we are challenging on

      17   *Daubert*, or whether these are just responses to our motion,

      18   which of course aren't in his expert opinion.

      19              MR. KESSELMAN:  Your Honor, I'll respond to that.

09:34:03 20   In fact, the cash and tolling authority questioned about

      21   whether they're in the relevant market or not was addressed

      22   in his opinion -- in his report.  It's at paragraphs 37 and

      23   49.  And they're taking issue and saying he should have

      24   included them.

09:34:22 25              And in his report he says, *No*.  And he's not

09:34:26  1   providing the basis both in the report, but now he's

2   explaining why he excluded it.  So this is not new.

3         THE COURT:  All right.  This is for evidentiary

4   objections.  It's not a cognizable objection at this time.

09:34:39  5   And, in fact, it sounds like the parties are just arguing

6   their positions.  Let me just make clear so that's why we

7   had, kind of, the pretrial on this or the prehearing on

8   this.  Present your case.  The Court is going to apply the

9   applicable law to the evidence as received that's been

09:34:54 10   provided in written form and also during this hearing, so

11   you can save that for your arguments.

12         Overruled.  Answer stands.  Ask your next

13   question.  Only object on cognizable evidentiary basis.

14         The Court is going to decide this on a *Daubert*

09:35:09 15   hearing.  I try to be very clear.  This is a *Daubert*

16   hearing.  Not anything else.

17         So please keep going on.  I have actually Westlaw

18   opened, looking at the standards in front of me right now.

19         Please continue.

09:35:20 20         MR. KESSELMAN:  Thank you, Your Honor.

21   BY MR. KESSELMAN: :

22   Q    Let me just ask, because I don't think we got an

23   answer, Professor.  Do you agree with Verra's critique of

24   your qualitative argument that you excluded cash and tolling

09:35:33 25   authorities from the relevant market?

*Deborah D. Parker, U.S. Court Reporter*

09:35:34  1    A    No, I don't agree with their critiques.  And I know

2    we'll get into the specifics of those qualitative arguments

3    that I made in my report.  But the fundamental issue is that

4    this pricing evidence directly shows that whatever people

09:35:49  5    may argue about these qualitative grounds, it must be the

6    case that these potential substitutes -- cash and tolling

7    product -- tolling authority products -- are not

8    sufficiently interchangeable to constrain a price increase;

9    therefore, they shouldn't be in the market.

09:36:06 10            So really the pricing evidence, I think, answers

11    the question.  These are just supplemental explanations as

12    to why is it that these particular substitutes wouldn't be

13    viewed as interchangeable by consumers.  But we know by the

14    pricing evidence that not enough of them view them as

09:36:22 15    interchangeable to constrain a price increase.

16    Q    And so, Professor, if you were to take the qualitative

17    opinion out, would your overall opinion change in any way?

18    A    No.  If you took those two paragraphs that they

19    critique in the *Daubert* motion out, I would still have the

09:36:39 20    same opinion on product market definition.  It would be more

21    than supported by the pricing evidence alone, and that is

22    confirmed by the documentary evidence.

23    Q    All right.  And let's get into just a few more of the

24    specifics on this question about whether cash would be in

09:36:56 25    the relevant market.

| | |
|---|---|
| 09:36:59 | 1 |

In Verra's *Daubert* motion, they state, quote:

"Elhauge's basis for excluding cash is

his reading of IBTTA's toll minor data

which he uses to state that only

8 percent of tolling facilities accepted

cash payments in 2021," end quote.

That's at page 2, I believe, of their motion.

Is Verra's characterization of your position

correct?

A    No.  It's incorrect on several levels.  First, this

argument that this is the sole basis for my opinion ignores

not just this pricing and documentary evidence that we

discussed, but also ignores the other grounds that were

mentioned in the very paragraph that they're focused on.

Namely, it ignores the fact that I also pointed out that the

trend in the industry was against accepting cash, which its

own economic expert agrees with me on.  And they ignored the

evidence that drivers are increasingly reluctant to go in

cash lanes because of the additional time that it takes.

Q    And so, just to be clear then, in Verra's motion

they're challenging the 8 percent number as a basis for your

conclusion, is that an accurate criticism?

A    No.  They actually mischaracterize even that one basis

which they incorrectly claim is the only basis for my

conclusion.  What I actually said in my report was that,

*Deborah D. Parker, U.S. Court Reporter*

09:38:39  1    quote, over 92 percent of tolls collected in the

2    United States were at all electronic tolling facilities,

3    which are called AET -- or Open Road Toll -- or ORT

4    facilities, so --

09:38:55  5    Q    Just so the record is clear, what paragraph are you

6    reading from in your report?

7             Is this paragraph 37?

8    A    I believe so.

9    Q    Okay.  Keep going.  I just want to make sure the record

09:39:08  10    is clear.

11    A    Yeah.  Paragraph 37 from my report.  So their

12    characterization of what I said is wrong.  Their

13    characterizations are focused on the percentage of

14    facilities that accepted it rather than percentage of tolls.

09:39:27  15    But their critique is also wrong because they rest upon the

16    testimony of Mr. Ling who said that I was misreading the

17    data when, in fact, he's the one that is misreading the

18    data.  The data clearly confirms that all electronic tolling

19    facilities, just like they sound, accept no cash.  They just

09:39:46  20    accept electronic payment.

21             And Mr. Ling misread the data, because if you

22    filter the data based upon whether a facility accepts cash,

23    it turns out the data will feed back all the revenue by any

24    operator of that facility which includes other facilities it

09:40:05  25    may operate.

*Deborah D. Parker, U.S. Court Reporter*

09:40:06  1            So, for example, in the state of Washington,

2    Washington DOT has five different facilities.  One at Tahoma

3    Bridge -- I think Tahoma Narrows Bridge, which does take

4    cash.  The other four facilities do not take cash that they

09:40:24  5    run.  Nonetheless, if you filter the data the way that

6    Mr. Ling does, it will include all the revenue at all five

7    facilities.  So it's including revenue at facilities that do

8    not take cash and, also, a facility is defined to include,

9    like, one toll road.  So if you have a toll road that takes

09:40:42 10    cash at one exit, the revenue at the entire facility is

11    going to be treated in this data as accepting cash in the

12    way that he filtered.

13            So, basically, he's vastly overstating the extent

14    to which facilities accept cash.  And in any event, in the

09:41:00 15    long run what really matters is what percentage of tolls are

16    actually paid in cash.  Because even if the percentage of

17    facilities that take cash is high and even if the percentage

18    of tolls at such facilities is high, drivers still have

19    incentives not to wait in those lines.  And, in fact, the

09:41:17 20    percentage of tolls actually paid in cash is only

21    five percent.  And I think that is significant, not only

22    because it supports my product market definition, but it

23    means even if you included that five percent of cash in a

24    relevant market, it would simply change Verra's market share

09:41:46 25    from 99 percent to 94 percent.  So it wouldn't change any of

*Deborah D. Parker, U.S. Court Reporter*

09:41:51  1   the conclusions about market power or about substantial

2   foreclosure shares in this case.

3   Q    Okay.  And let's get to the second challenge in Verra's

4   *Daubert* motion with respect to tolling authorities.  In

09:42:06  5   their motion at pages 2 and 3, Verra posits, quote:

6                    "The sole basis for this conclusion is

7                    Elhauge's personal opinion that toll

8                    authority products are less convenient

9                    and far more cumbersome than using the

09:42:24 10                    PlusPass app," end quote.

11                    Is that a fair characterization of your opinion?

12   A    No.  Not only does it ignore all the pricing and

13   documentary evidence that we discussed before and that I

14   detail elsewhere in my report -- and that justifies

09:42:43 15   excluding tolling authority products -- but it also ignores

16   the other parts of that paragraph that they are focusing

17   on -- paragraph 49 of my report -- which explains,

18   for example, that the tolling authorities are not engaged in

19   the market for electronic toll payment services.  They are

09:43:04 20   just collecting tolls themselves.

21                    So including them in the market is like saying the

22   IRS is in the same market as TurboTax, because the IRS has

23   tax forms on file.

24                    The other problem that I explained in that

09:43:18 25   paragraph that they -- that they claim -- ignored is that

| | |
|---|---|
| 09:43:23 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 09:43:39 | 5 |
| | 6 |
| | 7 |

there's no evidence that any significant share of rental car
tolls are paid via tolling authority products.  In fact,
Verra calculates its market share at 99 percent.  So to the
extent we thought these were in the relevant product market,
it just means they're part of that one percent that Verra is
not supplying.

Q    Is Verra's *Daubert* motion correct that one of the bases
for your opinion on tolling authorities was just a personal
opinion?

THE COURT:  I'm sorry.  I just have to ask:  Are
you asking about his opinion on that -- from his opinions in
the case, or his opinion on their legal work?

MR. KESSELMAN:  I'm asking about his opinion in
his --

THE COURT:  What's the basis for -- did he read
all the motions?  Is he doing a legal analysis of the
motions?

I'm just trying to understand if this is going
towards his report and his qualifications and relevant and
reliable; or if he is now an expert on the legal filing?
I'm a little confused here.

MR. KESSELMAN:  No, Your Honor.  I was just using
this as a vehicle to try to get through very quickly.

Yes, Professor Elhauge has read the motion and
the --

*Deborah D. Parker, U.S. Court Reporter*

```
09:43:23   1   there's no evidence that any significant share of rental car
           2   tolls are paid via tolling authority products.  In fact,
           3   Verra calculates its market share at 99 percent.  So to the
           4   extent we thought these were in the relevant product market,
09:43:39   5   it just means they're part of that one percent that Verra is
           6   not supplying.
           7   Q    Is Verra's Daubert motion correct that one of the bases
           8   for your opinion on tolling authorities was just a personal
           9   opinion?
09:43:57  10            THE COURT:  I'm sorry.  I just have to ask:  Are
          11   you asking about his opinion on that -- from his opinions in
          12   the case, or his opinion on their legal work?
          13            MR. KESSELMAN:  I'm asking about his opinion in
          14   his --
09:44:09  15            THE COURT:  What's the basis for -- did he read
          16   all the motions?  Is he doing a legal analysis of the
          17   motions?
          18            I'm just trying to understand if this is going
          19   towards his report and his qualifications and relevant and
09:44:21  20   reliable; or if he is now an expert on the legal filing?
          21   I'm a little confused here.
          22            MR. KESSELMAN:  No, Your Honor.  I was just using
          23   this as a vehicle to try to get through very quickly.
          24            Yes, Professor Elhauge has read the motion and
09:44:36  25   the --
```

*Deborah D. Parker, U.S. Court Reporter*

```
09:44:37   1              THE COURT:  The question was:  What is the
           2   question going to?  Is it going to relevant and reliable and
           3   his qualifications?  Or is he opining now as to the
           4   efficacy, so to speak, of the legal briefing of defense?
09:44:52   5              MR. KESSELMAN:  Okay, Your Honor.  Understood.
           6              THE COURT:  No, no.  The question is still
           7   unanswered.  There's no "understood."  I'm asking a
           8   question, so I don't know what you understand.  Maybe you
           9   understand the question, but what is the question going to
09:45:03  10   so I understand?
          11              MR. KESSELMAN:  The question is going to his
          12   opinions on economics.
          13              THE COURT:  Okay.  All right.  I'll try to
          14   understand that, but it sounded like he was opining as now
09:45:13  15   kind of super witness to be able to opine as to legal
          16   efficacy of briefs, as the question was formed.  I just was
          17   confused.
          18              Thank you.  You may ask your next question.
          19              MR. KESSELMAN:  Thank you, Your Honor.
09:45:26  20   BY MR. KESSELMAN:
          21   Q    From an economic point of view, Professor Elhauge, were
          22   you simply offering a personal opinion when you excluded
          23   toll authorities from the market?
          24   A    No, it was not a personal opinion.  It wasn't a
09:45:40  25   personal opinion about the PlusPass app.  Most of what I
```

*Deborah D. Parker, U.S. Court Reporter*

09:45:43  1  rely on in that paragraph is, in fact, a comparison to

2  Verra's product, because Verra after all is 99 percent of

3  the market.  So for market definition, the lack of

4  interchangeability with the tolling authority products is

09:46:05  5  something I mainly examined vis-à-vis Verra's product.

6          But, anyway, my analysis was based upon economic

7  factors related to functional differences, not my personal

8  opinion about what was convenient.  And the fact is that to

9  use tolling authority products, you have to sign up in

09:46:27  10  multiple tolling authority -- multiple tolling authorities,

11  if you're going to be renting cars and driving in multiple

12  states as most people do.

13  Q    Professor, the last two questions on relevant market:

14  From an economic point of view, is your position or your

09:46:46  15  opinions on the market undermined by a finding from the

16  defense expert that 85 percent of renters incur tolls in

17  only one state?

18  A    No, because he didn't find that.  He found that for

19  87 percent of rental agreements, the driver for one

09:47:07  20  agreement only drives in one state.  But the fact is that

21  people have multiple rental agreements, because they rent

22  cars multiple times in their life.  And for the tolling

23  authority product, they'd have to sign up with a different

24  tolling authority every time they did a trip to a different

09:47:23  25  location or different state where they needed to rent a car

*Deborah D. Parker, U.S. Court Reporter*

09:47:26   1    and get their tolls covered.

2                    In fact, the tolling authority products generally

3    require you to sign up anew for each rental agreement with

4    that tolling authority.  So that's a substantially different

09:47:42   5    product and greater cost than simply taking the

6    PlusPass app, entering your information once and then it's

7    good in every state in which Verra may operate -- in which

8    PlusPass may operate.  Sorry.

9    Q    I'm going to move you now to damages.  You understand

09:48:01  10    that there are five critiques of your damages analysis at

11    issue, correct?

12    A    Correct.

13    Q    Okay.  If we start with the first one, you estimated

14    the but-for size of the now foreclosed relevant market.  In

09:48:20  15    doing so, you excluded -- I'm sorry.  You included certain

16    states in your but-for market before PlusPass offered its

17    app in those states in the real world.

18                    Is there any problem with that from an economic

19    point of view?

09:48:40  20    A    No, I don't think so.  The fact that they were

21    eventually approved means there was no insuperable political

22    or technical problem to offering it in that state.  And in a

23    but-for world without the restraints, PlusPass would have

24    had much more incentive to offer their product earlier in

09:48:57  25    those states.  During the period of near absolute

09:48:59  1    foreclosure, obviously, it's relatively futile to do so.

2    Q    And does this in any way, from an economic point of

3    view, conflict -- your opinion on that conflict with the

4    fact that your damages analysis excludes states in which

09:49:18  5    PlusPass does not currently offer its app?

6    A    No, if it doesn't currently offer the app, then it's at

7    least possible that there is some insuperable, technical or

8    political problem to offering a PlusPass app in that state,

9    and so I conservatively excluded that possibility from

09:49:38  10    damages.

11            So, for example, in Ohio, until -- they didn't use

12    to allow video tolling which the PlusPass app uses.  So the

13    conservative nature of that assumption can be seen by the

14    fact that since then, Ohio does allow video tolling now.  So

09:49:58  15    it turned out there wasn't an insuperable barrier, but I

16    conservatively assumed maybe there was, because at the time

17    of my report, I didn't have that information.

18            So that's very different from -- when they already

19    had access to a state, then you know there's no insuperable

09:50:17  20    barrier, so it's not justifiable, I think, to conservatively

21    exclude the possibility that they would have entered

22    earlier.

23    Q    And, Professor, just from a methodology point of view,

24    in your understanding, is it standard for an economist to

09:50:34  25    testify about the but-for world being different from the

09:50:39  1   actual world when it comes to damages?

2   A     Yes.  I think that's very routine in antitrust.  And

3   what we mean by the but-for world is, what the world would

4   have looked like as an economic matter but for the

09:50:53  5   challenged restraint.  So you imagine that the restraint was

6   not there, what will we economically predict would have

7   happened?

8   Q     And with respect to a second challenge raised by Verra

9   and the but-for percentage of renters who would have used

09:51:11  10  ETP apps, you opine on that in your report, correct?

11  A     Correct.

12  Q     Okay.  In your view, is ridesharing and parking apps a

13  good yardstick for measuring damages in a but-for world,

14  from an economic point of view?

09:51:32  15  A     Well, the good metric for measuring this particular

16  input, which is the but-for market penetration of apps and

17  are a good benchmark for that because, like the apps in this

18  case, those are apps related to vehicles that offer

19  electronic tolling -- electronic payment services and that

09:51:54  20  we're replacing a legacy system.

21  Q     And to your understanding, do any of the defense

22  experts opine that rental car company apps would have been a

23  better yardstick?

24  A     No, they did not.

09:52:11  25  Q     To your understanding, in reviewing the record and

09:52:13  1   compiling the report, did Verra's own internal analysis use

2   rental car company apps as a yardstick?

3   A    No, they didn't.  They refer to actually parking and

4   ridesharing apps, just like I did, when evaluating rental

09:52:29  5   car ETP apps.

6   Q    And you understand that there's a critique about your

7   using ridesharing and parking app yardsticks that were

8   limited to certain East Coast cities.  How do you respond to

9   that critique?

09:52:46  10  A    Well, the only reason I limited it to those cities was

11  that's the only place we had data that covered relevant

12  periods so that we could do a but-for projection.

13  Q    There's a further critique that you should have looked

14  at James Sutton's deposition testimony -- James Sutton of

09:53:06  15  Advantage or previously of Advantage -- where he testified

16  that he thought less than 10 percent of car renters were

17  likely to use ETP apps.

18       How do you respond to that?  Why did you not rely

19  on that?

09:53:21  20  A    Well, I don't think that's an economically reliable

21  basis for an opinion.  I mean, Mr. Sutton simply offered one

22  offhand guesstimate in response to a question -- a

23  hypothetical he was asked in deposition.  So he didn't cite

24  any data or analysis to support his estimate.  And,

09:53:46  25  you know, he's -- he's just an employee at one rental car

*Deborah D. Parker, U.S. Court Reporter*

09:53:51   1   company with one percent of the market, so he wouldn't even

2   have a practical exposure of what 99 percent of the

3   customers were doing.  So I just -- that clearly to me is

4   not a reliable basis, certainly less reliable than the

09:54:05   5   economic basis that I used.

6   Q    Let's move on to the third of the five critiques.  I'm

7   trying to be mindful of time.

8            THE COURT:  All right.  So, Counsel, if you want

9   additional time, you may ask for time.  There's been several

09:54:17  10   times you keep mentioning about going quickly or there's

11   constraints.  The Court is listening to all that.

12            Please go forward and ask your questions.  If you

13   need your additional time, the Court indicated it would be

14   flexible.  And, again, just know that we are here for a

09:54:30  15   *Daubert* hearing and we plan the *Daubert* standard to the

16   testimony.  And that's to both sides.

17            All right.  That's to both sides.  Please

18   continue.

19            MR. KESSELMAN:  Thank you, Your Honor.

09:54:37  20   BY MR. KESSELMAN:

21   Q    Professor Elhauge, there is a reference in your report

22   to the first mover, Advantage, to conclude that PlusPass

23   would capture 75 percent of the rental car ETP app sales.

24            When you came to your opinion, did you solely rely

09:54:59  25   on the first mover, Advantage?

09:55:02  1    A    No.  I rely on a combination of the first mover

2    Advantage and the fact that PlusPass had a patent that none

3    of its rivals had; that PlusPass, at the start of the

4    damages period, would have only had one rival that had a

09:55:21  5    technologically inferior product and both PlusPass and

6    Verra's documents indicate that.  It was inferior.  And that

7    PlusPass had throughout the damages period a very strong

8    price advantage over all rivals, not just that sole one it

9    would have faced at the start of the damages period.

09:55:43  10   Q    To the limited extent you did rely on a first mover,

11   Advantage, did your report cite literature to support it?

12   A    I didn't, because it's such a well-recognized point.

13   In fact, if you'd look at the 1996 article that they cite,

14   it's -- you know, it, itself, acknowledges that the first

09:56:05  15   mover, Advantage, is a strong advantage.  And that was even

16   1996, a largely pre-Internet period.  It's an even stronger

17   advantage in an Internet era when there's powerful network

18   effects.

19   Q    Professor, there's a contention that in estimating

09:56:21  20   PlusPass' but-for share of the rental car ETP, you should

21   have used PlusPass' percentage of non-rental car ETP app

22   downloads or ratings.

23        Do you think that is an economically sound

24   methodology?

09:56:39  25   A    I don't think it's economically sound for a number of

09:56:42  1    reasons.  One is that non-rental car app usage doesn't tell

2    us about rental car app usage.  So these ETP apps are much

3    less attractive for non-rental car usage, because if you're

4    basically the driver and owner of your own car and you have

09:57:06  5    a consistent ownership, it's much more efficient to just get

6    a transponder from the relevant tolling authorities.  You

7    avoid paying any extra fees.  You actually get a discount on

8    the tolls.  You get automatic prioritization.  So it's just

9    not a very attractive space to sell in, these apps, the

09:57:27  10    rental car space -- sorry, the non-rental car space.  It's

11    really designed for the rental car space.  And, in fact,

12    you know, PlusPass' employees were clear that when they

13    discovered that they just couldn't -- they were just being

14    thwarted from being able to sell in rental car space, they

09:57:47  15    pivoted to making these sticker tags instead, because they

16    realized that that was the only way to make the product

17    attractive, unless and until they could eliminate the

18    foreclosure.

19    Q    Professor, let's move on to topic four of the critique

09:58:06  20    of your damages by Verra.

21    A    I forgot something.  May I supplement my answer?

22              THE COURT:  You may.  Thank you.

23              THE WITNESS:  Yeah, I forgot to say also that it's

24    also mistaken to measure usage by downloads and ratings.

09:58:20  25    Downloads are not actually usage.  And the fact that the

*Deborah D. Parker, U.S. Court Reporter*

| | |
|---|---|
| 09:58:25 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 09:58:41 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 09:59:03 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 09:59:26 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 09:59:40 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 10:00:01 | 25 |

1 PlusPass product is half the price of the rival products,

2 means it's more likely to be used, even if it's downloaded

3 less often.  But here downloads are particularly dubious

4 measure of usage in the United States, because there's

5 evidence that one rival, PayTollo, actually paid people to

6 download its app to jump up its stats.  And there's evidence

7 that, you know, another rival, Uproad®, is owned by a

8 European company and thus likely have lots of European

9 downloads that wouldn't be relevant to the U.S. market.

10 Q    Thank you, Professor.

11        Moving to the fourth challenge raised about your

12 damages analysis, so the record is clear in your damages

13 analysis in a but-for world, do you assume that the price

14 point that PlusPass would sell would be at the 15 percent of

15 toll charge?

16 A    Yeah, I conclude that mostly likely price that it would

17 charge.

18 Q    And why, Professor -- and I know this is in your

19 report, so just briefly.  But why did you not rely upon the

20 testimony of PlusPass CEO, Glenn Deitiker, where there was a

21 reference to a potential higher price point?

22 A    Well, I think, it more reliable to go with the price

23 that they actually charged.  And they charged 15 percent for

24 non-rental car usage of the app and for rental car usage of

25 the app in the limited sales that they had and in their

10:00:03  1    proposals to try to get tolling authorities to take their

          2    apps.

          3               So in both spaces, they're actually charging

          4    15 percent.  The testimony that they're talking about is

10:00:14  5    where the CEO of PlusPass is saying that to overcome the

          6    existing exclusive agreements, he's going to need to charge

          7    more to be able to pay the rental car companies more, but

          8    that's about the actual world.  In the but-for world, we

          9    wouldn't have these restraints.  They wouldn't have to do

10:00:32 10    that.

         11               In any event, I wanted to pick the conservative

         12    number.  If I had gone with a bigger number, a bigger price

         13    than 15 percent, that means that PlusPass would have had

         14    more profits in the but-for world and thus the damages

10:00:46 15    estimate would be higher.  So what I did is choose the

         16    method that conservatively resulted in a lower damages

         17    number.

         18    Q    Now, Professor, in your report and in your damages

         19    analysis, you do ultimately conclude that PlusPass in a

10:01:03 20    but-for world absent the restraints would have been

         21    profitable; is that correct?

         22    A    Yes.

         23    Q    And what is your response to a critique that PlusPass

         24    never turned a profit in the real world?  Does that impact

10:01:21 25    your analysis of damages for the but-for world?

*Deborah D. Parker, U.S. Court Reporter*

| 10:01:25 | 1 | A    No, because the question is what its profits would have |
| | 2 | been in the but-for world.  In the actual world -- |
| | 3 | *(Court Reporter requests clarification for the* |
| | 4 | *record.)* |
| 10:01:29 | 5 | THE WITNESS:  In the actual world, it was subject |
| | 6 | to the restraints that limited its sales and thus it wasn't |
| | 7 | able to make enough sales to overcome its overhead -- to |
| | 8 | cover its overhead.  So it didn't get the economy of scale |
| | 9 | it would have had in the but-for world. |
| 10:01:53 | 10 | In the but-for world, it would have had that |
| | 11 | economy of scale and, in fact, it's -- PlusPass's gross |
| | 12 | profits without overhead costs are 58 percent, so it's |
| | 13 | clearly profitable to make -- to have incrementally more |
| | 14 | sales for PlusPass even today. |
| 10:02:11 | 15 | BY MR. KESSELMAN: |
| | 16 | Q    And Professor, you've indicated an opinion that |
| | 17 | PlusPass's but-for profit margin would have been |
| | 18 | 36.9 percent; is that correct? |
| | 19 | A    Yes.  That's what I estimate. |
| 10:02:27 | 20 | Q    And in concluding that, you did not base that on, |
| | 21 | for example, Uber's profit margin.  You used firms that |
| | 22 | process payments. |
| | 23 | Why did you do that? |
| | 24 | A    Well, that's the benchmark that Verra, itself, used as |
| 10:02:44 | 25 | a profitability benchmark in its internal analysis, and I |

10:02:49  1    thought it made good sense to use other payment services.

      2           Uber –– no defense expert is claiming that they're

      3    a good but-for benchmark for profitability.  But Uber has

      4    negative income, because it's famous for incurring huge

10:03:07  5    fixed costs, because it's trying to expand, as much as

      6    possible, capture –– make the market huge and capture as

      7    much of it.  And, you know, it has negative income now, but

      8    its gross profits, leaving aside that fixed cost, are

      9    13 billion and its gross profit margin is 39 percent.  So

10:03:28 10    even higher than the 36.9 percent that I used in my

     11    estimate.

     12           So, you know, they have a particular short run

     13    strategy of spending big to expand the market and they hope

     14    to profit handsomely from that in the future.  Obviously,

10:03:45 15    the stock market price suggests that investors think they

     16    will.  But I don't think that you should take that into

     17    account in figuring out what the but-the profitability would

     18    have been of PlusPass.

     19    Q    In conducting your damages analysis, there's a critique

10:04:00 20    that you are potentially inconsistent because you use

     21    ridesharing apps as a but-for yardstick for market

     22    penetration but then did not use Uber's profits as a but-for

     23    yardstick on profitability.  Is that critique economically

     24    sound, your point of view?

10:04:20 25    A    I don't think to.  I think it makes sense to use

10:04:21  1    ridesharing apps and parking apps, which I use in

2    combination as a benchmark for the but-for penetration

3    level, because in both cases we're talking about apps

4    related to vehicles providing electronic payment services

10:04:36  5    that are replacing a legacy system to expect a similar sort

6    of penetration and ramp-up in those kinds of markets.

7            For profitability, the trouble is, a lot depends

8    upon idiosyncratic spending decisions of particular firms.

9    And particular in this case, Uber has a very unique strategy

10:04:58 10   that affects its profitability that I don't think makes it

11   appropriate to use them as the benchmark.  And I don't

12   think -- the defense experts didn't use it as a benchmark

13   either.

14   Q    And just so the record is clear, Professor, you used a

10:05:17 15   yardstick method.  To your understanding, is that a standard

16   methodology for an economist to use in calculating damages

17   in antitrust cases?

18   A    Yes.  I would say that's the standard method used by an

19   antitrust economist to calculate damages.

10:05:35 20   Q    And there's a contention that, in calculating damages,

21   you used a flawed 2017 PlusPass forecast to provide

22   additional support for the but-for profit margin of

23   36.9 percent.

24           Can you respond to that contention?

10:05:52 25   A    Yeah, it's incorrect.  In my report, I expressly say

*Deborah D. Parker, U.S. Court Reporter*

10:05:55  1    that I'm not using it -- that forecast in order to justify

2    my assumption of 36.9 percent but-for profitability.  I only

3    cite to it to support the proposition that if PlusPass had

4    expanded, its profitability would go up.  But that's

10:06:19  5    independently established from the fact that its actual

6    gross profit margin was 58 percent.  But I did not use that

7    forecast in order to reach my conclusion about the

8    36.9 percent yardstick that I used.

9    Q    And in your report, did you also rely on a

10:06:40 10    Congressional Research Service study in calculating but-for

11    profits for damages?

12    A    Yes, I did.  I found that the Congressional Research

13    Study had found that electronic tolling costs were about

14    10 percent of tolls and dropped a percentage.  So given my

10:07:02 15    but-for price of 15 percent that -- and assuming PlusPass

16    would have had to cover the same costs -- that means the

17    profits of PlusPass would have been from 5 percent, if we

18    assume a 10 percent cost, down -- to 6 percent of tolls,

19    assuming the 9 percent cost.

10:07:22 20         And that 5- to 6 percent range indicated by that

21    Congressional study is right around the 5.5 percent of tolls

22    that I use as profitability.  We mentioned the figure of

23    36.9 percent.  That's five -- that's 5.5 divided by

24    15 percent, which is the price.  So that gives that price

10:07:43 25    margin.  But in terms of the profits per toll that I'm

10:07:46 1    assuming, it's 5.5 percent of tolls.

2    Q    Professor, let's move on to the fifth and final

3    category of challenge by Verra to your damages.

4         There's a contention that your analysis improperly

10:08:05 5    relied on Mr. Zehnder's rebuttal report.  Did you rely on

6    Mr. Zehnder's rebuttal report in preparing your report in

7    providing your opinions?

8    A    No, I hadn't even seen it at the time I wrote my

9    report.

10:08:19 10   Q    There's a contention that you commented, however, on

11   Mr. Zehnder's report in your deposition.

12         Can you just very briefly explain why?

13   A    Well, I was asked a question at deposition, so I think

14   I commented that I relied on Mr. Deitiker's testimony, but

10:08:36 15   that Mr. Zehnder was saying a similar thing.  But that's

16   just because I was asked at deposition to comment on the

17   topic.

18   Q    And just so the record is clear, Mr. Deitiker is the

19   CEO of PlusPass?

10:08:47 20   A    Yes.

21   Q    And just to be clear, have you relied on Mr. Zehnder's

22   report for any of your affirmative economic opinions in the

23   case?

24   A    I have not.

10:08:58 25   Q    There's a contention that in your deposition you

| | |
|---|---|
| 10:09:04 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 10:09:21 | 5 |

10:09:04   1   revealed that your analysis assumes that in the but-for

2   world PlusPass would have developed a backstop solution --

3   backstop platform that would allow the use of rival tolling

4   products at rental car firms.  Is that contention accurate

10:09:21   5   with respect to your opinions?

6   A     No.  The opinion I offer is the economic opinion that

7   it would have been profitable and there would have been

8   economic incentives for either PlusPass, Verra, or some

9   other firm to offer that backstop platform.  So as a matter

10:09:38   10   of economics, one would predict that some firm would have

11   done so in the but-for world.  I never offered the

12   affirmative opinion that it would have been PlusPass in

13   particular.

14   Q     Professor, there's one final contention raised by Verra

10:09:54   15   and that is with respect to the cartel ringmaster theory.

16   The argument rests on the premise that the cartel ringmaster

17   theory was not disclosed.  That's a legal argument for

18   counsel to have with the Court.

19          But from an economic point of view, is Verra

10:10:12   20   correct that a cartel ringmaster theory assumes a horizontal

21   agreement among the rental car companies on price?

22          MR. NORRIS:  Objection.  Relevance.

23          THE COURT:  Overruled.

24          You may answer.

10:10:25   25          THE WITNESS:  No.  The whole point of the cartel

*Deborah D. Parker, U.S. Court Reporter*

10:10:28   1   ringmaster theory is to explain why without any horizontal

2   agreement among firms, such as the rental car companies

3   here, a series of vertical exclusionary agreements can have

4   a similar effect to a horizontal cartel.  It's not assuming

10:10:48   5   that there was a horizontal agreement or cartel.  It's just

6   a theory to explain how vertical agreements can have similar

7   effects to a horizontal cartel.

8   BY MR. KESSELMAN:

9   Q    And so just to be clear, your cartel --

10:11:06  10       (Court Reporter requests clarification for the

11       record.)

12            MR. KESSELMAN:  I'm sorry.

13   BY MR. KESSELMAN:

14   Q    -- your cartel ringmaster theory assumes only vertical

10:11:11  15   exclusionary agreements that share supercompetitive profits

16   with the rental car companies?

17   A    Yes.

18   Q    And we could go through it -- I don't know if His Honor

19   wants to have this discussion now --

10:11:27  20            THE COURT:  Listen, this is your presentation.

21   You haven't asked for additional time.  You're at

22   45 minutes, so the Court allowing you to go, to try to go to

23   your one hour, so you can present how you'd like.  It's not

24   my choice.  We're here for a *Daubert* hearing.  How you'd

10:11:42  25   like to present is up to you, but it's a *Daubert* hearing.

10:11:46  1              So I don't want this being put on the Court.  I'll

2      ask my own questions about *Daubert*.

3              You may continue.  And so go ahead.  We're at

4      45 minutes right now.

10:11:57  5              MR. KESSELMAN:  Thank you, Your Honor.

6              THE COURT:  And there's been no leave of court,

7      but I'm allowing you to do that, because I've heard several

8      times, talking about time constraints and quickly, so I took

9      that as a passive way of asking for more time.

10:12:10 10              Hopefully, that was understood by you as well why

11      I didn't stop you.  I mean, I'm sure you're responsible with

12      the clock.  The Court had an order of 30 minutes, but there

13      was nothing asked.

14              You may continue, please.

10:12:22 15              MR. KESSELMAN:  I apologize, Your Honor.

16              THE COURT:  Oh, there's no need to apologize.

17      I've granted you leave inherently.  Please continue with

18      your testimony and questioning.

19              MR. NORRIS:  Thank you, Your Honor.

10:12:33 20              THE COURT:  Of course.  Please continue.  I'm

21      ready to listen.

22      BY MR. KESSELMAN:

23      Q    Professor Elhauge, to your understanding, was your

24      ringmaster theory consistent with allegations that were

10:12:46 25      already in the record?  And, specifically, I'm referencing

10:12:50   1   the second-amended complaint and the interrogatory responses
          2   that PlusPass had provided in this case.
          3   A    Yes, I believe they are consistent with those
          4   allegations.
10:13:02   5   Q    And Professor Elhauge, would your ultimate conclusions
          6   on any issue change if you are unable to refer to the cartel
          7   ringmaster theory in this case?
          8   A    None of my conclusions.  I guess certain parts of the
          9   analysis would have to be reexpressed.  And I do think it's
10:13:21  10   an -- it's illuminating -- the theory is a good way to
         11   illuminate some of the economic incentives that drive
         12   entering into these agreements and they can foster these
         13   anticompetitive effects.  But even without the theory, none
         14   of my ultimate conclusions on effects or efficiencies or the
10:13:42  15   other ultimate conclusions, none of them would really
         16   change.  They would just not be this additional analysis
         17   that explains the underlying economic incentives in a way
         18   that I think is helpful.
         19   Q    Professor, final question on damages:  Did you
10:13:57  20   utilize -- to your understanding, did you utilize
         21   methodologies that are well accepted by economists who are
         22   opining on damages?
         23   A    Yes, I did.
         24   Q    And that was primarily relying on the yardstick
10:14:13  25   methodology; is that correct?

62

```
10:14:15   1   A      Correct.
           2              MR. KESSELMAN:  Your Honor, thank you very much
           3   for your indulgence.
           4              I will pass the witness.
10:14:23   5              THE COURT:  Okay.  We're going to take a recess at
           6   this time.  We've been going for about hour and 15 minutes
           7   for the court reporter.
           8              Thank you, Ms. Parker.  I appreciate that very
           9   much.
10:14:32  10              So we'll take a -- how much time would you need,
          11   Ms. Parker?
          12              THE COURT REPORTER:  15 minutes, Your Honor.
          13              THE COURT:  We'll take a 15-minute recess and then
          14   we will begin.
10:14:42  15              Again, to the witness, you may step down.  Thank
          16   you for your time.  Please make sure that you're back on the
          17   stand at 10:30 and then we'll begin at that time.
          18              Thank you everyone.  We're in recess.
          19        (Recess taken from 10:14 a.m. to 10:29 a.m.)
10:29:55  20              THE CLERK:  On the record in Case No. 1,
          21   CV 20-10078, PlusPass, Inc. versus Verra Mobility Corp.,
          22   et al.
          23              THE COURT:  All right.  Thank you.
          24              Counsel are present.  Everyone please be seated.
10:30:07  25   And the witness is on the stand.
```

*Deborah D. Parker, U.S. Court Reporter*

|           |    |                                                            |
|-----------|----|------------------------------------------------------------|
| 10:30:09  | 1  | And to Mr. Kesselman, would you like more time             |
|           | 2  | with your witness?  You asked for an hour.  If you want more |
|           | 3  | time, take the time.  It may impact the ability to finish  |
|           | 4  | today in terms of the other witness, but I want to make sure |
| 10:30:23  | 5  | that it's open to you.                                     |
|           | 6  | Would you like more time?                                  |
|           | 7  | MR. KESSELMAN:  Your Honor, could I just reserve           |
|           | 8  | 10 minutes for redirect?                                   |
|           | 9  | THE COURT:  Thank you.  That will be granted.              |
| 10:30:33  | 10 | MR. KESSELMAN:  Thank you, Your Honor.                     |
|           | 11 | THE COURT:  Okay.  Then we'll go to                        |
|           | 12 | cross-examination at this time, since you've concluded, and |
|           | 13 | you've reserved your time.                                 |
|           | 14 | We'll go to the defense.  You may begin your               |
| 10:30:42  | 15 | questioning.                                               |
|           | 16 | CROSS-EXAMINATION                                          |
|           | 17 | BY MR. NORRIS:                                             |
|           | 18 | Q    Good morning, Professor Elhauge.                      |
|           | 19 | A    Good morning.                                         |
| 10:31:10  | 20 | Q    All of my questions this morning are going to be      |
|           | 21 | yes-or-no questions.  So to move things along, if you could |
|           | 22 | listen to the questions that I ask and answer the questions |
|           | 23 | that I ask, I would appreciate it.                         |
|           | 24 | And I want to start with the damages opinion which          |
| 10:31:28  | 25 | was discussed during your direct examination with          |

64

10:31:32  1  Mr. Kesselman.  And so I understood from your direct

2  examination that the first thing you did to calculate

3  damages was to determine what you call the but-for size of

4  the now foreclosed market, correct?

10:31:46  5  A    Correct.

6  Q    And by "but for" you mean the size of the market that

7  you calculate that PlusPass could have accessed but for the

8  challenged conduct, correct?

9  A    Correct.

10:31:59 10  Q    And you calculated this based on the tolls that U.S.

11  rental car drivers pay to --

12      (Court Reporter requests clarification for the

13      record.)

14  BY MR. NORRIS:

10:32:10 15  Q    -- Verra Mobility, correct?

16  A    So, actually, I conservatively adjusted that downward

17  in two respects, so I guess I would say incorrect.

18  Q    The starting point before any adjustments was the tolls

19  rental car drivers pay to Verra, right?

10:32:29 20  A    The starting points, yes, but then I conservatively

21  adjusted it downward.

22  Q    And then one the adjustment downwards was to deduct

23  tolls from Louisiana, Kansas, Ohio and Utah because PlusPass

24  can't currently be used to pay for tools in those states,

10:32:47 25  correct?

*Deborah D. Parker, U.S. Court Reporter*

10:32:47  1    A     Yes.  But if you're including that one, it's three

2    different conservative adjustments downward then.

3    Q     Well, this is the one I want to focus on for a second.

4    And I understood you testified during direct examination

10:32:59  5    that you were excluding them, because that would eliminate

6    an argument that there was some insuperable political or

7    technical obstacle to working in that state -- in those

8    states, correct?

9    A     I wouldn't say because it eliminates an argument.  I

10:33:14 10   would say it's because it's the conservative assumption to

11   make as a matter of economics, if the evidence doesn't

12   itself eliminate that possibility that there was some

13   insuperable barrier, so I took that into account.

14   Q     So you're talking about eliminating potential

10:33:36 15   insuperable, political or technical barriers or obstacles,

16   correct?

17   A     No, I'm not talking about eliminating insuperable

18   barriers.  I'm talking about taking into account that they

19   might exist and might explain why PlusPass did not at the

10:33:53 20   time of my report have access to certain states.  So I

21   conservatively assumed that maybe they did and thus excluded

22   them from damages.

23   Q     And the example you provided during direct examination

24   was Ohio.  Yes or no?

10:34:10 25   A     Yes.

*Deborah D. Parker, U.S. Court Reporter*

66

10:34:10    1    Q    And you said that Ohio didn't allow video tolling, but

2    now it does, right?

3    A    At least it announced it will at least by the end of

4    this year.  Whether it's actually started or not, I'm not

10:34:28    5    positive.

6    Q    And so before Ohio offered video tolling, PlusPass

7    wouldn't work in the state, right?

8    A    No.  You have to have video tolling to be able to work

9    it, but the point is that it could have offered video

10:34:44   10    tolling earlier.

11    Q    Ohio could have?

12    A    Yes.

13    Q    But didn't?

14    A    They did not.

10:34:48   15    Q    Okay.  And so while you deduct tolls from Louisiana,

16    Kansas, from those states we talked about earlier, your

17    damages calculation includes tolls from the other 28 states

18    across the country that have toll roads, correct?

19    A    I don't recall offhand if the right number is 28, but I

10:35:12   20    do include other states that have toll roads.

21    Q    And as you testified on direct examination, that would

22    include states whether or not PlusPass worked in those

23    states as of March 2018, correct?

24    A    Correct.  Even if it didn't work on March 2018 in that

10:35:30   25    state.

*Deborah D. Parker, U.S. Court Reporter*

10:35:32   1   Q    And you're aware that PlusPass didn't work in

           2   California until June of 2022?

           3   A    I forget the exact month; but in some point in 2022,

           4   they signed up in California.

10:35:49   5   Q    But your damages calculation assigns lost profits to

           6   PlusPass in California from March 2018 to June of 2022,

           7   whenever this first transaction occurred, correct?

           8   A    Correct.

           9   Q    And you're aware that PlusPass didn't start working in

10:36:07  10   the -- with the toll authority in the EZPass region until

          11   2019, correct?

          12   A    I don't recall that date.

          13   Q    Let me ask it this way:  In paragraph 79 of your

          14   report, which you have as Exhibit 1, paragraph 162 --

10:36:30  15   A    I'm sorry, you said page 79?

          16   Q    It is on page 79, correct?

          17   A    Yes, I see it.

          18   Q    Paragraph 162.

          19   A    Yes.

10:36:44  20   Q    And so what you cite for the four states where PlusPass

          21   doesn't work is "PlusPass' Supplemental Responses to

          22   Defendant Verra's First Set of Interrogatories," correct?

          23   A    Yes.

          24   Q    I would like to show that to you.  This is Exhibit 106.

10:37:16  25              THE COURT:  So marked for identification purposes,

*Deborah D. Parker, U.S. Court Reporter*

10:37:17  1    being provided to plaintiff; is that correct?

        2             MR. NORRIS:  Correct, Your Honor.

        3        *(Defendant's Exhibit 106 was marked for*

        4        *identification.)*

10:37:23  5             THE COURT:  So identified.  Did you receive that,

        6    Mr. Kesselman?

        7             MR. KESSELMAN:  Yes, Your Honor.  It was just

        8    handed to me.

        9        *(The document was published in open court.)*

10:37:43 10    BY MR. NORRIS:

       11    Q    And if you look on page 5, line 10, that's where you

       12    pulled the states where you deducted because PlusPass

       13    currently -- could not currently be used to pay for tolls,

       14    correct?

10:37:55 15    A    Yes.

       16    Q    And if you flip on to the next page, it lists the

       17    accounts with the following toll authorities and the first

       18    dates of transactions with that toll authority, starting at

       19    line 20.

10:38:11 20             Do you see that?

       21    A    This is on page 6?

       22    Q    Correct.

       23    A    Doesn't it start on line 26?

       24    Q    That's where it lists the toll authorities, correct?

10:38:29 25    A    Okay.  So I see it.  There's a screen here.  That's

10:38:32  1    where you started highlighting.

2    The line 20 is where you start highlighting, yes.

3    Q    Right.  And on the next page, it lists the first

4    toll authority with the 19 states --

10:38:53  5    *(Court Reporter requests clarification for the*

6    *record.)*

7    MR. NORRIS:  I'm so sorry.

8    BY MR. NORRIS:

9    Q    -- with the 19 states currently in the EZPass Network.

10:38:57  10   That's the Massachusetts Department of Transportation.

11   Do you see that?

12   A    I see a Massachusetts Department of Transportation.

13   What was your question about them?

14   Q    The date for that is in May of 2019?

10:39:11  15   A    That's the date of the first transaction, according to

16   this document.

17   Q    And these are the PlusPass interrogatories responses

18   that you relied upon in your report, correct?

19   A    Yes.

10:39:20  20   Q    And so assuming that date is correct for the start of

21   EZPass, you would have assigned lost profits to PlusPass for

22   March 2018 to May before PlusPass was working in EZPass,

23   correct?

24   A    Well, I think you're making an incorrect premise that

10:39:40  25   the first transaction is the first date which they could

10:39:43  1    have worked.  The transaction is also affected by the

2    foreclosure.  So I don't know from this document the date

3    with which they initially signed up with Massachusetts and

4    that it could have worked.  All we know is the first date of

10:39:59  5    the first transaction in the Massachusetts Department of

6    Transportation.

7    Q    You're not aware, though, whether they were working in

8    EZPass prior to that date, correct?

9    A    I don't know.  I just know that's the date of the first

10:40:17 10    transaction.  So logically you have to set these things up

11    before the first transaction.  How far before the first

12    transaction it was set up, I don't know.

13    Q    And the first transaction for the Florida Turnpike

14    Enterprises [sic] is listed in June of 2019.

10:40:33 15         Do you see that?

16    A    Yes.

17    Q    And, again, I want to go back to this -- the lack of

18    political -- insuperable, political or technical barriers,

19    because you would have assigned lost profits based in

10:40:48 20    Florida, prior to the date of that first transaction,

21    correct?

22    A    Correct.

23    Q    And I want to direct your attention to what PlusPass

24    says about getting this account, further down the page.

10:41:03 25    This is starting on line 24:

*Deborah D. Parker, U.S. Court Reporter*

10:41:06  1          "PlusPass also recalls that the Florida

2          Turnpike Enterprise initially said it

3          could not work with PlusPass because it

4          was having a back-office procurement

10:41:16  5          issue."

6          Do you see that?

7  A    Yes.

8  Q    Then it says:  "Once those issues were sorted out, it

9  provided PlusPass with an account," correct?

10:41:24  10  A    Correct.

11  Q    One more question on these insuperable, political or

12  technical obstacles, Professor Elhauge, that terminology --

13  "insuperable, political or technical obstacles" -- that does

14  not appear anywhere in your report, correct?

10:41:47  15  A    I don't use that phrase, but I do explain that I -- to

16  be conservative, I excluded these states.

17  Q    Okay.  Let's now turn to the next part of your damages

18  opinion, which is PlusPass -- PlusPass' but-for market

19  share.  And in layman's terms that means the market share

10:42:23  20  PlusPass would have received of rental car ETP in the

21  but-for world.

22          Is that fair?

23  A    Yes.  It's not just one single figure, though.  It's

24  ramped up over seven years.

10:42:39  25  Q    And so to calculate this, you first estimate the

10:42:44   1   percent of rental drivers that you believed would use apps

2   to pay for tolls in the but-for world?

3   A     Yes.

4   Q     And then you calculated the percent of those rental

10:42:57   5   drivers who you estimate would use the PlusPass app instead

6   of a different app, correct?

7   A     Yes.

8   Q     And in paragraph 166 of your report, which is on

9   page 81, you relied on the so-called yardstick approach for

10:43:17   10   this analysis, correct?

11   A     Correct.

12   Q     And in paragraph 166, you don't cite any books or

13   peer-review literature about the yardstick methodology,

14   correct?

10:43:46   15   A     I don't.  It's an extremely well-known methodology, so

16   I -- I didn't bother to have a citation to that fact.

17   Q     And, in fact, there are no citations to economic

18   literature, peer-reviewed articles anywhere in your report

19   about the yardstick methodology, correct?

10:44:08   20   A     I would have to check the whole report to be sure, but

21   I don't recall offhand.

22          THE COURT:  Would you like to have that time to be

23   able to do so?  The Court will grant you that opportunity.

24   Is that a request?

10:44:19   25          THE WITNESS:  If you would want be to sure about

*Deborah D. Parker, U.S. Court Reporter*

10:44:22  1    the answer, I would --

2              THE COURT:  It's up to you.  I didn't know if you

3    were requesting.  You said you would have to look at the

4    report.  If you'd like to, you may do so.

10:44:27  5              THE WITNESS:  I just didn't want to take Counsel's

6    time, but sure.  Let's see.

7          (Pause)

8              THE WITNESS:  I guess there is one citation that

9    includes -- it doesn't reference the yardstick approach but

10:47:18  10   includes a chapter on it.  That is on page 120 of my report

11   where I list the books that I have worked on.  It includes

12   the fact that I edited the research handbook on the

13   economics of antitrust law.  One of the chapters of which is

14   about damages, methods, particularly the yardstick and the

10:47:37  15   benchmark approach to damages.

16   BY MR. NORRIS:

17   Q    Right.  But you don't discuss what that book says about

18   the yardstick approach in any paragraphs of your report,

19   correct?

10:47:48  20   A    No.  I was using such a well-known usage of the

21   yardstick approach, I didn't bother to cite it for that

22   specific thing.

23   Q    On this same page that you just directed our attention

24   to is a citation to Areeda and Hovenkamp's treatise on

10:48:09  25   antitrust law, correct?

*Deborah D. Parker, U.S. Court Reporter*

10:48:10   1    A    Well, the volume I cite is the volume I worked on,

2    which is Areeda, Elhauge and Hovenkamp.  I understand

3    Professor Hovenkamp has worked on other volumes.

4    Q    Right.  So you are the coauthor of Volume 10 with

10:48:26   5    Areeda and Hovenkamp, on the antitrust law treatise,

6    correct?

7    A    As of 1996.  There's been a number of subsequent

8    editions to it that, I assume, changed things in it.

9    Q    You also cite Areeda and Hovenkamp's 2007 Third Edition

10:48:41  10    on Antitrust Law, correct?

11    A    I believe so.

12    Q    What I would like to do now is show you Exhibit 109.

13         THE COURT:  It's been marked for identification

14    purposes as 109.

10:48:57  15         (Defendant's Exhibit 109 was marked for

16         identification.)

17              THE COURT:  Have you provided that to plaintiff?

18              MR. NORRIS:  I have, Your Honor.

19              THE COURT:  And Mr. Kesselman?

10:49:01  20              MR. KESSELMAN:  I'm looking at it now, Your Honor.

21              THE COURT:  Thank you.  You may proceed.

22    BY MR. NORRIS:

23    Q    For the record, Exhibit 109 is Phil Areeda and Herbert

24    Hovenkamp's "Antitrust Law:  An Analysis of [sic] Principles

10:49:17  25    and Their Application," Fourth and Fifth Editions 2023.

75

|  |  |
|---|---|
| 10:49:27 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 10:49:46 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 10:49:54 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 10:50:10 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 10:50:21 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 10:50:35 | 25 |

1    So, first, I'd like to direct your attention to --

2  there's two sections in there.  Section 399 and Section 392.

3    I'd like to first direct your attention to

4  Section 399, on page 5 -- excuse me, on page 3, which I'll

5  bring up on the screen as well.

6    *(The document was published in open court.)*

7  BY MR. NORRIS:

8  Q    And the highlighted language says:  "Traditional

9  methodologies before and after and yardstick approaches are

10  available."

11    Do you see that?

12  A    You say it was on page 3?

13  Q    Of 399, correct.

14  A    It says that page 3 is paragraph 392, so I'm having

15  difficulty finding --

16  Q    Are you in 399 or 392?  There's two --

17  A    Two separate documents.

18  Q    Right.

19  A    Sorry.  They were bounded together here.  All right.

20  So 399, paragraph 3.

21  Q    And that says -- the highlighted portion:  "Traditional

22  methodologies before and after and yardstick approaches are

23  available."

24    Do you see that?

25  A    Yes.

10:50:35  1   Q    Then it says:  "These reliable methodologies may be
2   unreliably implemented, which would lead to speculative
3   results," correct?
4   A    Correct.
10:50:46  5   Q    Now, if you go to Section 392, you'll see paragraph 4,
6   which is 392-F.  And that reads:  "The major difficulty
7   encountered in the use of yardstick is finding a suitable
8   one."
9        Do you see that?
10:51:08 10   A    Yes.
11   Q    "The central idea behind the yardstick approach is to
12   find a firm that is comparable in all important respects to
13   the plaintiff."
14        Do you see that?
10:51:19 15   A    Yes.
16   Q    "The economic performance of the yardstick firm is then
17   used as an estimate of the performance that the plaintiff
18   would have experienced but for the antitrust violation,"
19   correct?
10:51:30 20   A    Yes.
21   Q    "The ideal yardstick is a clone or identical twin of
22   the plaintiff."  Right?
23   A    That would be ideal, yes, but not usually attainable.
24   Q    The next sentence says:  "Short of this, one must
10:51:45 25   identify a firm that is truly comparable in order for the

*Deborah D. Parker, U.S. Court Reporter*

10:51:50  1    inferences to be drawn to be reliable rather than

2    speculative."  Correct?

3    A    Correct.

4    Q    One more passage, if you flip on to the next page,

10:52:06  5    highlighted, it says:  "The putative yard stick must be

6    comparable to the plaintiff in all important respects:

7    Products offered, structure of the firm, management,

8    geographic market and so on."  Correct?

9    A    That's what it says here, yes.

10:52:23  10    Q    Now, in Table 4 of your report is where you calculated

11    the app market penetration or app market adoption, using the

12    yardstick approach, right?

13    A    I don't offhand recall the table number; but if you

14    refer me to the page --

10:52:46  15    Q    Page 83?

16    A    -- I can verify that.

17         All right.  I'm sorry.  What was your question

18    again?

19    Q    Table 4 is where you calculated the app market

10:52:59  20    penetration using the yardstick market approach?

21    A    Yes.

22    Q    And the yardsticks you include in Table 4 are

23    ridesharing apps and parking apps, right?

24    A    Correct.

10:53:10  25    Q    And the ridesharing apps that you use are Uber and

10:53:12  1    Lyft, right?

2    A    Correct.

3    Q    And the city you used for Uber and Lyft is New York

4    City, right?

10:53:18  5    A    Correct.

6    Q    In your report, though, you don't compare how Uber and

7    Lyft are structured as companies, as compared to PlusPass,

8    right?

9    A    I'm not sure what you mean by that.

10:53:31  10    Q    Well, I mean what Phil Areeda and Herbert Hovenkamp

11    mean in this section that's still on the page [sic],

12    comparing to the structure of the firm.  You didn't perform

13    a structure of the form analysis in your report between Uber

14    and Lyft and PlusPass, correct?

10:53:47  15    A    I would have to look more into their footnotes and

16    support to see what they mean by "structure of the firm."  I

17    mean, I think these are all corporations, so they all have

18    the same corporate structure.  So I'm not exactly sure what

19    they mean.

10:54:05  20    Q    How about marketing?  You don't compare the way Uber

21    and Lyft are marketed compared to how PlusPass markets its

22    app, correct?

23    A    Well, we don't have a but-for world to see how PlusPass

24    would have marketed its app in the but-for world.  We just

10:54:21  25    have the actual world where it's foreclosed.

*Deborah D. Parker, U.S. Court Reporter*

10:54:23  1    Q     So that's a "yes" you haven't performed that

2    comparative?

3    A     It's not that I haven't performed it.  It's just that

4    you can't perform an analysis that looks -- that observes

10:54:33  5    what happens in a but-for world because, by definition, the

6    but-for world does not exist.

7    Q     In your report, you don't compare the management of

8    Uber and Lyft to the management of PlusPass either, correct?

9    A     I don't compare their management.

10:54:47 10    Q     You're aware that PlusPass has four employees, correct?

11    A     I don't recall the number of employees that they have.

12    Q     You don't know how many employees PlusPass has?

13    A     I don't.

14    Q     You're aware that Uber and Lyft have more than four

10:55:04 15    employees, correct?

16    A     Yes.

17    Q     You cite Uber's 2019 10-K in your report, correct?

18    A     I don't recall that offhand, but I cite information

19    from Uber.

10:55:32 20    Q     This is -- I'm showing you page 81 of your report,

21    footnote 374.

22          (The document was published in open court.)

23    BY MR. NORRIS:

24    Q     And I'll ask the question again:  You cite Uber

10:55:44 25    technology as 2019 10-K in your report, correct?

*Deborah D. Parker, U.S. Court Reporter*

10:55:52  1   A    Yes.

2   Q    Let me show you a copy of that 10-K.

3         THE COURT:  Is this being marked for

4   identification?

10:56:19  5         MR. NORRIS:  I'm sorry, Your Honor.  Exhibit 110

6   to this hearing.

7         THE COURT:  Thank you.  I do understand that.

8         But it will be so marked on my copy as "110."

9         *(Defendant's Exhibit 110 was marked for*

10:56:25 10        *identification.)*

11        THE COURT:  And did plaintiff receive a copy of

12  that?

13        MR. KESSELMAN:  Yes, Your Honor.

14        THE COURT:  Thank you very much.

10:56:32 15        You may proceed.

16  BY MR. NORRIS:

17  Q    And if you turn to page 9, which is 16 pages in,

18  because there's a mismatch on the printing.  There's a

19  section on employees which says:  "As of December 31, 2019,

10:56:58 20 we and our subsidiaries had approximately 26,900 employees."

21        Do you see that?

22  A    Yes.

23  Q    Now, if PlusPass has four employees, that's a pretty

24  stark difference, correct?

10:57:35 25 A    Well, you're comparing apples to oranges.  This is the

10:57:38    1    actual world without restraints.   Whereas, PlusPass is in a

            2    world with restraints.

            3    Q    So you think the comparison between PlusPass and Uber

            4    is an apples-and-oranges comparison, right?

10:57:49    5    A    No, I think comparing actual employment with a firm

            6    that has no restraints is a good comparison to what the

            7    but-for world would be for PlusPass.   But comparing it to a

            8    number of employees that PlusPass has in the actual world

            9    with restraints is to compare apples to oranges.   You can't

10:58:08   10    use benchmarks that are tainted by the anticompetitive

           11    conduct.   It would be logical to assume that PlusPass would

           12    have had far more employees in the but-for world, just like

           13    Uber did.

           14    Q    Now, in your report you also don't compare the

10:58:26   15    profitability of Uber or Lyft to PlusPass either, correct?

           16    A    I do not.

           17    Q    And I think that you testified on your direct

           18    examination that Uber has negative profits because it's

           19    famous for spending a lot of money to grow as much and as

10:58:45   20    quickly as possible, correct?

           21    A    Yes.

           22    Q    Okay.   And if you look at page 11 of this 10-K --

           23            THE COURT:   That would be, again, just for --

           24            MR. NORRIS:   Exhibit 110.

10:59:09   25            THE COURT:   Yes.

*Deborah D. Parker, U.S. Court Reporter*

82

|          |    |                                                            |
|----------|----|------------------------------------------------------------|
| 10:59:10 | 1  | MR. NORRIS:  Sorry, Your Honor.                            |
|          | 2  | THE COURT:  Just for record purposes.  I                  |
|          | 3  | appreciate it.                                             |
|          | 4  | Thank you.                                                 |
| 10:59:13 | 5  | BY MR. NORRIS:                                              |
|          | 6  | Q    -- it says, quote:  "We have incurred significant     |
|          | 7  | losses since inception."                                   |
|          | 8  | Do you see that?                                           |
|          | 9  | A    Yes.                                                   |
| 10:59:20 | 10 | Q    "We incurred operating losses of 4.1 billion,        |
|          | 11 | 3 billion, 8.6 billion in the years ended December 31st,  |
|          | 12 | 2017, 2018 and 2019," correct?                             |
|          | 13 | A    Yes.                                                   |
|          | 14 | Q    And then it says:  "As of December 31st, 2019, we had |
| 10:59:38 | 15 | an accumulated deficit of 16.4 billion," correct?         |
|          | 16 | A    Correct.                                               |
|          | 17 | Q    Now, the other yardsticks that you used in your report|
|          | 18 | are ParkMobil and ParkBoston, correct?                     |
|          | 19 | A    Correct.                                               |
| 10:59:55 | 20 | Q    Those are the parking apps?                           |
|          | 21 | A    Yes.                                                   |
|          | 22 | Q    Now, in your report, you don't compare how ParkMobil  |
|          | 23 | and ParkBoston market their products as compared to        |
|          | 24 | PlusPass, correct?                                          |
| 11:00:12 | 25 | A    I don't recall discussing their marketing.            |

*Deborah D. Parker, U.S. Court Reporter*

11:00:16   1   Q    And in your report, you don't compare how ParkMobil and

2   ParkBoston are managed as compared to PlusPass, correct?

3   A    At least I don't recall that discussion.  Whether it's

4   there somewhere, I don't know.

11:00:29   5   Q    And in your report, you don't compare the profitability

6   of ParkMobil or ParkBoston to PlusPass either, correct?

7   A    Correct.

8   Q    And for ParkMobil in Table 4, you looked at one city,

9   which was Miami Beach, correct?

11:00:48  10   A    Yes.

11   Q    And in Table 4 for ParkBoston, you looked at one city,

12   the City of Boston, right?

13   A    Well, I should say for both of them, we looked at

14   multiple cities, but we only had those cities where we had

11:01:02  15   enough data to do a seven-year ramp up.

16   Q    Understood.  And in your --

17        (Court Reporter requests clarification for the

18        record.)

19   BY MR. NORRIS:

11:01:12  20   Q    -- in your report, that's where you say, you say,

21   quote:  "These are the only areas for which I was able to

22   obtain the relevant data," right?

23   A    Yes.

24   Q    And I asked you about this at your deposition and you

11:01:24  25   testified that it was your staff who was responsible for

*Deborah D. Parker, U.S. Court Reporter*

84

| | | |
|---|---|---|
| 11:01:27 | 1 | collecting that data, correct? |
| | 2 | A    Correct. |
| | 3 | Q    And at your deposition, you also testified that you |
| | 4 | weren't a part of the process of figuring out where we could |
| 11:01:36 | 5 | get that data, correct? |
| | 6 | A    Correct.  I relied on my staff to figure out where we |
| | 7 | could get the data and they're the ones who contacted |
| | 8 | companies. |
| | 9 | Q    And so since you weren't a part of that process, you |
| 11:01:50 | 10 | don't know who your staff contacted, correct? |
| | 11 | A    Well, I do know some of them, because it was discussed |
| | 12 | here, I think, in the appendix.  And there's a few documents |
| | 13 | that were produced to you, because you asked for production |
| | 14 | of all contact between my staff and third parties, so I |
| 11:02:10 | 15 | remember seeing those during my deposition. |
| | 16 | Q    Right.  And those -- the documents you produced were a |
| | 17 | total of five cities that your staff reached out to. |
| | 18 |      Do you remember that? |
| | 19 | A    I don't recall the number. |
| 11:02:21 | 20 | Q    Because you don't remember who your staff reached out |
| | 21 | to for this data, correct? |
| | 22 | A    I just don't recall the number. |
| | 23 |      THE COURT:  All right.  So just so you know, |
| | 24 | you're at about the half an hour mark.  But given what's |
| 11:02:33 | 25 | happened previously, take the time you need up to the hour |

*Deborah D. Parker, U.S. Court Reporter*

| | | |
|---|---|---|
| 11:02:38 | 1 | that you would like to have that -- again, the Court had |
| | 2 | made an order to that, but I'll leave it to that.  Again, |
| | 3 | knowing that we are in a *Daubert* hearing for *Daubert* |
| | 4 | principles, please continue. |
| 11:02:50 | 5 | MR. NORRIS:  Thank you, Your Honor.  I'll try to |
| | 6 | be brief. |
| | 7 | THE COURT:  It's up to you.  Again, I set kind of |
| | 8 | guidelines on trying to have a *Daubert* hearing on *Daubert* |
| | 9 | aspects, but I will leave it to the parties.  The parties |
| 11:03:01 | 10 | know the case better than me.  You wanted an hour.  You can |
| | 11 | have your hour.  The Court will just sit by.  It may impact, |
| | 12 | again, how we may have to come back on another day. |
| | 13 | Thank you.  Please continue. |
| | 14 | MR. NORRIS:  Thank you, Your Honor. |
| 11:03:13 | 15 | BY MR. NORRIS: |
| | 16 | Q    Now, I want to talk briefly about profitability.  In |
| | 17 | your opinion, you calculated what you call PlusPass's |
| | 18 | but-for profit margin, right? |
| | 19 | A    Yes. |
| 11:03:22 | 20 | Q    And that's your opinion on how profitable PlusPass |
| | 21 | would be in the but-for world, correct? |
| | 22 | A    Correct. |
| | 23 | Q    And you opined that in the but-for world, PlusPass |
| | 24 | would -- first, you acknowledged during direct examination |
| 11:03:38 | 25 | that PlusPass hasn't been profitable in the actual world, |

11:03:42  1    correct?

2    A    Well, if on gross profits, but not net profits.

3    Q    Okay.  But you opined that in the but-for world,

4    PlusPass --

11:03:55  5        (Court Reporter requests clarification for the

6        record.)

7    BY MR. NORRIS:

8    Q    In the but-for world, you opine that PlusPass would

9    enjoy a profitability rate of 36.9 percent, correct?

11:04:04  10   A    Yes.

11            THE COURT:  The Court does have a question.  There

12   is a differentiation now between gross profits and net

13   profits.  Please explain for the record the difference

14   between gross profit and net profits, understanding that

11:04:15  15   revenues minus cost would be profit, generally in economics

16   from the Court's understanding of the readings.  What is the

17   difference between gross profits and net profits?

18            THE WITNESS:  The gross profits are considering

19   just the variable cost, basically, while the net profits are

11:04:30  20   including all these fixed costs that have to be borne, like

21   overhead.  So the gross profits are what you look at to see,

22   if you expanded, would you be making money on those

23   incremental additional sales.

24            THE COURT:  Thank you.  That clarifies that for

11:04:45  25   the record.

*Deborah D. Parker, U.S. Court Reporter*

11:04:45  1          Please ask your next question.

       2          MR. NORRIS:  Thank you, Your Honor.

       3   BY MR. NORRIS:

       4   Q    Now, on page 88 of your report, to get to the

11:04:55  5   36.9 percent, you used the actual profit rates for

       6   comparable companies operating in a competitive market,

       7   correct?

       8   A    Yes.

       9   Q    So you don't use Uber and Lyft here as your comparable

11:05:10 10   companies, correct?

      11   A    Correct.

      12   Q    And you don't use ParkMobil or ParkBoston here as your

      13   comparable companies, correct?

      14   A    Correct.

11:05:17 15   Q    Instead, you write in your report that, quote:  "A

      16   reasonable benchmark for this purpose is the six firms that

      17   Verra identified as comparable 'transaction processors,'"

      18   correct?

      19   A    Correct.

11:05:30 20   Q    And you cited a Verra document, Verra 3756, where again

      21   Verra supposedly compared itself to these billion-dollar

      22   companies, like Fiserv and Fidelity, correct?

      23   A    Yes.

      24   Q    You don't in your report cite any PlusPass documents

11:05:47 25   where PlusPass compared itself to these companies, correct?

*Deborah D. Parker, U.S. Court Reporter*

88

| | |
|---|---|
| 11:05:52 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 11:06:01 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 11:06:18 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 11:06:29 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 11:06:34 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 11:06:47 | 25 |

A    Correct.

Q    And you don't compare the management of these billion-dollar companies to the management of PlusPass, correct?

A    Correct.

Q    And you don't analyze the geographic markets in your report where these billion-dollar companies operate as compared to PlusPass, correct?

A    I don't recall a discussion about their geographic markets.

Q    And I just want to -- during direct examination, you discussed a 2017 study by the Congressional Research Service.

Do you recall that?

A    Yes.

Q    That was a study of six tolling authorities with extensive use of electronic tolling --

A    Yes.

Q    -- right?

A    Yes.

Q    And so these are the toll authorities, these are the companies that own, operate and run the toll road, correct?

A    Yes.

Q    And these are the same toll authorities whose mobile apps you conclude are not in the relevant market because

*Deborah D. Parker, U.S. Court Reporter*

| 11:06:49 | 1 | they're not comparable to the PlusPass app, correct? |

11:06:49  1  they're not comparable to the PlusPass app, correct?

2  A    Correct.

3  Q    Now, I want to go back now and just spend a little bit

4  of time on product market.  So you discussed the *It's My*

11:07:09  5  *Party* case during your direct examination, correct?

6  A    Correct.

7  Q    And that's a case where the federal court excluded one

8  of your expert opinions, right?

9  A    Correct.

11:07:22  10  Q    And that was your opinion about the amphitheater

11  concert venue market, correct?

12  A    Correct.

13  Q    And during direct, you talked about the methodology

14  that you use applied in this case which was the Hypothetical

11:07:37  15  Monopolist Test from the horizontal merger guidelines,

16  correct?

17  A    Yes.

18  Q    That's the same methodology that you used in *It's My*

19  *Party*, correct?

11:07:53  20  A    No.  In *It's My Party*, we didn't have the data to run

21  it.  I said that the methodology the Court wanted me to use

22  there basically relied on a similar question about, if you

23  raised prices, would enough people switch to other products

24  to constrain that price increase.  Here, we have data

11:08:13  25  showing that they wouldn't.  I applied that test, but I just

*Deborah D. Parker, U.S. Court Reporter*

11:08:18  1    didn't have that data in *It's My Party.*

2    Q    I'm going to show you now what's been marked as

3    Exhibit 107.

4         *(Defendant's Exhibit 107 was marked for*

11:08:24  5         *identification.)*

6    BY MR. NORRIS:

7    Q    I thought this would be -- I thought this would be an

8    uncontroversial point, but we'll do it briefly.

9              I'm showing you page 107 *of the It's My Party,*

11:08:51 10   *Inc. versus Live Nation* case, 88 F.Supp.3d 475.

11             Do you see that?

12   A    Yes.

13   Q    And I'm directing your attention to paper page 5, but

14   it's pin cite 486.

11:09:08 15            Do you see that?

16   A    Yes.

17   Q    And it says, quote:  "Elhauge bases his market

18   definition on a portion of the U.S. Department of Justice

19   and Federal Trade Commission horizontal merger guidelines,"

11:09:20 20  correct?

21   A    Yes.

22             THE COURT:  Just so the record is clear,

23   Mr. Kesselman, you also have received a copy of 107?

24             MR. KESSELMAN:  I have, Your Honor.  Thank you.

11:09:28 25            THE COURT:  Please continue.

*Deborah D. Parker, U.S. Court Reporter*

BY MR. NORRIS:

Q    Quote:  "These provide that a market can be defined using a targeted customers approach," correct?

A    Correct.

Q    The next quote:  Thus, if a hypothetical monopolist could profitably target a subset of customers for price increases, the agencies may identify relevant markets defined around those targeted customers, correct?

A    Yes.  But we just didn't have the data to show that in that case.

Q    But you applied the Hypothetical Monopolist Test, as the District Court said that you did, correct?

A    Well, we tried to infer whether it could be met, but we lacked exactly the data that we have here, so I was able to apply the methodology directly.  As I mentioned in my direct testimony, normally we don't have the luxury of that kind of data.  You have to infer it from other economic factors.

        But the Court goes on to say they specifically wanted data on whether prices went up, would enough of the amphitheater artists switch to other arenas, for example, and they didn't.  They know that there wasn't that pricing evidence, which was true.  There wasn't that pricing evidence there, but it is present here.

Q    I guess my question, Professor Elhauge, was whether you applied in that test the Hypothetical Monopolist Test from

11:10:55  1    the U.S. Department of Justice and FTC's Horizontal Merger

2    guidelines.  I just want to understand, yes or no, did you

3    apply the Hypothetical Monopolist Test in *It's My Party* or

4    not?

11:11:07  5    A    I couldn't really apply the pricing test, because we

6    didn't have the pricing data.  What I explained was a

7    slightly different portion of the guidelines which specified

8    you can define a market not only if the product is different

9    but based upon certain customers being targeted.  So if

11:11:27  10   Hypothetical Monopolist could profitably target a subset of

11   customers for price increases, you could define a price

12   discrimination market is what I was pointing out, but we had

13   to infer it in that case.  We didn't have the pricing data,

14   so I could not directly apply the Hypothetical Monopolist

11:11:46  15   Test in that case, which is what the Court was looking for

16   there and what I was able to do here.

17            MR. NORRIS:  I'm going to object as nonresponsive

18   and move to strike that response.

19            THE COURT:  Overruled.  The answer will stand.

11:12:00  20            The Court will look to the evidence that's

21   presented during this hearing and apply it to the applicable

22   standards.

23            Please ask your next question.

24   BY MR. NORRIS:

11:12:19  25   Q    Now, during your direct examination, you testified that

*Deborah D. Parker, U.S. Court Reporter*

11:12:28  1    you couldn't find any significant evidence of rental car

2    toll payments being made directly to toll authorities,

3    correct?

4    A    Correct.

11:12:40  5    Q    But you testified at your deposition that you didn't

6    perform a calculation of this, because you couldn't find any

7    data about it, correct?

8         MR. KESSELMAN:  Objection.  Mischaracterizes the

9    testimony.

11:12:52 10        THE COURT:  Overruled.

11        You may answer.

12        THE WITNESS:  I believe what I said is what I said

13    today, which is that Verra itself did a calculation.  It had

14    99 percent market share, so that to the extent that rental

11:13:05 15    cars were being paid through these tolling authority apps,

16    Verra's own calculation indicates it must be within that

17    one percent.

18    BY MR. NORRIS:

19    Q    On the screen is page 131 from your deposition.  And

11:13:20 20    the question was:

21         "You couldn't find this analysis of how

22          much people are paying

23          toll authorities -- renters paying

24          toll authorities directly for tolls.

11:13:31 25          That analysis is not in your report,

94

| | | |
|---|---|---|
| 11:13:33 | 1 | because you couldn't find data on it, |
| | 2 | one way or other.  Is that fair?" |
| | 3 | MR. NORRIS:  And your answer was: |
| | 4 | "I don't have a calculation of it, |
| 11:13:39 | 5 | because there's no data I could find on |
| | 6 | it." |
| | 7 | Did I read that correctly? |
| | 8 | A    Yeah.  We don't know how little of the one percent that |
| | 9 | they have.  We don't have the data.  We just have evidence |
| 11:13:57 | 10 | that they don't have any significant share. |
| | 11 | MR. KESSELMAN:  Your Honor, for completeness, I |
| | 12 | would ask that Counsel read the rest of the response.  He |
| | 13 | only read a portion of the answer into the record. |
| | 14 | THE COURT:  I understand. |
| 11:14:09 | 15 | You may redirect as to that in your allotted time. |
| | 16 | Thank you.  Overruled.  You may proceed with your |
| | 17 | questioning. |
| | 18 | BY MR. NORRIS: |
| | 19 | Q    And you testified at deposition that you weren't aware |
| 11:14:18 | 20 | of whether PlusPass had asked for any of this data from the |
| | 21 | toll authorities, correct? |
| | 22 | A    I did. |
| | 23 | Q    And you also -- and your staff never asked for any of |
| | 24 | this data from the toll authorities, correct? |
| 11:14:32 | 25 | A    I cannot from my personal knowledge testify about |

*Deborah D. Parker, U.S. Court Reporter*

11:14:35    1    whether they did or not.

2    Q    You don't know one way or another whether they asked

3    for this data, correct?

4    A    I don't know.

11:14:43    5    Q    And you talked earlier about how you produced

6    documents -- third-party communications between who your

7    staff communicated with about this case to us, correct?

8    A    Yes.  Any documents that we had, we produced to you.

9    Q    And you didn't produce any communications that your

11:14:57   10    staff had with toll authorities, correct?

11    A    Produced all we had.  If any of those were with

12    toll authorities, I don't recall myself, because I'm not the

13    one who engaged in those communications.

14    Q    You also testified at your deposition that you have not

11:15:13   15    independently checked the download figures on any of the

16    toll authority apps, correct?

17    A    I don't recall giving that testimony.  But what do you

18    mean by "independently checked the download figures"?

19    Q    This is from page 136 of your deposition, starting at

11:15:37   20    line 5.

21        "QUESTION:  You haven't independently checked the

22        download figures on any of these toll authority

23        apps, is that fair?

24        "ANSWER:  I have not."

11:15:47   25        Did I read that correctly?

96

11:15:48  1    A    Yes.  I'm still not sure what "independently checked"

2    really means.

3    Q    Just a few more questions on this.  In Appendix B, on

4    page 99 of your report, is where you calculated Verra's

11:16:04  5    market share, correct?

6    A    I'm sorry.  Is that Appendix B of?

7    Q    Of your report.  That's where you calculated Verra's

8    market share.

9    A    Well, I did a confirmation of the calculation that

11:16:31  10   Verra had.

11   Q    You did your own calculation of Verra's market share,

12   correct?

13   A    Yes.  Based on the -- a particular source.

14   Q    Right.  So that source was -- to do that calculation,

11:16:47  15   you estimated the share of all rental car revenue that was

16   covered by a known Verra contract, correct?

17   A    Yes.

18   Q    So you started with each rental car company share of

19   total car revenue in the United States as of 2018, correct?

11:17:04  20   A    Correct.

21   Q    And so, for example, Enterprise got a 56.3 percent of

22   the market, because it has 56.3 percent of rental car

23   revenue in the United States in 2018, correct?

24   A    Yes.  According to the source.

11:17:19  25   Q    And then you added those percentages together for

*Deborah D. Parker, U.S. Court Reporter*

11:17:23  1    contracts between Verra and the rental car company, right?

2    A    Correct.  Conservatively excluding some cases that

3    were -- just was not known whether they had a contract or

4    not.

11:17:34  5    Q    So if a renter rents a car from Enterprise but pays the

6    toll authority directly for the toll, that transaction is

7    covered by your market share for Verra, even though Verra

8    doesn't process that transaction, correct?

9    A    If there were such transactions, yes, but that

11:17:53 10    wouldn't -- that wouldn't explain why Verra's own

11    calculation 99 percent of its -- that it's market share was

12    99 percent.

13    Q    Well, Verra might have been talking about the services

14    it provides to its rental car customers, correct?

11:18:11 15    A    I think the phrase was "its market share in the rental

16    space."  So I would say that, combined with this, confirms

17    that there aren't very many significant sales of tolls

18    through these tolling authority products.

19    Q    When I asked you at your deposition who had made that

11:18:31 20    99 percent market statement, you didn't even know who had

21    made it, correct?

22    A    I just know it's in a Verra strategic document.

23    Q    Okay.  And when I asked you about it at your

24    deposition, you couldn't remember the context behind the

11:18:43 25    person making that statement, correct?

98

11:18:46    1    A    I can't remember the context of my deposition from when

2    I made that statement, so I don't have photographic recall,

3    but I don't -- I don't recall the context.

4            MR. KESSELMAN:  Your Honor -- and I apologize,

11:18:58    5    Counsel -- I'm just going to object and try to give

6    latitude.  This is beyond the scope of what I understand is

7    directly challenged in the *Daubert* motion.

8            THE COURT:  Overruled.

9            I will just listen to everything from both parties

11:19:13    10    how they proceeded with this Daubert hearing, both plaintiff

11    and defense.  So I'm going to apply the evidence to the

12    applicable standard for why we're here.  Overruled.

13            You may ask your questions.  It looks like you

14    have about 10 minutes left of the one hour that the parties

11:19:29    15    asked for, but the Court did ask and order it be a half an

16    hour, but I'm granting that latitude.  I'm allowing the

17    parties to present as they'd like to present this matter.

18            Please continue.  Thank you.

19            MR. NORRIS:  Thank you, Your Honor.

11:19:41    20    BY MR. NORRIS:

21    Q    Just one more brief question then.  You don't know how

22    this unknown person who calculated that market share, you

23    don't know what they did to come up with it, correct?

24    A    I don't know.

11:19:54    25    Q    And you also don't in your report perform an analysis

99

| | | |
|---|---|---|
| 11:20:04 | 1 | on the percentage of rental drivers who use one of Verra's |
| | 2 | products, correct? |
| | 3 | A    I'm sorry.  Can you say that again? |
| | 4 | Q    You don't perform an analysis in your report on the |
| 11:20:18 | 5 | percentage of rental drivers who actually use one of Verra's |
| | 6 | products, correct? |
| | 7 | A    I don't recall that particular calculation. |
| | 8 | Q    Right.  At your deposition, I showed you a Verra |
| | 9 | document that calculated for Avis Budget the percent of |
| 11:20:41 | 10 | renters who actually used a Verra product. |
| | 11 |        Do you remember that? |
| | 12 | A    I don't. |
| | 13 | Q    Okay. |
| | 14 | A    It could well be true; I just don't recall it. |
| 11:20:57 | 15 | Q    You don't recall seeing an Avis Budget document that |
| | 16 | said about 32 percent of Avis Budget renters who rent a |
| | 17 | vehicle in a checkout location where there's toll roads |
| | 18 | actually use a Verra product? |
| | 19 | A    I don't recall that particular statement.  I do recall |
| 11:21:17 | 20 | talking about the topic generally in deposition. |
| | 21 | Q    Let me show it quickly.  This is page 203, starting at |
| | 22 | line 5. |
| | 23 |        "QUESTION:  So for Budget you see it's |
| | 24 |        32.2 percent adoption, yes or no? |
| 11:21:53 | 25 |        "ANSWER:  That's what it says here in this |

*Deborah D. Parker, U.S. Court Reporter*

11:21:55  1      document, yeah."

2           Do you see that?

3   A    Yes.

4   Q    *(Reading)*:

11:21:59  5      "QUESTION:  And so you agree that would mean that

6      67.8 percent of Budget customers are not using the

7      tolling products provided by Budget, yes or no?

8      "ANSWER:  Correct.  At least using these

9      two tolling programs."

11:22:13 10           Right?

11  A    Well, I go on to say a lot more that's relevant, but

12  what you've read, you've read correctly.

13           MR. NORRIS:  No further questions, Your Honor.

14           THE COURT:  Thank you.

11:22:26 15           Redirect at this time?

16           MR. KESSELMAN:  Yes, Your Honor.

17                   REDIRECT EXAMINATION

18  BY MR. KESSELMAN:

19  Q    Professor Elhauge, just briefly.  If you go back to

11:22:53 20  what has been marked as Exhibit 1 to this hearing, which is

21  your expert report and Appendix B, I believe, Counsel was

22  just asking you questions about that.

23  A    Yes.

24  Q    And just to be clear, if you look at Appendix B,

11:23:05 25  "Calculation of Market Shares in HHI," under "Source," are

11:23:11  1    the source of these calculations Verra documents?

2    A    Well, the -- the source of whether or not there's a

3    Verra contract is all Verra.  And there are -- let's see.

4    There are other sources, though, for the appendix.  The Auto

11:23:34  5    Rental News Fact Book is also a source.

6    Q    Oh, understood.  I see it.  Under "Notes," on the next

7    page -- just for the record, it's page 100.  Is that what

8    you're referring to?

9    A    Yes.  The source is on 99 -- the 99 -- page 99 sources

11:23:51  10   are all Verra.  On page 100, there are sources, at least one

11   of which is Verra, but it's also another source.

12   Q    And from an economic point of view, from a methodology

13   point of view, is it typical to rely on sources provided by

14   the defendant in calculating market relevant market and

11:24:12  15   market share?

16   A    Sure.

17   Q    I'm going to go back in the order that Counsel asked

18   you a few questions, and I'm going to try to keep this

19   succinct.

11:24:23  20         Counsel started his exam on damages.  Do you

21   recall that?

22   A    Yes.

23   Q    Okay.  And from an economic point of view, why is it

24   that you can assume in a but-for world that PlusPass would

11:24:45  25   have relationships or contracts with toll authorities that

*Deborah D. Parker, U.S. Court Reporter*

11:24:49  1    it did not have in the actual world?

2    A    Well, it would just have a lot more economic incentive

3    to initiate those and to fund them to the extent it needs to

4    be funded to overcome any obstacles there might be.

11:25:05  5    Whereas, if it's futile anyway because you foreclose from

6    the market, a rational business would spend a lot less money

7    lining up contracts with Tolling Authorities.

8    Q    Professor, is it standard methodology to assume sales

9    in a but-for world that were absent in the real world?

11:25:23  10    A    Yeah.  The whole point is that but-for sales are higher

11    than actual sales when there is foreclosure.  And the

12    question is to reasonably approximate for damages purposes

13    by how much is the question.

14    Q    And, Professor, you indicated earlier that you

11:25:40  15    calculated, you know, a 99 percent foreclosure rate in the

16    rental car ETP market; is that correct?

17    A    Correct.

18    Q    Okay.  And does that type of foreclosure then create a

19    disincentive in the real world for a company like PlusPass

11:25:57  20    to enter into relationships with tolling authorities?

21    A    Yeah.  It means that it faces an insuperable barrier

22    anyway.  It's futile.  And there's also threats of being

23    sued for tortious interference because -- if it tried to

24    interfere with these exclusive contracts.

11:26:16  25              MR. NORRIS:  Objection.  Nonresponsive.  Outside

*Deborah D. Parker, U.S. Court Reporter*

11:26:18   1   the scope of evidence.

           2          THE COURT:  Overruled.

           3          Again, the Court is granting leeway and how you

           4   would like to present as to the *Daubert* standard for what

11:26:26   5   we're here.  I'll apply the evidence to the applicable

           6   standard.

           7          You may ask your next question.  Thank you.

           8          MR. KESSELMAN:  Thank you, Your Honor.

           9   BY MR. KESSELMAN:

11:26:33  10   Q    And, again, you applied the yardstick methodology in

          11   calculating damages in this case, correct?

          12   A    Correct.

          13   Q    And I believe we have gone over this.  But in your

          14   experience as an economist, is the yardstick methodology a

11:26:51  15   standard methodology that's used to calculate damages in

          16   antitrust cases?

          17   A    Yes.

          18   Q    In this case, Counsel, you'll recall, walked you

          19   through the Uber 10-K.  Do you recall that in the series of

11:27:06  20   questions about Uber?

          21   A    I do.

          22   Q    Okay.  In this case, was there a perfect yardstick that

          23   you could use that exactly mirrored PlusPass?

          24   A    No, because there's total foreclosure in this

11:27:22  25   marketplace, so there is -- there's no nice benchmark that

*Deborah D. Parker, U.S. Court Reporter*

11:27:27  1    we can observe, so we have to use the closest yardstick we

2    can find.

3    Q    And in standard economic methodology for an antitrust

4    analysis, is it typical that you would use a benchmark that

11:27:45  5    may not be perfect because of the harm to the plaintiff?

6    A    Well, it's typical to use the best reasonable

7    approximation you can and often to use different industries

8    altogether.  So, you know, you may say for this medical

9    drug, we're going to use some other medical drug as our

11:28:11  10   yardstick.  That is very common, even though it's a

11   different product, different drug operates differently --

12   different set of patients.  Nonetheless, you use the

13   yardstick you can to reasonably approximate as much as you

14   can.  Understanding that the whole reason we can observe the

11:28:35  15   but-for world is that there is by assumption an antitrust

16   violation that foreclosed that world from existing.

17   Q    And Professor Elhauge, do you have an understanding

18   that Verra, itself, used Uber and Lyft as a method of

19   comparison for rental car ETP?

11:28:55  20   A    Yes.

21          THE COURT:  I'm going to ask a question.  When I

22   hear about are you aware or have an understanding, that

23   could be from a whole bunch of sources.

24          What is your understanding based upon?

11:29:08  25          THE WITNESS:  Documents.  Verra documents where it

*Deborah D. Parker, U.S. Court Reporter*

11:29:10   1   looked at these ridesharing companies to figure out the

2   attractiveness of rental car ETP apps.

3          THE COURT:  Thank you.  That answers the Court's

4   question.

11:29:20   5          You may ask your next question.

6          MR. KESSELMAN:  Thank you, Your Honor.

7   BY MR. KESSELMAN:

8   Q    And I know it's referenced in your report, did you, in

9   fact, review Verra documents that identified Uber and Lyft

11:29:33  10   as comparatives for mobile ETP?

11   A    Yes.

12          MR. KESSELMAN:  Your Honor, we would like to just

13   identify for the record an exhibit that was included on our

14   exhibit list and show it to the witness.  I believe the

11:30:01  15   witness has it; but, Your Honor, if you'll allow, I would

16   hand it to you to have it, unless you already have a

17   version.

18          THE COURT:  I'm not sure what you're doing, what

19   your presentation is.  Tell me what you'd like to do.  I

11:30:17  20   would be glad to then answer.

21          MR. KESSELMAN:  I'm going to show the witness just

22   an exemplar document where Verra compared --

23          THE COURT:  What is the exhibit number?

24          MR. KESSELMAN:  It's Exhibit 16, Your Honor.

11:30:31  25          THE COURT:  I have a folder with 16.  It's so

*Deborah D. Parker, U.S. Court Reporter*

11:30:34  1    marked for identification purposes.

2              Do you have a copy of that, Defense?  I have it

3    listed it as Exhibit N in my folder; is that correct?

4              MR. KESSELMAN:  That's correct.

11:30:45  5              THE COURT:  So it's Exhibit 16, or is it

6    Exhibit N?  What are you referring it to?  There's two

7    different tags.

8              MR. KESSELMAN:  In the record that was filed, it

9    was Exhibit N and then what we submitted for reference for

11:31:01 10    this hearing is Exhibit 16, but it's the same Verra

11    document.

12              THE COURT:  We'll have it as 16, just for

13    clarification purposes.  Understanding that it does

14    reference Document 272-3, which inclusive of pages 1 through

11:31:14 15    3, is Exhibit N, for the record.

16              *(Plaintiff's Exhibit 16 was marked for*

17              *identification.)*

18              MR. KESSELMAN:  Thank you, Your Honor.

19    BY MR. KESSELMAN:

11:31:18 20    Q    Professor Elhauge --

21              MR. NORRIS:  I have a copy, Your Honor.

22              THE COURT:  Thank you.

23    BY MR. KESSELMAN:

24    Q    Professor Elhauge, if you'd turn to Exhibit 16 in the

11:31:27 25    book that you have, do you see on the second page there is a

11:31:29  1    reference to "PlatePass Update – What are we solving for,"

2    question mark?

3    A    Yes.

4    Q    Okay.  And underneath that, it reads:

11:31:37  5          "Future RAC Tolling, External

6    Innovation/Disruption Mitigation.  Uber, Lyft, Why They Are

7    Winning," and it goes on.

8          Do you see that?

9    A    Yes.

11:31:47 10    Q    And to your understanding, is this a document that you

11    reviewed and is consistent with your opinions in this case?

12    A    It is.

13    Q    And just so the record is clear, that's a document that

14    came out of Verra's files, to your understanding?

11:32:06 15    A    Yes.

16    Q    Now, there was a question posed to you with respect to

17    your deposition testimony.  This was pages 131 and 132, and

18    you recall I objected and asked for an opportunity to have

19    you read the complete answer that you gave.

11:32:27 20          Do you recall that?

21    A    Yes.

22    Q    Okay.  What I'd like to do now is have you read the

23    full answer.

24          MR. KESSELMAN:  Your Honor, may I approach?

11:32:39 25          THE COURT:  I stated earlier, Counsel are free to

*Deborah D. Parker, U.S. Court Reporter*

11:32:41  1    approach throughout the entire hearing.

        2         Thank you.

        3      *(Pause)*

        4    BY MR. KESSELMAN:

11:33:06  5    Q    Professor Elhauge, you will recall this put on the

        6    screen by Verra's counsel.  I would ask you for the answer.

        7    Just so the record is clear, let me start with the question

        8    so we know what we're talking about here.  The question was

        9    from Mr. Norris.

11:33:22 10         "QUESTION:  Let me ask a better question.  I'm not

       11         trying to be controversial here."

       12              MR. KESSELMAN:  This is page 131, line 17 of your

       13    deposition.

       14              I guess the point is, you couldn't find this

11:33:33 15    analysis of how much people are paying toll authorities --

       16    renters paying toll authorities directly for tolls.  That

       17    analysis is not in your report, because you couldn't find

       18    data on it one way or the other; is that fair?

       19              The answer that I understood you were allowed to

11:33:50 20    review was the first portion.  I don't have a calculation of

       21    it, because there's no data I could find on it.

       22              Can you read the rest of your answer just for

       23    completeness there at the top of 132, starting at line 1?

       24    A    Yes.  I go on to say, "But there was no evidence that

11:34:06 25    they have any significant share.  And if they were

11:34:09  1  significant, then you would expect them to be in the

2  documents and in Verra's market share calculation, if they

3  thought they were in the market."

4           And elsewhere in the deposition, I make the point

11:34:21  5  I made today that if they're in the market, they'd be part

6  of the one percent that Verra thought they didn't have of

7  the market.

8  Q    Thank you, Professor.  Just a couple more questions to

9  follow up on questions asked of you.

11:34:35 10           Staying with damages, do you recall that counsel

11  for Verra asked you some questions about in the real world

12  PlusPass -- the time frame that PlusPass entered into

13  contracts or provided services for certain tolling

14  authorities?

11:34:53 15  A    Yes.

16  Q    Okay.  Are you aware -- I know you're familiar with it.

17           Can you explain for the record the concept of

18  interoperability with respect to the tolling authorities?

19  A    Oh, it just means -- as I discussed in the report, if

11:35:08 20  you operate in one state, you can often operate in a lot of

21  other states.  EZPass is one of the biggest.  Many, many

22  states -- I can use my Massachusetts pass and drive all the

23  way down to Florida, I think, using an EZPass.

24  Q    And so, as you understand the record, based on your

11:35:31 25  report, if a company like Verra -- let me strike that.

11:35:36   1            Do you understand that Verra does not, itself,

2    actually have contracts with every toll authority in the

3    United States?

4    A    That's true.

11:35:43   5    Q    And do you understand that Verra uses interoperability

6    between different toll authorities?

7    A    Yes.

8    Q    And do you understand that PlusPass also can use

9    interoperability between different toll authorities?

11:35:59  10    A    Yes.

11    Q    And so, as a consequence of that, is it necessary to

12    have agreements or relationships with every toll authority

13    in the United States to be able to operate ETP car rental

14    services?

11:36:10  15    A    It is not.

16    Q    Now, there was also a reference by Mr. Norris about

17    when it was that the PlusPass app was operational -- this

18    was a continuation of the same line of questioning -- and

19    would work with different toll authorities in the real

11:36:28  20    world.  Are you familiar with the Wolf test?  This was in

21    Mr. Deitiker's testimony.

22    A    This the Wolf test?  I'm not recalling.

23    Q    Do you recall Mr. Deitiker testifying in deposition

24    that, in fact, there had been an earlier test of PlusPass'

11:36:51  25    app that worked across the country as far back as 2014?

*Deborah D. Parker, U.S. Court Reporter*

| | | |
|---|---|---|
| 11:36:55 | 1 | A     Yes. |
| | 2 | Q     Okay.  And so even though PlusPass may not have had a |
| | 3 | formal contract or relationship, do you have an |
| | 4 | understanding that the PlusPass app could still work even |
| 11:37:07 | 5 | before that with toll authorities? |
| | 6 | A     That is what PlusPass' CEO testified to. |
| | 7 | Q     And, again, just circling back, the methodology that |
| | 8 | you used for determining damages in this case, that's a |
| | 9 | standard methodology, the yardstick? |
| 11:37:28 | 10 | A     Yes. |
| | 11 | Q     And to your understanding you applied that and used |
| | 12 | inputs in a way that's consistent with your training as an |
| | 13 | economist? |
| | 14 | A     Yes. |
| 11:37:45 | 15 | MR. KESSELMAN:  I have no further questions, |
| | 16 | Your Honor. |
| | 17 | THE COURT:  All right.  Thank you. |
| | 18 | MR. NORRIS:  Your Honor -- |
| | 19 | THE COURT:  Let me tell you where the time stands. |
| 11:37:56 | 20 | Initial was 45 minutes with plaintiff, and then we had an |
| | 21 | additional 17 to 18 minutes, so a little over an hour. |
| | 22 | I have 48 minutes from defense.  So you may |
| | 23 | present.  But, again, I have offered flexible time periods. |
| | 24 | So, please, go ahead. |
| 11:38:24 | 25 | MR. NORRIS:  Thank you, Your Honor.  I'll be |

| | | |
|---|---|---|
| 11:38:25 | 1 | brief. |
| | 2 | THE COURT:  It's up to you.  The Court has before |
| | 3 | it all the time the parties wanted and then some. |
| | 4 | So please go ahead. |
| 11:38:36 | 5 | RECROSS-EXAMINATION |
| | 6 | BY MR. NORRIS: |
| | 7 | Q    Professor Elhauge, I just want to follow up very |
| | 8 | briefly on a point you just discussed with Mr. Kesselman, |
| | 9 | and that was interoperability.  In your report, you don't |
| 11:38:56 | 10 | offer an opinion that the State of California is |
| | 11 | interoperable with any other state, correct? |
| | 12 | A    I'm not recalling offhand any such opinion. |
| | 13 | Q    So until PlusPass was able to process transactions in |
| | 14 | California, if California is not inoperable with any other |
| 11:39:27 | 15 | toll authority, interoperability wouldn't help PlusPass work |
| | 16 | in California, correct? |
| | 17 | A    If that premise is true, yes. |
| | 18 | Q    Well, let's look at paragraph 65 to 66 of your report. |
| | 19 | It's page 30. |
| 11:39:52 | 20 | In paragraph 65, you mention interoperability with |
| | 21 | EZPass, correct? |
| | 22 | A    Yes. |
| | 23 | Q    And then you provide a map of EZPass interoperability |
| | 24 | as of 2021? |
| 11:40:08 | 25 | A    Correct. |

*Deborah D. Parker, U.S. Court Reporter*

113

11:40:09  1    Q    And then in the next paragraph, you discuss

2    interoperability between Texas, Oklahoma and Kansas, right?

3    A    Yes.

4    Q    And you don't discuss PlusPass -- excuse me.  You don't

11:40:23  5    discuss California being interoperable with any other

6    toll authorities, correct?

7    A    I don't.  I just don't know whether they are or not.  I

8    only cited two examples here.

9    Q    And so because you don't know whether they are or are

11:40:37 10    not interoperable with other toll authorities, that can't be

11    the basis.  Interoperability can't be the basis for you

12    assigning lost profits to PlusPass, in California, dating

13    back to March of 2018, correct?

14    A    I don't know whether it would provide a basis or not,

11:40:56 15    but I didn't mention that in my report.

16    Q    That's not the basis you relied on, correct?

17    A    I relied on the general point that you would think they

18    could make sales earlier in the but-for world.  I didn't

19    specifically rely on interoperability for why they could do

11:41:15 20    so in California.

21    Q    And about things that you didn't rely on in your

22    report, Mr. Kesselman asked you about the Wolf test.  Do you

23    recall that question?

24    A    But I did opine that -- and I note that Hertz --

11:41:34 25    PlatePass, itself, is not available in some parts of

| | |
|---|---|
| 11:41:39 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 11:41:59 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 11:42:12 | 10 |

11:41:39  1   California.  So I -- I just raise that, because it might

2   suggest there is some interoperable to explain how

3   nonetheless Verra's PlatePass is nonetheless able to work in

4   California.

11:41:59  5   Q    My question was:  Do you recall Mr. Kesselman's

6   question to you about the Wolf test?

7   A    Yes.

8   Q    And you didn't recall the Wolf test, correct?

9   A    I did not recall that name, no.

11:42:12  10   Q    And you don't discuss the Wolf test in your expert

11   report, correct?

12   A    I don't believe I do.

13        MR. NORRIS:  No further questions, Your Honor.

14        THE COURT:  Thank you.  Any additional questions?

11:42:24  15        MR. KESSELMAN:  Your Honor, may I have one -- just

16   one?

17        THE COURT:  You may ask one question per your

18   request, but that is one question that is granted.  Not a

19   follow-up question.  I'm following what your words are.

11:42:33  20        MR. KESSELMAN:  Thank you, Your Honor.

21                    REDIRECT EXAMINATION

22   BY MR. KESSELMAN:

23   Q    Professor Elhauge, in your experience, is it standard

24   methodology to assume that in a but-for world a plaintiff

11:42:46  25   would have economic incentives to enter into agreements with

| | |
|---|---|
| 11:42:51 | 1 |

toll authorities, including in California?

A    I think that is a correct application of a standard economic method.

MR. KESSELMAN:  Thank you.

THE COURT:  Thank you.  Anything further from the defense?

MR. NORRIS:  No, Your Honor.

THE COURT:  Thank you.  The Court does have some questions, too.  I'll start with the witness.

VOIR DIRE EXAMINATION

BY THE COURT:

Q    Thank you for your time today and thank you for coming in for our *Daubert* hearing.

A    Thank you.

Q    The Court has reviewed your report, and I note that generally it's quite an extensive report and generally proceeds in certain sections -- the vast majority in a narrative fashion.  It does not necessarily contain a number of opinions or conclusions throughout that narrative portion.

So just so I'm clear, since you're the author, please identify in your report the principal opinions or final conclusions by reference to page number or paragraph number.  So, again, these are principal opinions or final conclusions and this would be as to all things.  Not just

116

11:43:56  1    what you believe is being challenged, but just so the Court

2    can understand, because the Court needs to understand for

3    itself.  Not just from the advocate's point of view.

4              Let's go through that page by page, shall we?

11:44:13  5    A    Sure.  I would say paragraphs 4 through 12 --

6    Q    Thank you.

7    A    -- describe my ultimate opinions.  These are ultimate

8    conclusions I reach about the economic issues in this case.

9              *(Court Reporter requests clarification for the*

11:44:27 10    *record.)*

11    BY THE COURT:

12    Q    I understand.  Thank you.

13    A    In the subsequents parts, there are all of these -- I

14    should say all of these bottom-line opinions depends upon a

11:44:45 15    series of subsidiary opinions that I identify in my report.

16    So, for example, the market definition opinion -- I guess,

17    the subsidiary point A is in Part 2A, which is basically

18    what is the right methodology for defining a market and why

19    is it a Hypothetical Monopolist Test, why could it include

11:45:17 20    price discrimination markets.

21              And then for Part B, I reach that ultimate

22    conclusion that the relevant product market is rental car

23    ETP.  But along the way to explain that, I apply the

24    Hypothetical Monopolist Test, both the direct product form

11:45:37 25    and the price discrimination form, to the data.  And I

*Deborah D. Parker, U.S. Court Reporter*

11:45:40  1  reached the conclusions that it's met because of the 17 and

2  25 percent price increase after the merger and the 150 to

3  400 percent price difference between this market and the

4  competitive benchmark of non-rental car --

11:45:56  5  Q    Okay.  I'm going to stop you, because we're going

6  beyond the Court's question.  I'll just say it again:

7  Please identify the principle opinions or final conclusions

8  in your report by reference to page number or paragraph

9  number.  Not the content of them.  Just the page numbers.

11:46:10 10  Just the paragraph numbers.  That's all that the question is

11  calling for.

12  A    Okay.

13  Q    And you started before, and I circled those.  That was

14  4 through 12, and I understand that they do depend upon

11:46:25 15  other parts of the report.

16       Please tell me what your final conclusions or

17  principal opinions are in the report.

18  A    Okay.  So paragraphs 26 to 35 --

19  Q    Thank you.

11:46:37 20  A    -- applies the opinion on what the right methodology

21  is.  Paragraphs 36 through 55 describe the subsidiary

22  opinions that I reach, in order to define the product

23  market.

24       Paragraphs 56 through 68 describe the subsidiary

11:47:16 25  opinions that I used to justify my geographic market

*Deborah D. Parker, U.S. Court Reporter*

11:47:21   1   definition.

2   Q      Thank you.  And I appreciate your answers.  This is

3   what I'm asking.  Thank you.

4   A      Okay.  So then paragraphs 69 through 75 is where I

11:47:39   5   explain the basis for my conclusion that Verra had not just

6   market power but monopoly power.

7              Paragraphs 76 through 85 is where I explain the

8   basis for my opinion that Verra's exclusive contracts

9   foreclosed on this entire relevant market.

11:48:16  10              Paragraphs 86 through 93 of provide the basis for

11   my conclusion that the contracts also gave Verra control

12   over the license plate registration process that it used to

13   foreclosed rivals.

14              And paragraphs 94 to 98 explain that the exclusive

11:48:41  15   contracts were also foreclosing by giving the rental car

16   companies incentives to interfere with customer use of rival

17   ATPs to agree to exclusivity by sharing supercompetitive

18   revenue.

19              Paragraphs 90 -- I guess there's two -- paragraphs

11:49:11  20   99 to 113 explain that the -- the basis for my conclusion

21   that the exclusionary contracts raised prices.

22   Q      Okay.  I think I have an idea.  I was just trying to

23   get a little bit more understanding.  But, again, I can read

24   the headings and see how they go through, but I was looking

11:49:31  25   for, again, principal opinions and final conclusions, not

*Deborah D. Parker, U.S. Court Reporter*

11:49:35   1   necessarily going through and describing the subsidiary

           2   leading up to.  That's not part of my question.

           3           I'll go to the next question:  What methodology

           4   did you apply to calculate plaintiff's lost profits?  Just

11:49:49   5   the methodology.

           6   A    To calculate lost profits, I used the yardstick

           7   approach.

           8   Q    What facts, data or assumptions did you rely on in

           9   applying the yardstick methodology?

11:50:10  10   A    Well, to apply it, I first had to define the sphere

          11   that was foreclosed to compare it to the but-for sphere, so

          12   I calculated that.  And then I calculated, as we've

          13   discussed, the -- where PlusPass ultimately had access to

          14   states.  And then I used Verra documents to explain the

11:50:45  15   growth rate of this market which I then applied to the

          16   dollar figures, in order to project it over time in Table 3.

          17           Then, for the but-for share of ETP absent rental

          18   car ETP market, I applied the yardstick approach by

          19   examining the evidence, including Verra's internal

11:51:15  20   documents -- that ridesharing apps and parking apps were a

          21   good benchmark.  And then for the data source to figure out

          22   what but-for penetration that meant over time, which I had

          23   to ramp up, I used actual data on how ridesharing apps and

          24   parking apps did in New York City, ParkBoston and the

11:51:42  25   ParkMobile app in Miami Beach, because those were the places

*Deborah D. Parker, U.S. Court Reporter*

11:51:47  1    I could get the relevant data.

2        And then to figure out PlusPass' but-for share of

3    rental car ETP that would be handled by apps, I relied on

4    evidence that Verra, itself, thought PlusPass had a first

11:52:06  5    mover advantage and was a disruptive technology that was a

6    big threat to it; that it -- Verra documents indicate that

7    it agreed that PlusPass' technology had a lot of

8    technological advantages over its rivals, including

9    particular PayTollo, which would have been the only rival at

11:52:28  10    the time it would have entered in the but-for world;

11    evidence that it had a patent that others do not have.  And

12    I rely on the data that I have summarized earlier that

13    showed that its prices were far lower than the prices of its

14    rivals.

11:52:48  15        Then, to estimate PlusPass' but-for profit margin,

16    I used its actual price that it charged to consumers both in

17    the non-rental space and the rental space for its ETP app

18    and proposed to tolling authorities and explained why

19    that -- it made sense to use that conservatively, rather

11:53:11  20    than PlusPass CEO's effort to say it would be even higher.

21        And then for the profit rate, I used as a data

22    source the six firms that Verra itself identified as a good

23    yardstick for profitability, and I confirmed that by showing

24    that it matched the conclusions one would reach from the

11:53:35  25    Congressional Research Service data.

*Deborah D. Parker, U.S. Court Reporter*

11:53:40  1        And then I just -- the rest of it is, I suppose,

2    the math of applying those assumptions and saying as a

3    result, what would the but-for for future share each year

4    have been, how big, multiply that by the sales to figure

11:53:57  5    what the but-for sales would have been and then to apply the

6    profit margin to figure out what profits has it lost over

7    time.

8    Q    Thank you.

9        My next question is:  Defendant argues that profit

11:54:09 10    calculations model -- excuse me.  Let me start that again.

11    Defendant argues that the profit calculations model utilize

12    improperly included lost profit damages from California,

13    beginning in March 2018, although PlusPass did not offer

14    services in California until June 2022.  Why did you include

11:54:32 15    lost profits from California in your model?

16    A    Because in the actual world, they didn't have much

17    incentive to apply --

18        *(Court Reporter requests clarification for the*

19        *record.)*

11:54:44 20        THE WITNESS:  In the actual world, they didn't

21    have much incentives; by which I mean, PlusPass lacked much

22    incentive to apply earlier in California, because it was

23    being foreclosed anyway.  And in the but-for world, though,

24    they would have not been foreclosed by all these contracts

11:55:00 25    and thus would have had incentives to contract with

*Deborah D. Parker, U.S. Court Reporter*

```
11:55:04   1   California.
           2           And my understanding is, once they made the
           3   decision to contract with California, it went relatively
           4   quickly.  They just had not pursued it before, because it
11:55:16   5   was futile.
           6   Q    What determines whether those incentives would have
           7   been futile?  Is that an assumption, or what's that premised
           8   upon?
           9   A    There's actual documents where the PlusPass executives
11:55:30  10   say they stopped making efforts, because they thought they
          11   were totally foreclosed.
          12   Q    And so, can we rely on those?  What if you have someone
          13   who is adventurous?  A PlusPass executive who said, *Every*
          14   *moment is an opportunity for greatest,* as opposed to *I got*
11:55:44  15   *my shot blocked.  I'm just going to sit on the bench.*
          16   Again, I'm trying to look at that, because it really does
          17   come down to someone's subjective analysis that then
          18   everything is flowing from?
          19   A    No, it's a great point.  And I think that -- you're
11:55:55  20   right.  I would never rely just on the fact that a CEO said
          21   it.  There's also the fact that the documents show and the
          22   data shows, there was 99 percent foreclosure, so they
          23   weren't imagining it.  It was actually out there, and it
          24   prevented a company like PlusPass from succeeding --
11:56:15  25   Q    How do we know that it prevented it as opposed to they
```

11:56:18  1  actually did it and then it was prevented as opposed to it

2  being speculative because of subjective decisions?  Because

3  something can exist.  I mean, perhaps we can go back to when

4  AT&T had the entire, kind of, phone market.  They had, kind

11:56:33  5  of, a monopoly.  And other people started to come in.  I

6  mean, is there some type of effort that needs to be taken?

7  　　　　　Again, I'm not testifying.  I'm just asking the

8  question, because it sounds like what I'm hearing from the

9  testimony that we're relying a lot on what someone's

11:56:50 10  subjective thought was that I'm not even going to try,

11  because I'm foreclosed.

12  A    Yeah.  Well, I think we have a few pieces of evidence

13  on that.  One is that in this one percent that wasn't

14  foreclosed, PlusPass actually was able to successfully make

11:57:04 15  some sales at teeny rental car companies like Long Horn.

16  But the others to solve the data and evidence about just how

17  foreclosing these contracts are, and I think it's a --

18  you know, the economic analysis concludes from that, it

19  would be very hard for any rival, not just PlusPass, to make

11:57:23 20  any sales in the rental car space because of the

21  interference with the registrations.

22  　　　　　So there's a lot of detailed documents and

23  evidence on just how destructive it is.  And I would also

24  add, it's not just PlusPass.  None of the companies with an

11:57:39 25  ETP app are able to succeed in the rental car space, which

*Deborah D. Parker, U.S. Court Reporter*

| | | |
|---|---|---|
| 11:57:44 | 1 | suggests that it's a more general fact, if not a |
| | 2 | PlusPass-specific problem. |
| | 3 | THE COURT:  All right.  Just one moment. |
| | 4 | *(Pause)* |
| 11:58:18 | 5 | THE COURT:  All right.  Thank you.  The Court |
| | 6 | concluded its questions. |
| | 7 | Anything further from the parties before the |
| | 8 | witness can step down?  And if I have any questions for the |
| | 9 | attorneys, I'll be able to ask the questions of the |
| 11:58:28 | 10 | attorneys. |
| | 11 | Anything further, Mr. Kesselman? |
| | 12 | MR. KESSELMAN:  Thank you, Your Honor.  No. |
| | 13 | THE COURT:  And from the defense? |
| | 14 | MR. NORRIS:  No, Your Honor. |
| 11:58:33 | 15 | THE COURT:  To the witness, thank you so much for |
| | 16 | taking the time to come to court.  I know that it probably |
| | 17 | took some travels to come here.  The Court greatly |
| | 18 | appreciates that.  You may step down. |
| | 19 | Okay to excuse him at this time? |
| 11:58:44 | 20 | MR. KESSELMAN:  Yes, Your Honor. |
| | 21 | MR. NORRIS:  Yes, Your Honor. |
| | 22 | THE COURT:  You're excused.  Thank you. |
| | 23 | THE WITNESS:  Do you want me to take these? |
| | 24 | THE COURT:  That's up to counsel on how they'd |
| 11:58:49 | 25 | like to present. |

11:58:51  1            And we're saying "these" for the record.  That

2      would be exhibit books and documents that are on the stand

3      currently.

4                  THE WITNESS:  I'll just bring them, just in case.

11:59:17  5      *(Witness excused)*

6          *(Pause)*

7                  THE COURT:  Thank you.

8            The witness has left the courtroom, for the

9      record.

11:59:32 10            We're right at 12:00 noon at this time.  Again, we

11     started approximately 9:00 a.m.  Had some introductory

12     comments and so we are now going to conclude.

13            Let me look at our schedule, because the Court

14     does have criminal matters in the afternoon today.

12:00:23 15      *(Pause)*

16                  THE COURT:  We're going to take our lunch recess

17     at this time.  We'll resume at 1:30.  We can only go until

18     2:30 today.  The Court, first, is going to have to ask

19     questions as to Counsel with regard to Professor Elhauge,

12:00:41 20     and then we will move on to your next witness for any time

21     allotted.  If we don't finish, then we'll have to pick a new

22     date.

23            So during the lunch hour, you're ordered to meet

24     and confer with regard to a continued date for the -- if the

12:00:55 25     witness is not concluded by this time.  Again, I have

*Deborah D. Parker, U.S. Court Reporter*

12:00:59  1    allowed the parties to go for the time periods that they

2    wanted to go for; but even looking at the schedule, I'm not

3    sure that that's finishing within the allotted time.

4            So the Court has allowed that.  Also, I'd like the

12:01:14  5    parties to keep in mind and take a look at -- for a *Daubert*

6    hearing, what the standard is.  We talked a little bit about

7    depositions and things of that nature.

8            I can talk about certain cases that the Court is

9    going to be looking at.  And so I'm going to read those for

12:01:31  10   the record, just -- this is a general kind of overview on

11   some of the standards.  Because if we are here on a certain

12   type of hearing, certain things are relevant.  Certain

13   things are less relevant.  But I do also understand that

14   Counsel may be going outside relevance and try to wrap

12:01:52  15   around and get to relevance, or may not get to that

16   relevance.  It just depends on the case.

17           Some of the cases that the Court will be

18   considering are *Primiano* -- P-R-I-M-I-A-N-O -- *versus Cook*,

19   2010, 598 F.3d 558.  Of course, the Court is going to be

12:02:14  20   considering *Daubert versus Merrill Dow Pharmaceuticals*,

21   *Incorporated*, 509 U.S. 579; also*, City of Pomona versus*

22   *SQM* -- as in "Mary" -- *North America Corporation*, 750 F.3d

23   1036.

24           Of course, the Court -- there are many other cases

12:02:52  25   that are cited within these cases, including the *Kumho* case

12:02:57  1    that I'm sure everyone is very familiar with:  *Kumho Tire*.

       2    And *Kumho Tire's* cite is 526 U.S. 137, 1999 case, Supreme

       3    Court.

       4           There are many other cases.  I'm going to start

12:03:28  5    just with that.  But the question I would ask of the parties

       6    when they come in, I'm going to be asking is:  Tell me how

       7    the testimony at the hearing as applied to the applicable

       8    standards benefit your case.

       9           I do understand there can be responses to what the

12:03:48 10    attacks are, but affirmatively the Court needs to understand

      11    is it relevant and reliable under these standards, under

      12    what criteria, looking at the methodology and those kind of

      13    things, because I'm not sure -- well, I'll leave it there to

      14    the parties to be able to make that argument.  And that

12:04:08 15    should be able to be accomplished on that question.  I'm

      16    going to set a hard list -- limit of three minutes.  It

      17    could be even in less than that, but I'm just asking for a

      18    summary of it.

      19           I have your papers.  Oftentimes, as you know,

12:04:23 20    *Daubert* hearings are decided without hearings.  We've had a

      21    hearing so there's supposed to be more information that

      22    fills in the gaps of what the papers did not provide among

      23    the *Daubert* and *Kumho* and all the other cases' criteria.

      24    Even though it is a flexible test.  I mean, you'll see what

12:04:46 25    it talks about.  That's what the Court is looking at.  I'm

12:04:49  1    not looking at deposition testimony.  I'm not looking at

2    impeachment testimony.  That's not part of my standard.

3              I'm going to read the standards into the record.

4    I can start reading them.  The Court doesn't look to

12:05:01  5    credibility.  I'm looking to see as a gatekeeper.  I'm

6    following strictly the requirements here.  And I would ask

7    counsel when answering the Court's question to take what the

8    evidence was that you elicited on either side and how that

9    benefits or is a detriment to your case.  That's what I'm

12:05:16 10    looking to here.

11              Any questions on that from plaintiff?

12              MR. KESSELMAN:  No, Your Honor.

13              THE COURT:  How much time do you think you need

14    for your next witness?

12:05:25 15              MR. GIBSON:  It will be me, Your Honor.

16              THE COURT:  Thank you.

17              How much time do you think you'll need?

18              MR. GIBSON:  I've been looking at -- I knew you

19    would ask me that question.  I've been looking at my notes.

12:05:32 20    My intention is to get it down to 30 minutes.

21              THE COURT:  Well, it's up to you.  Again, the

22    Court, in looking at the application of why we're here,

23    was -- well, you know, we talked about an hour; but then the

24    Court looked at it and the hearing is for the Court's

12:05:47 25    benefit.  And so the Court has certain questions, and I try

12:05:51  1  to get those questions answered as to a proffer, what the
       2  testimony is going to be under the *Daubert* standards and
       3  looking at that criteria.

       4         Again, I'm not trying to stop anyone from their
12:06:06 5  line of questioning.  That's one thing -- I had one judge
       6  one time that wanted to know my questions ahead of time, and
       7  I gave my questions, actually, and I stuck to my questions.
       8  That's not what the Court is doing here.

       9         The Court is looking to efficiently look at why
12:06:20 10  we're here.  And there have been relevance objections on
      11  either side kind of talking about that that's going beyond
      12  the scope of Daubert.  It's up to you how you'd like to
      13  present.  Ultimately, what I'm going to look at is the
      14  application of the evidence to that standard.  If there's
12:06:37 15  something that is not relevant, then it's not relevant.  It
      16  is what it is.

      17         MR. GIBSON:  Well, what I was going to suggest,
      18  Your Honor, as I've heard the proceedings here this morning,
      19  I thought that we could address the relevance issue, we
12:06:49 20  could address the methodology issue directly.  For the next
      21  witness, he's rebuttal witness, so he has very clean
      22  delineations:  Here's the opinion offered by the defendant.

      23         THE COURT:  Were there not clean delineations on
      24  the other witness?  I mean, there's --
12:07:00 25         MR. GIBSON:  I didn't mean that pejoratively, Your

12:07:00  1    Honor.  I'm just saying that we have in the opinion itself.

2    It says, *Here's what they say.  Here's my response.*  So I

3    think the papers are very clean when it comes to the next

4    witness.

12:07:11  5              THE COURT:  But as to just applying that kind of

6    relevance, reliability methodology and all that, isn't that

7    why we're here?  I mean, you're kind of reiterating the

8    standard, so I appreciate that, but is that different from

9    what's happened before that?

12:07:24 10              Again, I'm just trying to understand what you

11    meant by that.

12              MR. GIBSON:  I think it will be a little different

13    in a rebuttal witness environment as opposed to an

14    affirmative expert who covers much larger ground.  I think

12:07:33 15    Professor Elhauge, you know, is obviously kind of the

16    seminal antitrust witness.  He covers these huge topics that

17    are very dense.

18              THE COURT:  Correct.

19              MR. GIBSON:  The next witness we have is much more

12:07:47 20    targeted.

21              THE COURT:  Okay.  So even if the witness covers

22    20 topics, aren't there certain areas that a *Daubert* hearing

23    in particular, as opposed to just going through the

24    testimony?

12:07:54 25              So I understand what you mean in terms of number

*Deborah D. Parker, U.S. Court Reporter*

12:07:57  1    of opinions, but I'm not sure if -- maybe I'm just

2    misunderstanding what you mean by that.

3            MR. GIBSON:  My only point, Your Honor, was I

4    think we could move quicker.  I think we needed additional

12:08:10  5    time for a larger witness who had more broad opinions.  For

6    a witness who has more targeted, lesser number of opinions,

7    I think we can move quicker.

8            THE COURT:  Okay.  To the defense, let's hear what

9    your thoughts are and how we've been proceeding so far.

12:08:20  10   Again, the Court is very well aware that we can do this

11   without a hearing, but the Court wanted more information

12   using the standards from *Daubert* and its progeny.

13           MR. CABIANCA:  About how we've gone this morning

14   or how we're going to go this afternoon?

12:08:33  15           THE COURT:  How we're going to go this afternoon.

16           This morning is -- that's how you presented.  The

17   Court has no characterization.  I'm just trying to

18   understand where the parties are coming from.  And, again,

19   the Court understands that I have case or controversy before

12:08:47  20   me.  I'm going to look at what's before me and look at the

21   relief being sought, apply the standards to the evidence and

22   go from there.

23           MR. CABIANCA:  Right.  On the point that this is a

24   rebuttal expert, we disagree with that.  The expert that

12:09:02  25   he's supposedly rebutting said, *These are the problems with*

*Deborah D. Parker, U.S. Court Reporter*

*the current PlusPass app.*  And their expert that's going to be coming in developed a whole new platform.

THE COURT:  I'm not going to go to the characterization at this point.  All I am really trying to do and I believe, at least from the third-party point of view, from how I'm hearing this is that this is expanded beyond *Daubert*, this -- what I'm hearing from the parties, you know, the Court hears *Daubert*.  Some are more towards *Daubert* and some really get expansive.  And I'm just going to just --

I have no characterization on what happened previously.  I'm going to just now take the evidence.  I'm just trying to understand how we're going forward, but the bottom line is that we're going to come back at 1:30.  We'll see how far we get.  And if we don't conclude, because I first have to ask my questions to counsel about the previous witness, Professor Elhauge; and then once we do that, then we'll get to the second witness.  And the Court needs to conclude by 2:30.

So I'm just trying to understand the parties' thought process on going forward, because the Court wants to be prepared.  I prepared as much as I can, but I never know what the testimony is going to be like.  I didn't, again, ask for questions ahead of time to see what they were going to be and what areas they were going into again.  But my

12:10:24  1    focus on this is to have a *Daubert* hearing, which I've now

2    repeated multiple times, but I will leave it to the parties

3    on how they would like to present.

4              All right.  I have a better idea.  I'll look

12:10:35  5    forward to seeing everyone at 1:30.  And we'll first start

6    with some questions for counsel, along the lines of what

7    I've talked about.  And then we'll see how much time we have

8    for the witness, and we'll go from there.  And, again,

9    you're ordered to meet and confer in the event we don't

12:10:54  10   finish.  When you can come back, I would ask you to have at

11   least five dates for the Court.

12             Greatly appreciate everyone's time this morning.

13   We're in recess.  Thank you.

14         *(Recess taken from 12:11 p.m. to 1:28 p.m.)*

01:28:34  15             THE CLERK:  Calling Item No. 1, CV 20-10078,

16   PlusPass, Inc. versus Verra Mobility Corp., et al.

17             Counsel, please restate your appearances for the

18   record.

19             MR. KESSELMAN:  Good afternoon, Your Honor.

01:28:44  20             David Kesselman, on behalf of the plaintiff

21   PlusPass.

22             MS. BRANTLY:  Good morning [sic], Your Honor.

23             Amy Brantly, on behalf of the plaintiff.

24             MR. GIBSON:  Good afternoon, Your Honor.

01:28:56  25             Ethan Gibson, on behalf of the plaintiff.

134

| | |
|---|---|
| 01:28:57 | 1 |

                    THE COURT:  Thank you, Plaintiff.

2                   MR. CABIANCA:  Good afternoon.

3                   Brian Cabianca, David Norris and Mark Dosker, on

4       behalf of Verra Mobility.

01:29:02  5         THE COURT:  Thank you to the defense.

6                   Okay.  We're back from lunch.  The Court is going

7       to start right with its questioning now.

8                   The Court does see that the second witness is

9       here.  We're talking about other testimony the Court is

01:29:13 10      going to -- I don't want his testimony to be influenced by

11      any of the Court's questions, so I'm going to ask that the

12      witness be excluded at this time.  Thank you so much for

13      doing so.  That's in the Court's discretion, as I want to

14      make sure that each witness is independently testifying

01:29:28 15      without any taint from other witnesses.

16                  Okay.  Now, moving forward.  I asked a question

17      before the break.  And I'll start with -- and it will be a

18      three-minute clock, and it would be a hard three-minute

19      clock.  So every time I set a time limit, it's up to you to

01:29:45 20      abide by it.  Look at your own clocks or computers.

21                  My question was:  Tell me how the testimony at the

22      hearing from Professor Elhauge applied to the applicable

23      *Daubert* standards benefit your case.  And, again, I'm asking

24      that from -- not in the responses to what their attacks are,

01:30:05 25      but your firmly wanting to bring this witness forward.  Tell

*Deborah D. Parker, U.S. Court Reporter*

01:30:08  1    me about the relevance, reliability methodology within the

2    case law.  Not just the responses.  We're not at trial.

3    Let's talk about the standard.

4         Go ahead.

01:30:19  5         MR. KESSELMAN:  So, Your Honor, taking

6    Professor Elhauge's testimony with respect to the relevant

7    market, he made very clear that he used an accepted

8    methodology.

9         Well, let me start by saying, based on the case

01:30:37  10   law, we believe that Professor Elhauge is eminently

11   qualified.  We referenced using his CV, his background, his

12   experience.

13        THE COURT:  I'm not cutting your time.  Any

14   question on qualifications?

01:30:48  15        MR. NORRIS:  No, Your Honor.

16        THE COURT:  Okay.  So we can move to the areas

17   that are relevant to this.

18        Please continue.

19        MR. KESSELMAN:  So with respect to the relevant

01:30:56  20   market, he made clear that his methodology, which is the

21   hypothetical monopolist test, is a well accepted methodology

22   and he walked the Court through -- you know, at a high

23   level, how he applied that methodology.

24        So the only thing then that was left to be

01:31:12  25   challenged is two qualitative opinions and he explained in

01:31:18  1  his testimony that those two qualitative points about cash

2  and tolling, he doesn't agree with them, but also he applied

3  proper methodology in including them in his report.

4  THE COURT:  All right.  Anything else?  The Court

01:31:33  5  is trying to make this very distinct and right to the

6  standard as opposed to going way out to trial-like testimony

7  and trying just to go to what the Court is going to in these

8  cases.

9  Anything else before I turn to your colleagues?

01:31:47 10  You're well within your time.

11  MR. KESSELMAN:  On damages, we had

12  Professor Elhauge walk through the five criticisms.  He used

13  a well accepted methodology for the yardstick.  He explained

14  that when dealing with antitrust economics, you have to make

01:32:06 15  certain assumptions for the but-for world.  It's going to

16  differ.  That is well within the reliability that is

17  expected of an expert opining on damages in a but-for world.

18  And then we walked through the various points that were

19  raised by the other side, and he provided testimony to

01:32:25 20  reaffirm that the methodology he used was correct.

21  THE COURT:  Anything further before I turn to your

22  colleagues?

23  MR. KESSELMAN:  Not at this time, Your Honor.

24  THE COURT:  To the defense.  Tell me why the

01:32:36 25  testimony as applied to the applicable *Daubert* standards

*Deborah D. Parker, U.S. Court Reporter*

01:32:41  1   does not pass muster.

2          MR. NORRIS:  Thank you, Your Honor.

3          The issue before the Court under *Daubert* and *City*

4   *of Pomona* is reliability.  The Court must assess the

01:32:52  5   expert's reasoning and methodology using appropriate

6   criteria, like testability or peer-reviewed publication.

7          And you heard Professor Elhauge admit that he

8   cites no peer-review literature in his report on how the

9   yardstick methodology works.  But the Areeda and Hovenkamp

01:33:11 10   treatise that he does rely on and cite in his report for

11   other reasons and then he co-authored for a time does

12   explain the methodology.  And the methodology works by

13   finding a yardstick that is, quote, "comparable to the

14   plaintiff in all important respects:  Products offered,

01:33:28 15   structure of the firm, management, geographic market and so

16   on, marketing and promotion."

17          And Professor Elhauge admitted on the stand today

18   that he never performed this methodology in his report.  He

19   admit that he didn't compare the marketing, the structure of

01:33:44 20   the firms, the management of any of his yardsticks to

21   PlusPass.  In fact, instead he admitted on the stand today,

22   that the yardsticks he picked, like Uber, aren't actually

23   good comparisons to PlusPass.  He said it's apples and

24   oranges, apples and oranges, because Uber spends so much

01:34:04 25   money growing and developing its products.  And, of course,

01:34:07  1    the problem that with is, that might be precisely why,

2    Your Honor, Uber is such a successful company, because it's

3    spending so much money on having the best products and

4    growing its products.

01:34:17  5         And that's the other problem.  The Areeda and

6    Hovenkamp treatise, it doesn't provide for mixing and

7    matching yardsticks to calculate the most favorable damages

8    possible.  It's about finding the most comparable firm.

9    Instead of doing that, what Elhauge does is mix and match.

01:34:30  10   You heard that he used Uber and Lyft and ridesharing for

11   adoption and then he uses different companies for

12   profitability, because Uber isn't profitable, as we showed.

13        And you heard, by the way, the reason Elhauge said

14   he picked the firms he did for profitability, is because

01:34:54  15   Verra, the defendant in this case, compared themselves to

16   these billion-dollar companies.  But here's the problem:

17   The yardstick methodology from Areeda and Hovenkamp, it's

18   about comparing the plaintiff, finding a comparable firm to

19   the plaintiff, PlusPass, not Verra.  And so that's not an

01:35:09  20   appropriate analysis for using a yardstick either.

21        Another problem with the yardstick is, he's got

22   three cities:  New York City, Boston and Miami.  Three of

23   the most metropolitan, largest cities in the United States,

24   that he uses for his yardstick approach without any analysis

01:35:26  25   of why that's comparable to where PlusPass operates, how

01:35:32  1    PlusPass operates.  That's not -- it's not reliable under

2    the treatise.

3              So that's my three minutes.

4              THE COURT:  Thank you.

01:35:38  5              I'm going to turn back to plaintiff.  I have a

6    specific question before we move on.  Professor Elhauge's

7    damages opinion is premised in part upon the idea that

8    plaintiff's lost profits should include potential profits

9    from California, beginning in March 2018, because plaintiff

01:36:02 10    could have operated in California but for defendant's merger

11    and other alleged anticompetitive conduct.

12              Professor Elhauge also testified that once

13    plaintiff decided to enter the California market in 2022,

14    plaintiff was able to do so fairly quickly.  How is

01:36:24 15    Professor Elhauge's inclusion of California, starting in

16    March of 2018, a reliable assumption under *Daubert*, given

17    that plaintiff was able to enter the market fairly quickly

18    in 2022?

19              The follow-up question will be:  Why wasn't

01:36:45 20    plaintiff able to enter the market in 2018 and what changed

21    between 2018 or March of 2018 and June 20, 2022?

22              So the first question, again:  How was

23    Professor Elhauge's inclusion of California, starting in

24    March 2018, a reliable assumption under *Daubert*, given that

01:37:08 25    plaintiff was able to enter the market fairly quickly in

01:37:12  1   2022?

2   MR. KESSELMAN:  Thank you, Your Honor.

3   It's reliable because the defense is conflating

4   the actual world and performance in the actual world with

01:37:25  5   the but-for world.  And as Professor Elhauge testified and

6   as generally accepted methodology, you look at -- when

7   you're an economist, you look at what the but-for world

8   would have been and then you look at the economic incentives

9   that a plaintiff like PlusPass would have had.  What he is

01:37:46 10   saying, it's not that it was impossible for PlusPass to have

11   entered the market in the real world in 2018.  What he is

12   saying in his report and his testimony today is that with

13   99 percent foreclosure, there was no economic incentive for

14   them to do it faster.

01:38:04 15   THE COURT:  Okay.  So if he have a town -- let's

16   just go back in time when Barstow maybe had one restaurant

17   and someone is about to then want to enter into the

18   industry -- in the restaurant industry, so it's 100 percent

19   monopoly, but they just sit back and say, *Well, I think it's*

01:38:19 20   *going to be hard for me to compete with that business.*

21   And then three years later, they decide that

22   they're going to compete with that business and they open up

23   their second restaurant there -- their business.  Why are

24   the lost profits between that time period applicable when

01:38:34 25   they just decided not to do it and the evidence is that,

*Deborah D. Parker, U.S. Court Reporter*

01:38:40  1    yes, this other -- other company did have all this market

2    share, but they didn't do anything?

3         Again, this is just asking questions.  The Court

4    is not taking positions, but I'm just trying to understand.

01:38:52  5    My questions are not loaded.  So I just saw a little

6    expression on your face like I'm asking something that

7    I'm -- I don't know the answer to the question.  That's why

8    I'm asking you, because that's -- essentially, when I asked

9    him that question, I'm not sure I had it answered.

01:39:07  10         And so, I understand he relied on certain

11    documents.  I understand that he looks at that.  And my

12    answer that I heard from you was, *They're conflating.*  I'm

13    not asking what the defense is doing here; I'm not.  I'm

14    asking what affirmatively from your side, from your expert,

01:39:23  15    under the *Daubert* standards, what's happening here?  I want

16    to keep the questioning away from responding what the

17    defense is doing.  I'm asking the question here.

18         So any questions about my question before you

19    answer?

01:39:36  20         MR. KESSELMAN:  Only in one sense, Your Honor.

21    Because, obviously, our opposition papers and what we were

22    prepared to have Professor Elhauge testify to today was very

23    specifically addressed to the arguments that they made.

24         But to answer your questions, specifically, I want

01:39:55  25    to make clear he also testified today that the PlusPass app

01:40:00  1    worked in California.  He had read the Deitiker testimony.

2    He didn't recall the name of "Wolf," which is the person

3    that did the test.

4            The app worked in California.  The issue is why

01:40:11  5    would you expend the time and effort to try to accelerate

6    contracts which can take time, if you're never going to be

7    able to penetrate and make any money?  It's a futile

8    exercise.  And as Professor Elhauge explained, this is not a

9    deficiency specific to PlusPass.

01:40:32  10           We have testimony from Uproad, which is owned by

11   Kapsch, which is a multinational corporation based in

12   Europe.  No other competitor in the ETP app space has been

13   able to penetrate.  So this is not just an academic

14   exercise.  Ultimately, it's true that in 2022 our client did

01:40:52  15   enter into an agreement to be able to provide services in

16   California.  And Professor Elhauge's point is, had there not

17   been these constraints, this 99 percent foreclosure that

18   comes out of Verra's own documents, there's no doubt that a

19   rational economic actor would have entered the agreement

01:41:10  20   sooner, even though their service worked.  And we know it

21   worked because we have testimony in the record that in every

22   state where it was unencumbered by a Verra contract for a

23   tiny little rental car company, Long Horn, the app actually

24   works.

01:41:28  25           THE COURT:  What changed between March 2018 and

*Deborah D. Parker, U.S. Court Reporter*

01:41:32   1   June 2022?

2       MR. KESSELMAN:  We're still foreclosed,

3   Your Honor, but what they have been doing is slowly but

4   surely trying to increase the number of toll authorities

01:41:42   5   that they have connections to, notwithstanding the

6   foreclosure.  And as Mr. Deitiker testified to -- and you

7   would hear at trial -- part of what slowed them down is they

8   actually had an earlier litigation and so they needed to

9   focus their time and effort on a different part of the

01:41:59  10   business.  That's the only thing that kept them afloat.

11       THE COURT:  All right.  So in your previous answer

12   you mentioned that you focused on what the defense had said.

13   Is that an implication that the Court's question was an

14   unfair question?  Is that what you're saying?

01:42:10  15       I'm trying to understand what you meant by that.

16   Because if I'm asking a question and I'm saying *What color*

17   *is the house*?  And you say, *The color of the house is white.*

18   Versus, *Well, we weren't focused on that.  We were focused*

19   *on what the defense was asking the color of the house was.*

01:42:26  20       I'm trying to understand what that meant.  Again,

21   because if I don't understand something, I always will ask.

22       What did you mean by that?

23       MR. KESSELMAN:  What I meant by it, Your Honor,

24   is, I sense some frustration that our proffer and the

01:42:37  25   testimony the way it was directed may not have been exactly

01:42:40  1  what you were looking for.  And we understood that what, you

2  know, we were responding to was an affirmative motion by the

3  other the side that only very narrowly challenged

4  Professor Elhauge's opinions on, basically, one ground on

01:42:57  5  relevant ground and on five specific points as to damages.

6          THE COURT:  So that doesn't go towards kind of the

7  damages?  That can't be related to damages asking that

8  question?

9          MR. KESSELMAN:  Absolutely, Your Honor.

01:43:09  10          THE COURT:  So I don't understand it.  Let me just

11  make something clear.  I always enjoy working with all

12  counsel.  And when you say you sensed frustration, there's

13  no frustration.  I'm an engaged judge.  I ask questions.

14  You know, if you want me -- want someone who's just back in

01:43:22  15  the back chipping golf balls, wrong court.

16          So let me tell you right now:  There's no

17  frustration.  I'm engaged.  That's kind of like saying

18  Michael Jordan was frustrated when he's out there playing

19  hard.  That's a complete misplaced assumption, speaking of

01:43:39  20  assumptions.

21          So, please, if you feel like the Court is

22  frustrated, ask.  I'm happy.  I told you at the beginning,

23  my glass is overflowing.  I'm excited to be here.  I love

24  hearings.  I'm prepared.  But I'm just trying to understand

01:43:55  25  when I hear things that -- that I don't understand or have

*Deborah D. Parker, U.S. Court Reporter*

01:43:59  1  relevant to a *Daubert* hearing, no.  I'm just asking the

2  questions because it may make perfect sense to you, but I am

3  the audience.  And if you're saying something that has

4  multiple interpretations to me and I'm not sure, I'll ask.

01:44:14  5  There's no frustration.  I've enjoyed everything.

6        MR. KESSELMAN:  I apologize, Your Honor.  I wasn't

7  trying to in any way offend --

8        THE COURT:  Oh, oh.  Let me tell you, again:  The

9  Court is not offended.  I'm not embroiled.  You're speaking

01:44:29  10  as if the Court is upset or anything, rather than just

11  questions about the hearing at hand.  There's no emotion

12  here.  This is a plus B equals C.  What's the admissible

13  evidence?  Apply the applicable standard.  Give the result.

14  That's what I'm trying to do.

01:44:45  15        But by the Court just asking questions, that

16  doesn't evoke any emotions.  So does that mean when a Court

17  just sits quietly that the Court is happy?  I don't know if

18  that's the assumption you're going under.  The Court's not

19  happy, not sad.  The Court is professional.

01:45:02  20        The Court wants to hear the answer so I can write

21  my order.  So, again, to all sides, if you have a question,

22  just ask.  Don't go by assumptions, you know.  You're all

23  experienced counsel.  I appreciate that, but I am going to

24  ask questions if I have a question.  And questions do not

01:45:19  25  mean anything about any emotions, or frustration, or how I

01:45:23  1  feel about the case.  I don't feel anything about the case.

2  That's not my job.  My job as a trial court is to answer and

3  respond to cases and controversies.

4        So the extent I'm just trying to understand what

01:45:38  5  you mean by things, because my questions go to the evidence

6  and the standards.  That's all I'm looking to.

7        MR. KESSELMAN:  Understood, Your Honor.

8        I guess I would make one other point about an

9  issue that has been raised here.  There's been a lot of

01:45:52  10  discussion about the decisions or choices that

11  Professor Elhauge made about the yardstick.  And in the

12  Ninth Circuit, at least, the leading antitrust case,

13  *Image Tech versus Kodak* --

14        *(Court Reporter requests clarification for the*

01:46:12  15        *record.)*

16        MR. KESSELMAN:  -- *Image Tech versus Eastman*

17  *Kodak*, 125 F.3d 1195, 1221, Ninth Circuit 1997 and whether a

18  yardstick properly compares is a question for the jury.  In

19  other words, we can have disagreements about, you know,

01:46:32  20  whether Uber and Lyft is the proper method or yardstick or

21  not, but we've got a whole line of case authority that says,

22  if you uses the proper methodology, they can certainly

23  cross-examine and take issue as they have done.  But that's

24  not a *Daubert* question.  That's really a question for the

01:46:50  25  trier of fact.

01:46:51  1          THE COURT:  I understand that completely and that

          2    would be, again, something responsive to a Court's question

          3    along a *Daubert*-type situation.  So I do understand that

          4    response.  I have no questions as to that particular

01:47:02  5    response.

          6          And to the defense, again, I'd ask everyone, just

          7    listen to the question.  They're not loaded questions.

          8    They're not trick questions.  I may even ask something that

          9    is very simple that is teeing up the next issue that's

01:47:17 10    leading to the next issue.

         11          So, again, the Court is glad to have counsel here.

         12    Thank you so much for answering the Court's questions.

         13          To the defense.

         14          MR. NORRIS:  Your Honor, I'm not sure what the

01:47:29 15    pending question is.  If I could respond to *Eastman Kodak*, I

         16    would appreciate it, but, otherwise, whatever question you

         17    have, I want to make sure I'm answering your question.

         18          THE COURT:  You can respond and then we're going

         19    to move forward.

01:47:42 20          MR. NORRIS:  Just briefly on *Eastman Kodak*,

         21    Your Honor.  That was a posttrial challenge to the evidence

         22    submitted at trial.  It was not a *Daubert* challenge.  So to

         23    argue that we can't use a methodological challenge to the

         24    yardstick approach that Elhauge offers in this case,

01:47:58 25    which -- again, the basis of that challenge is, he's not

*Deborah D. Parker, U.S. Court Reporter*

01:47:59  1    applying the methodology the way the literature says it's

2    supposed to be applied, based on a post-trial challenge, not

3    a *Daubert* challenge, is an inaccurate argument.

4           THE COURT:  I understand.  The Court will always

01:48:09  5    read the cases, but I'm going to allow all counsel to make

6    all the arguments they want and understand what their

7    positions are.  Again, I'm not ruling one way or another.

8    This matter will be going under submission, so I'm just

9    trying to hear your positions.

01:48:22  10          Thank you.

11          MR. GIBSON:  Your Honor, can I ask a question of

12   the Court?

13          THE COURT:  I don't know if he's finished yet.

14          You may continue, to the defense.

01:48:28  15          MR. NORRIS:  Thank you, Your Honor.

16          The other point -- the question that you then

17   asked previously that's sparked this discussion was about

18   why it was appropriate to assign lost profit damages in the

19   state of California four years before PlusPass worked there.

01:48:43  20   And so I just want to respond to a couple of points.

21          The main thing before just going, sort of,

22   tit-for-tat, from a big-picture methodological perspective

23   is, there is no reliable methodology underlying that basis,

24   that assumption that we just worked everywhere that we could

01:49:00  25   work in the hypothetical world.  And that came out,

*Deborah D. Parker, U.S. Court Reporter*

01:49:05  1    Your Honor, at the hearing.

       2            There was a question about, sort of states what

       3    happened in states and why PlusPass did work in certain

       4    states and didn't work in other states.  And you heard

01:49:17  5    Professor Elhauge testify that Ohio used to not to allow

       6    video tolls, so PlusPass would never work there before that

       7    change but now does so, now can work there.

       8        *(Court Reporter requests clarification for the*

       9        *record.)*

01:49:32 10            MR. NORRIS:  You saw PlusPass' interrogatory

      11    response where in that interrogatory response, PlusPass said

      12    it did try earlier in Florida but was denied by the

      13    toll authority.  This is the problem with departing from the

      14    real world, which is informed by the political,

01:49:49 15    technological, the effort -- the amount of effort you put in

      16    as a company, all of those things that are baked in.  That's

      17    why there's no reliable methodology underlying the basis of

      18    assigning lost profits.

      19            Again, the only other clarifying point I would

01:50:04 20    make is -- well, two:  Number one, it's not just California.

      21    It's states across the United States where Elhauge has

      22    assigned lost profit damages before PlusPass worked there.

      23    And one other problem is on economic incentives.  This is

      24    outside sort of the scope of this hearing, because

01:50:23 25    Rick Carrier wasn't here and testified at this hearing.  But

01:50:26  1    the director of tolling, the toll authority here in Orange

2    County, California -- Rick Carrier -- submitted a

3    declaration with our motion --

4              THE COURT:  I keep trying to slow you down.  I

01:50:34  5    think the court reporter is trying as well, but we're going

6    to have to go a little bit slower.

7              MR. NORRIS:  I'm a repeat offender on this.  I

8    really and truly apologize.

9              The point I'm just trying to make is, the director

01:50:49 10    of the toll authority here in Orange County, Rick Carrier,

11    submitted a declaration with Verra's motion for summary

12    judgment, saying that they set up a system that would allow

13    apps to go direct to renter or rental cars.

14             THE COURT:  Is this going, though, outside the

01:51:05 15    *Daubert* hearing?  I understand -- the Court asks its

16    questions.  And the Court at some point is going to have to

17    just tailor this down, because it's not a springboard to

18    argue what you want to argue.  And so just please be

19    responsive to the Court's questions.  If it's something

01:51:22 20    going afield, the Court has tried to allow the parties to

21    present as they have.

22             So, please, continue to do so.

23             MR. NORRIS:  I appreciate it.  Just briefly, if I

24    tie it in.  The point being, you can't just say that there's

01:51:35 25    no economic incentive to go out and develop in California

*Deborah D. Parker, U.S. Court Reporter*

01:51:38  1  and that's why they didn't.  Because the testimony in the

2  record is, if they had, they could have sold the product.

3  If they had, could have actually gone and tried to sell the

4  product to the rental car companies instead of filing an

01:51:49  5  antitrust lawsuit.  So that's the point --

6         THE COURT:  Could that be elicited on

7  cross-examination?  Because, again, I can read the standards

8  on different things.  Again, I'm not going into my rulings

9  at all.  I'm just saying, if I can look at several of the

01:52:02  10  cases that I have up, right now -- you know, I'm a

11  gatekeeper.  There's certain standards that I'm going to be

12  looking to here, and both --

13         Excuse me.  What I'm seeing is that we're

14  sometimes going beyond that.

01:52:16  15         So anything else?

16         MR. NORRIS:  The point is just -- on that is just,

17  the methodology here is what's being challenged.  Is there a

18  reliable basis in the record to assume that the only -- you

19  know, to assume and assign lost profits for four years in

01:52:35  20  California before PlusPass worked there?

21         And the point being, you can't just say there was

22  no incentive.  That can't be it, because there was.  That's

23  the testimony from TCA's former head of tolling I was

24  referencing.

01:52:48  25        THE COURT:  Okay.  Plaintiff would like to be

01:52:51  1    heard.

2         MR. GIBSON:  Your Honor, I just wanted to make

3    sure that the Court's questions was answered.  So of the

4    attorneys on the plaintiff's side, I typically -- they look

01:52:58  5    to me for some of the technology questions, some of the

6    technology issues that come up frequently with this case.

7         THE COURT:  Slow down.

8         MR. GIBSON:  And I wanted to make sure that the

9    Court understood an important distinction that was present

01:53:09 10    in the Professor's testimony when he was testifying to the

11    Court.  He didn't -- he wasn't testifying that PlusPass

12    entered the market in California in July 2022.  What he was

13    testifying was that we signed up for what was called a fleet

14    account.  A fleet account is the account that allows you to

01:53:28 15    collect tolls from the local toll authority.  And so the

16    reason -- so that -- even if that account was established,

17    it doesn't allow us to charge tolls to rental car companies

18    because of the way the Verra registers their plates.  They

19    do it in a way that even if we catch the registration on the

01:53:49 20    first day, we get kicked off for the second.  The long story

21    is, it creates an unreliability.

22         THE COURT:  I do understand that distinction.  I

23    appreciate that.  The Court's question was just trying to

24    look to, again, this -- relying on this premise and, again,

01:54:07 25    the documents from PlusPass and that they couldn't and then

01:54:12  1    later on going and doing something.  I understand.  Again,

2    I'm not trying to go and try the case right now.  I'm just

3    trying to understand that distinction.

4              I think I've heard the answers.  That's all I'm

01:54:24  5    looking for right now.

6              MR. GIBSON:  Okay.  I just wanted to make sure the

7    Court -- because you'd asked that question before, and I

8    wasn't sure you got a full answer.  So if you had any

9    questions about us on that point, I wanted to make sure the

01:54:33 10    Court was clear.

11             THE COURT:  I appreciate that.  Thank you.

12             The next thing I want to talk about, given the

13   time, is:  When is your witness available, if we do not

14   finish today?

01:54:43 15             MR. GIBSON:  May I speak to that, Your Honor?

16             We have conferred as you ordered.  We have -- we

17   have a couple dates available.

18             THE COURT:  Okay.  I asked for five, please.

19             MR. GIBSON:  You asked for five.  We can do the

01:54:54 20   3rd -- October 3rd, October 4th, or October 5th.  We would

21   also -- we would ask -- obviously, it's at the Court's

22   discretion whether we could do this, but it would nice for

23   the parties -- because several of us are traveling in from

24   out of town -- whichever day we do it, if we could follow it

01:55:12 25   up.  We have a motion for summary judgment scheduled --

*Deborah D. Parker, U.S. Court Reporter*

01:55:15  1    continuation scheduled on the 5th.  So if we were going to

2    do it on the 3rd --

3         *(Court Reporter requests clarification for the*

4         *record.)*

01:55:22  5         MR. GIBSON:  If you had the schedule available, it

6    would be nice to move from one hearing to the other, just so

7    we can knock those issues out.  But if the Court can't,

8    obviously, it's at the Court's discretion, of course.

9         But the 3rd, 4th and 5th would work.

01:55:36  10        THE COURT:  Okay.

11        MR. GIBSON:  The 18th, all day works.

12        THE COURT:  I think that we can stop now.  It will

13   be one of those days.  Probably the 3rd or the 4th.  So

14   that's what we're looking at right now.  So you can go with

01:55:49  15   other dates, too, that are going further out, but --

16        MR. GIBSON:  I do want to mention something.

17   There was a concern from the defense side.

18        Are you okay?

19        Those dates are clean and available.

01:56:00  20        THE COURT:  Okay.  Thank you.

21        Before we have start the next hearing, I'm just

22   going to read from some of the cases.  This is not by any

23   means a recitation of all the applicable law, but I'm just

24   going to read from some of the cases.  I'm going to start

01:56:17  25   with City of Pomona, which is 750 F.3d 1036:

*Deborah D. Parker, U.S. Court Reporter*

01:56:25  1              "Rule 702 of the Federal Rules of
          2         Evidence provides that expert opinion
          3         evidence is admissible if:  (1) the
          4         witness is sufficiently qualified as an
01:56:34  5         expert by knowledge, skill, experience,
          6         training, or education; (2) the
          7         scientific, technical or other
          8         specialized knowledge will help the
          9         trier of fact to understand the evidence
01:56:45 10         or to determine a fact in issue; (3) the
         11         testimony is based on sufficient facts
         12         or data; (4) the testimony is the
         13         product of reliable principles and
         14         methods, and (5) the expert has reliably
01:57:03 15         applied the relevant principles and
         16         methods to the facts of the case."
         17         Signed, Federal Rule of Evidence 702.
         18              Now, I'm going to go through more of the case, but
         19    I'm going omit internal citations and internal quotation
01:57:18 20    marks:
         21              "Under Daubert" -- as I heard earlier
         22    *"Dou-bare"* -- And I do understand tomato, "ta-ma-to."  I
         23    appreciate that from both sides.
         24              "Under *Daubert* and its progeny,
01:57:28 25              including *Daubert* II, a District Court's

01:57:31  1        inquiry into admissibility is a flexible

2        one.  In evaluating proffered expert

3        testimony, the trial court is a

4        gatekeeper, not a fact-finder.  The

01:57:42  5        trial court must assure that the expert

6        testimony both rests on a reliable

7        foundation and is relevant to the task

8        at hand.  Expert opinion testimony is

9        relevant if the knowledge underlying it

01:57:55 10       has a valid connection to the pertinent

11       inquiry and it is reliable if the

12       knowledge underlying it has a reliable

13       basis in the knowledge and experience of

14       the relevant discipline.  Shaky but

01:58:10 15       admissible evidence is to be attacked by

16       cross-examination, contrary evidence,

17       and attention to the burden of proof,

18       not exclusion.  The judge is supposed to

19       screen the jury from unreliable nonsense

01:58:24 20       opinions but not exclude opinions merely

21       because they are impeachable.  Simply

22       put, the District Court is not tasked

23       with deciding whether the expert is

24       right or wrong, just whether his

01:58:35 25       testimony has substance such that it

*Deborah D. Parker, U.S. Court Reporter*

01:58:38  1           would be helpful to a jury.  The test of
          2           reliability is flexible.  The Court must
          3           assess the expert's reasoning or
          4           methodology using, as appropriate,
01:58:50  5           criteria such as testability.
          6           Publication and peer-reviewed
          7           literature, known or potential error
          8           rate, and general acceptance.  But these
          9           factors are meant to be helpful, not
01:59:04 10           definitive, and the trial court has
         11           discretion to decide how to test an
         12           expert's reliability, as well as whether
         13           the testimony is reliable, based on the
         14           particular circumstances of the
01:59:17 15           particular case.  The test is not the
         16           correctness of the expert's conclusions
         17           but the soundness of his methodology.
         18           And when an expert meets the threshold
         19           established by Rule 702, the expert may
01:59:32 20           testify and the fact-finder decides how
         21           much weight to give to that testimony.
         22           Challenges go to the weight of the
         23           evidence" --
         24           THE COURT:  Excuse me.
01:59:43 25           "Challenges that go to the weight of the

*Deborah D. Parker, U.S. Court Reporter*

01:59:45  1          evidence are within the province of a

2          fact-finder, not a trial court judge.  A

3          District Court should not make

4          credibility determinations that are

01:59:55  5          reserved for the jury."

6      Now, this is going from pages 1043 to 1044 of the

7 *City of Pomona* case.

8      The Court only says that because there are many

9 other standards we could go through here that we talked

02:00:11 10 about with regard to this.  This is kind of where we are.

11 This is the world we're in.

12      For the next witness, I just remind everyone,

13 we're here for a *Daubert* hearing.  Any questions on any

14 standards or any standards that the parties think that the

02:00:27 15 Court should be looking to.  And I understand if there's a

16 case that you'd like me to be having before me before you

17 start your questioning.  Anything that you would like me to

18 look to, because I have nine tabs open on my computer right

19 now with *Daubert*-related cases.  But I can open up more and

02:00:51 20 be glad to read them for the standards that we're using.

21      To plaintiff, any other cases you would like me to

22 consider going forward, knowing that I've read your papers?

23      MR. KESSELMAN:  Your Honor, if you have read our

24 papers, it's all set out in there.  The only thing I would

02:01:05 25 respond to is this point about *Image Tech*.  That standard is

02:01:11  1  applied at the *Daubert* stage.

2  THE COURT:  Okay.  Thank you.  Anything else?

3  MR. KESSELMAN:  No, Your Honor.  I appreciate it.

4  Thank you.

02:01:18  5  THE COURT:  And to the defense?

6  MR. NORRIS:  No, Your Honor.

7  THE COURT:  What's your time estimate?  I heard

8  that it was going to be maybe a half an hour for the witness

9  for the plaintiff.

02:01:28 10  What's your thought on this witness?

11  MR. CABIANCA:  The next witness, Your Honor, we

12  think we could do it in 45.

13  THE COURT:  All right.  Well, we'll start now at

14  this time and then we'll have to just continue on the

02:01:43 15  continued date.  So just know that at about 2:30, we're

16  going to have to conclude.  So at 2:25, please start

17  wrapping that up.  The Court is then going to continue the

18  matter for the date and I'll set the date and we'll be

19  coming back.

02:01:57 20  Anything else that the Court can be helpful?

21  Again, I tried to talk from the very beginning how we are

22  moving along with this *Daubert* hearing.  I've now gone

23  through the standards again.

24  Anything else that would assist the parties in

02:02:10 25  their presentation?

*Deborah D. Parker, U.S. Court Reporter*

| | | |
|---|---|---|
| 02:02:11 | 1 | From the plaintiff? |
| | 2 | MR. KESSELMAN:  Not from me, Your Honor. |
| | 3 | MR. GIBSON:  No, Your Honor.  We're ready to |
| | 4 | proceed. |
| 02:02:17 | 5 | THE COURT:  And the defense? |
| | 6 | MR. CABIANCA:  No, Your Honor. |
| | 7 | THE COURT:  All right.  Thank you. |
| | 8 | Then, at this time, if you would like to call your |
| | 9 | witness. |
| 02:02:23 | 10 | MR. GIBSON:  Yes, Your Honor.  Your Honor, the |
| | 11 | plaintiff calls Matthew Zehnder.  I'll go collect him from |
| | 12 | the witness room. |
| | 13 | THE COURT:  That would be great.  Thank you so |
| | 14 | much. |
| 02:02:40 | 15 | *(Pause)* |
| | 16 | THE COURT:  Please come forward to the witness |
| | 17 | [sic].  If you could come, please, to the court reporter and |
| | 18 | raise your right hand to be sworn at this time. |
| | 19 | Thank you so much. |
| 02:03:15 | 20 | MATTHEW PAUL ZEHNDER, PLAINTIFF'S WITNESS, SWORN |
| | 21 | THE WITNESS:  I do. |
| | 22 | *(Pause)* |
| | 23 | MR. GIBSON:  May I proceed, Your Honor? |
| | 24 | THE COURT:  No.  We're still having -- the clerk |
| 02:03:25 | 25 | is going to ask some questions. |

02:03:27   1          THE CLERK:  Please state and spell your full name

           2  for the record.

           3          THE WITNESS:  My name is Matthew Paul Zehnder,

           4  M-A-T-T-H-E-W P-A-U-L Z-E-H-N-D-E-R.

02:03:39   5          THE COURT:  Thank you.

           6          To the witness, please make sure you're speaking

           7  slowly and clearly and loudly and into the microphone.

           8          The court reporter is directly in front of you,

           9  taking down the testimony.

02:03:46  10          At this time, to Plaintiff, you may proceed.

          11                    DIRECT EXAMINATION

          12  BY MR. GIBSON:

          13  Q    Good afternoon, Mr. Zehnder.

          14  A    Good afternoon.

02:03:55  15  Q    Before we get into your opinions, I think the Court --

          16  for today's *Daubert*, the Court is going to want to hear your

          17  qualifications.  Can you start with your education?

          18          Where did you obtain your undergraduate?

          19  A    Sure.  I obtained my bachelor's of arts from Harvard.

02:04:11  20  I majored in biology and literature, and I also took a

          21  number of courses --

          22          *(Court Reporter requests clarification for the*

          23          *record.)*

          24          THE WITNESS:  -- in product design.  I

02:04:21  25  cross-registered at MIT in product design.

02:04:24   1          THE COURT:  I'm just going to start off, much

2    slower, okay?  I know it's not a natural process and you're

3    so used to your qualifications, but the court reporter has

4    to get it down and also you have an audience.

02:04:35   5          THE WITNESS:  Sure.

6          THE COURT:  And if it's going so fast that the

7    court reporter can't get it, it's hard for the finder of

8    fact, also, or the Judge to hear it.

9          Thank you.

02:04:43  10          THE WITNESS:  No problem.

11          Let me know if you need me to repeat any of that.

12   BY MR. GIBSON:

13   Q    Now, did you complete your answer with respect to your

14   undergraduate education?

02:04:56  15   A    I did.

16   Q    Did you have post-graduate education?

17   A    I do.

18   Q    And where did you obtain that?

19   A    I received a master's in computer science from NYU.

02:05:06  20   Q    Okay.  What was your first job in the technology field?

21   A    My first job in the technology field was at Memorial

22   Sloan Kettering Cancer Center in New York.  I was a

23   bioinformatics analyst, B-I-O-I-N-F-O-R-M-A-T-I-C-S.

24   Q    Now, is your CV -- have you provided a CV to the -- as

02:05:48  25   part of your report in this case?

02:05:50  1    A    Yes, I did.

2    Q    There's a binder in front of you that has already been

3    utilized for a witness prior to this testimony.  Do you see

4    it there, sir?

02:06:01  5         Oh, it's over here.  Let the record reflect I'm

6    handing the witness a binder of the plaintiff's exhibits.

7              THE COURT:  It will so reflect.

8              MR. CABIANCA:  Do you have a binder?

9         (Pause)

02:06:38  10            MR. GIBSON:  Let the record reflect we're

11    presenting defense with a copy of our binder.

12              THE COURT:  Thank you.

13    BY MR. GIBSON:

14    Q    Mr. Zehnder, I would like to turn your attention to

02:06:49  15   Exhibit 18 -- Plaintiff's Exhibit 18 for today's hearing.

16    It should be the very last one.

17              Are you there?

18    A    I am.

19    Q    Is Exhibit 18 a true and correct copy your curriculum

02:07:13  20   vitae that you submitted as an exhibit to your report in

21    this case?

22    A    It is.  It is slightly out of date, since I submitted

23    it; but at the time I submitted it, it was complete.

24    Q    Okay.  Well, we'll cover the additional information

02:07:26  25   through the questioning.

*Deborah D. Parker, U.S. Court Reporter*

164

02:07:27  1          Your Honor, we would offer Exhibit 18 into the

2   record.

3          THE COURT:  Any objection?

4          MR. CABIANCA:  No objection.

02:07:32  5          THE COURT:  Thank you.  It is received.

6          *(Plaintiff's Exhibit 18 received in evidence.)*

7   BY MR. GIBSON:

8   Q    Now that we have your CV, I'd like to just kind of

9   focus, if I could, on some of the high points in your

02:07:39 10  background.

11          Could you take us to the positions that you held

12  with Google and talk about your first one?  What was it?

13  A    Sure.  My first role at Google was as a data scientist

14  on the ad words API Team.  This is the team that is

02:07:56 15  responsible for monitoring the usage of the developer API

16  that advertisers use to create advertising campaigns on

17  Google.

18          In my role on the ad words on the API team, as a

19  data scientist, I was responsible for consulting machine

02:08:17 20  learning models that are used to identify if the usage of

21  the API is fraudulent or would be used to create spam, which

22  can be a problem for Google and for Google search results,

23  if the results include things that are fraudulent or

24  spamming.

02:08:36 25  Q    What level were you at, at least with your first

*Deborah D. Parker, U.S. Court Reporter*

02:08:39  1    position with Google?

2    A     In my first position as a data scientist, I was an

3    individual contributor or an "IC"; meaning, I was

4    responsible technical as an individual and did not manage a

02:08:50  5    team.

6    Q     So that meant you were actually creating the code that

7    was being used?

8    A     Yes.

9    Q     Okay.  What was the second position you had with

02:08:58  10    Google?

11    A     My second role, I was a product manager on

12    Google Search.  In that role, I was -- I managed a team of

13    software engineers, designers, user interface designers,

14    user interface researchers, test engineers to build the

02:09:26  15    experience in Google Search that gives you answers regarding

16    your health information.

17              So if you've ever searched for a condition like

18    the flu or a fever, you'll see on the right-hand side of the

19    screen a little card.  That was the product that I worked on

02:09:41  20    with this team.

21    Q     Now, I see in your CV that you worked in Uber and

22    starting in 2015; is that correct?

23    A     That's correct.

24    Q     All right.  So tell us what position did you start

02:09:51  25    with, with Uber?

02:09:53  1    A    At Uber, I started as a senior product manager, and I

2    worked on two different products in my time there.  My first

3    product, I was responsible for the experience of onboarding

4    individual drivers or fleets of drivers onto the Uber

02:10:09  5    platform using software tools.

6              In the earliest days of Uber, this was done

7    manually by an operations field member who would sign up an

8    individual driver or taxi fleet onto the service.  I was

9    responsible for leading a team of software engineers, user

02:10:28  10   interface designers, user interface researchers and testers

11   to build a software product that would enable a driver to

12   upload information about their vehicle, about themselves or

13   about their fleet of vehicles to list them as potential

14   drivers on the Uber platform.

02:10:46  15   Q    Now, you said your first position was the -- kind of

16   automating the onboarding process.

17             Did you move into another direction or focus with

18   Uber?

19   A    I did.  In my second role, I was the product manager

02:11:05  20   for the routing engine at Uber.  This is the piece of

21   software that's used to calculate any route between two

22   points for the purposes of either predicting the cost of a

23   trip.  So when you take a trip with Uber, it gives you an

24   estimate of the cost.  This is how Uber estimates how far

02:11:27  25   you will travel and how much it will cost.  It's also used

167

02:11:30   1    in navigation.  So when you're on a trip, navigating the

2    actual route that the car will take.

3           And, lastly, after the trip is completed, it

4    provides a completed route for the final billing of that

02:11:45   5    trip.

6    Q    Did your work at Uber include work related to the

7    tolling function and tolling charges?

8    A    Yes, it did.  As part of estimating the cost of a trip,

9    Uber needed to have understanding of where the toll -- toll

02:12:01  10    roads or tolls were located so that we could provide riders

11    with a correct estimate of their trip, as well as to

12    properly calculate the final cost of the trip, assuming that

13    the trip did traverse through a toll over a toll road.

14    Q    So in addition to the technologies that you were

02:12:22  15    exposed to at Google and Uber, I guess including Uber, if

16    you worked specifically on the development of mobile apps in

17    your career?

18    A    Yes, I have.  At -- both Google and at Uber, I worked

19    directly with -- on mobile applications that are used by

02:12:41  20    billions of people.  And at subsequent startups, I also have

21    worked on other mobile apps as well.

22    Q    Is it fair to say that you believe you have extensive

23    experience with respect to mobile apps?

24    A    Yes.  On IOS and Android, I have a great deal of

02:12:59  25    experience building mobile apps.

*Deborah D. Parker, U.S. Court Reporter*

02:13:02  1   Q    Do you have also experience with startups and how they
2   can get their -- and their beginning and compete against
3   larger corporations?
4   A    Yes.  I, myself, have started two startup companies.
02:13:14  5   I'm currently the CEO of a new startup.  And before my
6   current role, I was the co-founder and chief product officer
7   of another software startup.
8   Q    So -- I don't want to get into the business aspect.
9   That's not why we've called you here, but do you have a good
02:13:29  10   background understanding of technology issues with respect
11   to startups and their capabilities?
12   A    I understand deeply how to build a startup and a
13   technical team from scratch, what that process looks like,
14   how you hire folks, what their capabilities are and what's a
02:13:46  15   reasonable amount of work that can be done by a small team
16   in its earliest days.
17   Q    Now, how did you -- what were you first asked to do in
18   this case?
19   A    In this case, I was first asked to consider and
02:14:06  20   write -- and write a response to the expert technical
21   testimony that the lawyers believed would be submitted by
22   the defense.
23   Q    Well, so -- some arguments have been made about the
24   fact that you were hired two days before the actual --
02:14:35  25       (Court Reporter requests clarification for the

*Deborah D. Parker, U.S. Court Reporter*

169

02:14:35  1        *record.)*
          2   BY MR. GIBSON:
          3   Q    -- Andrews and Ling reports were released; meaning, the
          4   Verra experts that you're responding to.
02:14:45  5              Do you remember what you did for those two days?
          6   A    I believe in those two days, I was just doing basic
          7   research on the case and understanding that -- the
          8   businesses that were at play, because there was no --
          9   nothing for me to respond to yet.
02:15:02 10   Q    So until you were given the reports, there was nothing
         11   for you to do?
         12   A    No.
         13   Q    So I want to kind of start at the top.  If you could
         14   kind of -- I know there's several opinions in your report
02:15:20 15   that we'll get to.  But if we can kind of raise it up to a
         16   30,000-foot view before we dial it in and boil it down to
         17   each one.  What would you say is your overall opinion of
         18   what you see inside the Andrews and Ling reports?
         19   A    My opinion is that the Andrews and Ling reports do not
02:15:39 20   fairly characterize the software capabilities and
         21   technologies that the PlusPass team is capable of
         22   developing, given the proper resources and access to the
         23   enterprise -- enterprise -- information that's necessary to
         24   build an enterprise SAAS product.  "SAAS" means "Software As
02:16:09 25   A Service."

*Deborah D. Parker, U.S. Court Reporter*

02:16:15   1    Q      Some of the -- I guess the Andrews and Ling reports,

2    they have some criticisms about the way that the

3    PlusPass app operates currently; meaning, today.  Do you

4    think -- is it -- do you have an opinion about whether that

02:16:27   5    fairly attributes whether PlusPass can provide a meaningful

6    service to RACs?

7    A      Yes.  I do not believe that is a fair characterization

8    of the capabilities of the PlusPass engineering and

9    technical team.  The way that I think about it is as

02:16:45   10   follows:  You can imagine when -- like the iPhone 10 first

11   came out.  It was the first time that the iPhone provided a

12   method for using face ID to unlock your phone.  Before that,

13   the only way you could unlock your phone was through your

14   passcode or through your fingerprint.

02:17:03   15        When Apple released that new feature, they also

16   would need to release API documentation and also -- and,

17   actually, technically enable software developers to access

18   that new tool to actually build an application around it.

19        If you had two banking apps, like Bank of America

02:17:21   20   and Chase, which, previously, you would log into using a

21   password or potentially with a fingerprint, if they only

22   gave Bank of America access to the API to actually build out

23   a face ID unlock mechanism and Chase did not have access to

24   that, and you went and you asked someone, if Chase was

02:17:38   25   unable -- if the Chase software engineering team could not

02:17:44   1  build a face unlock feature with the Chase app, the answer

2  would be, no.  That's not a fair characterization, because

3  they don't have access to the developer tools they need to

4  perform that task.

02:17:54   5  Q     They need the key to the door to get through?

6  A     They need the technical information to complete the

7  task, and it's not fair to make a comparison in this case

8  between the Chase app and the Bank of America app if they

9  don't both have access to the same underlying --

02:18:11  10        MR. CABIANCA:  Your Honor, this is just beyond the

11  scope of what is in his report.  He didn't talk about any of

12  this in his report.  I guess I object on that we're just --

13  that we have gone far afield.

14        THE COURT:  I'll overrule the objection.  Again,

02:18:27  15  how the case is being presented, I'm going to have a *Daubert*

16  hearing here, so overruled.  Answer stands.

17        Please ask your next question.

18  BY MR. GIBSON:

19  Q     So, Mr. Zehnder, kind of -- you given us kind of a

02:18:43  20  hypothetical example.  Can you relate that down to our case?

21  Who is -- you said Apple was the one holding the APIs.  Who

22  is the Apple in our scenario here for this case?

23  A     In this case, the RACs are the folks who have access to

24  this data that is necessary to be used by the developers to

02:18:59  25  build a compelling application.

02:19:01 1    THE COURT:  I'm sorry.  So the record is clear, a

2    "RAC" is a rental car company.

3        Again, I just want to make sure that this is a

4    user-friendly transcript.  And to the extent we can, if we

02:19:10 5    could have clarification on any acronyms or abbreviations.

6    You know, it may come out later, but it's always helpful.

7    I'm just glad I read the stuff ahead of time, okay?

8        MR. GIBSON:  Thank you for the reminder.

9        THE COURT:  And, again, I know everyone is very

02:19:23 10   familiar with it.  You've been living with it for a long

11   time.  It's your fields.  But, again, know the audience.

12       MR. GIBSON:  Yes, Your Honor.

13   BY MR. GIBSON:

14   Q    So before I used the term RAC, R-A-C.  Can we agree

02:19:34 15   that that means not just rental car company, it means the

16   three rent-a-car companies that Verra contracts with?

17   A    Yes.  When I say RAC, I mean rental car companies, the

18   three big rental car companies:  Avis, Hertz and Enterprise.

19       THE COURT:  Okay.  And so I understand that when I

02:19:50 20   read his report at paragraph 2, it has a "hereinafter" as

21   rent-a-car companies as RACs.

22       Is "RAC" now being only the VERRA rental car

23   company, big three?  Because I want to be consistent on how

24   I'm making my analysis on what the here and after refers to.

02:20:06 25       MR. GIBSON:  Yes, I think -- we can -- the only

*Deborah D. Parker, U.S. Court Reporter*

02:20:09  1    ones that we can't communicate with the Verra contracting

2    RACs.  They are very tiny little subset of independents that

3    we -- as it sits now, the current application works with.

4    No problem.

02:20:21  5          We're really talking about the lack of access to

6    the big three.  So that is what I mean by when I say "RACs."

7          THE COURT:  Okay.  I'm just trying to understand

8    from the report, because I don't know if it has that

9    specific definition, but I need to understand that.

02:20:35 10          Thank you.

11    BY MR. GIBSON:

12    Q    Okay.  Getting back to the information.  When you

13    say -- you said that the RACs where the company that had the

14    information.  What specific information do the RACs have

02:20:46 15    that would enable multi-vendor solutions, tolling solutions

16    like -- such as the PlusPass app to operate at the same time

17    Verra is operating?

18    A    The RACs have a number of key pieces of information

19    that would be useful to develop a solution to a

02:21:04 20    multi-provider solution for managing toll payments:

21    Information such as the beginning and end of a rental car

22    period, the election by the rent -- by the rental car

23    customer of which payment provider they are opting to use,

24    the payment information that they have provided either to

02:21:26 25    the rental car company or to the payment -- or the selected

*Deborah D. Parker, U.S. Court Reporter*

174

02:21:31  1  payment option, information about the vehicle itself that is

2  being rented, information such as the license plate number

3  and state, make and model.  These are some of the key data

4  that can be used in offering a multi-provider payment

02:21:54  5  solution for tolls.

6  Q    Okay.  Now, I also want to talk about the methodology

7  that you employed in providing the opinions that we find in

8  your account -- in your report.  Now, obviously, the first

9  step when -- is it fair to say that the first step,

02:22:12  10  obviously, was to review the reports that you would be

11  responding to?

12  A    Yes.

13  Q    Now, after you read the Ling and Andrews reports, what

14  information did you review to familiarize yourself with the

02:22:25  15  facts of this case so that you could provide a reliable

16  opinion?

17  A    I read a number of depositions, including the

18  deposition of Glenn Deitiker from PlusPass; from

19  representatives from Verra, including their technical

02:22:41  20  representatives, as well as representatives from the rental

21  car companies as well.  So I reviewed those depositions, and

22  then I --

23  Q    Let me follow up before you go too far along.

24       When you reviewed the technical representatives of

02:22:57  25  the Verra employees, did that give you insight into the

*Deborah D. Parker, U.S. Court Reporter*

02:23:00  1  technologies that were being utilized by Verra?

2  A    It gave me some insight into the way that those systems

3  operate, yes.

4  Q    For example, the exchanging of text files as a primary

02:23:11  5  means of communication?

6  A    Yes.

7  Q    Now, could you explain for the Court the exchange of

8  text files, is that a new technology or an old technology?

9  A    It is very old technology.  I will say that nothing in

02:23:24 10  the technology -- in the -- nothing in the depositions by

11  the technical experts from Verra was any sort of technology

12  that I had not heard of, and it was pretty standard and

13  simple interfaces.

14  Q    So let me follow that up, because one of the

02:23:45 15  complaints -- one of the objections that Verra has lodged is

16  that you shouldn't be allowed to give opinions in this case,

17  because you've never worked for a RAC or developed a system

18  for a RAC, okay?

19        Are you aware of that objection they're making?

02:23:59 20  A    I am aware of that objection.

21  Q    Okay.  After reviewing the technical representatives of

22  Verra and the depositions of the RACs themselves, did you

23  see any indication that there was a technology you were

24  unfamiliar with?

02:24:10 25  A    My understanding was -- my belief is that there is

*Deborah D. Parker, U.S. Court Reporter*

176

02:24:14  1    nothing in the -- that was described by Verra in their

2    technology stack that is outside the norms or my experiences

3    in building enterprise grade software so, no.

4    Q    Okay.  The other objection that Verra is making is that

02:24:31  5    you're not really a rebuttal expert.  You're an affirmative

6    expert.

7             Did you read that component?

8    A    Yes, I did read that component.

9    Q    Do you -- could you explain to the Court what steps you

02:24:42  10   made to clarify exactly how you were -- what's your --

11   what's your opinion of Mr. Andrews or Mr. Ling you're

12   responding to?

13   A    I took a number of steps to try to clearly offer myself

14   as a rebuttal expert.  The first is, in the construction of

02:24:58  15   my -- of my report, I tried to format the report such that

16   each section is directly rebutting the -- a particular

17   aspect of either Ling or Andrews' report.  So there's the

18   format of how I construct that for the Court.

19             The second is that I -- as part of constructing

02:25:21  20   that rebuttal, I drew upon illustrated examples from my

21   conversations with Glenn Deitiker of ways in which that

22   these rebuttals could be realized to offer more like real

23   world examples of how this could work for the reader.

24   Q    How many conversations did you have with

02:25:41  25   Glenn Deitiker?

*Deborah D. Parker, U.S. Court Reporter*

| | | |
|---|---|---|
| 02:25:42 | 1 | A    I had four conversations with Glenn Deitiker. |
| | 2 | THE COURT:  Counsel, just so you know -- |
| | 3 | MR. GIBSON:  10 minutes. |
| | 4 | THE COURT:  No.  I think I mentioned earlier that |
| 02:25:49 | 5 | we're going to start wrapping up at 2:25.  It's 2:25. |
| | 6 | MR. GIBSON:  Can we just reserve our remaining |
| | 7 | time for the continuation of the hearing? |
| | 8 | THE COURT:  The hearing will be continued in full. |
| | 9 | You'll have the time that you'll be able to utilize.  The |
| 02:26:03 | 10 | Court is by no means cutting off -- I said that with a big |
| | 11 | smile, not at all, but we are out of time for today. |
| | 12 | The Court is going to continue this hearing until |
| | 13 | October 4th, 2023, at 9:00 a.m. in this courtroom, |
| | 14 | Courtroom 10. |
| 02:26:18 | 15 | The witness is ordered to return on that day |
| | 16 | without further order or notice from the Court, meaning that |
| | 17 | even if you don't get notice from the attorneys, there will |
| | 18 | be no faxes -- I know that's a word you don't hear probably |
| | 19 | anymore.  No thermal paper faxes.  No social media blasts. |
| 02:26:35 | 20 | No phone calls.  No sky writing.  There's going to be no |
| | 21 | more notice.  You just have to be here on that day in this |
| | 22 | courtroom, 9:00 a.m. |
| | 23 | Understood? |
| | 24 | THE WITNESS:  Yes. |
| 02:26:43 | 25 | THE COURT:  Excellent.  So we're going to continue |

*Deborah D. Parker, U.S. Court Reporter*

02:26:43  1    to that day.

2            The motion for summary judgment remains on

3    October 5th.

4            MR. GIBSON:  Yes, Your Honor.

02:26:47  5    THE COURT:  Okay.  Thank you.  So that will stay

6    the same.

7            So the witness, right now, you may step down.

8    Thank you so much.

9            THE WITNESS:  Thank you.

02:26:53 10   THE COURT:  To the extent you traveled, thank that

11   you so much for that.  And we'll look forward to seeing you

12   on the next date.

13           THE WITNESS:  Okay.  Thank you.

14           THE COURT:  And now we'll wrap up and do any

02:27:01 15   housekeeping matters with Counsel.

16           So we're going to continue this hearing, going

17   forward.  Anything I can help the parties with going

18   forward?  We'll just resume as if we are -- the witness is

19   back on the stand.

02:27:14 20   MR. GIBSON:  I think that's right.  Nothing from

21   us.

22           MR. CABIANCA:  Nothing from defendants.

23           THE COURT:  And so, again, I tried to get a little

24   bit of time estimates and all that, but I'll leave it to the

02:27:24 25   parties.  I have pushed that aside in the interest of that's

*Deborah D. Parker, U.S. Court Reporter*

02:27:31   1   what the parties wanted to present.  And then the Court will

2   then have its rulings once we have the hearing completed on

3   this as well.

4              Any other law that the Court should be looking at?

02:27:43   5   Again, I see in your papers.  The Court has a little of

6   different things for this *Daubert* hearing.  I posed that

7   question earlier.  I didn't hear anything.

8              Anything in particular?

9              MR. NORRIS:  No, Your Honor.

02:27:58  10              MR. GIBSON:  Nothing more from us that's not in

11   our briefing.

12              THE COURT:  Okay.  Anything else I can do to help

13   the parties at this time?

14              MR. CABIANCA:  Thank you, Your Honor.

02:28:07  15              MR. GIBSON:  No, Your Honor.

16              THE COURT:  I'll look forward to seeing everyone,

17   on October 4th, 2023, at 9:00 a.m.  And so, let's plan on at

18   9:00 a.m. just starting, okay?

19              So to the extent there needs to be any

02:28:20  20   conversation or setup, let's try to be ready just ahead of

21   time, because I may even take the bench a few minutes early.

22   So I think that sometimes, whether it be trial or hearing,

23   we often will start a little early.

24              THE COURT REPORTER:  Yes, Your Honor.

02:28:34  25        *(Laughter)*

*Deborah D. Parker, U.S. Court Reporter*

`02:28:36`  1          THE COURT:  All right.  So thank you so much to

2    everyone.  Please be well, happy, healthy and safe.  I

3    always encourage everyone on all aspects of any case, meet

4    and confer often.  You're here together now.  You're not on

`02:28:47`  5    computer terminals, sending e-mails through cyberspace -- I

6    think that's the right term -- on the WWW, or whatever they

7    say.

8          MR. GIBSON:  The guy who knows the answer just

9    left.

`02:28:58` 10          THE COURT:  Yes, I think he just left.

11          So there's an attorney room at the end of the

12    hallway.  There's witness rooms out front, or you just can

13    sit in the hallway.  It's very nice out there.

14          So the best to everyone.  Have a great day.

`02:29:08` 15          We'll be in recess.  Thank you.

16          *(At 2:29 p.m., proceedings were adjourned.)*

17                          -oOo-

18

19

20

21

22

23

24

25

*Deborah D. Parker, U.S. Court Reporter*

```
 1                        CERTIFICATE

 2          I hereby certify that pursuant to Section 753,

 3    Title 28, United States Code, the foregoing is a true and

 4    correct transcript of the stenographically reported

 5    proceedings held in the above-entitled matter and that the

 6    transcript page format is in conformance with the

 7    regulations of the Judicial Conference of the United States.

 8

 9    Date:  September 28, 2023

10

11

12                       _____/s/DEBORAH D. PARKER_____
                          DEBORAH D. PARKER, OFFICIAL REPORTER
13

14

15

16

17

18

19

20

21

22

23

24

25
```

*Deborah D. Parker, U.S. Court Reporter*